IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
: 
In re: : Chapter 11
:
Orchard Supply Hardware Stores Corporation, : Case No. 13-11565 (_____)
*et al.*,[1] :
: (Joint Administration Pending)
Debtors. :
:
---------------------------------------------------------------x

**DECLARATION OF CHRIS D. NEWMAN
IN SUPPORT OF FIRST DAY PLEADINGS**

1. I, Chris D. Newman, am the Executive Vice President, Chief Financial Officer and Treasurer for Orchard Supply Hardware Stores Corporation ("Orchard" or the "Company"). I have been employed as the Company's CFO since November 2011. Prior to joining Orchard, I was the Senior Vice President, Chief Financial Officer and Secretary of Restoration Hardware, Inc., from March 2006 to July 2011. Prior to that, I served in similar capacities with Limited Brands and PepsiCo.

2. On the date hereof (the "Petition Date"), each of the above-captioned debtors and debtors in possession (collectively, the "Debtors") filed with this Court voluntary petitions for relief under chapter 11 (the "Chapter 11 Cases") of title 11 of the United States Code (the "Bankruptcy Code"), as well as certain motions and other pleadings (the "First Day Pleadings").

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard Supply Hardware LLC (3395) and OSH Properties LLC (3391). The mailing address of each of the Debtors, solely for purposes of notices and communications, is 6450 Via Del Oro, San Jose, California 95119.

I am authorized by the Debtors to submit this Declaration on their behalf in support of the First Day Pleadings.

3. The First Day Pleadings are intended to enable the Debtors to operate effectively and efficiently during these Chapter 11 Cases, as well as avoid certain adverse consequences that might otherwise result from the commencement of the Chapter 11 Cases. Among other things, the First Day Pleadings seek relief aimed at maintaining the confidence of the Debtors' various stakeholders, vendors, customers and employees to preserve value that would otherwise quickly erode. Retaining the support of these key constituencies is critical to the Debtors' efforts to reorganize successfully and efficiently. I have reviewed the First Day Pleadings, and it is my belief that the relief sought therein is necessary to: (a) avoid immediate and irreparable harm to, and ensure the uninterrupted operation of, the Debtors' business; and (b) maximize and preserve the value of the Debtors' estates.

4. In my capacity as Chief Financial Officer, Executive Vice President and Treasurer of the Company, I am familiar with the Debtors' day-to-day operations, financial condition, business affairs and books and records. Except as otherwise indicated, all facts set forth in this Declaration are based upon (a) my personal knowledge, (b) my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team or professionals retained by the Debtors, or (d) my opinion based upon my experience and knowledge of the Debtors' operations and financial condition. If called upon, I could and would testify competently to the facts set forth herein.

5. Part I of this Declaration provides an overview of the Debtors' business. Part II provides a description of the Debtors' current debt obligations. Part III provides a discussion of the events that compelled the commencement of these Chapter 11 Cases, as well as the Debtors'

plan for these Chapter 11 Cases. Part IV affirms and incorporates the facts that support the relief requested in the First Day Pleadings.

**Part I**
**Overview of the Debtors' Business**

History and General Background

6. Orchard and its affiliated debtor subsidiaries (collectively, "Orchard", the "Debtors" or the "Company"), operate neighborhood hardware and garden stores. The Company was originally founded as a purchasing cooperative in San Jose, California in 1931. As of the Petition Date, the Company operates 89 stores in California and 2 stores in Oregon. The Debtors lease 82 of the 91 stores, own three store properties in fee simple, and the remaining six stores are ground leased locations where the Debtors own the buildings located on the leased ground. The Debtors also rent a distribution center in Tracy, California, comprising approximately 517,000 square feet. In addition, the Debtors operate a proprietary web site, www.osh.com, which includes both marketing material and promotions for the Debtors' physical stores, and also provides online shopping services. The Debtors' principal executive offices are located in San Jose, California. The Debtors' stores average 36,000 square feet of enclosed retail space and 8,000 square feet of exterior nursery and garden space, carrying a broad assortment of merchandise that primarily is focused on paint, repair and the backyard. With this footprint, Orchard is able to own the niche between the big-box warehouse centers, such as Lowe's and Home Depot (averaging between 125,000 and 150,000 square feet) and the local hardware chains, such as Ace and TruValue (averaging between 5,000 and 20,000 square feet).

