**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------------x
:
In re: : Chapter 11
:
Orchard Supply Hardware Stores Corporation, : Case No. 13-11565 (_____)
*et al.*,[1] :
: (Joint Administration Pending)
Debtors. :
:
---------------------------------------------------------------x

**DEBTORS' MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE DEBTORS TO (A) PAY PRE-PETITION CLAIMS OF SHIPPERS, WAREHOUSEMEN AND FOREIGN INSPECTOR AND (B) SATISFY CUSTOMS DUTIES IMPOSED ON SHIPMENTS FROM FOREIGN SUPPLIERS**

The above captioned debtors and debtors-in-possession (collectively, the "Debtors"), hereby submit this motion (the "Motion") for entry of an order, in substantially the form attached hereto, authorizing the Debtors to (i) pay certain pre-petition claims of Shippers, Warehousemen, and the Foreign Inspector (each as defined below) in the ordinary course of business and (ii) to satisfy Customs Duties (as defined below) imposed on shipments of goods from foreign suppliers. In support of this Motion, the Debtors rely on and incorporate by reference herein, the *Declaration of Chris D. Newman in Support of First Day Pleadings* (the "Newman Declaration"), and respectfully represent as follows:

**JURISDICTION**

1. This Court has jurisdiction over this Motion under 28 U.S.C. § 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard Supply Hardware LLC (3395) and OSH Properties LLC (3391). The mailing address of each of the Debtors, solely for purposes of notices and communications, is 6450 Via Del Oro, San Jose, California 95119.

of Delaware dated as of February 29, 2012. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein are sections 105(a), 363 and 507(a)(8)(F) of title 11 of the United States Code, 11 U.S.C §§ 101 et seq. (the "Bankruptcy Code"), as supplemented by rules 6003 and 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Federal Rules").

## BACKGROUND

3. On June 17, 2013 (the "Petition Date"), each of the Debtors filed with this Court voluntary petitions for relief under the Bankruptcy Code.

4. Originally founded in San Jose, California in 1931, Orchard Supply Hardware Stores Corporation and its affiliated debtor subsidiaries (collectively, "Orchard," the "Debtors" or the "Company"), operate neighborhood hardware and garden stores. As of the Petition Date, the Company operates 89 stores in California and two stores in Oregon.

5. While the Orchard brand has been synonymous with California retailing for over eighty years, a highly leveraged capital structure instituted in 2006, combined with increasingly competitive conditions and a perilous California economy led the Company to experience sales declines of 21% over the three year period from 2007 through 2010. The Company's extensive debt, combined with the increased costs as the Company transitioned to an independent public company in late 2011 following the Company's spin-off from Sears Holding Corporation ("Sears") made it difficult for the Company to comply with its loan covenants under the senior secured term loan (the "Senior Secured Term Loan") which, if defaulted, would then trigger a cross-default under its asset-backed revolving credit facility (the "Senior Secured Credit Facility").

6. While the Company's new management stemmed the tide of declining sales through the strategic implementation of a number of key initiatives, including the highly successful new store prototype, due to the constraints present in the Company's debt structure, the Company was unable to dedicate the resources necessary to fully transform the Orchard brand in the manner necessary to support the debt structure.

7. For these reasons, beginning just prior to, and continuing after the Sears spin-off, the Company began to explore and take action against a number of strategic alternatives aimed at, in the short-term, continued compliance with the leverage ratio covenants contained in the Senior Secured Term Loan, and, in the long-term, achieving a sustainable capital structure for the Company. These efforts, some of which were successful in the short-term did not result in a sustainable long-term solution to support the Company's existing debt structure. When it became clear that the existing debt structure rendered it exceedingly difficult to achieve a sustainable capital structure, the Company began to work cooperatively with its lender constituencies toward a deleveraging transaction for the Company.

8. As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors and, as a result, many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position. These recent strains in liquidity, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and a looming debt maturity, ultimately resulted in the Company's decision to commence these chapter 11 cases.

