## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x
                                                             :
In re:                                                       :  Chapter 11
                                                             :
Orchard Supply Hardware Stores Corporation,                  :  Case No. 13-11565 (_____)
*et al.*,[1]                                                 :
                                                             :  (Joint Administration Pending)
                    Debtors.                                 :
                                                             :
-------------------------------------------------------------x

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF AN ORDER (A) APPROVING THE CONTINUED USE OF THE DEBTORS' CASH MANAGEMENT SYSTEM AND (B) EXTENDING THE DEADLINE TO COMPLY WITH THE DEPOSIT AND INVESTMENT REQUIREMENTS OF SECTION 345 OF THE BANKRUPTCY CODE

The above-captioned debtors and debtors in possession (collectively, the "Debtors")

hereby move the Court for an order pursuant to sections 345, 363 and 503(b)(1) of title 11 of the

United States Code (the "Bankruptcy Code"):  (i) approving the Debtors' continued use of their

current cash management system and the Debtors' existing bank accounts and business forms,

(ii) authorizing the Debtors to open and close bank accounts, (iii) allowing the Debtors a 60 day

extension to comply with certain requirements of section 345(b) of the Bankruptcy Code and (iv)

authorizing all banks participating in the Debtors' cash management system to honor certain

transfers and charge bank fees and certain other amounts.  In support of this Motion, the Debtors

incorporate the statements contained in the *Declaration of Chris D. Newman in Support of First*

---

[1]    The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard Supply Hardware LLC (3395) and OSH Properties LLC (3391).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 6450 Via Del Oro, San Jose, California 95119.

*Day Pleadings* (the "<u>Newman Declaration</u>") filed contemporaneously herewith and further respectfully state as follows:

<u>**Jurisdiction and Venue**</u>

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

<u>**Background**</u>

2.      On June 17, 2013 (the  "<u>Petition Date</u>"), each of the Debtors filed with this Court voluntary petitions for relief under the Bankruptcy Code.

3.      Originally founded in San Jose, California in 1931, Orchard Supply Hardware Stores Corporation and its affiliated debtor subsidiaries (collectively, "<u>Orchard</u>," the "<u>Debtors</u>" or the "<u>Company</u>"), operate neighborhood hardware and garden stores.  As of the Petition Date, the Company operates 89 stores in California and two stores in Oregon.

4.      While the Orchard brand has been synonymous with California retailing for over eighty years, a highly leveraged capital structure instituted in 2006, combined with increasingly competitive conditions and a perilous California economy led the Company to experience sales declines of 21% over the three year period from 2007 through 2010.  The Company's extensive debt, combined with the increased costs as the Company transitioned to an independent public company in late 2011 following the Company's spin-off from Sears Holding Corporation ("<u>Sears</u>") made it difficult for the Company to comply with its loan covenants under the senior secured term loan (the "<u>Senior Secured Term Loan</u>") which, if defaulted, would then trigger a cross-default under its asset-backed revolving credit facility (the "<u>Senior Secured Credit Facility</u>").

5.      While the Company's new management stemmed the tide of declining sales through the strategic implementation of a number of key initiatives, including the highly successful new store prototype, due to the constraints present in the Company's debt structure, the Company was unable to dedicate the resources necessary to fully transform the Orchard brand in the manner necessary to support the debt structure.

6.      For these reasons, beginning just prior to, and continuing after the Sears spin-off, the Company began to explore and take action against a number of strategic alternatives aimed at, in the short-term, continued compliance with the leverage ratio covenants contained in the Senior Secured Term Loan, and, in the long-term, achieving a sustainable capital structure for the Company.  These efforts, some of which were successful in the short-term did not result in a sustainable long-term solution to support the Company's existing debt structure.  When it became clear that the existing debt structure rendered it exceedingly difficult to achieve a sustainable capital structure, the Company began to work cooperatively with its lender constituencies toward a deleveraging transaction for the Company.

7.      As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors and, as a result, many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position.  These recent strains in liquidity, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and a looming debt maturity, ultimately resulted in the Company's decision to commence these chapter 11 cases.

8.      Prior to the filing of these cases, the Debtors determined that the interests of the Company's stakeholders would be best served by a going-concern sale of substantially all of the Debtors' assets pursuant to an auction process in accordance with section 363 of the Bankruptcy Code.  The Debtors undertook a focused marketing process with certain potential purchasers.  As a result of the Debtors' efforts, the Debtors have filed a motion to, among other things, approve certain bid procedures related to a sale pursuant to section 363 of the Bankruptcy Code to sell substantially all of the Debtors' assets and approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser (the "Stalking Horse Purchaser").

9.      The Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery while protecting jobs and minimizing the impact to the substantial majority of the Company's vendors.

*The Debtors' Cash Management System*

10.      As more fully described below, in the ordinary course of business, the Debtors maintain 122 accounts (the "Bank Accounts") with various banks (the "Banks") that operate in connection with a centralized cash management system (the "Cash Management System").  A list of the Bank Accounts is attached hereto as Exhibit A.[2]  Through the Bank Accounts, the Debtors efficiently collect, transfer and disburse funds generated from their operations on a daily basis.  The Debtors routinely deposit, withdraw and otherwise transfer funds to, from and between the Bank Accounts by wire transfer and/or book transfer.

---

[2]      The Debtors believe that the list of Bank Accounts attached as Exhibit A is complete, but reserve the right to supplement such list if the Debtors have inadvertently omitted a Bank Account.

11.     As reflected in Exhibit A, the Debtors maintain, among other accounts (i) 92

individual store bank accounts (the "Store Deposit Accounts") with Bank of America for the

receipt of customer payments made by cash or check; (ii) a corporate depository account with

Bank of America (the "Corporate Depository Account"); (iii) a store depository concentration

account with Bank of America (the "Store Depository Concentration Account"); (iv) a primary

concentration account with Bank of America (the "Main Concentration Account"); (iv) an

accounts payable account with Bank of America; (v) a payroll account with Bank of America;

(vi) an account with Wells Fargo for payment of business expenses relating to corporate credit

cards; (vii) a money market account and an overnight mutual fund account with Bank of

America for short-term investment purposes,[3] (viii) an account with Pinnacle Bank for protection

against insufficient funds on customer checks; and (ix) 22 accounts with Bank of America

associated with certain of the Debtors' stores related to appliance purchases.

12.     As more fully described below,[4] the funds in the Store Deposit Accounts,

consisting of cash receipts at each of the Debtors' stores, are swept at the end of each business

day into the Store Depository Concentration Account.  The majority of customer payments are

through credit card or debit transfers and such payments are deposited directly in the Store

Depository Concentration Account.  Checks are processed by TeleCheck and deposited directly

into the Main Concentration Account.  With respect to payroll and accounts payable, funds are

transferred from the Main Concentration Account to the applicable accounts for payment to the

Debtors' employees and vendors.  On a daily basis, funds from the Store Depository

Concentration Account and the Corporate Depository Account are swept to a segregated account

---

[3]     The Debtors no longer use the money market and overnight mutual fund accounts in the ordinary course.
[4]     A flow chart  showing the flow of funds in the Debtors' Cash Management System is attached hereto as Exhibit B.

with Wells Fargo, and such amounts are applied in accordance with the amended and restated

senior secured revolving credit and term loan facility (the "Senior Secured Credit Facility") with,

among others, Wells Fargo Bank, National Association.  In addition, the Company requests, on

an as-needed basis, wire transfers from Wells Fargo to fund amounts pursuant to the Senior

Secured Credit Facility into the Main Concentration Account.

## A.    Cash Collection

13.    The Debtors generate revenue primarily from two principal selling channels: (i)

their stores located throughout California and Oregon; and (ii) the Internet, through their primary

website, www.osh.com.  The monies generated from these sources are deposited at the end of

each business day as follows:

> Cash from In-Store Purchases.  The Debtors generate the majority of their
> revenue at individual stores.  The Debtors maintain approximately 92
> depository accounts in which individual stores deposit funds primarily
> from cash sales into the designated Store Deposit Account.

> Credit Card Sales.  The Debtors utilize an external service provider, First
> Data, that administers and processes debit card and credit card payments
> from four credit card companies, Visa, MasterCard, Discover, and
> American Express.  Throughout each business day, First Data deposits
> funds received, minus certain settlement fees, on account of debit and
> credit card payments into the Store Depository Concentration Account.

> Checks.  The Debtors utilize an external service provider, TeleCheck, that
> administers and processes check payments and front-end fraud detection
> efforts with respect to customers paying for merchandise by check.  Each
> day, TeleCheck deposits funds received, minus certain settlement fees, on
> account of check payments into the Main Concentration Account.

> e-Commerce Sales.  The Debtors utilize an external service provider,
> iCongo, that administers the website and online system for customers to
> process e-commerce sales.  On a daily basis, iCongo deposits the amount
> received from the previous day's e-commerce purchases for Visa,
> Mastercard, Discovery and American Express credit cards, deducting the
> various settlement fees relating to the credit cards, into the Debtors' Store
> Depository Concentration Account.

**B.**       <u>**Cash Concentration**</u>

14.    At the end of each business day, funds from the cash accounts are transferred,

through a variety of mechanisms, as follows:

> <u>Store Deposit Accounts</u>.  Via an overnight process, all cash from the Store
> Deposit Accounts is transferred to the Store Depository Concentration
> Account.

> <u>Wells Fargo</u>.  The monies in the Store Depository Concentration Account
> and Corporate Depository Account are transferred via wire transfer into a
> segregated account with Wells Fargo, and such amounts are applied to the
> Senior Secured Credit Facility.  Wells Fargo also deposits certain amounts
> requested by the Debtors, and draws down the Senior Secured Credit
> Facility accordingly, into the Main Concentration Account.

**C.**       <u>**Cash Disbursements**</u>

15.    The Debtors transfer funds from the Main Concentration Account to the following

disbursement accounts:

> <u>Payroll Account</u>.  The Debtors maintain an account at Bank of America in
> order to fund the payroll for employees on a bi-weekly basis.

> <u>Accounts Payable Account</u>.  The Debtors maintain an account at Bank of
> America to satisfy, on an as-needed basis, outstanding payables owed to
> vendors and service providers in connection with the operation of their
> businesses, as well as an account at Wells Fargo to fund payments made
> on account, among other things, of business expenses on corporate credit
> cards.

<u>**Relief Requested**</u>

**A.**       ***The Debtors' Continued Use of Its Cash Management System, Bank Accounts and
       Business Forms Is Essential to the Debtors' Ongoing Business and Is In the Best
       <u>Interests of the Debtors' Estates</u>***

<u>Cash Management System</u>

16.    The Debtors seek authority to continue to use their Cash Management System

consistent with their prepetition business practices and procedures.  The Cash Management

System is an ordinary course, essential business practice of the Debtors and, absent the requested

relief, the Debtors would be forced to significantly alter their Cash Management System in order

to comply with United States Trustee established guidelines with respect to a debtor's cash management system (the "UST Guidelines").[5]  The Cash Management System currently in place enables the Debtors to: (a) control and monitor corporate funds, (b) ensure cash availability and (c) reduce administrative expenses by facilitating the efficient movement of funds.

17.    In light of the manner in which the Debtors generate and track sales related to their operations, any disruption in the Debtors' cash management procedures will hamper the Debtors' efforts to preserve and enhance the value of their estates.  Altering the Cash Management System may disrupt payments to key vendors and employees.  Therefore, it is essential that the Debtors be permitted to continue to use their Cash Management System in accordance with their existing cash management procedures.

18.    The Debtors further seek authority to implement ordinary course changes to their Cash Management System in the event that the Debtors determine, in their reasonable business judgment, that changes in the Cash Management System would be beneficial to their business.

19.    In addition, the Debtors request authority to open and close bank accounts.  The Debtors request that the Banks (as defined below) be authorized to honor the Debtors' requests to open or close any bank accounts; provided, however, that any new domestic account is established at a bank insured with the FDIC and that is organized under the laws of the United States or any State therein or, in the case of accounts that may carry a balance exceeding the insurance limitations set thereby, on the list of authorized bank depositories for the District of Delaware.

---

[5]    Among other requirements, the UST Guidelines include:  (a) closing all existing bank accounts and opening new debtor in possession accounts and (b) maintaining separate debtor in possession accounts for cash collateral and postpetition taxes.

20.      Bankruptcy courts routinely permit chapter 11 debtors to maintain their existing

cash management systems, generally treating requests for such relief as a relatively "simple

matter."  In re Baldwin-United Corp., 79 B.R. 321, 327 (Bankr. S.D. Ohio 1987); see also In re

Columbia Gas Sys., 997 F.2d 1039, 1061 (3d Cir. 1993) (recognizing that a requirement to

maintain all accounts separately "would be a huge administrative burden and economically

inefficient"); Charter Co. v. Prudential Ins. Co. of Am. (In re Charter Co.), 778 F.2d 617, 621

(11th Cir. 1985) (holding that allowing the debtors to use their prepetition "routine cash

management system" was entirely consistent with applicable provisions of the Bankruptcy

Code).

21.      The Debtors respectfully submit that under the circumstances, the maintenance of

the Debtors' Cash Management System in substantially the same form as it existed prior to the

Petition Date is in the best interests of the Debtors' estates and creditors.  Preserving a "business

as usual" atmosphere and avoiding the unnecessary distractions that inevitably would be

associated with any substantial changes to the Cash Management System will: (a) facilitate the

Debtors' stabilization of their postpetition business operations; and (b) assist the Debtors in their

efforts to reorganize and preserve value.

22.      Further, the continued postpetition use of cash management systems also has been

approved as a routine matter in other bankruptcy cases in this District.  See, e.g., In re Real Mex

Restaurants, Inc., No. 11-13122 (BLS) (Bankr. D. Del. Oct. 5, 2011) (authorizing debtors to

continue using their cash management system according to their prepetition practices during the

pendency of their chapter 11 cases) ("Real Mex Order"); In re Barnes Bay Dev. Co., No. 11-

10792 (PJW) (Bankr. D. Del. Mar. 21, 2011) (authorizing debtors to continue to manage their

cash pursuant to the cash management system maintained prepetition) ("Barnes Bay Order"); In

re PJ Finance Co., No. 11-10688 (BLS) (Bankr. D. Del. Mar. 8, 2011) (authorizing debtors to use their prepetition cash management system postpetition) ("PJ Finance Order"); In re East West Resort Dev. V, L.P., No. 10-10452 (BLS) (Bankr. D. Del. Feb. 18, 2010) (allowing debtors to use their prepetition cash management system postpetition) ("East West Order"); In re Fairfield Residential LLC, No. 09-14378 (BLS) (Bankr. D. Del. Dec. 15, 2009) (approving debtors' use of their prepetition cash management system on a postpetition basis) ("Fairfield Order"); In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) (allowing debtors to continue their existing cash management system on a postpetition basis) ("Linens Order").

Bank Accounts

23.     As set forth above, the Debtors currently maintain multiple Bank Accounts in the ordinary course of their business.  In order to ensure that the Debtors' vendors continue to provide goods and services to the Debtors, it is critical that the Debtors maintain as much consistency as possible during the early stages of these cases in order to avoid serious disruption to their operations.  To preserve a "business as usual" atmosphere, as part of their request to maintain their Cash Management System, the Debtors hereby request that they be permitted to continue to use their Bank Accounts with the same account numbers.  Absent this relief, the UST Guidelines would require the Debtors to close all of their prepetition Bank Accounts and open new accounts, which will disrupt the Debtors' relationships with customers and suppliers, all of which are accustomed to working with the current Cash Management System.  Allowing the Debtors to continue to use their prepetition Bank Accounts will assist the Debtors in accomplishing a smooth transition to operating in chapter 11.

24.     To protect against the possible inadvertent payment of prepetition claims, the Debtors will immediately advise their banks not to honor checks issued by the Debtors prior to the Petition Date, except as otherwise expressly permitted by an order of the Court.  The Debtors

will communicate to the Banks which checks have been expressly permitted by an order of the Court.  The Debtors, moreover, have the capacity to draw the necessary distinctions between prepetition and postpetition obligations and payments without closing the Bank Accounts and opening new ones.

25.    Authority to continue the use of bank accounts has been granted in other chapter 11 cases.  See, e.g., Real Mex Order (authorizing debtors to continue using all of their prepetition bank accounts under the same account numbers); Barnes Bay Order (allowing debtors to maintain and use their existing bank accounts "in the names and with the account numbers existing immediately prior to the [p]etition [d]ate"); PJ Finance Order (authorizing debtors to use their bank accounts "under existing account numbers without interruption"); East West Order (authorizing debtors to use their bank accounts "under existing account numbers without interruption" and to treat such accounts for all purposes as debtor-in-possession accounts); Fairfield Order (allowing debtors to use their existing bank accounts under the same account numbers).

Business Forms

26.    In the ordinary course of their businesses, the Debtors use a multitude of checks and other business forms, including both electronic forms and paper forms, including preprinted letterhead and related documents (the "Forms").  By virtue of the nature and scope of the Debtors' business operations and the large number of suppliers of goods and services with whom the Debtors deal on a regular basis, it is important that the Debtors be permitted to continue to use the Forms without alteration or change and without the "Debtor in Possession" designation. Otherwise, the estates will be required to bear a potentially significant expense that the Debtors' believe is unwarranted, provided that once the paper Forms are depleted, the Debtors will then seek to replace them with forms containing the "Debtor in Possession" designation.

27.     As parties that presently conduct business with the Debtors likely will be aware of the Debtors' status as debtors in possession, the alteration of the Debtors' Forms would be unnecessary and unduly burdensome.   Further, this Court has allowed debtors to use their prepetition business and check forms without the "Debtor-in-Possession" label in other large cases.   See, e.g., Real Mex Order (authorizing debtors to use their present forms, including preprinted checks, without reference to their status as debtors-in-possession, provided, however, that debtors would start imprinting the legend "DIP" thereon as soon as practicable); Barnes Bay Order (same); PJ Finance Order (same); East West Order (same).

28.     Indeed, the relief requested herein – namely the continued postpetition use of cash management systems, authority to maintain and use their existing bank accounts, authority to open and close bank accounts in the ordinary course of business and the ability to use their pre-existing business forms, also has been approved in other bankruptcy cases in this District.   See, e.g., In re Real Mex Restaurants, Inc., No. 11-13122 (BLS) (Bankr. D. Del. Oct. 5, 2011) (authorizing debtors to continue using their Cash Management System, including the ability to maintain existing bank accounts and business forms, according to their prepetition practices during the pendency of their chapter 11 cases); In re Barnes Bay Dev. Co., No. 11-10792 (PJW) (Bankr. D. Del. Mar. 21, 2011) (same); In re PJ Finance Co., No. 11-10688 (BLS) (Bankr. D. Del. Mar. 8, 2011) (same); In re East West Resort Dev. V, L.P., No. 10-10452 (BLS) (Bankr. D. Del. Feb. 18, 2010) (same); In re Fairfield Residential LLC, No. 09-14378 (BLS) (Bankr. D. Del. Dec. 15, 2009) (same); In re Linens Holding Co., No. 08-10832 (CSS) (Bankr. D. Del. May 2, 2008) (same).

**B.    The Court Should Allow the Debtors 60 Days to Comply With the Requirements of
Section 345(b) of the Bankruptcy Code**

29.    Pursuant to section 345(b) of the Bankruptcy Code, any deposit or other
investment made by a debtor, except those insured or guaranteed by the United States or by a
department, agency or instrumentality of the United States or backed by the full faith and credit
of the United States, must be secured by a bond in favor of the United States that is secured by
the undertaking of a corporate surety approved by the United States Trustee for the relevant
district or the deposit of securities of the kind specified in 31 U.S.C. § 9303.  Section 345(b)
provides further, however, that a bankruptcy court may allow the use of alternatives to these
approved investment guidelines "for cause."  In re Service Merchandise Co., 240 B.R. 894
(Bankr. M.D. Tenn. 1999).

30.    The Service Merchandise court set out a list of factors to be considered in
determining whether or not "cause" exists for the use of an alternative to the approved
investment guidelines:

    (i)    The sophistication of the debtor's business;

    (ii)    The size of the debtor's business operations;

    (iii)    The amount of investments involved;

    (iv)    The bank ratings (Moody's and Standard and Poor) of the financial
institutions where debtor-in-possession funds are held;

    (v)    The complexity of the case;

    (vi)    The safeguards in place within the debtor's own business of insuring the
safety of the funds;

    (vii)    The debtor's ability to reorganize in the face of a failure of one or more of
the financial institutions;

    (viii)    The benefit to the debtor;

    (ix)    The harm, if any, to the estate; and

       (x)      The reasonableness of the debtor's request for relief from § 345(b) requirements in light of the overall circumstances of the case.

In re Serv. Merch. Co., 240 B.R. at 896-97 (Bankr. M.D. Tenn. 1999)

31.      Rule 4001-3 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") also provides guidance with respect to "cause" for relief from the requirements of Bankruptcy Code 345(b). The Local Rules provide that "cause" exists when a debtor invests funds in an open-end management investment company that is regulated as a "money market fund" pursuant to Rule 2a-7 under the Investment Company Act of 1940, and the investment fund satisfies the following requirements:

      (a)      Exclusive investment in United States Treasury Bills and United States Treasury Notes owned directly or through repurchase agreements;

      (b)      Receipt of the highest money market fund rating from a nationally recognized statistical rating organization, such as Standard & Poor's or Moody's;

      (c)      Having agreed to redeem funds shares in cash, with payment being made no later than the business day following a redemption request by a shareholder, except in the event of an unscheduled closing of Federal Reserve Banks or the New York Stock Exchange; and

      (d)      Having adopted a policy that it will notify its shareholders sixty (60) days prior to any change in its investment or redemption policies under (a) and (c) above.

Del. Bankr. L.R. 4001-3 (2011).

32.      Local Rule 2015-2(b) provides that no waiver of "section 345 shall be granted without notice and an opportunity for hearing in accordance with these Local Rules." Nevertheless, Local Rule 2015-2(b) further provides that "if a motion for such waiver is filed on the first day of a chapter 11 case in which there are more than 200 creditors, the Court may grant an interim waiver until a hearing on the debtor's motion can be held." As this Motion has been

filed on the first day of the Debtors' chapter 11 cases and the Debtors have in excess of 200 creditors, the Debtors submit that a temporary waiver of the requirements of section 345(b) of the Bankruptcy Code is appropriate under the Local Rules.

33.     To the extent that any of the Debtors' funds are not deposited in accordance with section 345 of the Bankruptcy Code or Local Rule 4001-3, the Debtors request that the Court allow them a 60-day extension of time to either:  (i) comply with the requirements of section 345(b) of the Bankruptcy Code or Local Rule 4001-3 or (ii) file a motion seeking an additional extension or waiver of the requirements of section 345(b) of the Bankruptcy Code.  This Court has permitted similar extensions in other cases.  See, e.g., Barnes Bay Order (granting a 60-day extension for debtors to either comply with section 345(b) of the Bankruptcy Code or to make other arrangements as agreed with the U.S. Trustee); PJ Finance Order (granting a 45-day extension for debtors to either comply with section 345(b) of the Bankruptcy Code, file a motion to deviate from the requirements thereof, or file a motion seeking further extension); see also East West Order (holding same); Fairfield Order (holding same).

**C.      *The Court Should Authorize Banks Participating in the Cash Management System to Honor Certain Transfers, Charge Bank Fees and Certain Other Amounts***

34.     Contemporaneously with the filing of this Motion, the Debtors have filed various motions for authorization to pay prepetition debt.  With respect to some of this debt, prior to the Petition Date, the Debtors issued checks that have yet to clear the banking system.  With respect to other debt, the Debtors intend to issue checks postpetition on account of such prepetition debt once the Court enters an order permitting the Debtors to take such action.  The Debtors intend to inform their Banks which prepetition checks should be honored pursuant to orders of the Court authorizing such payment.

35.     As a result of the foregoing, the Debtors request that the Banks be authorized to accept and honor all representations from the Debtors as to which checks, drafts, wires or automated clearing house transfers ("ACH Transfers") should be honored or dishonored consistent with any order of this Court and governing law, whether such checks, drafts, wires or ACH Transfers are dated prior to, on, or subsequent to the Petition Date.  Pursuant to the relief requested in this Motion, the Banks will not be liable to any party on account of: (a) following the Debtors' instructions or representations as to any order of this Court; (b) honoring any prepetition check or item in a good faith belief that the Court has authorized such prepetition check or item to be honored; or (c) an innocent mistake made despite implementation of reasonable item-handling procedures.  Such relief is reasonable and appropriate because the Banks are not in a position to independently verify or audit whether a particular item may be paid in accordance with a Court order or otherwise.

36.     Finally, the Debtors request authority for the Banks to charge, and the Debtors to pay or honor, both prepetition and postpetition service fees and other costs, charges and expenses to which the Banks may be entitled under the terms of and in accordance with their contractual arrangements with the Debtors (collectively, the "Bank Fees").  The Debtors also request the Banks be authorized to charge back returned items to the Bank Accounts in the normal course of business.

37.     The Debtors require this relief to minimize the disruption of the Cash Management System and their Bank Accounts and to assist them in accomplishing a smooth transition to operating in chapter 11.  Authority for debtors to pay bank fees and banks to charge back returned items has been routinely granted in other chapter 11 cases.  See, e.g., Barnes Bay Order (authorizing debtors to pay "any fees or charges associated with the Bank Accounts" and

allowing banks to assess and deduct from the bank accounts normal service fees for any returned or dishonored payment items); <u>PJ Finance Order</u> (authorizing banks to charge and debtors to pay or honor fees related to debtors' bank accounts); <u>Fairfield Order</u> (holding same).

### The Debtors Satisfy Bankruptcy Rule 6003

38.    Bankruptcy Rule 6003 provides that to the extent "relief is necessary to avoid immediate and irreparable harm" a Bankruptcy Court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty-one days after the Petition Date.  While the Debtors do not anticipate that any prepetition amounts will be due to the Banks on account of maintaining the Cash Management System, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, the requirements of Bankruptcy Rule 6003 for expedited relief are satisfied, and that Bankruptcy Rule 6003 has been satisfied to permit such payments, if any are necessary.

### Request for Waiver of Stay

39.    In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the Debtors require immediate relief to continue ordinary business operations for the benefit of all parties in interest.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent that it applies.

### Notice

40.    Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a

consolidated basis; (c) counsel to the agent under the Senior Secured Credit Facility; (d) counsel

to the lenders under the Senior Secured Term Loan; (e) agent under the Senior Secured Term

Loan; (f) counsel to the lenders under the proposed debtor-in-possession financing; (g) the

United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i)

the Securities and Exchange Commission; and (j) the Banks.  As this Motion is seeking first-day

relief, notice of this Motion and any order entered hereon will be served on all parties required

by Del. Bankr. L.R. 9013-1(m).  Due to the urgency of the circumstances surrounding this

Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice

of this Motion is required.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Debtors respectfully request that the Court enter an order, substantially in the form attached hereto as Exhibit C: (i) granting the relief requested herein and (ii) granting such other and further relief as the Court may deem proper.

Dated:  June 17, 2013           Respectfully submitted,
       Wilmington, Delaware

                              /s/ Stuart M. Brown
                             Stuart M. Brown (DE 4050)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com

-and-

Richard A. Chesley (IL 6240877)
Chun I. Jang (DE 4790)
Daniel M. Simon (IL 6297629)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:   richard.chesley@dlapiper.com
chun.jang@dlapiper.com
daniel.simon@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION