**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

---------------------------------------------------------x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
|  | : Case No. 13-11565 (_____) |
| Orchard Supply Hardware Stores Corporation, | : |
| *et al.*,[1] | : (Joint Administration Pending) |
|  | : |
| Debtors. | : ***Requested** Auction Procedures Obj. Deadline: 6/18/13* |
|  | : ***Requested** Auction Procedures Approval Hearing: 6/18/13* |
|  | : |
|  | : ***Requested** Sale Objection Deadline:  6/25/13* |
|  | : ***Requested** Sale Approval Hearing: 6/28/13* |

--------------------------------------------------------- x

**EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR
ORDERS APPROVING AUCTION PROCEDURES, AGENCY AGREEMENT,
<u>STORE CLOSING SALES AND RELATED RELIEF</u>**

The above-captioned debtors and debtors in possession (collectively, the "<u>Debtors</u>")

hereby submit this motion (the "<u>Motion</u>") seeking (i) following the Procedures Hearing (as

defined below), entry of an order approving the terms and conditions for conducting an auction,

fixing the manner and extent of notice, and scheduling a Sale Hearing (defined below), and

approving certain bid protections to a Stalking Horse Liquidator (defined below); and (ii)

following the Sale Hearing, entry of an order (a) authorizing the Debtors to close certain retail

store locations (including certain additional stores upon exercise of the Put Option (defined

below); (b) authorizing the Debtors to conduct store closing sales free and clear of liens pursuant

to sections 105 and 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the

"<u>Bankruptcy Code</u>"); and (c) authorizing the Debtors to enter into an agency agreement

providing for the liquidation of merchandise inventory and other assets with the successful

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification
numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard Supply
Hardware LLC (3395) and OSH Properties LLC (3391).  The mailing address of each of the Debtors, solely for
purposes of notices and communications, is 6450 Via Del Oro, San Jose, California 95119.

bidder at the auction, and granting the successful bidder liens pursuant to section 364 of the

Bankruptcy Code; and (d) granting such other related relief as may be appropriate.  In support of

this Motion, the Debtors respectfully represent as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and

the Amended Standing Order of Reference from the United States District Court for the District

of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b).

Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.  The statutory bases for the

relief requested herein are sections 105, 363 and 364 of the Bankruptcy Code, Rules 2002, 2014,

6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and

Rule 2014-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States

Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

2.      On June 17, 2013 (the  "Petition Date"), each of the Debtors filed with this Court

voluntary petitions for relief under the Bankruptcy Code.

3.      Originally founded in San Jose, California in 1931, Orchard Supply Hardware

Stores Corporation and its affiliated debtor subsidiaries (collectively, "Orchard," the "Debtors"

or the "Company"), operate neighborhood hardware and garden stores.  As of the Petition Date,

the Company operates 89 stores in California and two stores in Oregon.

4.      While the Orchard brand has been synonymous with California retailing for over

eighty years, a highly leveraged capital structure instituted in 2006, combined with increasingly

competitive conditions and a perilous California economy led the Company to experience sales

declines of 21% over the three year period from 2007 through 2010.  The Company's extensive

debt, combined with the increased costs as the Company transitioned to an independent public

company in late 2011 following the Company's spin-off from Sears Holding Corporation ("Sears") made it difficult for the Company to comply with its loan covenants under the senior secured term loan (the "Senior Secured Term Loan") which, if defaulted, would then trigger a cross-default under its asset-backed revolving credit facility (the "Senior Secured Credit Facility").

5.      While the Company's new management stemmed the tide of declining sales through the strategic implementation of a number of key initiatives, including the highly successful new store prototype, due to the constraints present in the Company's debt structure, the Company was unable to dedicate the resources necessary to fully transform the Orchard brand in the manner necessary to support the debt structure.

6.      For these reasons, beginning just prior to, and continuing after the Sears spin-off, the Company began to explore and take action against a number of strategic alternatives aimed at, in the short-term, continued compliance with the leverage ratio covenants contained in the Senior Secured Term Loan, and, in the long-term, achieving a sustainable capital structure for the Company.  These efforts, some of which were successful in the short-term did not result in a sustainable long-term solution to support the Company's existing debt structure.  When it became clear that the existing debt structure rendered it exceedingly difficult to achieve a sustainable capital structure, the Company began to work cooperatively with its lender constituencies toward a deleveraging transaction for the Company.

7.      As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors and, as a result, many of the Company's most significant suppliers tightened their payment terms, thereby constricting

the Company's already-strained liquidity position.  These recent strains in liquidity, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and a looming debt maturity, ultimately resulted in the Company's decision to commence these chapter 11 cases.

8.    Prior to the filing of these cases, the Debtors determined that the interests of the Company's stakeholders would be best served by a going-concern sale of substantially all of the Debtors' assets pursuant to an auction process in accordance with section 363 of the Bankruptcy Code.  The Debtors undertook a focused marketing process with certain potential purchasers.  As a result of the Debtors' efforts, the Debtors have filed a motion to, among other things, approve certain bid procedures related to a sale pursuant to section 363 of the Bankruptcy Code to sell substantially all of the Debtors' assets and approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser (the "Stalking Horse Purchaser").

9.    The Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery while protecting jobs and minimizing the impact to the substantial majority of the Company's vendors.

**RELIEF REQUESTED**

10.    Prior to the Petition Date, the Debtors' management in conjunction with their real estate advisors, A&G Realty Partners, LLC, performed an in-depth analysis of the Debtors' financial performance to identify areas for improvement.  This analysis helped management identify some key steps that could be taken to improve the Debtors' overall financial performance–including the closing of unprofitable stores.  In this regard, the Debtors' management, working closely with their advisors, undertook a comprehensive review of the

performance of each store and market in which the Debtors operate and identified eight stores (each a "Closing Store," and collectively, the "Closing Stores")[2] as underperforming stores that should be closed at the outset of the Debtors' chapter 11 cases in order to aid in the Debtors' chapter 11 efforts and to ease liquidity restraints that the Debtors currently face by means of a store closing and similar themed sales (the "Store Closing Sales").  In addition, the Debtors consulted their lenders and the Stalking Horse Purchaser with respect to the going-concern real estate strategy and determination of which stores, if any, to close immediately.  The proposed Store Closing Sales will dramatically reduce the administrative costs associated with these underperforming Closing Stores, are customary in retail chapter 11 cases, and are designed to provide the maximum value to the Debtors' estates.  Moreover, the proceeds of the Store Closing Sales will benefit the Debtors' estates by providing liquidity during these chapter 11 cases and reducing the need for taking on additional debtor in possession financing.

11.    In order to maximize the value of the inventory to be included in the Store Closing Sales at the Closing Stores (the "Merchandise") and the owned furniture, fixtures and equipment in the Closing Stores (the "Owned FF&E," and together with the Merchandise, the "Liquidation Assets"), the Debtors intend to obtain the assistance of one or more of the national liquidation firms that specializes in, among other things, the large scale liquidation of inventory and Owned FF&E on this type and scale (collectively, the "Liquidation Firms").  Through the use of a Liquidation Firm, the Debtors will ensure the most feasible, economical, and efficient means of achieving the disposition of the Liquidation Assets.  Prior to the filing of the petitions, the Debtors solicited a proposal for an agency agreement ("Agency Agreement") for the Store Closing Sales from Hilco Merchant Resources, LLC, a Liquidation Firm that the Debtors have

---

[2]    In addition to the Closing Stores, the Debtors are seeking authority to conduct Store Closing Sales at up to 22 additional stores if the Debtors choose to exercise the Put Option (defined below).

engaged in the past for store closing sales.[3]  After ensuing discussions, the Debtors selected a

joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners,

LLC (together, the "Stalking Horse Liquidator") to act as the stalking horse liquidator pursuant

to an Agency Agreement (the "Stalking Horse Agreement" a copy of which is attached as

Exhibit 1 to the proposed Procedures Order (defined below)).  The Stalking Horse Liquidator, in

making this offer, has relied on promises by the Debtors to seek this Court's approval of a break-

up fee of $300,000 (the "Break-Up Fee")[4] and in the reasonable expectation that this Court

would enter an order providing such relief.  The Debtors, in the exercise of their business

judgment, believe that the Break-up Fee is a necessary inducement for the Stalking Horse

Liquidator to enter into the Stalking Horse Agreement and necessary to establish a "floor" for the

sale of the Liquidation Assets and ultimately encourage competitive bidding and realization of

the highest value for the Liquidation Assets, thereby providing substantial value to the estates.

To ensure that the process is thorough and the best price is obtained (and to allow creditors to

have input in the process), the Debtors hereby seek (a) to subject the Stalking Horse Agreement

to higher or better offers as may be obtained at an auction, and (b) approval of the Break-up Fee

for the Stalking Horse Liquidator to promote competitive bidding at the auction.

12.    Accordingly, the Debtors seek the entry of two orders:

- The Debtors request the entry of an order (the "Procedures Order"), pursuant to sections 105(a) and 363 of the Bankruptcy Code and Bankruptcy Rules 6004, (A) (i) approving proposed auction procedures, including approval of the Break-up Fee (the "Auction Procedures"), (ii) setting the time, date, and place of the auction (the "Auction"), and (iii) approving the form of notice of the Auction and notice of the Store

---

[3]    Indeed, the Debtors are currently using Hilco Merchant Resources, LLC to conduct store closing sales at two of their stores.  By separate motion, the Debtors are seeking to assume the contracts governing the current store closing sales.

[4]    The Break-Up fee will be reduced to the extent a Successful Bidder purchases signs that were pre-ordered by the Stalking Horse Liquidator at actual cost.

6

Closing Sales; and (B) setting a hearing (the "<u>Sale Hearing</u>"), to be held on June 28, 2013, to consider the entry of the Approval Order (as defined below).  A copy of the proposed Procedures Order is attached hereto as <u>Exhibit A</u>; and

- Following the Sale Hearing, the Debtors request the entry of an order (the "<u>Approval Order</u>"), pursuant to Sections 105(a) and 363(b), (f), and (m) of the Bankruptcy Code and Bankruptcy Rules 6004, approving (i) the Agency Agreement with the party submitting the highest or otherwise best Bid (as defined below) at the Auction and (ii) the Store Closing Sales and waiving the Debtors' compliance with state and local laws, statutes, rules, ordinances and/or lease provisions restricting the Store Closing Sales. Additionally, the Debtors request authority to exercise the Put Option and execute an amendment to such Agency Agreement or a new agency agreement substantially similar to such Agency Agreement without further order of the Court.  A copy of the proposed Approval Order is attached hereto as <u>Exhibit B</u>.

## THE PROPOSED STORE CLOSING SALES

13.     The Debtors propose to commence the Store Closing Sales at the Closing Stores immediately following the Sale Hearing, and thereby stem the losses resulting from the continued operation of the Closing Stores.  The Debtors also seek approval of the Agency Agreement to allow the successful bidder at the auction (the "<u>Successful Bidder</u>" or the "<u>Agent</u>") to serve as the Debtors' agent in conducting the Store Closing Sales in a manner consistent with the Store Closing Sales Procedures attached to the proposed Approval Order as <u>Exhibit 2</u>, which procedures and guidelines are typical of and consistent with those that have been approved in this and other bankruptcy courts nationwide in similar transactions.

14.     Delay in commencing the Store Closing Sales would diminish value for several important reasons.  First, the Closing Stores lose money and are a drain on liquidity.  The sooner the Liquidation Assets are liquidated (and the Closing Stores' leases are either sold or rejected), the sooner the strain on the Debtors' liquidity will be mitigated.  Second, delays in the liquidation process could cause the inventory in the Closing Stores to become unbalanced or out

of "season," thus, reducing the value of the Merchandise.  Third, commencing the Store Closing

Sales expeditiously avoids the risk of inventory "shrink."

## THE AUCTION

15.    The Debtors believe that the solicitation of bids to act as the Debtors' agent in

connection with the Store Closing Sales is the best way to maximize the value of the Liquidation

Assets, and an auction as described herein with the Stalking Horse Liquidator leading the

bidding will result in the most beneficial arrangement for the Debtors and their creditors.  Based

on the Auction results, the Debtors will enter into a final Agency Agreement with the Successful

Bidder, substantially similar to the Stalking Horse Agreement, or if none, the form of the Agency

Agreement, in each case as modified by the Successful Bidder as part of its successful bid at or

prior to the Auction.  Toward that end, the Debtors request that the Court approve the Auction

Procedures, as set forth in detail below.

**The Agency Agreement.**

16.    The use of the Stalking Horse Agreement, upon which the initial bids, as well as

bids at the Auction will be based, will enable the Debtors and other parties in interest to easily

compare and contrast any differing terms of the Bids made by the Liquidation Firms, both as part

of the initial bid phase for purposes of selecting a Stalking Horse, and subsequently at the

Auction.  The Debtors reserve the right to amend or otherwise change the terms of the Agency

Agreement in such manner as the Debtors deem to be in their best interests after consultation

with the Debtors' postpetition debtor-in-possession financing lenders (collectively, the "DIP

Lenders") and agreement of the Stalking Horse Liquidator.

17.    Although the Debtors respectfully refer the Court to the Stalking Horse

Agreement in its entirety, below is a summary of certain of the material terms set forth therein

(with all capitalized terms having the meaning ascribed thereto in the Stalking Horse

Agreement):

- <u>Guaranteed Amount</u>.  As a guaranty of Agent's performance under the Agency Agreement, the Agent will guarantee that the Debtors shall recover a fixed percentage (the "<u>Guaranty Percentage</u>") of the Cost Value of the Merchandise included in the Sale.

- <u>Expenses Reimbursed by Agent</u>.  From the Sale Commencement Date through and including the Sale Termination Date, Agent shall be unconditionally responsible for all Expenses enumerated in Section 4.1 of the Stalking Horse Agreement (including Occupancy Expenses, Payroll, benefits for Retained Employees, Agent's on-site supervision related costs, signs and banners, promotional costs, Sale supplies, telephone, postage/overnight or delivery/courier charges, utility charges, credit card and bank fees, costs related to moving, transferring or consolidating merchandise between Closing Stores, insurance costs, trash removal and cleaning costs, security and building alarm costs, 50% of cost of the physical inventory taking, cost of capital and letter of credit fees, armored car fees, Retention and Incentive Bonuses for Retained Employees, and Third-Party payroll processing fees), incurred in conducting the Sale during the Sale Term, which Expenses may be funded and paid from Proceeds of the Sale to the extent available and in accordance with other applicable provisions of the Stalking Horse Agreement.

- <u>Agent's Fee</u>.  In consideration of the services to be provided by the Agent pursuant to the Stalking Horse Agreement, the Agent would receive a fee, calculated based upon a fixed percentage of Cost Value of the Merchandise included in the Sale (the "<u>Agent's Base Fee</u>").  In addition to the Agent's Base Fee, the Agent would be entitled to retain all Proceeds from the Sale of the Merchandise after reimbursement of Expenses of the Sale, and payment to the Debtors of any "<u>Recovery Amount</u>" (described below).

- <u>The Recovery Amount</u>.  The Debtors have requested that, to the extent that Proceeds exceed the sum of the Guaranteed Amount, Expenses of the Sale, and the Agent's Base Fee (collectively, the "<u>Sharing Threshold</u>"), the Agent share such excess Proceeds with the Debtors such that 50% of such excess Proceeds shall be payable to the Debtors.  All amounts to be received by the Debtors in excess of the Sharing Threshold is the "<u>Recovery Amount</u>."

- <u>Payment.</u>  On the second business day following the entry of the Approval Order, the Agent shall wire to the Debtors 90% of the estimated Guaranteed Amount.  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Debtors on the later of (i) 30 days

after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Debtors (the "Final Inventory Report" with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date"). To the extent that the Debtors are entitled to receive any Recovery Amount, Agent shall pay such Recovery Amount as part of the Final Reconciliation under Section 8.7 of the Stalking Horse Agreement. To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to the Debtors as part of the Final Reconciliation.

- Merchandise Threshold. The Guaranteed Amount that Agent guaranteed to the Debtors was conditioned upon there being an agreed upon minimum amount of Merchandise at Cost Value included in the Sale (the "Merchandise Threshold"). To the extent that the aggregate Cost Value of the Merchandise is less than the Merchandise Threshold, then the Guaranty Percentage will be adjusted downward in accordance with a mutually agreed upon schedule made an exhibit to the Stalking Horse Agreement. In addition, to the extent that the Cost Value of the Merchandise is more than 53.0% of the Retail Price of the Merchandise (the "Cost Factor"), the Guaranty Percentage will likewise adjust in accordance with an agreed upon schedule made an exhibit to the Stalking Horse Agreement.

- Inventory Taking. The Debtors and the Agent will jointly conduct a physical inventory taking in all of the Closing Stores for purposes of calculating the aggregate Cost Value of the Merchandise in the Closing Stores. Pursuant to Inventory Taking Instructions to be agreed upon between the Debtors and the Agent. Distribution Center Merchandise and/or On-Order Merchandise, if any, will be counted as it is received in the Closing Stores.

- FF&E. If Orchard elects, Agent shall sell all Owned FF&E at the Stores owned by Orchard and not otherwise included on the Excluded FF&E List set forth on Exhibit 7.1 to the Stalking Horse Agreement, pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to seventeen and one half percent (17.5%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided, however, that Orchard shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Orchard and Agent following execution of the Agency Agreement.

- <u>Additional Agent Goods</u>.  Subject to the consent of Orchard on a product category by product category and store by store basis, Agent may supplement the Merchandise at the Stores with additional merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("<u>Additional Agent Goods</u>").  The Additional Agent Goods shall be included in at Agent's sole expense (and not as an Expense).  In addition to all other compensation due to Debtors under the Stalking Horse Agreement, Agent shall pay to the Debtors an amount equal to five percent (5%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods.

- <u>Sale Term</u>.  Agent shall have the right to conduct the Store Closing Sales commencing the day after entry of the Approval Order, which shall be entered no later than June 28, 2013, through and including September 30, 2013 (the "<u>Sale Termination Date</u>").

- <u>Sale Guidelines</u>.  The Store Closing Sales shall be conducted in accordance with the Sale Guidelines attached to the Approval Order as <u>Exhibit 1</u>.  Agent shall be authorized to advertise and promote the sales as a store closing or similar themed sale, including stating that all sales are final.

- <u>Employees</u>.  The Agent shall have the right to use the Debtors' store-level employees during the Sale Term and will reimburse the Debtors for actual payroll, and Employee Benefits up to an agreed upon cap based upon a percentage of the aggregate base payroll.  The employees will remain the Debtors' employees at all times.  Agent shall pay, as an Expense, retention and incentive bonuses ("<u>Retention and Incentive Bonuses</u>") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), in the aggregate, up to a maximum of ten percent (10%), but no less than a minimum of five percent (5%), in the aggregate, of base payroll for all Retained Employees payable to such Retained Employees as Agent may determine in its discretion.  The amount of such Retention and Incentive Bonuses to individual Retained Employees shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through the Debtors' payroll system.

- <u>Merchandise Returns/Gift Cards/Coupons</u>.  Although sales of all items of Merchandise sold during the Sale Term shall be a "final sale," the Agent will accept returns of Merchandise sold prior to the Sale Commencement Date at the Closing Stores during the entire Sale Term.  In addition the Agent shall accept Gift Cards during the entire Sale Term.  The Debtors shall reimburse the Agent for Refunds issued and or Gift Cards that were honored at the Closing Stores in accordance with the terms of the Stalking Horse Agreement.  The Agent shall not honor any discount coupons issued

by the Debtors or the Debtors competitors either prior to or during the Sale Term.

- <u>Weekly Reconciliation</u>.  On each Wednesday of the Sale Term, Agent and the Debtors shall reconcile amounts due and owing as between them, including Expenses, Proceeds, and Recovery Amount, if any.

- <u>Security Interest in Merchandise and Proceeds Thereof</u>.  Subject to the Agent's obligation to pay the Guaranteed Amount, reimburse Expenses of the Sale, and pay the Recovery Amount, if any, to the Debtors, the Agent shall be granted a first priority lien on the Merchandise and the Proceeds from the Store Closing Sale.

- <u>Put Option</u>.  Up until 5:00 pm on July 31, 2013, the Debtors shall have the absolute right, in their discretion, subject to the consent of the DIP Lenders, to include up to 22 Additional Closing Stores (the "<u>Additional Closing Stores</u>") and the Merchandise and FF&E located therein in the Sale (the "<u>Put Option</u>").  If and to the extent the Debtors exercise the Put Option, the Debtors and the Agent may enter into an agency agreement (or an amendment to the Agency Agreement) governing such Sale, which agreement shall provide the same Guaranteed Percentage, Agent's Fee, and sharing allocation above the Sharing Threshold, without the need for further Court approval.   If the Debtors exercise the Put Option, the Debtors shall provide the affected landlords with at least five (5) business days' notice of the commencement of the store closing sales at the Additional Closing Stores.

**The Auction Procedures.**

18.    The Debtors request that the Court approve the following Auction Procedures:

- The Debtors will cooperate and provide access to potential bidders who seek to conduct diligence (collectively, the "<u>Potential Bidders</u>").

- Within two (2) business days following the entry of the Procedures Order, the Debtors will serve the Auction and Store Closing Sales Notice (as defined below) on:  (i) the Office of the United States Trustee (the "<u>US Trustee</u>"); (ii) counsel to the DIP Lenders; (iii) counsel to any official committee(s) of unsecured creditors appointed by the US Trustee, (iv) those creditors holding the 20 largest unsecured claims against the Debtors' estates; (v) all parties known to be asserting a lien in the Debtors' Liquidation Assets in the Closing Stores; (vi) each of the Debtors' landlords; (vii) the California Attorney General; (viii) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency; (ix) all Potential Bidders; and (x) all entities entitled to notice in pursuant to Local Rule 2002.

- Except with respect to the Stalking Horse Liquidator, prior to forming a joint venture between two or more Potential Bidders, the Potential Bidders must obtain prior written approval from the Debtors.

- In the event that a Potential Bidder other than the Stalking Horse Liquidator is selected as the Successful Bidder at the Auction and approved at the Sale Hearing as the Agent, then the Stalking Horse Liquidator shall be paid the Break-Up Fee.  In addition, such Successful Bidder shall be permitted to purchase from the Stalking Horse Liquidator signs ordered by the Stalking Horse Liquidator prior to the Auction at the Stalking Horse Liquidator's actual cost.  The Successful Bidder's purchase of the signs shall reduce the Break-Up Fee by the amount recovered by the Stalking Horse Liquidator.

- On or before **June 25, 2013 at 4:00 p.m. (Eastern)** (the "Bid Deadline"), each Potential Bidder must submit a Qualified Bid (as defined below) to the following:  Orchard Supply Hardware Stores Corporation, 6450 Via Del Oro, San Jose, California 95119 (Attn: Michael W. Fox), with copies to their attorneys, counsel to the Debtors, DLA Piper LLP (US), 203 North LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn:  Richard A. Chesley, Esq. and Chun I. Jang, Esq.) and 919 North Market Street, 15th Floor, Wilmington, Delaware 19801 (Attn:  Stuart M. Brown, Esq.) (the "Bid Recipients").[5]  The Debtors shall provide copies of the bids to the DIP Lenders.

- Bids must be unconditional and not contingent upon any event, including, without limitation, any additional due diligence investigation, inventory evaluation, or financing.  Neither the Debtors, nor any of the other Bid Recipients shall be permitted to share the bids received among the bidders, without consent of the Debtors.  All Bids are irrevocable until seven days after the Sale Hearing.  Bids that meet the foregoing conditions shall be deemed "Qualified Bids," and bidders submitting Qualified Bids shall be deemed "Qualified Bidders."

- All proposed bids shall be based upon the terms and conditions of the Stalking Horse Agreement and shall be, at a minimum of a 74% Guaranty Percentage.

- Bids must contain the information specified in the following paragraphs:

    (i)    Bidders shall send the Bid to the Bid Recipients.

---

[5]    While bidders may suggest modifications to the proposed Agency Agreement, any such modifications that the Debtors deem to increase their obligations or burdens (such as additional conditions) will be considered by the Debtors in determining whether to accept such Bid.

(ii)    To be considered by Debtors as a Qualified Bid, such bid must (unless otherwise determined by Debtors): (a) provide for consideration payable only in cash; (b) give sufficient indicia that the bidder or its representative is legally empowered, by power of attorney or otherwise, to both bid on behalf of the bidder and also to complete and sign, on behalf of the bidder, a binding and enforceable Agency Agreement; (c) provide written evidence of the bidder's ability to consummate the transaction; and (d) not contain any contingencies materially greater than what is in the Stalking Horse Agreement, including, but not limited to due diligence and financing contingencies.

(iii)    Potential Bidders shall be required to complete and execute a confidentiality agreement.  Upon execution of a confidentiality agreement, Debtors will provide reasonable access to due diligence material before the Auction.

(iv)    Debtors will, in their discretion, determine whether an offer is a Qualified Bid and whether a Qualified Bid constitutes the most favorable transaction for Debtors' estates.  The Debtors may determine, in their business judgment, which Qualified Bids are the highest and best offers for the Liquidation Assets.  Further, Debtors may, in their discretion, withdraw some or all of the Liquidation Assets from the Auction or sale at any time before entry of an order approving a sale of a property to a Qualified Bidder.  The Debtors may also reject any bid that, in the Debtors' sole discretion, is (a) inadequate or insufficient; (b) contrary to the best interests of Debtors, their estate and their creditors, or (c) not in conformity with the requirements of the bidding procedures or the Bankruptcy Code.

(v)    The Bid Recipients and each bidder and all other entities shall keep Qualified Bids confidential, with access restricted to the Debtors. Bids may be revealed to any other entity at the option of the Debtors.  Debtors may request additional information from a bidder to evaluate the bidder's ability to consummate a transaction and to fulfill its obligations in connection therewith, and such bidder shall be obligated to provide such information.

(vi)    Each bidder, as a consequence of submitting a bid shall be deemed to acknowledge: (a) that it is bound by these bidding procedures; (b) that it had an opportunity to inspect and examine the Liquidation Assets and to review all pertinent documents and information with respect to Liquidation Assets before making its offer and that each such bidder relied solely on that review and upon its own investigation and inspection in making its bid; and (c) except as expressly provided for in the Agency Agreement, such

bidder is not relying upon any written or oral statements, representations or warranties of Debtors, their agents or representatives.

(vii) At the commencement of the Auction, the Debtors will announce the best bid received to date and will open the Auction for other Qualified Bidders to improve upon their bid. Bidding increments will be announced at the outset of the Auction.

- The Auction will be conducted on **June 27, 2013 at 10:00 a.m. (Eastern)** at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, 27th Floor, New York, NY 10020 or such other location as may be selected by the Debtors. Only Qualified Bidders who have complied with the Auction Procedures may improve their Bids at the Auction. Bidding at the Auction will continue until such time as the highest or otherwise best bid is determined. The Debtors may adopt rules for the bidding process that, in their judgment, will better promote the goals of the bidding process. The Debtors will select the highest or otherwise best Bid(s) at the conclusion of the Auction, subject to Court approval, and the winning bidder will be required to enter into a definitive Agency Agreement (as consensually modified by the parties, if appropriate) before the Auction is deemed closed.

- The Debtors request that the Sale Hearing be held on **June 28, 2013**. The Sale Hearing may be adjourned without further notice other than by announcement at the Sale Hearing. The Debtors have also requested that the Court establish June 25, 2013 at 4:00 p.m. (Eastern) as the deadline for objections to the Motion and the Approval Order.

- The Debtors reserve the right to (i) adjourn the Auction with respect to some or all of the Liquidation Assets at or prior to the Auction, (ii) modify the Bidding Procedures at the Procedures Hearing or the Auction and/or (iii) remove any assets from the Store Closing Sales if the Debtors determine that such action will maximize value to their estates.

- The Debtors will consult with the DIP Lenders as to important terms, including but not limited to, the determinations of Qualified Bidders and Qualified Bids, acceptable modifications to the Agency Agreements, the adjustment of the Auction Procedures, and the determination of the highest or otherwise best Bid(s) at the conclusion of the Auction.

- ANY BIDDER FAILING TO COMPLY WITH THESE REQUIREMENTS MAY NOT BE CONSIDERED A QUALIFIED BIDDER.

19.      The Debtors believe that these Auction Procedures provide an appropriate process for selecting and soliciting bids to act as the Debtors' agent and will enable them to review and compare any Bids received and determine which Bid(s) is the highest or best Bid.

### THE AUCTION AND STORE CLOSING SALES NOTICE

20.      Under Bankruptcy Rule 2002(a) and (c), the Debtors are required to notify their creditors of the Auction and the Sale, including a disclosure of the date, time, and place of the Auction, the terms and conditions of the Store Closing Sales, the date, time, and place of the Sale Hearing, and the deadline for filing any objections to the relief requested herein (the "Auction and Store Closing Sales Notice").  The Debtors respectfully request that the form of Auction and Store Closing Sales Notice, substantially in the form attached hereto as Exhibit C, be approved and that service of the Auction and Store Closing Sales Notice be no later than three (3) business days after the entry of the Procedures Order on:  (i) the Office of the United States Trustee (the "US Trustee"); (ii) counsel to the DIP Lenders; (iii) counsel to any official committee(s) of unsecured creditors appointed by the US Trustee, (iv) those creditors holding the 20 largest unsecured claims against the Debtors' estates; (v) all parties known to be asserting a lien in the Debtors' Liquidation Assets in the Closing Stores; (vi) each of the Debtors' landlords; (vii) the California Attorney General; (viii) various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency; (ix) all Potential Bidders; and (x) all entities entitled to notice pursuant to Local Rule 2002.  The Debtors request that such notice be deemed adequate and sufficient notice under the circumstances of these chapter 11 cases.

### APPROVAL OF STORE CLOSING SALES UNDER SECTION 363 AND FOR THE SALE OF MERCHANDISE FREE AND CLEAR OF ALL ENCUMBRANCES IS WARRANTED

21.      Section 363(b)(1) of the Bankruptcy Code provides:

> The trustee, after notice and a hearing, may use, sell, or lease, other
> than in the ordinary course of business, property of the estate ….

11 U.S.C. § 363(b)(1); see also In re Ames Dep't Stores, Inc., 136 B.R. 357, 359 (Bankr.

S.D.N.Y. 1992) (holding that going-out-of-business sales are governed by section 363(b)).

22.     To obtain Court approval to use property under section 363(b) of the Bankruptcy

Code for the purpose of a store closing sale, the Debtors must articulate a business reason for the

proposed action.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996)

(citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991));

Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070-71 (2d

Cir. 1983); In re Abbotts Dairies, Inc., 788 F.2d 143, 147-48 (3d Cir. 1986) (implicitly adopting

the "sound business judgment" test of Lionel Corp. and requiring good faith); In re Delaware &

Hudson Ry. Co., 124 B.R. 169, 175-76 (D. Del. 1991) (concluding that the Third Circuit adopted

the "sound business judgment" test in the Abbotts Dairies decision); Dai-Icho Kangyo Bank v.

Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.), 242 B.R. 147, 153

(Bankr. D. Del. 1999) (same).  When a valid business justification exists, the law vests the

debtor's decision to use its property with a strong presumption "that in making a business

decision[,] the directors of a corporation acted on an informed basis, in good faith and in the

honest belief that the action taken was in the best interests of the company."  Official Comm. of

Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650, 656

(S.D.N.Y. 1990) (holding that the Delaware business judgment rule has "vitality by analogy" in

Chapter 11, especially where the debtor is a Delaware corporation) (quotations omitted).  In this

District, once a court is satisfied that there is a sound business justification for the proposed sale,

the court must then determine whether (i) the debtor-in-possession has provided the potential

bidders with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the

purchaser is proceeding in good faith.  In re Delaware and Hudson Ry. Co., 124 B.R. at 176;

accord In re Decora Indus., Inc., 2002 WL 32332749 at *3 (D. Del. 2002); see also In re

Integrated Res., Inc., 147 B.R. at 656 (parties challenging a debtor's sound business decision

must show bad faith, self-interest or gross negligence).

      23.     Ample business justification exists in these cases to approve the proposed Store

Closing Sales.  The Debtors, with the assistance of their advisors, have determined to close the

Closing Stores by means of the Store Closing Sales as set forth in the Stalking Horse Agreement,

and begin liquidating the Liquidation Assets.  Time is of the essence to preserve and maximize

the value of the Debtors' assets before the Merchandise significantly declines in value, and to

reduce on-going administrative expenses.  Each of the Closing Stores contains significant levels

of Merchandise that will be included in the Store Closing Sales.  The realization of fair value for

these assets as promptly as possible will inure to the benefit of all parties in interest.  Moreover,

the Auction, through its competitive bidding procedures, ensures that (i) all parties in interest

will have both notice and an opportunity to participate in the sale process, (ii) all Bids will be

made in good faith and at arm's-length, and (iii) the winning Bid will provide a fair and

reasonable sale price for the Merchandise.  Therefore, the Debtors propose to commence the

Store Closing Sales at the Closing Stores immediately upon Court approval of the Agency

Agreement by and through the Successful Bidder at the Auction.

      24.     Store closing or liquidation sales are a routine occurrence in chapter 11 cases

involving retail debtors.  See In re Ames Dept. Stores, Inc., 136 B.R. at 359 (holding that "going-

out-of-business" sales are an important part of "overriding federal policy requiring [a] Debtor to

maximize estate assets").  Bankruptcy courts in this District have approved similar store closing

sales.  See, e.g., In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW)

(Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A 's Holdings, L.L.C., Ch. 11 Case No. 06-10886 (BLS) (Jointly Administered) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); In re M T S Inc., Ch. 11 Case No. 04-10394 (PJW) (Bankr. D. Del. Mar. 2, 2004) (same); In re Wherehouse Entm't, Inc., Ch. 11 Case No. 03-10224 (PJW) (Bankr. D. Del. Feb. 21, 2003) (same); In re Zany Brainy, Inc., Ch. 11 Case No. 01-1749 (MFW) (SLR) (Bankr. D. Del. Oct. 11, 2001) (same).

25.    As noted above, the Stalking Horse Liquidator proceeded in reliance on promises by the Debtors to seek approval of the Break-up Fee and in reasonable expectation that this Court would enter an order providing such relief.  The Break-Up Fee, in the amount of $300,000 and such amount includes the actual costs incurred by the Stalking Horse Liquidator for signage that was pre-ordered.  If the Successful Bidder purchases those signs from the Stalking Horse Liquidator, the Break-Up Fee will be reduced by the amount recovered.  The Debtors submit that Break-up Fee is a normal and oftentimes necessary component of sales outside the ordinary course of business under section 363 of the Bankruptcy Code.  In particular, a Break-up Fee encourages a potential purchaser to invest the requisite time, money and effort to conduct due diligence and sale negotiations with a debtor and submit such proposal to other bids.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill. Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately necessary to convince a "white knight" to offer an initial bid by providing some form of compensation for the expenses such bidder incurs

and the risks such bidder faces by having its offer held open, subject to higher and better offers);

In re Hupp Indus., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1997) (without any reimbursement,

"bidders would be reluctant to make an initial bid for fear that their first bid will be shopped

around for a higher bid from another bidder who would capitalize on the initial bidder's. . . due

diligence"); In re Marrose Corp., 1992 WL 33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that

"agreements to provide reimbursement of fees and expenses are meant to compensate the

potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable

offers"); In re 995 Fifth Ave.  Assocs., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (finding that

bidding incentives may be "legitimately necessary to convince a white knight to enter the

bidding by providing some form of compensation for the risks it is undertaking") (citations

omitted).

26.    A proposed bidding incentive, such as the Break-Up Fee should be approved

when it is in the best interests of the estate.  In re S.N.A. Nut Co., 186 B.R. 98, 104 (Bankr. N.D.

Ill. 1995); see also In re America West Airlines, Inc., 166 B.R. 908 (Bankr. D. Ariz. 1994); In re

Hupp Indus., Inc., 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the

bidding incentive provide some benefit to the debtor's estate.  Calpine Corp. v. O'Brien Envtl.

Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527, 533 (3d Cir. 1999) (holding even

though bidding incentives are measured against a business judgment standard in non-bankruptcy

transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in

the bankruptcy context).

27.    In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy), the

Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp.

("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the

value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The Debtors believe that approval of the Break-up Fee is necessary to preserve the value of their estates.

28.     First, the Break-Up Fee induced the Stalking Horse Liquidator to submit a bid that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the Stalking Horse Liquidator has provided a material benefit to the Debtors, their estates and their respective creditors by encouraging bidding and increasing the likelihood that the best possible price for the Purchased Assets will be received.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. 8. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of substantial benefit to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr. N.D. Ill. May 10, 2002); Integrated Resources, 147 B.R. at 659 (noting that termination payment is an "important tool to encourage bidding and to maximize the value of the debtor's assets").

29.     Second, the Debtors believe that the proposed Break-Up Fee is fair and reasonably compensates the Stalking Horse Liquidator for taking actions that will benefit the Debtors' estates.  This is especially true given that there is not a separate request for expense reimbursement other than a recoupment of actual costs for signs purchased by the Stalking Horse Liquidator prior to the Auction built into the Break-Up Fee.

30.     Third, the proposed Break-up Fee is the result of an arm's-length negotiated agreement between the Debtors and the Stalking Horse Liquidator.  There is no evidence or reason to believe that the relationship between the Debtors and the Stalking Horse Liquidator has been tainted by self-dealing or manipulation.

31.     Fourth, the Debtors do not believe that the Break-up Fee will have a chilling effect on the sale process.  Rather, the Stalking Horse Liquidator has increased the likelihood that the best possible price for the Liquidation Assets will be received, by permitting other

qualified bidders to rely on the diligence performed by the Stalking Horse Liquidator, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

32.     Finally, the Break-up Fee will be paid only if, among other things, the Debtors enter into a transaction with a bidder other than the Stalking Horse Liquidator.  Accordingly, no Break-up Fee will be paid unless a higher and better offer is achieved and consummated.

33.     In sum, the Break-up Fee is reasonable under the circumstances and will enable the Debtors to maximize the value for the Liquidation Assets while limiting any chilling effect in the sale process.

**The Court Should Waive Compliance with Any State and Local Laws, Statutes, Rules and Ordinances Restricting Store Closing Sales.**

34.     Many state and local laws, statutes, rules and ordinances require special and cumbersome licenses, waiting periods, time limits and other procedures for store closing, liquidation or similar sales.  By virtue of 28 U.S.C. § 1334, this Court has exclusive jurisdiction over the Debtors' property wherever located.  28 U.S.C. § 1334.  In the context of bankruptcy cases, therefore, since creditors receive notice of the proposed sale, as well as opportunity to be heard in this Court, enforcement of such statutes and regulations is redundant and unnecessary.

35.     The Bankruptcy Code preempts state and local laws that conflict with its underlying policies.  See Belculfine v. Aloe (In re Shenango Group, Inc.), 186 B.R. 623, 628 (Bankr. W.D. Pa. 1995) ("Trustees and debtors-in-possession have unique fiduciary and legal obligations pursuant to the bankruptcy code.'. . . '[A] state statute[] cannot place burdens on them where the result would contradict the priorities established by the federal bankruptcy code."), aff'd, 112 F.3d 633 (3d Cir. 1997).  While preemption of state law is not always appropriate, see Baker & Drake, Inc. v. Public Serv. Comm'n of Nev. (In re Baker & Drake,

Inc.), 35 F.3d 1348, 1353-54 (9th Cir. 1994) (holding that Bankruptcy Code did not preempt

state law prohibiting taxicab leasing that was promulgated in part as public safety measure),

preemption is appropriate where, as here, the only state laws involved concern economic

regulation rather then the protection of public health and safety.[6]  See id. at 1353 (finding that

"federal bankruptcy preemption is more likely. . . where a state statute is concerned with

economic regulation rather than with protecting the public health and safety"); see also In re

Scott Housing Sys. Inc., 91 B.R. 190, 196-97 (Bankr. S.D. Ga. 1988) (holding that automatic

stay under Section 362 is broad and preempts state law except for those laws designed to protect

public health and safety).

     36.     In the instant cases, state and local licensing requirements, time limits or other

restrictions on liquidation sales would undermine the fundamental purpose of section 363(b) of

the Bankruptcy Code by placing constraints on the Debtors' ability to marshal and maximize

estate assets for the benefit of creditors.  Accordingly, authorizing the Store Closing Sales

without the delays and burdens associated with obtaining various state and local licenses,

observing state and local waiting periods or time limits, and/or satisfying any additional

requirements with respect to advertising and the like is necessary and appropriate.

     37.     It is also necessary that any action by any lessor or any federal, state or local

agency, department or governmental authority or any other entity to prevent, interfere with or

otherwise hinder consummation of the Store Closing Sales or advertisement of such sales be

enjoined.  See Missouri v. U.S. Bankruptcy Court, 647 F.2d 768, 776 (8th Cir. 1981) (same),

cert. denied, 454 U.S. 1162 (1982) (holding that attempt to enforce state regulations governing

---

[6] The Debtors will comply with applicable state and local public health and safety laws ("Safety Laws"), and applicable tax, labor, employment, environmental, and consumer protection laws, including consumer laws regulating deceptive practices and false advertising (collectively, "General Laws").

liquidation of grain warehouses directly conflicted with bankruptcy court's control over property of debtor's estate and therefore violated automatic stay).

38.     The requested waiver is narrowly tailored to facilitate the successful consummation of the Store Closing Sales.  The Debtors do not seek a general waiver of all state and local requirements, but only those that apply specifically to liquidation sales.  As noted above, the Debtors fully intend to be bound by and comply with all General and Safety Laws, and will require that their Agent do the same.

39.     Similar relief has been granted in other bankruptcy cases in this District.  See, e.g., In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A's Holdings, L.L.C., Ch. 11 Case No. 06-10886 (BLS) (Jointly Administered) (Bankr. D. Del. Sept, 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); In re M T S Inc., Ch. 11 Case No. 04-10394 (PJW) (Bankr. D. Del. Mar. 2, 2004) (same); In re Zany Brainy, Inc., Ch. 11 Case No. 01-1749 (MFW) (Bankr. D. Del. Oct. 11, 2001) (SLR) (same).

**The Court Should Waive Any Restriction in the Leases as Unenforceable.**

40.     Certain of the leases governing the premises of the Closing Stores (the "Leases") may contain provisions purporting to restrict or prohibit the Debtors from conducting store closing, liquidation, or similar sales.  Such provisions have been held to be unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to properly administer its reorganization case and maximize the value of its assets under section 363 of the Bankruptcy Code.  See, e.g., In re Ames Dep't Stores, Inc., 136 B.R. at 359 (holding that enforcement of such lease restrictions would "contravene overriding federal policy requiring debtor to maximize estate assets. . . ."); In re R. H. Macy and Co., Inc., 170 B.R. 69, 73-74

(Bankr. S.D.N.Y. 1994) (holding that the lessor could not recover damages for breach of a covenant to stay open because the debtor had a duty to maximize the value to the estate and the debtor fulfilled this obligation by holding a store closing sale and closing the store.); In re Tobago Bay Trading Co., 112 B.R. 463, 467-68 (Bankr. N.D. Ga., 1990) (finding that a debtor's efforts to reorganize would be significantly impaired to the detriment of creditors if lease provisions prohibiting a debtor from liquidating its inventory were enforced); In re Lisbon Shops, Inc., 24 B.R. 693, 695 (Bankr. E.D. Mo. 1982) (holding restrictive lease provision unenforceable in Chapter 11 case where debtor sought to conduct going-out-of-business sale).

41.     As such, to the extent that such provisions or restrictions exist in any of the Leases of the Closing Stores, such landlords may not interfere with or otherwise seek to restrict the Debtors and/or the Agent from conducting the Store Closing Sales.  Accordingly, the Debtors request that the Court authorize the Debtors and/or the Agent to conduct the Store Closing Sales without interference by any landlords or other persons affected, directly or indirectly, by the Store Closing Sales.

42.     Bankruptcy courts in this District have held that restrictive lease provisions affecting store closing sales in chapter 11 cases are unenforceable.  See, e.g., In re Tweeter Home Entm't Group, Inc., Ch. 11 Case No. 07-10787 (PJW) (Jointly Administered) (Bankr. D. Del. July 13, 2007) (final order authorizing debtor to continue store closing sales pursuant to store closing agreement); In re Three A's Holdings, L.L.C., Ch. 11 Case No. 06-10886 (RLS) (Jointly Administered) (Bankr. D. Del. Sept. 25, 2006) (order authorizing, among other things, agent to conduct store closing sales); In re MTS Inc., Ch. 11 Case No. 04-10394 (BLS) (Bankr. D. Del. Mar. 2, 2004) (same); In re Wherehouse Entm't, Inc., Ch. 11 Case No. 03-10024 (PJW) (Bankr. D. Del. Feb. 21, 2003) (same); In re Zany Brainy, Inc., Ch. 11 Case No. 01-1749 (MFW)

(opinion by Robinson, D.J.) (Bankr. D. Del. Oct. 11, 2001) (same); In re Just For Feet, Inc., Case

No. 99-4110 (RRM) (Bankr. D. Del. Nov. 26, 1999) (same); In re London Fog, Inc., Case No.

99-3446 (PJW) (Bankr. D. Del. Oct. 7, 1999) (same).

**A Sale of Liquidation Assets Free and Clear Of All Encumbrances is Warranted.**

43.     The Debtors request approval to sell the Liquidation Assets subject to the Agency

Agreement, on a final "as is" basis, free and clear of any and all liens, claims and encumbrances

in accordance with section 363(f) of the Bankruptcy Code.  A debtor in possession may sell

property under sections 363(b) and 363(f) "free and clear of any interest in such property of an

entity other than the estate" if any one of the following conditions is satisfied:

- applicable non-bankruptcy law permits sale of such property free and clear of such interest;

- such entity consents;

- such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

- such interest is in bona fide dispute; or

- such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345

(E.D. Pa. 1988) (noting that since Section 363(f) is written in the disjunctive, the court may

approve a sale free and clear if any one subsection is met).  The DIP Lenders, who are secured

by, among other things, the Liquidation Assets, has consented to the sale of the Liquidation

Assets.  With respect to any other party asserting a lien, claim, or encumbrance against the

Merchandise or the Owned FF&E, the Debtors anticipate that they will be able to satisfy one or

more of the conditions set forth in Section 363(f).  In connection with the sale of the Liquidation

Assets pursuant to the terms and conditions of the Agency Agreement, the Debtors propose that

any liens, claims, and encumbrances asserted against the Merchandise be transferred to and attach to the amounts payable to the Debtors under the Agency Agreement, in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, provided that the Debtors' share of the proceeds of the Store Closing Sales, including the Guaranteed Amount, shall be applied in accordance with any interim or final orders approving DIP financing herein.

## REQUEST FOR WAIVER OF STAY

44.     In addition, by this Motion, the Debtors seek a waiver of any stay of the effectiveness of the orders approving the relief requested in this Motion, both the Procedures Order and the Approval Order.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the Debtors are facing significant liquidity constraints.  Given this liquidity crisis, the Debtors anticipate that the Successful Bidder(s) for the Offered Assets will want to close on its transaction as soon as possible.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), to the extent that they apply.

## NOTICE

45.     Notice of this Motion shall be provided to (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the agent under the Senior Secured Credit Facility; (d) counsel to the Senior Secured Term Loan Lenders; (e) agent under the Senior Secured Term Loan; (f) the United States Attorney's Office for the District of Delaware; (g) the Securities and Exchange Commission; (h) all parties known to be asserting a lien in the Debtors' Liquidation Assets in the Closing Stores; (i) each of the Debtors' landlords; (j) the Attorney General for California; (k)

various federal and state tax and environmental authorities, including the Internal Revenue Service and the Environmental Protection Agency; (l) all Potential Bidders; and (m) all entities having filed a request for the notice pursuant to Bankruptcy Rule 2002 in these chapter 11 cases.  In light of the nature of the relief requested, the Debtors submit that no further notice is required.

## <u>NO PRIOR REQUEST</u>

46.     No previous application for the relief requested herein has been made by the Debtors to this or any other court.

WHEREFORE, the Debtors respectfully request the entry of the Procedures Order and

the Approval Order, substantially in the forms attached hereto as <u>Exhibits B and C</u>, respectively,

granting the relief requested herein and such other and further relief as the Court may deem just

and proper.

Dated: June 17, 2013     Respectfully submitted,
   Wilmington, Delaware

          /s/ Stuart M. Brown
         Stuart M. Brown (DE 4050)
         DLA PIPER LLP (US)
         919 North Market Street, Suite 1500
         Wilmington, Delaware 19801
         Telephone:  (302) 468-5700
         Facsimile:  (302) 394-2341
         Email:  stuart.brown@dlapiper.com

           -and-

         Richard A. Chesley (IL 6240877)
         Chun I. Jang (DE 4790)
         Daniel M. Simon (IL 6297629)
         DLA PIPER LLP (US)
         203 N. LaSalle Street, Suite 1900
         Chicago, Illinois 60601
         Telephone:  (312) 368-4000
         Facsimile:  (312) 236-7516
         Email:    richard.chesley@dlapiper.com
             chun.jang@dlapiper.com
             daniel.simon@dlapiper.com

         PROPOSED ATTORNEYS FOR DEBTORS AND
         DEBTORS IN POSSESSION