7. While the Orchard brand has been synonymous with California retailing for over eighty years, the chain has gone through myriad ownership changes that led the Company to its current situation. From the acquisition by W.R. Grace in 1979, to its subsequent purchase by

Wickes in 1986 to its initial public offering in 1993, the Company grew to over 40 stores. Following the initial public offering, the Company acquired seven former Builders Emporium stores, which provided the Company with an initial footprint in the Southern California market. In 1996, the Company was acquired by Sears Holdings Corporation ("Sears"), which continued to own the Company until 2011,[2] during which the Company more than doubled the overall number of stores.

8. This growth aside, from 2007 until 2010, the Company's sales fell from almost $850 million to slightly more than $650 million. This precipitous decline in revenue was caused by three separate factors, (i) the decline in the California economy, (ii) continued competitive openings in the California market by Home Depot and Lowe's, and (iii) chain-wide operational deficiencies, caused in large part by a highly leveraged capital structure.

9. First, from 2007 through 2010, the California economy experienced a catastrophic decline, led primarily by a significant increase of job loss, as the unemployment rate in California more than doubled from less than 6% to greater than 12%. The increased unemployment, coupled with rapidly declining property values and a corresponding drop in new home construction, in turn led to a dramatic decrease in the average price of existing home sales in California from its peak of more than $600,000 to less than $300,000. Needless to say, these macroeconomic factors caused substantial harm to the Company's business, which was heavily focused on discretionary spending by homeowners. Second, and relatedly, the Company suffered as Orchard's largest competitors, Lowe's and Home Depot were better positioned to weather the financial storm through competitive pricing, product differentiation and a broader

---

[2] On November 23, 2005, Ares Corporate Opportunities Fund ("Ares") purchased approximately a 20% ownership interest in Orchard Supply Hardware Stores Corporation, leaving Sears owning approximately an 80% ownership interest.

marketing blueprint. During this time the Company decelerated new unit growth. By the end of 2012, Lowe's and Home Depot collectively had over 340 stores within California, many of which were located in close proximity to Company locations. The decline in Orchard's business was not singularly tied to external factors, however, as the Company suffered from a number of failures in operational execution, many of which were influenced by the Company's highly leveraged capital structure. Sales were negatively impacted by low in-stock levels, poor merchandising decisions, a lack of professional store management and significant declines in store investment and maintenance.

10.   By 2010, the Company's sales had declined by 21% in three years. And, as described further below, the Company's substantial debt due, in part, to significant recapitalization dividends paid to Sears, made it difficult, if not impossible for the Company to right itself. The ever-present prospect of violating the Company's leverage ratio covenants hampered many of its operational strategies.

11.   Notwithstanding these hurdles, following the spin-off from Sears in 2011, and Orchard's emergence as a stand-alone, publicly traded company, steps were taken to stem the tide of Orchard's decline. A new management team was brought in, which included Mark Baker, (CEO), Steve Mahurin (EVP of Merchandising) and myself, who collectively have over 75 years of relevant retail experiencing. Immediately, the new management team set about to focus on five key initiatives, (i) project a consistent and compelling brand identity, (ii) drive sales through merchandising and marketing initiatives, (iii) improve operational efficiency, (iv) align resources and talent and (v) strengthen the Company's financial position.

12.   The hallmark of these efforts was the Company's new store prototype, which was unveiled in September 2011, and which was designed to showcase the Company's new,

productive store format featuring Orchard's updated logo and branding, enhanced curb appeal, a prominent and conveniently located nursery and garden center, a racetrack layout, and a new "Workbench" area that concentrates key hardware services into one convenient location. This innovative store design exemplifies the Company's efforts to provide an engaging, easy to shop and inspirational experience, with helpful, knowledgeable store associates and high quality, relevant and differentiated merchandising. To date, the Company has opened or remodeled 17 stores with the new format and branding and expects that an additional 3 will be completed by year end. The remodel strategy has quickly proven to be a success, as the Company's remodeled stores have seen sales growth approximately 15% higher than same-store sales prior to the remodel. Unfortunately, due to the Company's debt structure and continuing efforts at compliance with its leverage ratio covenants, the store remodels have been limited to those locations where landlord financing, including through the leverage of term renewals and sale-leaseback transactions, was available.

13.    In addition to these efforts, the Company has been able to achieve a number of additional improvements throughout its operations. First, new product assortments enhanced margin structures and improved market differentiation. Second, improved in-stock levels addressed customer issues in meeting their purchasing needs. Third, a new employee training program and regional management team improved the customer service experience throughout the Orchard chain. Fourth, the Orchard loyalty program and focused marketing spend strengthened consumer dedication to the Company in critical demographics. Finally, through a number of initiatives, the Company was able to improve its efficiency and reduce excess costs. The result of these actions was improved sales results with comparable store sales slowing their decline to -0.6% in 2011 and -0.2% in 2012, marked by an improvement in the average sales per

transaction. Despite improved sales, however, the Company's debt structure has limited its ability to dedicate the resources necessary to transform the Orchard brand to its full potential.

**Part II**
**Corporate and Capital Structure of the Debtors**

*Corporate Structure*[3]

14. Orchard Supply Hardware Stores Corporation ("OSH Corp.") is a Delaware corporation that is the holding company, and is the 100% owner of Orchard Supply Hardware LLC ("OSH LLC"), a Delaware limited liability company. OSH LLC holds many of the material assets and is obligor for many of the material liabilities of the Debtors and, in turn, owns 100% of the limited liability company interests in OSH Properties LLC ("OSH Properties"), a Delaware limited liability company. OSH Properties holds certain of the Debtors' real estate assets.

15. On December 30, 2011, Sears spun-off its interest in the Company, which resulted in Sears obtaining, and then distributing all of the Orchard Class A Common Stock and Orchard Series A Preferred Stock to its shareholders. In addition, Ares Capital obtained all of the Company's Class C Common Stock. The spin-off resulted in the Company listing its Class A Common Stock on the NASDAQ Capital Market under the symbol "OSH" and its Series A Preferred Stock on the OTCQB under the symbol "OSHSP".

*Capital Structure*

*Senior Secured Credit Facility*

16. In December 2006, the Company entered into an amended and restated five-year, $130.0 million senior secured revolving credit facility (as such agreement was subsequently amended, restated or modified, the "Senior Secured Credit Facility"). The borrower under the

---

[3] Attached hereto as Exhibit A is an organizational structure chart for the Debtors.

Senior Secured Credit Facility is OSH LLC, and its obligations are guaranteed by OSH Corp. Borrowings under the Senior Secured Credit Facility are collateralized by a first lien on substantially all of the assets of the Company, except (i) the assets of, and equity interests in, OSH Properties, LLC, consisting primarily of owned real property; and (ii) certain furniture, fixtures and equipment, as more fully described and reflected in the Amended and Restated Intercreditor Agreement, dated as of January 29, 2010 (the "<u>Intercreditor Agreement</u>") whereby the Senior Secured Term Lenders hold a senior lien and the lenders under the Senior Secured Credit Facility hold a junior lien on such assets.[4]

17. On January 29, 2010, the Company amended, restated and extended the Senior Secured Credit Facility, reducing the revolving commitment to $120 million (which was subsequently further amended to reduce the revolving commitment to $100 million). On October 17, 2012, the Company amended and restated its Senior Secured Credit Facility to, among other things, increase the credit facility's revolving loan facility from $100 million back to $120 million, decrease the interest rate margins on which interest rates are calculated, and add a first-in-last-out term facility of $7.5 million. On February 11, 2013, the Company expanded its existing Senior Secured Credit Facility, increasing borrowing capacity to $145 million through the addition of a $17.5 million last-in-last-out term supplemental loan tranche. Wells Fargo Bank, National Association acts as lender and agent under the Senior Secured Credit Facility. The Senior Secured Credit Facility matures on the earlier to occur of 90 days prior to the maturity of any portion of the Senior Secured Term Loan (as defined below) and October 17,

---

[4] The Debtors have not completed their investigation as to the extent, validity, priority, perfection or avoidability of the claims and liens evidenced by the Senior Secured Credit Agreement and Senior Secured Term Loan and, therefore, nothing set forth herein shall be construed as a waiver or admission against interest on the part of the Debtors with respect thereto.

2017.  As of the Petition Date, approximately $107 million was outstanding under the Senior Secured Credit Facility.

*Senior Secured Term Loan*[5]

18. On December 21, 2006, the Debtors entered into a $200 million senior secured term loan agreement, which required quarterly principal payments and was set to mature in December 2013.  The Debtors paid down the senior secured term loan obligations to approximately $127 million due, in part, to the application of proceeds received in certain sale leaseback transactions.  On December 22, 2011, the Company entered into the Amended and Restated Senior Secured Term Loan Agreement (the "Senior Secured Term Loan"), which split the Senior Secured Term Loan into two tranches with a syndicate of lenders (collectively, the "Senior Secured Term Loan Lenders").  The first tranche has a maturity date of December 21, 2013, of which $54.7 million was outstanding as of the Petition Date.  The second tranche includes an accrued PIK interest component, has a maturity date of December 21, 2015, of which $74.3 million was outstanding as of the Petition Date.  Gleacher Products Corporation currently acts as administrative agent and collateral agent under the Senior Secured Term Loan.

19. On October 26, 2012, the Debtors and the Senior Secured Term Loan Lenders entered into a Waiver and Amendment No. 1 whereby, among other things, the Senior Secured Term Loan Lenders waived any and all defaults or events of default which would otherwise occur under the Senior Secured Term Loan as a result of any failure by the Debtors to comply with the maximum adjusted leverage ratio covenant contained in the Senior Secured Term Loan

---

[5]  In October 2012, the Debtors entered into a $50.0 million real estate secured loan with a group of lenders (the "Real Estate Secured Term Loan").  On July 27, 2012, the Debtors completed a sale leaseback transaction for six properties and entered into a leaseback agreement with respect to the sale.  Proceeds of $25.2 million from the sale leaseback transaction were used to pay-off the Real Estate Secured Term Loan in its entirety as of July 28, 2012.

for the fiscal quarter ended October 27, 2012. On February 14, 2013, the Debtors and the Senior Secured Term Loan Lenders entered into a Waiver, whereby the Senior Secured Term Loan Lenders, among other things, agreed to waive, subject to the Company's continued compliance with certain terms and conditions of the Waiver and supplemental Side Letter, any and all defaults or events of default, which would otherwise occur under the Senior Secured Term Loan as a result of any failure by the Debtors to comply with the maximum adjusted leverage ratio covenant contained in the Senior Secured Term Loan Agreement for the fiscal quarters ended February 2, 2013 and ending May 4, 2013.

*Trade Debt*

20. As of the Petition Date, the Company has trade payables outstanding in an amount of approximately $40.9 million for expenses incurred in the ordinary course of operating the Company, of which $34.8 are related to the Company's merchandise.

**Part III**
**Events Leading to the Commencement of**
**These Cases and the Debtors' Chapter 11 Plans and Strategies**

21. As described above, although the Debtors have worked to stabilize their business in the months leading up to the Petition Date, a combination of the slow pace of the economic recovery and the Company's balance sheet, have made these efforts difficult. As a result of the decline in the Company's operating results in the first three quarters of 2011, coupled with continued economic weakness in the markets in which the Company operates, the Company recognized the critical need to delever its balance sheet in order to avoid violating leverage ratio loan covenants. To this end, in the third quarter of 2011, the Company generated cash proceeds of $21.2 million, net of fees from the sale-leaseback transaction of its distribution center located in Tracy, California, and also entered into an Appliances Agreement with Sears to sell Sears

branded appliances at certain of its stores, pursuant to which it also transferred certain inventory to a subsidiary of Sears for approximately $2 million in cash.

22. In the fourth quarter of 2011, the Company utilized the proceeds of additional sale-leaseback transactions to pay-down the Real Estate Secured Term Loan and make additional principal payments to the Senior Secured Term Loan. Around the same time, and as more fully described above, the Debtors entered into the amended and restated Senior Secured Term Loan. In doing so, the Company projected a 5% increase in comparable store sales in 2012, which, if achieved, would have resulted in compliance with the leverage ratio covenants contained in the Senior Secured Term Loan. Unfortunately, the Company's operating results in the first quarter of 2012 significantly declined to the point where management recognized that prospective compliance with the leverage ratio covenants was in serious jeopardy. As a result, the Company sought to remain in compliance with its financing arrangements through additional sale-leaseback transactions in the first and second quarters of 2012, which included provisions for the remodeling of certain of the Company's stores for which the landlord would reimburse the Company for the costs of certain tenant improvements. These improvement allowances have allowed the Company to conserve cash while, at the same time, largely with landlord financing, improve their stores by rolling out the rebranded and newly remodeled stores.

23. Simultaneously with these efforts, the Company continued to examine a number of alternatives with respect to future financial covenant compliance and a looming maturity on the Senior Secured Term Loan, including, among other things, raising additional capital through an equity financing transaction or refinancing. To that end, beginning in the second quarter of 2012, the Debtors' management team held negotiations with certain potential lenders in a strategic effort to refinance the Senior Secured Term Loan. In addition, the Company hired an

investment banking services firm to explore a potential private placement offering. When these discussions failed to produce any meaningful results, the Debtors hired Moelis and Company ("Moelis") to pursue a potential rights offering with existing equityholders. Unfortunately, these efforts also proved unsuccessful.

24. The Company also continued to work cooperatively with the lenders under the Senior Secured Credit Facility and Senior Secured Term Loan to, among other things, examine ways to modify the Company's business plan in a manner that would allow the Company to preserve liquidity, while at the same time work towards modifications of the Senior Secured Credit Facility and Senior Secured Term Loan. To that end, the Company amended the Senior Secured Credit Facility on October 17, 2012 to increase the credit facility's revolving loan facility from $100 million to $127.5 million and on February 11, 2012, the Company further amended its Senior Secured Credit Facility to increase the loan facility by $17.5 million through a last-in-last-out term supplemental loan tranche which increased the total availability to $145 million. As noted earlier, the Company also obtained from the Senior Secured Term Loan Lenders a waiver from compliance with the leverage ratio covenant through the fiscal quarter ending May 4, 2013.

25. In connection with the waivers obtained by the Senior Secured Term Loan Lenders, the parties executed a side letter which required the Debtors, among other things, to provide certain diligence materials to the Senior Secured Term Loan Lenders, schedule monthly meetings with respect to the Debtors' business plan and achieve a mutually acceptable agreement with the Senior Secured Term Loan Lenders by May 1, 2013 relating to refinancing or modifications to the Company's capital structure in a way that serves the best interests of all of the Company's stakeholders. This deadline was subsequently amended to June 30, 2013.

26. As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors as many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position. Moreover, in the days and weeks leading up to the Petition Date, certain major news media outlets published stories that further instilled a sense of panic in the Debtors' suppliers, leading to certain of the Debtors' major suppliers to stop shipping certain goods to the Debtors. These recent strains in liquidity and product availability, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and the looming maturity of one tranche of the Senior Secured Term Loan, ultimately resulted in the Company's decision to commence these Chapter 11 Cases.

27. Following the considerable, but ultimately unsuccessful efforts to consummate a private placement offering as described above, the Debtors, with the support of their investment banker, Moelis, continued to work toward a consensual restructuring with certain of the Debtors' stakeholders. These efforts included several months of negotiations regarding a new potential rights offering to existing equityholders, which efforts failed under the weight of the Company's balance sheet. Following those efforts, the Company worked with its Senior Secured Term Lenders on a variety of restructuring options, including the sale of substantially all of the Debtors' assets in an attempt to right-size the Debtors' operations and ultimately decrease the Debtors' overall debt load. Simultaneously with these discussions and with the constraints noted above, the Debtors undertook a focused marketing process with certain potential purchasers. In doing so, the Debtors determined that the interests of the Company's stakeholders would be best served by a going concern sale of substantially all of the Debtors' assets. As a result of the

Debtors' efforts, the Debtors filed a motion on the Petition Date to, among other things, approve a a section 363 of the Bankruptcy Code sale of substantially all of the Debtors' assets, approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser and approve related bidding procedures (the "<u>Sale Motion</u>").  The Debtors believe that the competitive sale process, as outlined further in the Sale Motion, will enable the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery to the Debtors' creditors. Indeed, through the extensive efforts of the Debtors and their advisors, the Debtors have garnered support from the lenders under the Senior Secured Credit Facility and, through the execution of a sale support agreement (as more fully described in the Sale Motion), obtained support from the lenders and term administrative agent under the Senior Secured Term Loan of the selection of the stalking horse purchaser.  Thus, the Debtors and their key creditor constituents believe that these recent developments have paved the way for not only a very strong stalking horse purchaser, but also a competitive auction process which, ultimately, will inure to the benefit of all of the Debtors' stakeholders.

28.     Furthermore, the Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees, enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery, while protecting jobs and minimizing the impact to the substantial majority of the Company's vendors.

29.     In addition, recognizing the critical importance of providing ample liquidity for the Debtors' operations, the Debtors filed on the Petition Date the *Motion of the Debtors and Debtors in Possession for Entry of Interim and Final Orders Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Authorizing Incurrence by the Debtors of Post-Petition Secured*

*Indebtedness with Priority Over All Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. § 363 and Providing for Adequate Protection, (4) Modifying the Automatic Stay, (5) Scheduling a Final Hearing and (6) Granting Related Relief* (the "<u>DIP Motion</u>") and the *Emergency Motion of Debtors and Debtors in Possession for an Order Approving Auction Procedures, Agency Agreement, Store Closing Sales and Related Relief* (the "<u>Limited GOB Sale Motion</u>").  As described more fully in the Limited GOB Sale Motion, the Debtors' management, working closely with the Debtors' advisors, undertook a comprehensive review of the performance of each store and market in which the Debtors operate and identified eight underperforming stores that should be closed at the outset of the Debtors' Chapter 11 Cases which, when coupled with the relief requested in the DIP Motion, will aid in the Debtors' efforts to ease certain of the liquidity restraints that the Debtors currently face.

**Part IV**
**<u>Facts Relevant to the First Day Pleadings</u>**

30.   Concurrently with the filing of these Chapter 11 Cases, the Debtors filed the First Day Pleadings, which request various forms of relief.  Generally, the First Day Pleadings have been designed to meet the Debtors' goals of: (a) continuing their operations in chapter 11 with as little disruption and loss of productivity as possible; (b) maintaining the confidence and support of their employees, vendors, suppliers, customers and service providers during the Debtors' reorganization process; and (c) establishing procedures for the smooth and efficient administration of these Chapter 11 Cases.

31.   I have reviewed and discussed with Debtors' counsel each of the First Day Pleadings (including the exhibits thereto and supporting memoranda).  I incorporate by reference the factual statements set forth in the First Day Pleadings as though set forth below.

32.     It is my belief that the relief sought in each of the First Day Pleadings is narrowly tailored to meet the goals described above and, ultimately, will be critical to the Debtors' ability to achieve a successful reorganization.  In addition, in accordance with the Protocol for the Employment of Claims and Noticing Agents Under 28 U.S.C. § 156(c),  the Debtors compared engagement proposals of three claims and noticing agents prior to selecting BMC Group, Inc., as more fully described in the *Debtors' Application for Entry of an Order Pursuant to 28 U.S.C. §156(c) Authorizing the Employment and Retention of BMC Group, Inc.  as Claims and Noticing Agent, Effective Nunc Pro Tunc to the Petition Date* to be engaged and approved by this Court.

33.     It is my further belief that, with respect to those First Day Pleadings requesting the authority to pay discrete prepetition claims or continue selected prepetition programs (*e.g.*, those First Day Pleadings seeking relief related to the Debtors' obligations to their employees, as well as the Debtors' motion seeking to pay discrete prepetition claims related to the Debtors' shippers, warehousemen and foreign inspector), the relief requested is essential to the Debtors' continuation as a going-concern and necessary to avoid immediate and irreparable harm to the Debtors, their employees and their vendors.    Impairment of the Debtors' business operations or of their relationships with their employees or the Debtors' other vendors, suppliers and customers — at the very time when the smooth and seamless nature of those operations and the dedication, confidence and cooperation of those constituencies is most critical —clearly would imperil the Debtors' chances of a successful sale.  The Debtors operate in an extremely competitive industry that relies upon the ability to satisfy and exceed customers' expectations.  Any impairment to the Debtors' ability to maintain their operations in the ordinary course will have an immediate and irreparable harmful impact upon the going concern value of the Debtors' estates to the detriment of all of the Debtors' creditor constituencies.  The Debtors believe that

payment of those selected prepetition claims identified in the First Day Pleadings will avoid this irreparable harm and that all creditors of the Debtors will ultimately benefit from the relief requested therein.

Dated: _____, 2013
San Jose, California

_____
CHRIS D. NEWMAN