9.     Prior to the filing of these cases, the Debtors determined that the interests of the Company's stakeholders would be best served by a going-concern sale of substantially all of the Debtors' assets pursuant to an auction process in accordance with section 363 of the Bankruptcy Code.  The Debtors undertook a focused marketing process with certain potential purchasers.  As a result of the Debtors' efforts, the Debtors have filed a motion to, among other things, approve certain bid procedures related to a sale pursuant to section 363 of the Bankruptcy Code to sell substantially all of the Debtors' assets and approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser (the "Stalking Horse Purchaser").

10.    The Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery while protecting jobs and minimizing the impact to the substantial majority of the Company's vendors.

## RELIEF REQUESTED

11.    It is essential for the Debtors' business and their efforts to maximize value for the benefit of stakeholders, that they maintain a reliable and efficient supply and distribution system both domestically and internationally.  In the ordinary course of business, the Debtors rely upon (i) reputable common carriers, movers, shippers, and companies (the "Shippers") that transport works-in-process and finished goods (together, the "Goods") from their original source to the Debtors' distribution center in Tracy, California and each of the Debtors' stores, including moving such Goods intra-company and (ii) warehousemen, bailees, storage facilities, loading and unloading services, and other providers of storage services for the Goods (the "Warehousemen").

12. The Debtors pay the Shippers and Warehousemen approximately $2 million per month for the services provided, and estimate that approximately $500,000 is outstanding as of the Petition Date.

13. In addition to the pre-petition obligations to Shippers and Warehousemen, approximately 15% of the Debtors' merchandise is purchased directly, and imported from foreign vendors. As a result, the Debtors are required to pay certain foreign duties, custom duties and similar expenses related to these Imported Goods that are directly imported by the Debtors (the "Customs Duties"). The Debtors pay the obligations upon arrival of product into the domestic port. The average monthly payment for Custom Duties is approximately $170,000, although such amount fluctuates significantly depending on the Debtors' import volume. The Debtors estimate that approximately $100,000 is outstanding as of the Petition Date.

14. Finally, with respect to the Debtors' merchandise purchased from foreign vendors, the Debtors utilize the services of CSA America, Inc. d/b/a OnSpeX (the "Foreign Inspector") to inspect, report, and analyze the Debtors' products at the foreign suppliers' location prior to shipping. The average monthly payment to OnSpeX is approximately $40,000 and the Debtors estimate that approximately $86,000 is outstanding as of the Petition Date.

15. By this Motion the Debtors seek the authority to continue to pay, in the ordinary course of business and to the extent necessary to preserve the value of their estates, in the Debtors' sole discretion, certain pre-petition claims of Shippers, Warehousemen, the Foreign Inspector and obligations related to the Custom Duties. The Debtors believe certain of the Shippers and Warehousemen may assert possessory liens upon the Goods in their possession, and non-payment would result in the Shippers and Warehousemen retaining the Goods in their possession, risking a significant disruption in business operations, and substantially harming the

WEST\241153109.4

Debtors and their estates.  Additionally, the Customs Duties are entitled to priority under the Bankruptcy Code, and the payment, in the ordinary course of business, will prevent disruption and is not likely to harm the creditor constituents in these cases.  Finally, the Debtors believe that non-payment to the Foreign Inspector may result in disruptions to their services and failure to inspect the goods and the facilities of foreign manufacturers supplying such goods to the Debtors, which would substantially harm the Debtors and their estates.

**A.    Shipping and Warehousing Claimants**

16.    The Debtors lease a distribution center in Tracy, California, which stocks the majority of products that are offered in the Debtors' stores and cross-stocks additional products to provide the stores with approximately 72% of the Debtors' merchandise needs.  The remainder of the Debtors' merchandise, including all live goods, are shipped directly from the Debtors' vendors or distributors directly to the Debtors' stores.  The Debtors also operate a private fleet of leased and owned trucks and trailers to deliver merchandise to most of the Debtors' Northern California stores.  The Debtors contract with a third party common carrier to deliver the Debtors' merchandise to selected coastal and more distant Northern California, Southern California and Oregon stores.

17.    Because the Debtors depend so heavily on the timely delivery of merchandise to their distribution center and stores, it is essential for the Debtors to incentivize such parties to continue performing timely services and providing the Goods.  For example, if the Debtors are unable to obtain certain goods that the Debtors' customers expect on a timely basis, the Debtors will be forced to seek out the same or similar goods in the marketplace, on an emergency basis, subject to unknown costs and availability from limited sources.  This is especially true given the seasonal and retail nature of the Debtors' business.  Specifically, it is crucial that the Debtors' inventory (especially in the case of live goods) is matched to specific planting and yard

maintenance seasons along with store promotions which feature certain discounted merchandise. Thus, the Debtors must ensure that such merchandise items in appropriate quantities are available to handle consumer demand. In the event that the Debtors are unable to provide such products in the quantities necessary to satisfy customer requirements, the Debtors face the significant risk of losing such business to their competitors and eroding customer loyalty, ultimately causing substantial harm to the value of the Debtors' businesses.

18.     Under certain applicable laws, a Shipper or a Warehousemen may have a lien on the goods in its possession, which secures the charges or expenses incurred in connection with the transportation or storage of the goods.[2] In addition, pursuant to Section 363(e) of the Bankruptcy Code, the Shippers or Warehousemen, as bailees, may be entitled to adequate protection for valid possessory liens.

19.     The Debtors expect that, as of the Petition Date, certain of the Shippers and Warehousemen will have outstanding invoices or have accrued but unbilled charges for Goods that were delivered to the Debtors prior to the Petition Date (the "<u>Shipping and Warehousing Charges</u>"). As a result, certain Shippers and Warehousemen could argue that they are entitled to possessory liens for transportation and storage, as applicable, on the Goods in their possession and may refuse to deliver or release such Goods before their claims have been satisfied and their liens redeemed. Indeed, even if the Shippers and Warehousemen did not have a valid lien, their possession (and retention) of the Goods could severely disrupt, and potentially cripple, the Debtors' operations because of the Debtors' need for Goods in their retail business.

---

[2]     For example, Section 7-307 of the Uniform Commercial Code provides, in pertinent part, that a "carrier has a lien on the goods covered by a bill of lading for charges subsequent to the date of its receipt of the goods for storage or transportation (including demurrage and terminal charges) and for expenses necessary for preservation of the goods incident to their transportation or reasonably incurred in their sale pursuant to law." U.C.C. § 7-307(1)(2003).

20. The value of the goods in the possession of the Shippers and Warehousemen and the potential injury to the Debtors if the goods are not released, is likely to greatly exceed the amount of the Shipping and Warehousing Charges. The Debtors believe that it is necessary and essential to the value of their estates that they be permitted to make payments on account of certain Shipping and Warehousing Charges. As set forth above, the unpaid pre-petition Shipping and Warehousing Charges are estimated to aggregate $500,000.

21. Accordingly, by this Motion, the Debtors seek an order authorizing them, *inter alia*, to pay non-disputed pre-petition amounts owing to the Shippers and Warehousemen relating to the Shipping and Warehousing Charges as the Debtors, in their business judgment, determine necessary or appropriate in order to obtain the release of goods held by such Shippers and Warehousemen. The Debtors will only pay Shipping and Warehousing Charges where they believe, in their business judgment, the benefits to their estates and creditors from making such payments would exceed (a) the costs that their estates would incur by bringing an action to compel the turnover of such goods, and (b) the detriment to the estates from delays associated with such actions.

22. The Debtors propose to condition the payment of Shipping and Warehousing Charges on the agreement of the Shippers and Warehousemen to provide services to the Debtors on the most favorable trade terms that such Shipper or Warehouseman offered to the Debtors in the six months prior to the Petition Date (the "Customary Trade Terms") or such other terms as may be agreed upon between the parties. Subject to objection rights of the Shippers and Warehousemen, if any Shipper or Warehouseman accepts payment on account of the Shipping and Warehousing Charges and does not continue to provide post-petition services to the Debtors on Customary Trade Terms, any payments made to such Shipper or Warehouseman hereunder

may be deemed an avoidable post-petition transfer under section 549 of the Bankruptcy Code and shall be recoverable by the Debtors in cash upon written notice.  In addition, the Debtors request that upon any refusal by a third party to release Goods being held as security for such party's unsatisfied pre-petition claim, the Debtors shall be entitled to seek an expedited hearing, on not less than five (5) days' notice to compel the release of such property.

23.    The Debtors submit that the total amount to be paid to the Shippers and Warehousemen, if the requested relief is granted is minimal compared to the importance and necessity of the Goods held by the Shippers and Warehousemen and the losses the Debtors may suffer if their operations are disrupted.  Moreover, the Debtors do not believe that there are viable timely alternatives to replace the Shippers or the Warehousemen that they have used prior to the Petition Date.

**B.    Customs Duties**

24.    As discussed above, the Debtors purchase certain Goods from outside the United States, and import such Goods into the United States (the "Imported Goods").  The Debtors' purchase of Imported Goods is vital to the operation of their businesses.  Without the continued and uninterrupted purchase and delivery of the Imported Goods, the Debtors could not continue their retail business in the ordinary course and could not meet the ongoing demands of their consumers.

25.    In order to maintain uninterrupted supply of the Imported Goods, the Debtors must pay certain Custom Duties to the United States Customs and Border Protection Agency (the "U.S. Customs Service").  If these Customs Duties are not timely paid, the U.S. Customs Service and other similar authorities may demand liquidated damages, attempt to assess interest, attempt to impose sanctions or take other precipitous actions on account of the unpaid Customs Duties. Absent payment of the Customs Duties, the U.S. Customs Service may, in some instances, assert

liens against the Imported Goods, and other customs authorities may seek to assert liens or take other action against the Debtors. Accordingly, the Debtors seek authority to pay, in the ordinary course of business, those Customs Duties, where the failure to pay would affect the Debtors' ability to receive necessary deliveries of Imported Goods.

**C.     Foreign Inspector**

26.     As noted above, the Debtors' purchase of Imported Goods is vital to the operation of their businesses. Just as critical is the Debtors' ability to inspect and review the Imported Goods prior to shipment. The Foreign Inspector contracts with the Debtors to visit a foreign supplier's manufacturing or shipping facility and provide a report to the Debtors that analyzes, among other things, a risk assessment and vendor performance measurement prior to the shipment of goods. The Foreign Inspector assists the Debtors in ensuring that the products that are shipped internationally to the Debtors' stores and distribution center meet the expectations of the Debtors, so that the Debtors, in turn, can meet the expectations of their customers. Any disruption in the services by the Foreign Inspector would result in a significant risk that the Imported Goods do not meet the expectations of the Debtors, which would, in turn, cause a significant shortage of products in their stores. Moreover, the Debtors do not believe that there are viable timely alternatives to replace the Foreign Inspector in a short time frame.

**BASIS FOR RELIEF**

**A.     Section 363(b) Permits the Payment of Shipping and Warehousing Charges and the Foreign Inspector.**

27.     The Court may authorize the Debtors to pay Shipping and Warehousing Charges and the Foreign Inspector under Section 363(b) of the Bankruptcy Code. Section 363(b) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Under this section, a

court may authorize a debtor to pay certain pre-petition claims. See <u>FV Steel and Wire Co.</u>, Case No. 04-22421 (Bankr. E.D. Wis. Feb. 26, 2004) (authorizing the continuation of customer programs and the payment of pre-petition claims under Section 363 of the Bankruptcy Code); <u>In re Federated Department Stores, Inc.</u>, 1990 Bankr. LEXIS 122 (Bankr. S.D. Ohio 1990) (authorizing payment of pre-petition claims under Section 363 of the Bankruptcy Code to employees, customers, and department lessees). The debtors' decisions to use, sell or lease assets outside the ordinary course of business must be based on the sound business judgment of the debtor. See <u>In re Chateaugay Corp.</u>, 973 F.2d 141, 143 (2nd Cir. 1992) (holding that a approval of a 363(b) application must be based on a good business reason).

As discussed more fully herein, the Debtors' request to pay the Shippers and Warehousemen and the Foreign Inspector easily meets this standard because the failure to satisfy the Shipping and Warehousing Charges, Customs Duties and the Foreign Inspector could have a material adverse impact on the day to day operations of their businesses.

**B.     The Court's Equitable Powers Under Section 105(a) Permits the Payment of Shipping, Warehousing, Customs Duties and the Foreign Inspector.**

28.     Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). A bankruptcy court's use of its equitable powers to "authorize the payment of pre-petition debt when such payment is needed to facilitate the rehabilitation of the debtor is not a novel concept." <u>In re Ionosphere Clubs, Inc.</u>, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989). "Under 11 U.S.C. § 105, a court can permit pre-plan payment of pre-petition obligations when essential to the continued operation of the debtor." <u>In re NVR L.P.</u>, 147 B.R. 126, 127 (Bankr. E.D. Va. 1992) (citing <u>In re Ionosphere Clubs</u>, 98 B.R. at 177).

WEST\241153109.4

29.     In a long line of well-established cases, federal courts have consistently permitted post-petition payment of pre-petition obligations where necessary to preserve or enhance the value of the debtor's estate for the benefit of all creditors.  See, e.g., Miltenberger v. Logansport Ry., 106 U.S. 286 (1882) (payment of pre-receivership claim prior to reorganization permitted to prevent "stoppage of [crucial] business relations"); In re Chateaugay Corp., 80 B.R. 279 (S.D.N.Y. 1987) (approving lower court order authorizing payment of pre-petition wages, salaries, expenses and benefits).

30.     The Third Circuit recognized the "necessity of payment" doctrine in In re Lehigh & New England Ry. Co., 657 F.2d 570, 581 (3d Cir. 1981).  The Third Circuit held that a court could authorize the payment of pre-petition claims if such payment was essential to the continued operation of the debtor.  Id.  (stating courts may authorize payment of pre-petition claims when there "is the possibility that the creditor will employ an immediate economic sanction, filing such payment"); see also In re Penn Central Transp. Co., 467 F.2d 100, 102 n.1 (3d Cir. 1972) (holding necessity of payment doctrine permits "immediate payment of claims of creditors where those creditors will not supply services or material essential to the conduct of business until their pre- reorganization claims have been paid."); In re Just for Feet, Inc., 242 B.R. 821, 824-26 (Bankr. D. Del. 1999) (noting that, in the Third Circuit, debtors may pay pre-petition claims that are essential to continued operation of business); In re Columbia Gas Sys., Inc., 171 B.R. 189, 191-92 (Bankr. D. Del. 1994) (same).

31.     This "necessity of payment" doctrine provides a mechanism by which the bankruptcy court can exercise its equitable power to allow payment of critical pre-petition claims not explicitly authorized by the Bankruptcy Code.  See In re Boston & Me. Corp., 634 F.2d 1359, 1382 (1st Cir. 1980) (recognizing the existence of a judicial power to authorize trustees to

pay claims for goods and services that are indispensably necessary the debtors' continued operation). The doctrine is invoked early in a reorganization, particularly in connection with those Chapter 11 transition issues that relate to the payment of pre-petition claims. Indeed, it is not uncommon for courts in this District and elsewhere to authorize the payment of pre-petition claims where such payment is essential to the continued operations of the debtor, and in particular claims of shippers and warehousemen. See e.g., In re WP Steel Venture LLC, Case No. 12-11661 (KJC) (Bankr. D. Del. June 1, 2012); In re Trade Secret, Inc., Case No. 10-12351 (MFW) (Bankr. D. Del. July 7, 2010); In re American Safety Razor Co., LLC, Case No. 10-12351 (MFW) (Bankr. D. Del. July 30, 2010); In re U.S. Concrete, Inc., Case No. 10-11407 (PJW) (Bankr. D. Del. April 30, 2010) (authorizing payment of shippers and warehousing charges); In re Lillian Vernon Corp., Case No. 08-10323 (BLS) (Bankr. D. Del. Feb. 21, 2008); In re Sharper Image Corp., Case No. 08-10322 (KG) (Bankr. D. Del. Feb. 20, 2008); In re Wickes Holdings, LLC, Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 5, 2008); In re Friedman's Inc., Case No. 08-10161 (CSS) (Bankr. D. Del. Jan. 28, 2008); In re Buffets Holdings, Inc., Case No. 08-10141 (BLS) (Bankr. D. Del. Jan. 24, 2008); In re Domain, Inc., Case No. 08-10132 (PJW) (Bankr. D. Del. Jan. 22, 2008); In re Hancock Fabrics, Inc., Case No. 08-10353 (BLS) (Bankr. D. Del. Mar. 22, 2007); In re Pliant Corp., Case No. 06-10001 (MFW) (Bankr. D. Del. Jan. 4, 2006); In re Ultimate Electronics, Inc., Case No. 05- 10104 (PJW) (Bankr. D. Del. 2005); In re KB Toys, Inc., Case No. 04-10120 (JBR) (Bankr. D. Del. 2005); In re Cone Mills Corp., Case No. 03-12944 (MFW) (Bankr. D. Del. 2003).

32. Paying, in the ordinary course of business, the Shipping, Warehousing Charges, Customs Duties and the Foreign Inspector that accrued before the Petition Date is critical to the Debtors' efforts in these Chapter 11 cases. In order to maximize the value of the Debtors'

business and maintain operations, the Debtors must be able to maintain their supply and delivery system in which each of the Shippers and Warehousemen are a vital link. Indeed, if this Motion is not granted, the Debtors' supply and delivery system would be drastically disrupted.

33. Additionally, if the unpaid Shipping and Warehousing Charges, and Customs Duties are not satisfied, a strong likelihood exists that the Debtors may not be able to take possession upon arrival in the United States of the Imported Goods that are currently in transit to the Debtors. The Debtors would have little recourse to demand the turnover of such products from the ocean freight carriers if such ocean freight carriers refused to deliver the products unless paid. Also, the Debtors' Shippers and Warehousemen may allege that they are entitled to possessory liens for transportation and storage, as applicable, of the products in their possession as of the Petition Date, and may refuse to deliver or release such products until their claims have been satisfied and their liens redeemed. Moreover, pursuant to Section 363(e) of the Bankruptcy Code, a carrier, as bailee, may be entitled to adequate protection on account of any valid possessory lien.

34. The Customs Duties which the Debtors seek authority to pay are also entitled to priority, see, 11 U.S.C. § 507(a)(8)(F), and are necessary to a successful restructuring of the Debtors; consequently, the Debtors' payments of those claims should be approved.

## NECESSITY FOR IMMEDIATE RELIEF

35. Bankruptcy Rule 6003 provides that "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition . . ." Fed. R. Bankr. P. 6003.

36. As described herein, the Shippers and Warehousemen provide critical Goods to the Debtors, the uninterrupted flow of which is crucial for the success of their continuing business. Likewise, the payment of the Customs Duties is required to avoid disruption to business operations. Finally, the Debtors' reliance on the Foreign Inspector is critical to maintain a constant supply of goods to the Debtors' stores. If the Debtors' access to the Goods is impeded or delayed, the Debtors' business will have to be shut down to the severe detriment and prejudice of all parties in interest.

37. Accordingly, the relief requested is necessary to avoid immediate and irreparable harm, and therefore, Bankruptcy Rule 6003 is satisfied.

## REQUEST FOR WAIVER OF STAY

38. In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion. Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest. Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

## NOTICE

39. Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the agent under the Senior Secured Credit Facility; (d) counsel to the lenders under the Senior Secured Term Loan; (e) agent under the Senior Secured Term Loan; (f) counsel to the lenders under the proposed debtor-in-possession financing; (g) the

United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; and (j) the Banks.  As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

*[remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter the Order substantially in the form attached hereto as <u>Exhibit A</u> granting the relief requested herein and granting such other and further relief to the Debtors as the Court may deem proper.

Dated: June 17, 2013
      Wilmington, Delaware

Respectfully submitted,

 /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com

-and-

Richard A. Chesley (IL 6240877)
Chun I. Jang (DE 4790)
Daniel M. Simon (IL 6297629)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email: richard.chesley@dlapiper.com
        chun.jang@dlapiper.com
        daniel.simon@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION