# EXHIBIT 1

**STALKING HORSE AGREEMENT**

**AGENCY AGREEMENT**

This Agency Agreement ("Agreement") is made as of June 17, 2013, by and between Orchard Supply Hardware LLC ("Merchant") and a contractual joint venture comprised of Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Agent").

Section 1.  Recitals.

WHEREAS, Merchant operates retail stores and desires that the Agent act as Merchant's exclusive agent for the limited purposes of: (a) selling all of the Merchandise (as hereinafter defined) from Merchant's eight (8) retail store locations identified on Exhibit 1 (each individually a "Store," and collectively the "Stores") and Merchandise at any Additional Store(s) (as hereinafter defined) to be designated by the Merchant at a future date, but prior to July 31, 2013, by means of a "store closing", "sale on everything", "everything must go", or similar sale (as further described below, the "Sale"); and (b) if Merchant elects, disposing of the Owned FF&E in the Stores and the Additional Stores.

WHEREAS, on June 17, 2013, Merchant filed a chapter 11 case in the United States Bankruptcy Court for the District of Delaware (such case, the "Bankruptcy Case" and such court, or other court of competent jurisdiction in which the Bankruptcy Case is filed, the "Bankruptcy Court").

NOW, THEREFORE, in consideration of the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Agent and Merchant hereby agrees as follows:

Section 2.  Appointment of Agent/Approval Order.

(a)     Subject to entry of an order authorizing Merchant to enter into this Agreement and authorizing Merchant to conduct the Sale in accordance with the terms of this Agreement (the "Approval Order"), Merchant hereby appoints the Agent, and the Agent hereby agrees to serve, as Merchant's exclusive agent for the limited purpose of conducting the Sale in accordance with the terms and conditions of this Agreement.  Except as otherwise expressly provided for in this Agreement, Agent shall have no authority to enter into any contract, agreement or other arrangement or take any other action, by or on behalf of Merchant, that would have the effect of creating any obligation or liability, present or contingent, on behalf of or for the account of Merchant without Merchant's prior written consent, which consent shall not be unreasonably withheld.

(b)     The Approval Order shall provide, in a form reasonably satisfactory to Merchant and Agent, *inter alia,* that (i) this Agreement is in the best interest of the Merchant, Merchant's estates, creditors, and other parties in interest, (ii) this Agreement (and each of the transactions contemplated hereby) is approved in its entirety; (iii) Merchant and Agent shall be authorized to continue to take any and all actions as may be necessary or desirable to implement this Agreement and each of the transactions contemplated hereby; (iv) upon payment of the Initial Guaranty Payments (as defined below) and delivery of the Letter of Credit (as defined below), Agent shall be entitled to sell all Merchandise and if Merchant elects, Owned FF&E hereunder free and clear of all liens, claims or encumbrances thereon, with any presently existing liens encumbering all or any portion of the Merchandise or Owned FF&E or the Proceeds (as defined below) thereof attaching only to the Guaranteed Amounts and other amounts to be received by Merchant under this Agreement; (v) Agent shall have the right to use the Stores and all related Store services, furniture, fixtures, equipment and other assets of the Merchant as designated hereunder for the purpose of conducting the Sale, free of any interference from any entity or person, subject to compliance with the Sale Guidelines (as defined below) and Approval Order; (vi) Agent, as agent for Merchant, is authorized to conduct, advertise, post signs, utilize signwalkers, and otherwise

promote the Sale as a "store closing", "sale on everything", "everything must go", or similar themed sale, in accordance with the Sale Guidelines (as the same may be modified and approved by the Bankruptcy Court) and without further compliance with the Liquidation Sale Laws (as defined below), subject to compliance with the Sale Guidelines and Approval Order; (vii) Agent shall be granted a limited license and right to use, until the Sale Termination Date, the trade names and logos relating to and used in connection with the operation of the Stores, solely for the purpose of advertising the Sale in accordance with the terms of the Agreement; (viii) all newspapers and other advertising media in which the Sale is advertised shall be directed to accept the Approval Order as binding and to allow Merchant and Agent to consummate the transactions provided for in this Agreement, including, without limitation, the conducting and advertising of the Sale in the manner contemplated by this Agreement; (ix) all utilities, landlords, creditors and other interested parties and all persons acting for or on their behalf shall not interfere with or otherwise impede the conduct of the Sale, or institute any action in any court (other than in the Bankruptcy Court) with respect to Merchandise or the Owned FF&E or before any administrative body which in any way directly or indirectly interferes with or obstructs or impedes the conduct of the Sale; (x) the Bankruptcy Court shall retain jurisdiction over the parties to enforce this Agreement; (xi) Agent shall not be liable for any claims against Merchant other than as expressly provided for in this Agreement; (xii) subject to Agent having satisfied its payment obligations hereunder, any amounts owed by Merchant to Agent under this Agreement shall be granted the status of superpriority claims in Merchant's Bankruptcy Case pursuant to section 364(c) of Title 11, United States Code, 11 U.S.C. §§ 101-1330 (the "Bankruptcy Code") senior to all other superpriority claims, including (without limitation) to the superpriority claims of the Lender; (xiii) Agent shall be granted a valid, binding, enforceable and perfected security interest as provided for in Section 16 hereof (without the necessity of filing financing statements to perfect the security interests); (xiv) the Bankruptcy Court finds that time is of the essence in effectuating this Agreement and proceeding with the Sale at the Stores uninterrupted; (xv) the Bankruptcy Court finds that the Merchant's decisions to (a) enter into this Agreement and (b) perform under and make payments required by this Agreement is a reasonable exercise of the Merchant's sound business judgment consistent with its fiduciary duties and is in the best interests of the Merchant, its estate, its creditors, and other parties in interest; (xvi) the Bankruptcy Court finds that this Agreement was negotiated in good faith and at arms' length between the Merchant and Agent and that Agent is entitled to the protection of section 363(m) of the Bankruptcy Code; (xvii) the Bankruptcy Court finds that Agent's performance under this Agreement will be, and payment of the Guaranteed Amounts under this Agreement will be made, in good faith and for valid business purposes and uses, as a consequence of which Agent is entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code; (xviii) this Agreement is approved pursuant to Bankruptcy Code section 363; and (xix) in the event any of the provisions of the Approval Order are modified, amended or vacated by a subsequent order of the Bankruptcy Court or any other court, Agent shall be entitled to the protections provided in Bankruptcy Code sections 363(m) and 364(e) and, no such appeal, modification, amendment or vacatur shall affect the validity and enforceability of the sale or the liens or priority authorized or created under this Agreement or the Approval Order.

(c)        Subject to entry of the Approval Order, Agent shall be authorized to advertise the Sale as a "store closing," "sale on everything", "everything must go", or similar-themed sale, and the Approval Order shall provide that Agent shall be required to comply with applicable federal, state and local laws, regulations and ordinances, including, without limitation, all laws and regulations relating to advertising, privacy, consumer protection, occupational health and safety and the environment, together with all applicable statutes, rules, regulations and orders of, and applicable restrictions imposed by, governmental authorities (collectively, the "Applicable General Laws"), other than all applicable laws, rules and regulations in respect of "going out of business", "store closing" or similar-themed sales and permitting (collectively, the "Liquidation Sale Laws"), provided that such Sale is conducted in accordance with the terms of this Agreement, the Sale Guidelines and Approval Order; and provided further that the Approval Order shall provide that so long as the Sale is conducted in accordance with the Sale Guidelines

and the Approval Order and in a safe and professional manner, Agent shall be deemed to be in compliance with any Applicable General Laws.

Section 3.  Consideration to Merchant and Agent.

3.1    Payments to Merchant.

(a)    Subject to Merchant's compliance in all material respects with all representations, warranties, covenants, terms and conditions set forth in this Agreement, as a guaranty of Agent's performance hereunder, Agent guarantees that Merchant shall receive seventy-two percent (72.0%) (the "Guaranty Percentage") of the aggregate Cost Value of the Merchandise (the "Guaranteed Amount"), which Guaranteed Amount shall be paid at such times and in such manner as shall hereinafter be provided. The Agent shall pay to Merchant the Guaranteed Amount and the Sharing Amount due to Merchant (if any) in the manner and at the times specified in Section 3.3.  The Guaranteed Amount will be calculated based upon the aggregate Cost Value of the Merchandise as determined by (A) the final certified report of the Inventory Taking Service after verification and reconciliation thereof by Agent and Merchant, (B) the aggregate Cost Value of the Merchandise subject to Gross Rings; and (C) any other adjustments to Cost Value as expressly contemplated by this Agreement.

(b)    The Guaranty Percentage has been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale being not less than $9,400,000 and not more than $10,500,000 (the "Merchandise Threshold") as of the Sale Commencement Date.  To the extent that the aggregate Cost Value of the Merchandise included in the Sale is less than, or greater than, the Merchandise Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(b) annexed hereto.

(c)    The Guaranty Percentage has also been fixed based upon the aggregate Cost Value of the Merchandise included in the Sale as a percentage of the aggregate Retail Price of the Merchandise included in the Sale, such percentage being 53% (the "Cost Factor Threshold").  To the extent that the ratio of the aggregate Cost Value of the Merchandise included in the Sale to the aggregate Retail Price of the Merchandise included in the Sale is a percentage other than the Cost Factor Threshold, the Guaranty Percentage shall be adjusted in accordance with Exhibit 3.1(c) annexed hereto.

3.2    Compensation to Agent, Sharing:

(a)    After Proceeds are used to repay Agent for amounts paid on account of the Guaranteed Amount and to pay Expenses, all remaining Proceeds shall be allocated in the following order of priority: FIRST: to Agent in an amount equal to four percent (4.0%) of the aggregate Cost Value of the Merchandise ("Agent's Fee"); and THEREAFTER: fifty percent (50%) to Agent and  fifty percent (50%) to Merchant ("Sharing Amounts").

(b)    To the extent that there is Merchandise remaining at the Sale Termination Date (the "Remaining Merchandise"), Agent shall use commercially reasonable efforts to dispose of all of such Remaining Merchandise by means of bulk sale/wholesale or otherwise, and the proceeds received by Agent from such disposition shall constitute Proceeds hereunder.

3.3    Proceeds; Time of Payments; Control of Proceeds.

(a)    For purposes of this Agreement, "Proceeds" shall mean the aggregate of (a) the total amount (in dollars) of all sales of Merchandise made under this Agreement and all service revenue received in the Store, in each case during the Sale Term and exclusive of Sales Taxes; (b) all proceeds of Merchant's insurance for loss or damage to Merchandise arising from events occurring during the Sale

3

Term; and (c) any and all proceeds received by Agent from the disposition of Remaining Merchandise. For the avoidance of doubt, proceeds from the sale of Additional Agent Goods shall not be "Proceeds".

(b)     On the second business day following the entry of the Approval Order (the "Payment Date"), Agent shall pay to Merchant an amount equal to ninety percent (90%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course as of the date immediately preceding the Payment Date) (the "Initial Guaranty Payment") by wire transfer to an account designated in writing by Merchant and controlled by Lender ("Merchant's Account").  The balance of the Guaranteed Amount, if any, shall be paid by Agent by wire transfer to the Merchant's Account on the later of (i) 30 days after the Sale Commencement Date and (ii) the second business day following the issuance of the final report of the aggregate Cost Value of the Merchandise included in the Sale by the Inventory Taking Service, after review, reconciliation and mutual written verification thereof by Agent and Merchant (the "Final Inventory Report" with the date of completion of such reconciliation and issuance of such Final Inventory Report to be referred to as the "Inventory Reconciliation Date").  To the extent that Merchant is entitled to receive any funds on account of the Sharing Amount due to Merchant, Agent shall pay such Sharing Amount as part of the Final Reconciliation under Section 8.7.  To the extent that the Guaranteed Amount has not been paid in full by the date of the Final Reconciliation, Agent shall pay the unpaid portion of the Guaranteed Amount to Merchant as part of the Final Reconciliation.

(c)     All Proceeds shall be controlled by Agent in the manner provided for below.

(i)     Agent may establish its own accounts (including without limitation credit card accounts and systems), dedicated solely for the deposit of the Proceeds and the disbursement of amounts payable to Agent hereunder (the "Agency Accounts") and Merchant shall promptly, upon Agent's reasonable request, execute and deliver all necessary documents to open and maintain the Agency Accounts; provided, however, Agent may elect to continue to use Merchant's Designated Deposit Accounts (as defined below) as the Agency Accounts.  Agent shall exercise sole signatory authority and control with respect to the Agency Accounts.  The Agency Accounts shall be dedicated solely to the deposit of Proceeds and other amounts contemplated by this Agreement and the distribution of amounts payable hereunder.  Upon request, Agent shall deliver to Merchant copies of all bank statements and other information relating to such accounts.  The Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all bank fees and charges, including wire transfer charges, related to the Sale and Agency Accounts, whether received during or after the Sale Term.  Upon Agent's notice to Merchant of Agent's designation of the Agency Accounts, all Proceeds of the Sale (including credit card Proceeds) shall be deposited into the Agency Accounts.

(ii)     Agent shall have the right to use Merchant's credit card facilities, including Merchant's credit card terminals and processor(s), credit card processor coding, Merchant's identification number(s) and existing bank accounts for credit card Proceeds relating solely to the Sale.  In the event that Agent elects to use Merchant's credit card facilities, Merchant shall process credit card transactions on behalf of Agent and for Agent's account, applying customary practices and procedures. Without limiting the foregoing, Merchant shall cooperate with Agent to download data from all credit card terminals each day during the Sale Term to effect settlement with Merchant's credit card processor(s), and shall take such other actions necessary to process credit card transactions on behalf of Agent under Merchant's identification number(s).  At Agent's request, Merchant shall cooperate with Agent to establish Merchant's identification numbers under Agent's name to enable Agent to process all such credit card Proceeds for Agent's account.  Merchant shall not be responsible for, and Agent shall pay as an Expense hereunder, all credit card fees, charges, and chargebacks related to the Sale, whether received during or after the Sale Term; provided, further, that, if Merchant's credit card processors or associated third parties seek to implement protections for chargebacks related to the Sale, Agent agrees to

4

cooperate with Merchant, Lender and such processors or third parties to reach an acceptable resolution and, in the event no such resolution is reached, adjust the Letter of Credit to provide Merchant with reasonable assurance that Agent shall pay all chargebacks related to the Sale. Agent shall not be responsible for, as an Expense or otherwise, any credit card fees, charges, or chargebacks that do not relate to the Sale, whether received, prior to, during or after the Sale Term.

(iii)     Subject to the terms of the Approval Order, prior to the date Agent establishes the Agency Accounts, all Proceeds (including credit card Proceeds), shall be collected by Merchant and deposited on a daily basis into depository accounts designated by, owned and in the name of, Merchant for the Stores, which accounts shall be designated solely for the deposit of Proceeds and other amounts contemplated by this Agreement (including credit card Proceeds), and the disbursement of amounts payable to or by Agent hereunder (the "Designated Deposit Accounts"). Subject to the Approval Order, the Designated Deposit Accounts shall be cash collateral accounts, with all cash, credit card payments, checks and similar items of payment, deposits and any other amounts in such accounts being Proceeds or other amounts contemplated hereunder, and Merchant hereby grants to Agent a first priority senior security interest in each Designated Deposit Account. The terms of the Approval Order shall provide for, *inter alia,* the acknowledgement of the Agent's security interest in Proceeds and other amounts deposited in such account, and for turnover of any such Proceeds or other amounts by Lender to Agent. If, notwithstanding the provisions of this Section, Merchant receives or otherwise has dominion over or control of any Proceeds or other amounts due to Agent, Merchant shall hold such Proceeds and other amounts in trust for Agent and shall not commingle Proceeds or other amounts due to Agent with any of Merchant's other funds or deposit such Proceeds or other amounts in any account except a Designated Deposit Account or as otherwise instructed by Agent.

(iv)     On each business day, Merchant shall promptly pay to Agent by wire funds transfer all funds constituting Proceeds (including, without limitation, Proceeds from credit card sales) deposited into the Designated Deposit Accounts for the prior day. Agent shall have ten (10) business days after the date of each such payment by Merchant to notify Merchant and Lender of any shortfall in such payment, in which case, Merchant shall promptly pay to Agent funds in the amount of such shortfall.

(d)     In the event that the Agent is obligated to fund or pay all or any portion of Merchant's obligations under this Agreement, such funding or payment cannot be recovered by the Agent under section 3.3(e) by means of an offset, and, as a result of such funding or payment, Merchant (or Wells Fargo Bank, N.A. ("Lender")) received more value than Merchant (or Lender) would have otherwise received under this Agreement had Agent not funded or paid such obligations, Lender shall refund (to the extent received by Lender) all such funded or paid amounts to Agent within two (2) business days of Agent's request. If and to the extent the Agent over-funds any amounts in respect of the Guaranteed Amount hereunder and Merchant for any reason fails to refund Agent such overfunded amount after two (2) business days written demand by Agent, and Agent is unable to recover such amount under section 3.3(e) by means of an offset, Lender shall, within two (2) business days of written demand by Agent, pay to the Agent the over-funded amount.

(e)     Merchant and Agent further agree that if at any time during the Sale Term, (i) Agent holds any amounts due to Merchant under this Agreement, Agent may, in its discretion, after five (5) business days notice to Merchant, offset such amounts being held by Agent against any undisputed amounts due and owing by, or required to be paid by, Merchant hereunder, and (ii) Merchant holds any amounts due to Agent under this Agreement, Merchant may, in its discretion, after five (5) business days notice to Agent, offset such amounts being held by Merchant against any undisputed amounts due and owing by, or required to be paid by, Agent hereunder.

(f)    In addition to the Guaranteed Amount, Agent shall purchase all cash in the Stores on and as of the start of business on the Sale Commencement Date on a dollar for dollar basis.

3.4    <u>Security</u>.  In order to secure Agent's obligations under this Agreement to pay the balance of the Guaranteed Amount and Expenses, no later than the Payment Date, Agent shall furnish Merchant or Lender, as Merchant's designee, an irrevocable standby Letter of Credit naming Lender and Merchant as co-beneficiaries (each, a "Beneficiary") in the aggregate original face amount equal to the sum of: (a) ten percent (10%) of the estimated Guaranteed Amount (based upon Merchant's books and records maintained in the ordinary course), plus (b) the parties' mutually agreed upon estimate of three weeks of Expenses, which shall be substantially in the form of Exhibit 3.4 hereof (the "Letter of Credit"). The Letter of Credit shall have an expiry date of no earlier than sixty (60) days after the Sale Termination Date.  Upon Lender's receipt of payment in full of its claims against the Merchant, Lender shall promptly deliver the Letter of Credit to Merchant and take all steps necessary to remove itself as a named co-beneficiary thereunder.  Unless the parties shall have mutually agreed that they have completed the Final Reconciliation under this Agreement, then, at least ten (10) days prior to the initial or any subsequent expiry date, the Beneficiaries shall receive an amendment to the Letter of Credit solely extending (or further extending, as the case may be) the expiry date by at least thirty (30) days.  If the Beneficiaries fail to receive such amendment to the Letter of Credit no later than ten (10) days before the expiry date, then the Beneficiaries shall be permitted to draw the full amount under the Letter of Credit to hold as security for amounts that may become due and payable to Merchant.  In the event that Agent, after receipt of five (5) business days' written notice, fails to pay any undisputed portion of the Guaranteed Amount, Expenses, Additional Agent Goods Fee, or any good faith request for indemnity under section 13.2 of this Agreement, the Beneficiaries may draw on the Letter of Credit in an amount equal to the unpaid, past due, amount of the Guaranteed Amount, Expenses, Additional Agent Goods Fee, or such indemnity request that is not the subject of a reasonable dispute.  Notwithstanding the foregoing, Lender, Merchant and Agent agree that, from time to time upon Agent's request, the face amount of the Letter of Credit shall be reduced by the aggregate amount of payments made by Agent on account of the Guaranteed Amount made to the time of each such request (and Merchant and Lender shall cooperate with respect to each such request); <u>provided</u>, <u>however</u>, in no event shall the face amount of the Letter of Credit be reduced to an amount less than the parties' mutually agreed upon estimate of three weeks of Expenses.

Section 4.    <u>Expenses of the Sale</u>.

4.1    <u>Expenses</u>.  Agent shall be unconditionally responsible for all "Expenses," which expenses shall be paid by Agent in accordance with Section 4.2 below.  As used herein, "Expenses" shall mean the Store-level operating expenses of the Sale which arise during the Sale Term and are attributable to the Sale, limited to the following:

(a)    actual payroll with respect to all Retained Employees used in connection with conducting the Sale for actual days/hours worked at a Store and for any paid time off taken by Retained Employees at the written direction or written suggestion of the Agent during the Sale Term (excluding hours worked during the Inventory Taking) as well as payroll for any temporary labor engaged for the Sale;

(b)    any amounts payable by Merchant for benefits for Retained Employees (including FICA, unemployment taxes, workers' compensation and healthcare insurance, but excluding Excluded Payroll Benefits) for Retained Employees used in the Sale, in an amount not to exceed 21.0% of the base payroll for each Retained Employee in the Stores (the "<u>Payroll Benefits Cap</u>");

(c)    the actual Occupancy Expenses categorized on Exhibit 4.1(c), but in all cases limited on a per Store and per diem basis not to exceed the amounts shown on Exhibit 4.1(c) incurred by Merchant under applicable leases or occupancy agreements;

(d)    Retention and Incentive Bonuses for Retained Employees, as provided for in Section 9.4 below;

(e)    advertising and direct mailings relating to the Sale, Store interior and exterior signage and banners, and signwalkers, in each case relating to the Sale;

(f)    credit card fees, bank card fees, and chargebacks and credit/bank card discounts with respect to Merchandise sold in the Sale;

(g)    bank service charges (for Store, corporate accounts, and Agency Accounts), check guarantee fees, and bad check expenses to the extent attributable to the Sale;

(h)    costs for additional Supplies at the Stores necessary to conduct the Sale as requested by Agent;

(i)    all fees and charges required to comply with applicable laws in connection with the Sale as agreed to by Agent;

(j)    Store cash theft and other store cash shortfalls in the registers;

(k)    all costs and expenses associated with Agent's on-site supervision of the Stores, including (but not limited to) any and all fees, wages, bonuses, taxes, third party payroll costs and expenses, and deferred compensation of Agent's field personnel, travel to, from or between the Stores, and out-of-pocket and commercially reasonable expenses relating thereto (including reasonable and documented corporate travel to monitor and manage the Sale);

(l)    postage, courier and overnight mail charges requested by Agent to the extent relating to the Sale;

(m)    fifty percent (50%) of cost of the Inventory Taking Service;

(n)    Agent's actual cost of capital (including Letter of Credit fees) and insurance;

(o)    Agent's reasonable out-of-pocket costs and expenses including but not limited to, reasonable legal fees and expenses incurred in connection with the review of data, preparation, negotiation and execution of this Agreement and any ancillary documents, and in connection with the Sale, capped at $100,000;

(p)    third party payroll processing expenses associated with the Sale;

(q)    costs of transfers initiated by Agent of Merchandise between and among the Stores during the Sale Term, including delivery and freight costs, it being understood that Agent shall be responsible for coordinating such transfer of Merchandise, subject, however, to the provisions of section 8.1(e);

(r)    the actual costs and expenses of providing such additional services as the Agent deems appropriate for the Sale capped at $100,000.

Notwithstanding anything herein to the contrary, to the extent that any Expense category listed in section 4.1 is also included on Exhibit 4.1(c), Exhibit 4.1(c) shall control and such Expenses shall not be double counted.   There will be no double payment of Expenses to the extent that Expenses appear or are contained in more than one Expense category.

As used herein, the following terms have the following respective meanings:

(i)        "Central Service Expenses" means costs and expenses for Merchant's central administrative services necessary for the Sale, including, but not limited to, internal payroll processing, MIS services, cash and inventory reconciliation, data processing and reporting, and accounting (collectively, "Central Services").

(ii)       "Excluded Payroll Benefits" means (i) the following benefits arising, accruing or attributable to the period prior to, during, or after the Sale Term:  (w) vacation days or vacation pay (unless such vacation is taken by Retained Employees at the written direction or written suggestion of the Agent during the Sale Term), (x) sick days or sick leave or any other form of paid time off (unless paid time off is taken by Retained Employees at the written direction or written suggestion of the Agent during the Sale Term), (y) maternity leave or other leaves of absence and (z) ERISA coverage and similar contributions and/or (ii) any other benefits in excess of the Payroll Benefits Cap, including, without limitation, any payments due under the WARN Act.

(iii)      "Occupancy Expenses" means, with respect to the Stores, base rent, percentage rent, HVAC, utilities, CAM, storage costs, real estate and use taxes, Merchant's association dues and expenses, utilities expenses, cash register maintenance, routine repairs, building maintenance, trash and snow removal, housekeeping and cleaning expenses, local and long-distance telephone and internet/wifi expenses, security (including, without limitation, security systems, courier and guard service, building alarm service and alarm service maintenance), and rental for furniture, fixtures and equipment.

(iv)      "Third Party" means, with reference to any Expenses to be paid to a Third Party, a party which is not affiliated with or related to the Merchant.

(v)       Notwithstanding any other provision of this Agreement to the contrary, "Expenses" shall not include: (i) Excluded Payroll Benefits; (ii) Central Service Expenses, (iii) Occupancy Expenses or any occupancy-related expenses of any kind or nature in excess of the respective per Store, per diem occupancy-related categories and amounts expressly provided for as an Expense under Section 4.1(c) above to the extent actually incurred; (iv) any expenses of any kind relating to or arising from Merchant's home office or Distribution Center, and/or (v) any other costs, expenses or liabilities payable by Merchant not provided for herein, all of which shall be paid by solely by Merchant promptly when due, subject to the provisions of the Bankruptcy Code and the Approval Order.

4.2      Payment of Expenses.

Agent shall be responsible for the payment of all Expenses out of Proceeds (or from Agent's own accounts if and to the extent there are insufficient Proceeds) after the payment of the Guaranteed Amount.  All Expenses incurred during each week of the Sale (*i.e.* Sunday through Saturday) shall be paid by Agent to or on behalf of Merchant, or paid by Merchant and thereafter reimbursed by Agent as provided for herein, immediately following the Weekly Sale Reconciliation; provided, however, in the event that the actual amount of an Expense is unavailable on the date of the reconciliation (such as payroll), Merchant and Agent shall agree to an estimate of such amounts, which amounts will be reconciled once the actual amount of such Expense becomes available.  Notwithstanding the foregoing, Agent shall be obligated to pre-fund any rent and payroll-related expenses consistent with Merchant's

customary rent and payroll funding practices and timing; provided, however, that the pre-funding of rent shall only apply to July rent; thereafter rent shall be paid and reconciled in connection with each Weekly Sale Reconciliation.  Agent and/or Merchant may review or audit the Expenses at any time,

      Section 5.  Inventory Taking; Gross Rings; Merchandise.

5.1      Inventory Taking.

      (a)      Commencing on the Sale Commencement Date, Merchant and Agent shall cause to be taken a SKU level Cost Value and Retail Price physical inventory of the Merchandise located in the Stores (collectively, the "Inventory Taking"), which Inventory Taking shall be completed in each of the Stores as soon as practicable (the date of the Inventory Taking at each Store being the "Inventory Date" for each such Store), but in any event no later than fourteen (14) days after the Sale Commencement Date (subject to the availability of the Inventory Taking Service).  Any Merchandise received at the Stores after the Inventory Date for such Stores shall be counted upon receipt at such Store.  Merchant and Agent shall jointly employ RGIS or other mutually agreed upon national inventory taking service (the "Inventory Taking Service") to conduct the Inventory Taking. The Inventory Taking shall be conducted in accordance with the procedures and instructions set forth on Exhibit 5.1(a) (the "Inventory Taking Instructions").  As an Expense, Agent shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service.  Merchant shall be responsible for fifty percent (50%) of cost of the Inventory Taking Service.  Except as provided in the immediately preceding two sentences, Merchant and Agent shall each bear their respective costs and expenses relative to the Inventory Taking.  Merchant, Lender, and Agent may each have representatives present during the Inventory Taking, and shall each have the right to review and verify the listing and tabulation of the Inventory Taking Service.  Merchant agrees that during the conduct of the Inventory Taking, the applicable Store shall be closed to the public, and no sales or other transactions shall be conducted within the applicable Store.  Merchant and Agent further agree that until the Inventory Taking in a particular Store is completed, neither the Merchant nor Agent shall: (i) move Merchandise within or about the Store so as to make any such items unavailable for counting as part of the Inventory Taking; (ii) remove or add any hang tags, price tickets, inventory control tags affixed to any Merchandise or any other kind of in-store pricing signage within the Store.  Merchant agrees to cooperate with Agent to conduct the Inventory Taking (including without limitation by making available to Agent information relating to sales, units, costs, Cost Value, and Retail Price, and making available to Agent Merchant's books, records, work papers and personnel to the extent reasonably necessary to calculate the Cost Value and Retail Price of the Merchandise), or (iii) transfer or move Merchandise between two or more Stores until after the Inventory Taking at each such Store has been completed.  Each Store will be closed during the Inventory taking; provided, however, that the parties agree that the Inventory Taking will commence at a time that will minimize the number of hours that the Stores will be closed for business.  The Inventory Taking, including, but not limited to the Final Inventory Report, shall be reconciled by the Merchant and Agent as soon as practicable following the Inventory Taking.

      (b)      At each Store, for the period from the Sale Commencement Date until the Inventory Date for such Store, Agent and Merchant shall jointly keep (i) a strict count of gross register receipts less applicable Sales Taxes but excluding any prevailing discounts ("Gross Rings"), and (ii) cash reports of sales within such Store.  Register receipts shall show for each item sold the Cost Value and Retail Price for such item and the markdown or discount, if any, specifically granted by Agent in connection with such Sale.  Agent shall pay that portion of the Guaranteed Amount calculated on the Gross Rings basis, to account for shrinkage, on the basis of 0.75% of the aggregate Cost Value of Merchandise sold during the Gross Rings Period.  All such records and reports shall be made available to Agent and Merchant during regular business hours upon reasonable notice.  Any Merchandise included in the Sale using the Gross Rings method shall be included as Merchandise.

5.2    <u>Merchandise Subject to This Agreement.</u>

(a)    For purposes of this Agreement, "<u>Merchandise</u>" shall mean all new, finished, first-quality saleable goods in the ordinary course of business located at the Stores as of the Sale Commencement Date (including Defective Merchandise and Merchandise subject to Gross Rings) and in transit to and received by the Stores within seven (7) days of the Sale Commencement Date (the "Receipt Deadline").  "Merchandise" shall not include:  (1) goods which belong to sublessees, licensees, department lessees, or concessionaires of Merchant; (2) goods held by Merchant on memo, on consignment, or as bailee; (3) Excluded Defective Merchandise; (4) Merchant's Consignment Goods; (5) Additional Agent Goods; (6) furnishings, trade fixtures, equipment and/or improvements to real property which are located in the Stores or the Distribution Centers ("FF&E"); <u>provided</u> that Agent shall be permitted to sell Owned FF&E as set forth in Section 7 below; (7) goods in the Distribution Center; or (8) goods received at the Stores after the Receipt Deadline.

(b)    As used in this Agreement, the following terms have the respective meanings set forth below:

"<u>Defective Merchandise</u>" means any item of Merchandise which is not new, finished, first-quality, saleable goods sold in the normal course.  Examples of Defective Merchandise include, but are not limited to goods, that are damaged, defective, scratched, soiled, dented, out of box (if normally sold as new in-the-box), missing pieces, mismatched, mismated, parts, items typically sold as a set which are incomplete, or gift with purchase items.

"<u>Excluded Defective Merchandise</u>" means any item of (i) Defective Merchandise that is not saleable in the ordinary course because it is so damaged or defective that it cannot reasonably be used for its intended purpose, (ii) expired or out-of-date goods, (iii) open container or open bag goods, and (iv) obsolete or discontinued goods or goods identified with an "obsolete SKU" or "deleted SKUs in clearance process".  Excluded Defective Merchandise shall be identified as such during the Inventory Taking.

"<u>Merchandise File</u>" shall mean Merchant's "SkuLevelInventory" Zip File containing a Text File; Inventory as of 5/21/2013, file dated 5/22/2013 and "510SkuLevel" Text File; Inventory as of 5/22/2013, file dated 5/24/2013, or, if an updated file(s) are provided, the most recent file(s), in identical format as adjusted to reflect the Load Factor (if applicable), provided by the Merchant to Agent prior to the Sale Commencement Date.

5.3    <u>Valuation.</u>

(a)    For purposes of this Agreement, "<u>Cost Value</u>" shall mean, with respect to each item of Merchandise, the lower of (i) the cost of such item within the specific Store (not across all Stores) as reflected in the Merchandise File as adjusted and increased by the Load Factor and (ii) the Retail Price.

(b)    For purposes of this Agreement, "<u>Load Factor</u>" shall mean with respect to the cost of each item as reflected in the Merchandise File adjusted and increased by 7%.  For the avoidance of doubt, the cost of each item shall be adjusted and increased only once and not once on account of the definition of Load Factor, again as part of the definition of Cost Value, and again in the Merchandise File.

(c)    For purposes of this Agreement, "<u>Retail Price</u>" shall mean with respect to each item of Merchandise, the lower of the lowest ticketed, marked, shelf, Merchandise File, point-of-sale, or other file price as reflected in Merchant's books and records for such item within the specific Store (not across all Stores).

(d)    For purposes of determining the Cost Value of Defective Merchandise, in lieu of an adjustment to each item of Defective Merchandise, Merchant and Agent agree that the aggregate Cost Value of the Merchandise shall be adjusted (*i.e.*, reduced) by means of a single global downward adjustment equal to one percent (1%) of the aggregate Cost Value of the Merchandise (the "Global Inventory Adjustment").

5.4    Excluded Goods.  Merchant shall retain all responsibility for any goods not included as "Merchandise" hereunder.  If the Merchant elects at the beginning of the Sale Term, Agent shall accept goods not included as "Merchandise" hereunder for sale as "Merchant's Consignment Goods" at prices mutually agreed upon by Agent and Merchant.  The Agent shall retain twenty percent (20%) of the receipts (net of Sales Taxes) for all sales of Merchant's Consignment Goods, and Merchant shall receive eighty percent (80%) of the receipts (net of Sales Taxes) in respect of such sales.  Merchant shall receive its share of the receipts of sales of Merchant's Consignment Goods on a weekly basis, immediately following the Weekly Sale Reconciliation.  If Merchant does not elect to have Agent sell merchandise not included as Merchandise, then all such items will be removed by Merchant from the Stores at Merchant's expense as soon as practicable.  Except as expressly provided in this Section 5.4, Agent shall have no cost, expense or responsibility in connection with any goods not included in Merchandise.

5.5    Put Option.  Up until 5:00 pm on July 31, 2013, Merchant shall have the absolute right, in its discretion, to include up to twenty-two (22) additional retail store locations (the "Additional Stores") in the Sale (the "Put Option").  If and to the extent the Merchant exercises the Put Option, the Merchant, Lender and the Agent may, in each party's discretion, promptly enter into an agency agreement (or an amendment to this Agreement) governing such Sale, which agreement shall provide the same Guaranteed Percentage, Agent's Fee, and sharing allocation above the Sharing Threshold set forth herein.

Section 6.  Sale Term.

6.1    Term.  Subject to satisfaction of the conditions precedent set forth in Section 10 hereof, the Sale shall commence at each Store on the date that is one (1) day after the Bankruptcy Court enters the Approval Order, which commencement date shall not be later than June 29, 2013 (the "Sale Commencement Date").  Agent shall complete the Sale at each Store no later than September 30, 2013 (the "Sale Termination Date", and the period from the Sale Commencement Date to the Sale Termination Date as to each Store being the "Sale Term").  Notwithstanding the foregoing, Agent may, in its discretion, earlier terminate the Sale on a Store-by-Store basis at upon not less than ten (10) days' prior written notice (a "Vacate Notice") to Merchant (the "Vacate Date"), provided, that it being understood that the Agent's obligations to pay all Expenses, including Occupancy Expenses for each Store, including each Store subject to a Vacate Notice, shall continue until the applicable Vacate Date for such Store.  In the event that the Merchant elects the Put Option for any Additional Stores, the Sale Term shall be no more than [80] days at each such Additional Store.

6.2    Vacating the Store.  At the conclusion of the Sale, Agent agrees to leave each Store in "broom clean" condition, ordinary wear and tear excepted, except for unsold items of Owned FF&E which may be abandoned by Agent in place in a neat and orderly manner pursuant to Section 7 below, provided that the Agent shall cooperate with the Merchant's efforts to remove such unsold Owned FF&E after the Vacate Notice has been provided.  Agent shall vacate each Store on or before the Sale Termination Date as provided for herein, at which time Agent shall surrender and deliver the Store premises and Store keys, to Merchant.  Agent's obligations to pay all Expenses for the Stores shall continue until the applicable Vacate Date for each Store; provided, however, that Agent's obligations to pay all Occupancy Expenses for each Store shall continue until the later of (a) the applicable Vacate Date for such Store and (b) the fifteenth (15th) day of the calendar month in which the Vacate Date for such

11

Store occurs in the event the Bankruptcy Court does not approve under the Approval Order Merchant's request to limit the Merchant's obligations to pay rent under such Store leases on a per diem basis through the effective rejection date only. All assets of Merchant used by Agent in the conduct of the Sale (*e.g.*, unsold FF&E, supplies, etc.) shall be returned by Agent to Merchant or left at the Stores, as applicable, to the extent same have not been used in the conduct of the Sale or have not been otherwise disposed of through no fault of the Agent. Where reference is made in this Section 6 to vacating the Stores, such reference shall mean vacating the Stores in favor of Merchant, its representatives or assignee and shall not mean vacating possession or disclaimer of lease in favor of the landlord or owner of the Store premises. Agent agrees that it shall be obligated to repair any damage caused by Agent (or any representative, agent or licensee thereof) to any Store during the Sale Term, ordinary wear and tear excepted.

Section 7. FF&E.

7.1    Owned FF&E. If Merchant elects, Agent shall sell all FF&E at the Stores owned by Merchant and not included on the Excluded FF&E list set forth on Exhibit 7.1 (the "Owned FF&E"), pursuant to a commission structure whereby Agent shall be entitled to receive a commission equal to seventeen and one half percent (17.5%) of the gross proceeds (net only of sales taxes) from the sale of any Owned FF&E; provided, however, that Merchant shall be responsible for the payment of all expenses (including reimbursement to Agent where applicable) incurred in connection with the disposition of the Owned FF&E in accordance with a budget to be mutually agreed upon between the Merchant and Agent following execution of this Agreement.

7.2    Abandonment of FF&E. Agent shall be authorized to abandon any and all sold or unsold Owned FF&E in place without any cost or liability to any party.

7.3    Guarantee Option. If Merchant elects, Agent and Merchant shall agree upon a guaranteed return for the Owned FF&E in each Store, including (without limitation) the Owned FF&E set forth on Exhibit 7.1 and Exhibit 7.3.

Section 8. Conduct of the Sale.

8.1    Rights of Agent. In addition to any other rights granted to Agent elsewhere in this Agreement, Agent shall be permitted to conduct the Sale as a "store closing", "sale on everything", "everything must go" or similar themed sale throughout the Sale Term without compliance with any Liquidation Sale Laws. The Agent shall conduct the Sale in the name of and on behalf of the Merchant in a commercially reasonable manner and in compliance with the terms of this Agreement and subject to the Approval Order. Agent shall conduct the Sale in accordance with the sale guidelines attached hereto as Exhibit 8.1(the "Sale Guidelines"). In addition to any other rights granted to Agent hereunder in conducting the Sale the Agent, in the exercise of its reasonable discretion shall have the right:

(a)    to establish Sale prices and discounts and Store hours;

(b)    except as otherwise expressly included as an Expense, to use without charge during the Sale Term all FF&E, computer hardware and software, existing supplies located at the Stores, intangible assets (including Merchant's name, logo and tax identification numbers), Store keys, case keys, security codes and safe and lock combinations required to gain access to and operate the Stores, and any other assets of the Merchant located at the Stores (whether owned, leased, or licensed);

(c)    (i) to be provided by Merchant (at no additional cost to Agent) with central office facilities, central administrative services and personnel to process and perform Central Services and

provide other central office services reasonably necessary for the Sale; (ii) to use reasonably sized offices located at Merchant's central office facility to effect the Sale; and (iii) to use all customer lists, mailing lists, email lists, and web and social networking sites utilized by Merchant in connection with its business (but solely in connection with the Sale and pursuant to such reasonable restrictions requested by Merchant in order for Merchant to comply with its privacy policy and applicable laws governing the use and dissemination of confidential consumer personal data);

(d)     to establish and implement advertising, signage and promotion programs consistent with the "store closing", "sale on everything", "everything must go" or similar themed (provided that such programs will not refer to the Sale as a "going out of business" sale), including without limitation by means of media advertising, and similar interior and exterior signs and banners, and the use of sign walkers, provided, however, that not less than forty-eight (48) hours prior to the release thereof to the media, Agent shall deliver copies of all advertising materials for the Sale to Merchant who shall have the right, within twenty-four (24) hours of such delivery, to approve such materials (which approval shall not be unreasonably withheld or delayed); and provided, further, that the failure of the Merchant to approve such delivered materials within such twenty-four (24) hour period shall be deemed to be approval of the subject materials;

(e)     to transfer Merchandise between and among the Stores at Agent's expense; provided, however, the Agent shall not transfer Merchandise between and among Stores until the Inventory Taking at the transferring and receiving Stores has been completed; and

(f)     subject to the provisions of Section 8.10 below, to include Additional Agent Goods in the Sale.

8.2     Terms of Sales to Customers; Final/As Is Sales.  All sales of Merchandise will be "final sales" and "as is," and appropriate signage and sales receipts will reflect the same.  Agent shall not warrant the Merchandise in any manner, but will, to the extent legally permissible, pass on all manufacturers' warranties to customers.  All sales will be made only for cash, Merchant's branded credit cards, or nationally recognized bank credit cards.   Agent shall accept and honor coupons during the Sale Term, including but not limited to Merchant's membership program as well as Merchant's employee discount terms as are in effect immediately prior to the commencement of the Sale Term.  The Agent shall clearly mark all receipts for the Merchandise sold at the Stores during the Sale Term so as to distinguish such Merchandise from the merchandise sold prior to the Sale Commencement Date.  Merchant shall reimburse Agent in cash for all amounts related to coupons, including, but not limited to Merchant's membership programs as well as Merchant's employee discount terms, during each Weekly Sale Reconciliation provided for in Section 8.7.

8.3     Sales Taxes.

(a)     During the Sale Term, all sales, excise, gross receipts and other taxes attributable to sales of Merchandise, as indicated on Merchant's point of sale equipment (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of Merchandise and collected by Agent, on Merchant's behalf, at the time of sale.  All Sales Taxes shall be deposited into a segregated account designated by Merchant and Agent solely for the deposit of such Sales Taxes (the "Sales Taxes Account").  Merchant shall prepare and file all applicable reports and documents required by the applicable taxing authorities, and Merchant shall promptly pay all Sales Taxes from the Sales Taxes Account.  Merchant will be given access to the computation of gross receipts for verification of all such tax collections.  Provided that Agent performs its responsibilities in accordance with this Section 8.3, Agent shall have no further obligation to the Merchant, the Lender, any taxing authority, or any other party with respect to Sales Taxes, and Merchant shall indemnify and hold

13

harmless Agent from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Agent sustains or incurs as a result or consequence of the failure by Merchant to promptly pay such taxes to the proper taxing authorities and/or the failure by Merchant to promptly file with such taxing authorities all reports and other documents required by applicable law to be filed with or delivered to such taxing authorities. If Agent fails to perform its responsibilities in accordance with this Section 8.3, and provided Merchant complies with its obligations hereunder, Agent shall indemnify and hold harmless Merchant from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Merchant sustains or incurs as a result or consequence of the failure by Agent to collect Sales Taxes and/or the failure by Agent to promptly deliver any and all reports and other documents required to enable Merchant to file any requisite returns with such taxing authorities.

(b)  Without limiting the generality of Section 8.3(a) hereof, it is hereby agreed that, as Agent is conducting the Sale solely as agent for the Merchant, various payments that this Agreement contemplates that one party may make to the other party (including the payment by Agent of the Guaranteed Amount) do not represent the sale of tangible personal property and, accordingly, are not subject to Sales Taxes.

8.4    Supplies.  Agent shall have the right to use, without charge, all existing supplies located at the Stores, including, without limitation, boxes, bags, paper, twine and similar sales materials (collectively, "Supplies").  In the event that additional Supplies are required in any of the Stores during the Sale, Merchant agrees to promptly provide the same to Agent, if available, for which Agent shall reimburse the Merchant at Merchant's cost therefor.

8.5    Returns of Merchandise.  Agent shall accept returns of merchandise sold by Merchant prior to the Sale Commencement Date ("Returned Merchandise"), provided that such return is in compliance with Merchant's return policy.  If such Returned Merchandise is otherwise "Merchandise" it shall be included in the Sale at its Cost Value, multiplied by the inverse of the then prevailing Sale discount on the date of the return.  The aggregate Cost Value of the Merchandise shall be increased by the adjusted Cost Value of any Returned Merchandise included in Merchandise (determined in accordance with this Section 8.5).  In addition, Merchant shall promptly reimburse Agent in cash for any refunds Agent is required to issue to customers in respect of any Returned Merchandise during each Weekly Sale Reconciliation provided for in Section 8.7.  Except to the extent that Merchant and Agent agree that Merchant's POS or other applicable systems can account for returns of Merchandise, all returns must be noted and described in a mutually agreeable Returned Merchandise log on a weekly basis during the Sale.

8.6    Gift Certificates; Membership Program.

(a)  During the Sale Term, Agent shall accept Merchant's gift certificates, gift cards, return credits, and similar Merchandise credits issued by Merchant (collectively, the "Gift Certificates"); and Merchant shall reimburse Agent in cash for such amounts during the Weekly Sale Reconciliation provided for in Section 8.7.  Agent shall not sell any Gift Certificates.

(b)  During the Sale Term, customers may elect to take advantage of (i) discounts afforded customers in connection with Merchant's membership program benefits and/or Merchant's then valid coupons ("Merchant's Discounts"); or (ii) the then-prevailing Sale discounts being offered by Agent, but not both on a cumulative basis. To the extent the customer elects the applicable Merchant's Discounts, then Merchant shall reimburse Agent for the differential between the discount received under the Membership Program and the then-prevailing Sale discounts being offered by Agent.

14

(c)    Merchant shall reimburse Agent in cash for the value of any discounts afforded customers in connection with the use during the Sale of Merchant's coupons and/or Merchant's other Membership program benefits ("Membership Program").   During the Sale Term, customers may elect to take advantage of Merchant's Membership Program benefits or the then-prevailing Sale discounts, but not both on a cumulative basis.

8.7    Sale Reconciliation.  On each Wednesday during the Sale Term, Agent, Lender and Merchant shall cooperate to reconcile Expenses of the Sale, make payments/setoffs on account of the Guaranteed Amount, Agent's Fee, Sharing Amounts, sales of Additional Agent Goods and Owned FF&E, and reconcile such other Sale-related items as either party shall reasonably request, in each case for the prior week or partial week (i.e. Sunday through Saturday), all pursuant to procedures agreed upon by Merchant and Agent (the "Weekly Sale Reconciliation").  Within thirty (30) days after the end of the Sale Term, or as soon as practicable thereafter, Agent and Merchant shall complete a final reconciliation of the Sale (the "Final Reconciliation"), the written results of which shall be certified by representatives of each of the Merchant and Agent as a final settlement of accounts between the Merchant and Agent.  Within five (5) days after the completion of the Final Reconciliation and execution of a settlement letter including an appropriate mutual release, Agent shall pay to Merchant, or Merchant shall pay to Agent, as the case may be, any and all amounts due the other pursuant to the Final Reconciliation.  During the Sale Term, and until all of Agent's obligations under this Agreement have been satisfied, Merchant and Agent shall have reasonable access to Merchant's and Agent's records with respect to Proceeds and Expenses to review and audit such records.  In the event that there is any dispute with respect to either (x) the determination of the aggregate Cost Value of the Merchandise as reflected in the Final Inventory Report and/or (y) the Final Reconciliation, such dispute shall be promptly (and in no event later than the third business day following the request by either Merchant or Agent) submitted to the Bankruptcy Court for resolution.  In the event of a dispute as described above, upon notice of such dispute, Agent shall extend the Letters of Credit in accordance with the provisions of Section 3.4 hereof.

8.8    Force Majeure.  If any casualty, act or threatened act of terrorism, or act of God prevents or substantially inhibits the conduct of business in the ordinary course at any of the Stores, the Merchandise located at such Store shall, in Agent's reasonable discretion (after consultation with the Merchant), be eliminated from the Sale and considered to be deleted from this Agreement as of the date of such event, and Agent and Merchant shall have no further rights or obligations hereunder with respect thereto; provided, however, that (i) the proceeds of any insurance attributable to such Merchandise shall constitute Proceeds hereunder, and (ii) the Guaranteed Amount shall be reduced to account for any Merchandise eliminated from the Sale which is not the subject of insurance proceeds, and Merchant (or Lender to the extent it has received any funds on account of the Guaranteed Amount) shall within five (5) business days following written demand by Agent reimburse Agent for the amount the Guaranteed Amount is so reduced.

8.9    Right to Monitor.  Merchant shall have the right to monitor the Sale and activities attendant thereto and to be present in the Stores during the hours when the Stores are open for business; provided that Merchant's presence does not unreasonably disrupt the conduct of the Sale.  Merchant shall also have a right of access to the Stores at any time in the event of an emergency situation and shall promptly notify Agent of such emergency.

8.10    Additional Agent Goods.

(a)    Subject to the consent of the Merchant on a product category by product category and store by store basis, Agent may supplement the Merchandise at the Stores with additional merchandise procured by Agent which is of like kind, and no lesser quality to the Merchandise located in the Stores ("Additional Agent Goods").  The Additional Agent Goods shall be included in the Sale at

Agent's sole expense (and not as an Expense). Sales of Additional Agent Goods shall be run through Merchant's cash register systems, provided however, Agent shall mark the Additional Agent Goods using either a "dummy" SKU or department number, or in such other manner so as to distinguish the sale of Additional Agent Goods from the sale of Merchandise. Agent and Merchant shall also cooperate so as to ensure that the Additional Agent Goods are marked in such a way that a reasonable consumer could identify the Additional Agent Goods as non-Merchant goods. Additionally, Agent shall provide signage in the Stores notifying customers that the Additional Agent Goods has been included in the Sale.

(b)       In addition to all other compensation due to Merchant under this Agreement, Agent shall pay to Merchant an amount equal to five percent (5%) percent of the gross proceeds (excluding Sale Taxes) from the sale of the Additional Agent Goods (the "Additional Agent Goods Fee") and Agent shall retain all remaining amounts from the sale of the Additional Agent Goods. Agent covenants to Merchant that Agent shall not add any "lift" to its cost of goods of the Additional Agent Goods. Agent shall pay Merchant its Additional Agent Goods Fee in connection with each Weekly Sale Reconciliation with respect to sales of Additional Agent Goods sold by Agent during each then prior week (or at such other mutually agreed upon time in the case of Additional Agent Goods sold pursuant to Section 3.2(b) above).

(c)       Agent and Merchant intend that the transactions relating to the Additional Agent Goods are, and shall be construed as, a true consignment from Agent to Merchant in all respects and not a consignment for security purposes. Subject solely to Agent's obligations to pay to Merchant the Additional Agent Goods Fee, at all times and for all purposes the Additional Agent Goods and their proceeds shall be the exclusive property of Agent, and no other person or entity shall have any claim against any of the Additional Agent Goods or their proceeds. The Additional Agent Goods shall at all times remain subject to the exclusive control of Agent.

(d)       Merchant shall, at Agent's sole expense (and not as an Expense), insure the Additional Agent Goods and, if required, promptly file any proofs of loss with regard to same with Merchant's insurers. Agent shall be responsible for payment of any deductible under any such insurance in the event of any casualty affecting the Additional Agent Goods, which amount shall be deemed an Additional Agent Goods expense.

(e)       Merchant acknowledges, and the Approval Order shall provide, that the Additional Agent Goods shall be consigned to Merchant as a true consignment under Article 9 of the Code. Agent is hereby granted a first priority security interest in (i) the Additional Agent Goods and (ii) the Additional Agent Goods proceeds, which security interest shall be deemed perfected pursuant to the Approval Order without the requirement of filing UCC financing statements or providing notifications to any prior secured parties (provided that Agent is hereby authorized to deliver all required notices and file all necessary financing statements and amendments thereof under the applicable UCC identifying Agent's interest in the Additional Agent Goods as consigned goods thereunder and the Merchant as the consignee therefor, and Agent's security interest in such Additional Agent Goods and Additional Agent Goods proceeds).

(f)       Lender hereby consents to the payments to Agent of Additional Agent Goods proceeds.

Section 9.  Employee Matters.

9.1       Merchant's Employees. Agent may use Merchant's employees in the conduct of the Sale to the extent Agent deems necessary for the Sale, and Agent may select and schedule the number and type of Merchant's employees required for the Sale. Agent shall identify any such employees to be

used in connection with the Sale (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Merchant's employees shall at all times remain employees of the Merchant.  Agent's selection and scheduling of Merchant's employees shall at all times comply with all applicable laws and regulations.  Merchant and Agent agree that, except to the extent that wages and benefits of Retained Employees constitute Expenses hereunder, nothing contained in this Agreement and none of Agent's actions taken in respect of the Sale shall be deemed to constitute an assumption by Agent of any of Merchant's obligations relating to any of Merchant's employees including, without limitation, Excluded Payroll Benefits, Worker Adjustment Retraining Notification Act ("WARN Act") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; nor shall Agent become liable under any employment agreement, collective bargaining agreement, or be deemed a joint or successor employer with respect to such employees.  Merchant shall not, without the prior consent of Agent, raise the salary or wages or increase the benefits for, or pay any bonuses or other extraordinary payments to, any Store employees prior to the Sale Termination Date.  Merchant shall not transfer any Retained Employee during the first 45 days of the Sale Term without Agent's prior consent.

9.2    Termination of Employees.  Agent may in its discretion stop using any Retained Employee at any time during the Sale, subject to the conditions provided for herein.  In the event that Agent desires to cease using any Retained Employee, Agent shall notify Merchant at least five (5) days prior thereto; provided, however, that, in the event that Agent determines to cease using an employee "for cause" (which shall consist of dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Agent shall immediately notify Merchant of the basis for such "cause."  From the date of this Agreement through and including the date that is 45th day after the Sale Commencement Date, Merchant shall not transfer or dismiss employees of the Stores except "for cause" or without Agent's prior consent; thereafter, Merchant shall not transfer or dismiss employees of the Stores except "for cause" or without consulting with Agent and obtaining Agent's consent, not to be unreasonably withheld.  Notwithstanding the foregoing, Agent shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Merchant).

9.3    Payroll Matters.  During the Sale Term, Merchant shall process the payroll for all Retained Employees and any former employees and temporary labor engaged for the Sale.  Each Wednesday (or such other date as may be reasonably requested by Merchant to permit the funding of the payroll accounts before such payroll is due and payable) during the Sale Term, Agent shall transfer to Merchant's payroll accounts an amount equal to the base payroll for Retained Employees plus related payroll taxes, workers' compensation and benefits for such week, to the extent such amount constitutes Expenses hereunder.

9.4    Employee Retention and Incentive Bonuses.  Subject to approval by the Bankruptcy Court, Agent shall pay, as an Expense, retention and incentive bonuses ("Retention and Incentive Bonuses") (which bonuses shall be inclusive of payroll taxes, but as to which no benefits shall be payable), in the aggregate, up to a maximum of ten percent (10%), but no less than a minimum of five percent (5%), in the aggregate, of base payroll for all Retained Employees payable to such Retained Employees as Agent may determine in its discretion.  Subject to approval by the Bankruptcy Court, the amount of such Retention and Incentive Bonuses to individual Retained Employees shall be in an amount to be determined by Agent, in its discretion, and shall be payable within thirty (30) days after the Sale Termination Date, and shall be processed through Merchant's payroll system.

Section 10.  <u>Conditions Precedent and Subsequent</u>.

(a)    The willingness of Agent to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by Agent:

(i)    All representations and warranties of the Merchant hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto).

(iii)    The Bankruptcy Court shall have entered the Approval Order by June 28, 2013, or such later date as mutually agreed upon by the Merchant and the Agent (the "<u>Approval Order Deadline</u>").

(b)    The willingness of Merchant to enter into the transactions contemplated under this Agreement is directly conditioned upon the satisfaction of the following conditions at the time or during the time periods indicated, unless specifically waived in writing by the Merchant:

(i)    All representations and warranties of Agent hereunder shall be true and correct in all material respects and no Event of Default shall have occurred at and as of the date hereof and on the Sale Commencement Date.

(ii)    Lender has executed this Agreement (with all Exhibits attached hereto), subject to the Approval Order.

Section 11.  <u>Representations, Warranties and Covenants</u>.

11.1    <u>Merchant's Representations, Warranties and Covenants</u>.  Merchant hereby represents, warrants and covenants in favor of Agent as follows:

(a)    Merchant (i) is a limited liability company duly organized, validly existing and in good standing under the laws of Delaware; (ii) has all requisite corporate power and authority to own, lease and operate its assets and properties and to carry on its business as presently conducted; and (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of the Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.

(b)    Subject to entry of the Approval Order, the Merchant has the right, power and authority to execute and deliver this Agreement and each other document and agreement contemplated hereby (collectively, together with this Agreement, the "<u>Agency Documents</u>") and to perform fully its obligations thereunder.  Subject to entry of the Approval Order, Merchant has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required for Merchant to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale, except for any such consent the failure of which to be obtained could not reasonably be expected to have a material adverse effect on the ability of Merchant to execute and deliver this Agreement and perform fully its obligations hereunder.  Subject to entry of the

18

Approval Order, each of the Agency Documents has been duly executed and delivered by the Merchant and constitutes the legal, valid and binding obligation of the Merchant enforceable in accordance with its terms.

(c)     Merchant owns, and will own at all times during the Sale Term, good and marketable title to all of the Merchandise and Owned FF&E to be included in the Sale, free and clear of all security interests, liens, claims and encumbrances of any nature (other than the security interests and liens of the Agent hereunder and Lender).  Merchant shall not create, incur, assume or suffer to exist any security interest, lien or other charge or encumbrance upon or with respect to any of the Merchandise or the Proceeds (or the Owned FF&E and its proceeds).

(d)     Merchant has maintained its pricing files (including without limitation the Merchandise File) in the ordinary course of business, and prices charged to the public for goods are the same in all material respects as set forth in such pricing files for the periods indicated therein, and all pricing files and records are true and accurate in all material respects as to the actual cost to Merchant for purchasing the goods referred to therein and as to the selling price to the public for such goods without consideration of any point of sale discounts, as of the dates and for the periods indicated therein. Merchant represents that (i) the ticketed prices of all items of Merchandise do not and shall not include any Sales Taxes and (ii) all registers located at the Stores are programmed to correctly compute all Sales Taxes required to be paid by the customer under applicable law, as such calculations have been identified to Merchant by its retained service provider.

(e)     Through the Sale Commencement Date, Merchant has ticketed or marked, and shall continue to ticket or mark, all items of inventory received at the Stores in a manner consistent with similar Merchandise located at the Stores, and in accordance with Merchant's ordinary course past practices and policies relative to pricing and marking inventory.  Since May 25, 2013, Merchant has not removed any POS promotions, sale stickers, or other markings indicating items are on sale or on clearance from the Merchandise prior to the Sale Commencement Date, and have not raised, and will not raise, prices of any Merchandise in contemplation of the Sale.

(f)     Due to constrained inventory with some vendors, existing vendor agreements, and current supply chain productivity initiatives, Merchant has the right, on a per Store basis, to remove up to 7.5% of the aggregate Cost Value of inventory in each such Store as of May 25, 2013 outside of the ordinary course of business to redeploy back into stores that will remain open for the foreseeable future; provided further that, such inventory removed from the Stores outside the ordinary course of business shall be limited to the inventory classes of gas grills in the box, patio furniture in the box, and interior paint; provided, further, that Merchant shall provide Agent with information so that Agent is capable of verifying the foregoing.  Merchant shall not transfer any inventory into or out of the Stores outside the ordinary course without Agent's consent from and after June 28, 2013.

(g)     To Merchant's knowledge after reasonable inquiry, all Merchandise is in compliance with all applicable federal, state and local product safety laws, rules and standards.  Merchant shall provide Agent with its historic policies and practices, if any, regarding product recalls prior to the Sale Commencement Date.

(h)     Subject to the provisions of the Approval Order, Agent shall have the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Stores, the assets currently located at the Stores, and the utilities and other services provided at the Stores.  Merchant shall, throughout the Sale Term, maintain in good working order, condition and repair all cash registers, heating systems, air conditioning systems, elevators, escalators and all other mechanical devices necessary or appropriate for the conduct of the Sale at the Store.  Except as otherwise restricted by the Bankruptcy

19

Code or as provided herein and absent a bona fide dispute, throughout the Sale Term Merchant shall remain current on all expenses and payables necessary for the conduct of the Sale.

(i)      Subject to approval by the Bankruptcy Court, Merchant has paid, and will continue to pay throughout the Sale Term, all self-insured or Merchant-funded employee benefit programs for Store employees, including health and medical benefits and insurance and all proper claims made or to be made in accordance with such programs.

(j)      Since May 25, 2013, Merchant has not taken, and shall not throughout the Sale Term take, any actions with the intent of increasing the Expenses of the Sale, including without limitation increasing salaries or other amounts payable to employees; except to the extent an employee was due an annual raise in the ordinary course.

(k)      Except as stated in Section 11.1(f), since May 25, 2013, Merchant has operated, and, except as otherwise restricted by the Bankruptcy Code or as provided herein and absent a bona fide dispute, through the Sale Commencement Date Merchant covenants to continue to operate, the Stores in all material respects in the ordinary course of business including without limitation by: (i) selling inventory during such period at customary prices consistent with the ordinary course of business; (ii) not promoting or advertising any sales or in-store promotions (including POS promotions) to the public outside of the Merchant's ordinary course of business; (iii) except as may occur in the ordinary course of business, not returning inventory to vendors and not transferring inventory or supplies out of or to the Stores; (iv) except as may occur in the ordinary course of business, not making any management personnel moves or changes at the Stores; and (v) replenishing the Stores in the ordinary course of business.

(l)      Prior to the execution of this Agreement, Merchant has provided Agent reasonable access to all pricing and cost files, computer hardware, software and data files, inter-Stores transfer logs, markdown schedules, invoices, style runs and all other documents relative to the price, mix and quantities of inventory located at the Stores.

(m)      Merchant has provided representatives of Agent with access to (and the opportunity to copy) all collective bargaining agreements, and all amendments, modifications, and supplements thereto.

(n)      To Merchant's knowledge after reasonable inquiry, all documents, information and supplements provided by Merchant to Agent in connection with Agent's due diligence and the negotiation of this Agreement were true and accurate in all material respects at the time provided.

(o)      Except as stated in Section 11.1(f), Merchant has not and shall not purchase or transfer to or from the Stores any merchandise or goods outside the ordinary course in anticipation of the Sale or of the Inventory Taking.

(p)      Merchant has not since May 25, 2013 shipped any Excluded Defective Merchandise from Merchant's other stores or the Distribution Center to the Stores.  Merchant will not ship any Excluded Defective Merchandise from the date of this Agreement from the Distribution Center to the Stores.

(q)      Other than filing the Bankruptcy Case, no action, arbitration, suit, notice, or legal, administrative or other proceeding before any court or governmental body has been instituted by or against the Merchant, or has been settled or resolved, or to Merchant's knowledge, is threatened against or

affects Merchant, relative to Merchant's business or properties, or which questions the validity of this Agreement, or that if adversely determined, would adversely affect the conduct of the Sale.

    11.2 <u>Agent's Representations, Warranties and Covenants</u>. Agent hereby represents, warrants and covenants in favor of Merchant as follows:

    (a) Each member of Agent: (i) is a limited liability company duly and validly existing and in good standing under the laws of the State of Delaware; (ii) has all requisite power and authority to carry on its business as presently conducted and to consummate the transactions contemplated hereby; (iii) is, and during the Sale Term will continue to be, duly authorized and qualified to do business and in good standing in each jurisdiction where the nature of its business or properties requires such qualification, including all jurisdictions in which the Stores are located, except, in each case, to the extent that the failure to be in good standing or so qualified could not reasonably be expected to have a material adverse effect on the ability of Agent to execute and deliver this Agreement and perform fully its obligations hereunder.

    (b) Agent has the right, power and authority to execute and deliver each of the Agency Documents to which it is a party and to perform fully its obligations thereunder.  Agent has taken all necessary actions required to authorize the execution, delivery and performance of the Agency Documents, and no further consent or approval is required on the part of Agent for Agent to enter into and deliver the Agency Documents, to perform its obligations thereunder and to consummate the Sale.  Each of the Agency Documents has been duly executed and delivered by the Agent and constitutes the legal, valid and binding obligation of Agent enforceable in accordance with its terms.  No court order or decree of any federal, state or local governmental authority or regulatory body is in effect that would prevent or impair, or is required for, Agent's consummation of the transactions contemplated by this Agreement, and no consent of any third party which has not been obtained is required therefor, other than as provided herein.  No contract or other agreement to which Agent is a party or by which Agent is otherwise bound will prevent or impair the consummation of the transactions contemplated by this Agreement.

    (c) No action, arbitration, suit, notice or legal administrative or other proceeding before any court or governmental body has been instituted by or against Agent, or has been settled or resolved or, to Agent's knowledge, has been threatened against or affects Agent, which questions the validity of this Agreement or any action taken or to be taken by Agent in connection with this Agreement or which, if adversely determined, would have a material adverse effect upon Agent's ability to perform its obligations under this Agreement.

    (d) The Sale shall be conducted in compliance with all applicable state and local laws, rules and regulations and Merchant's leases and other agreements, except as otherwise provided for in the Sale Guidelines and Approval Order.

    (e) Absent prior consent by the Merchant, Agent will not cause any non-emergency repairs or maintenance (emergency repairs are repairs necessary to preserve the security of a Store premise or to ensure customer safety) to be conducted at the Stores.

    (f) To the best of Agent's knowledge, all Additional Agent Goods is in compliance with all applicable federal, state or local product safety laws, rules and standards.  All Additional Agent Goods shall be of like kind and no lesser quality to the Merchandise located in the Stores.

Section 12.  Insurance.

    12.1  Merchant's Liability Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall continue at its cost and expense until the Sale Termination Date, in such amounts as it currently has in effect, all of its liability insurance policies, including, but not limited to, products liability, comprehensive public liability, auto liability and umbrella liability insurance, covering injuries to persons and property in, or in connection with, Merchant's operation of the Stores; and shall cause Agent to be named as an additional named insured (as its interest may appear) with respect to all such policies.  Merchant shall deliver to Agent certificates evidencing such insurance setting forth the duration thereof and naming Agent as an additional named insured, in form reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to Agent of cancellation, non-renewal or material change during the Sale Term.  In the event of a claim under any such policies, Merchant shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Agent, or Agent's employees, independent contractors or agents.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

    12.2  Merchant's Casualty Insurance.  Subject to approval by the Bankruptcy Court, Merchant will provide, as an Occupancy Expense, throughout the Sale Term fire, flood, theft and extended coverage casualty insurance covering the Merchandise in a total amount equal to no less than the retail value thereof.  From and after the date of this Agreement until the Sale Termination Date, all such policies will also name Agent as an additional named insured (as its interest may appear).  In the event of a loss to the Merchandise on or after the date of this Agreement, the Proceeds of such insurance attributable to the Merchandise, shall constitute Proceeds hereunder.  Merchant shall deliver to Agent certificates evidencing such insurance, setting forth the duration thereof and naming the Agent as an additional insured, in form and substance reasonably satisfactory to Agent.  All such policies shall require at least thirty (30) days' prior notice to the Agent of cancellation, non-renewal or material change during the Sale Term.  Merchant shall not make any change in the amount of any deductibles or self-insurance amounts prior to the Sale Termination Date without Agent's prior written consent.

    12.3  Agent's Insurance.  Agent shall maintain at Agent's cost as an Expense hereunder throughout the Sale Term, in such amounts as it currently has in effect, comprehensive public liability insurance policies covering injuries to persons and property in or in connection with Agent's agency at the Store, and shall cause Merchant to be named as additional insureds with respect to such policies.  Agent shall deliver to Merchant certificates evidencing such insurance policies setting forth the duration thereof and naming Merchant as additional insureds, in form and substance reasonably satisfactory to Merchant.  In the event of a claim under any such policies, Agent shall be responsible for the payment of all deductibles, retentions or self-insured amounts thereunder, unless it is determined that liability arose by reason of the willful misconduct or grossly negligent acts or omissions of Merchant or Merchant's employees, independent contractors or agents (other than Agent or Agent's employees, agents or independent contractors).  Agent shall not make any change in the amount of any deductibles or self insurance amounts prior to the Sale Termination Date without Merchant's prior written consent.

    12.4  Worker's Compensation Insurance.  Subject to approval by the Bankruptcy Court, Merchant shall at all times during the Sale Term maintain in full force and effect workers' compensation insurance (including employer liability insurance) covering all Retained Employees in compliance with all statutory requirements.

22

Section 13.  Indemnification.

      13.1    Merchant's Indemnification.  Merchant shall indemnify and hold Agent and its officers, directors, employees, agents and independent contractors (collectively, "Agent Indemnified Parties") harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from or related to: (i) Merchant's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) subject to Agent's compliance with its obligations under Section 8.3 hereof, any failure by Merchant to pay any Sales Taxes to the proper taxing authorities or to properly file with any taxing authorities any reports or documents required by applicable law to be filed in respect thereof; (iii) any failure of Merchant to pay to its  employees any wages, salaries or benefits due to such employees during the Sale Term; (iv) any consumer warranty or products liability claims relating to Merchandise; (v) any liability or other claims asserted by customers, any of Merchant's employees, or any other person against any Agent Indemnified Party (including, without limitation, claims by employees arising under collective bargaining agreements, worker's compensation or under the WARN Act); (vi) any harassment or any other unlawful, tortious, or otherwise actionable treatment of any customers, employees or agents of Agent by Merchant or any of its representatives; and (vi) the gross negligence (including omissions) or willful misconduct of the Merchant, or its officers, directors, employees, agents or representatives.

      13.2    Agent Indemnification.  Agent shall indemnify and hold the Merchant and its officers, directors, employees, agents and representatives harmless from and against all claims, demands, penalties, losses, liability or damage, including, without limitation, reasonable attorneys' fees and expenses, directly or indirectly asserted against, resulting from, or related to: (i) Agent's material breach of or failure to comply with any of its agreements, covenants, representations or warranties contained in any Agency Document; (ii) any claims by any party engaged by Agent as an employee or independent contractor arising out of such employment; (iii) any harassment or any other unlawful, tortious or otherwise actionable treatment of any customers, employees or agents of the Merchant by Agent or any of its representatives; (iv) any consumer warranty or products liability claims relating to Additional Agent Goods; (v) as set forth in section 8.3 above; and (vi) the gross negligence (including omissions) or willful misconduct of Agent, its officers, directors, employees, agents or representatives.

    Section 14.  Defaults.  The following shall constitute "Events of Default" hereunder:

      (a)    The Merchant or Agent shall fail to perform any material obligation hereunder if such failure remains uncured five (5) days after receipt of written notice thereof;

      (b)    Any representation or warranty made by the Merchant or Agent proves untrue in any material respect as of the date made and, to the extent curable, continues uncured five (5) days after written notice to the defaulting party; or

      (c)    Entry of an order converting Merchant's bankruptcy case to a case under another chapter of the Bankruptcy Code (other than chapter 11), dismissing Merchant's case, or appointing a chapter 11 trustee.

      (d)    The Sale is terminated prior to the Sale Termination Date or materially interrupted or impaired at any Store for any reason other than (i) an Event of Default by Agent, or (ii) any other material breach or action by Agent not authorized hereunder.

Upon an Event of Default, the non-defaulting party (in the case of (a) or (b) above), or Agent (in the case of (c) above) may in its discretion elect to terminate this Agreement, and any party's damages or

entitlement to equitable relief on account of an Event of Default shall (in addition to the right to terminate as provided above) be determined by a court of competent jurisdiction.

      Section 15.  <u>Miscellaneous</u>.

      15.1    <u>Notices</u>.  All notices and communications provided for pursuant to this Agreement shall be in writing and sent by email, by hand, by facsimile or by Federal Express or other recognized overnight delivery service, as follows:

<table>
<tr><td>If to the Agent:</td><td>HILCO MERCHANT RESOURCES, LLC<br>5 Revere Drive, Suite 206<br>Northbrook, IL 60062<br>Attention: Ian S. Fredericks<br>Tel: (847) 418-2075<br>Fax: (847) 897-0859<br>Email: ifredericks@hilcotrading.com</td></tr>
<tr><td></td><td>GORDON BROTHERS RETAIL PARTNERS, LLC<br>101 Huntington Avenue, 10th Floor<br>Boston, MA 02199<br>Attention:  Michael Chartock<br>Tel: (617) 210-7116<br>Fax:<br>Email:  mchartock@gordonbrothers.com</td></tr>
<tr><td></td><td>With a copy to:</td></tr>
<tr><td></td><td>Curtis, Mallet-Prevost, Colt & Mosle LLP<br>101 Park Avenue<br>New York, NY 10178<br>Attention Steven Reisman<br>Fax: 212-697-1559<br>Email: sreisman@curtis.com</td></tr>
<tr><td>If to the Merchant:</td><td>ORCHARD SUPPLY HARDWARE<br>6450 Via Del Oro<br>San Jose, CA 95119<br>Fax no.: (408) 365-2799<br>Attention: Michael Fox<br>Senior Vice President, General Counsel and Secretary<br>E-mail:  michael.fox@osh.com</td></tr>
<tr><td></td><td>With a copy  to:</td></tr>
<tr><td></td><td>DLA Piper LLP (US)<br>203 N. LaSalle Street, Suite 1900<br>Chicago, IL 60601<br>Fax no.:  (312) 630-5330<br>Attention:   Richard Chesley<br>               Chun Jang<br>E-mail:  richard.chesley@dlapiper.com</td></tr>
</table>

chun.jang@dlapiper.com

If to the Lender:                    RIEMER & BRAUNSTEIN LLP
3 Center Plaza
Boston, Massachusetts  02108
Fax:  617-880-3456
Attention: Donald E. Rothman
Email: drothman@riemerlaw.com

15.2      <u>Governing Law/Exclusive Jurisdiction</u>.  This Agreement shall be governed by and interpreted in accordance with the laws of the State of Delaware, without reference to any conflict of laws provisions thereof, except where governed by the Bankruptcy Code.  Each of the parties hereto irrevocably and unconditionally submits, for itself and its properties, to the exclusive jurisdiction of the Bankruptcy Court, in any action or proceeding arising out of or relating to this Agreement.

15.3      <u>Entire Agreement</u>.  This Agreement contains the entire agreement between the parties hereto with respect to the transactions contemplated hereby and supersedes and cancels all prior agreements, including, but not limited to, all proposals, letters of intent or representations, written or oral, with respect thereto.

15.4      <u>Amendments</u>.  This Agreement may not be modified except in a written instrument executed by each of the parties hereto.

15.5      <u>No Waiver</u>.  No consent or waiver by any party, express or implied, to or of any breach or default by the other in the performance of its obligations hereunder shall be deemed or construed to be a consent or waiver to or of any other breach or default in the performance by such other party of the same or any other obligation of such party.  Failure on the part of any party to complain of any act or failure to act by the other party or to declare the other party in default, irrespective of how long such failure continues, shall not constitute a waiver by such party of its rights hereunder.

15.6      <u>Currency</u>.  All reference to dollars in this Agreement and all schedules, exhibits, and ancillary documents related to this Agreement shall refer to US dollars.

15.7      <u>Successors and Assigns</u>.  This Agreement shall inure to the benefit of and be binding upon Agent and Merchant and their respective successors and assigns, including, but not limited to, any chapter 11 or chapter 7 trustee; provided, however, that this Agreement may not be assigned by Merchant or Agent to any party without the prior written consent of the other.

15.8      <u>Execution in Counterparts</u>.  This Agreement may be executed in one or more counterparts.  Each such counterpart shall be deemed an original but all such counterparts together shall constitute one and the same agreement.  This Agreement, to the extent signed and delivered by means of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute original forms hereof and deliver them to all other parties.  No party hereto shall raise the use of a facsimile machine, electronic mail, or other electronic transmission in which the actual signature is evident to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine, electronic mail or other electronic transmission in which the actual signature is evident as a defense to the formation of a contract and each party forever

waives such defense.  In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against which enforcement is sought.

15.9    Section Headings.  The headings of sections of this Agreement are inserted for convenience only and shall not be considered for the purpose of determining the meaning or legal effect of any provisions hereof.

15.10    Wiring of Funds.  All amounts required to be paid by Agent or the Merchant under any provision of this Agreement shall be made by wire transfer of immediately available funds which shall be wired by Agent or Merchant, as applicable, no later as 2:00 p.m. (Eastern Time) on the date that such payment is due; provided, however, that all of the information necessary to complete the wire transfer has been received by Agent or Merchant, as applicable, by 10:00 a.m. (Eastern Time) on the date that such payment is due.  In the event that the date on which any such payment is due is not a business day, then such payment shall be made by wire transfer on the next business day.

Section 16.    Agent's Security Interest.  Effective upon payment by Agent of the Initial Guaranty Payment and issuance of the Letter of Credit, Merchant hereby grants to Agent first priority, senior security interests in and liens upon: (i) the Merchandise; (ii) the Additional Agent Goods; (iii) all Proceeds (including, without limitation, credit card Proceeds); (iv) the commission regarding the sale or other disposition of Merchant's Consignment Goods under Section 5.4 hereof; (v) the commission regarding the sale or other disposition of Owned FF&E under Section 7 hereof; (vi) any Sharing Amount, but only up to the amount of Agent's percentage share of such Sharing Amount under Section 3.2(a) hereof, and (vii) all "proceeds" (within the meaning of Section 9-102(a)(64) of the Code) of each of the foregoing (all of which are collectively referred to herein as the "Agent Collateral"), to secure the full payment and performance of all obligations of Merchant to Agent hereunder.  Upon entry of the Approval Order, payment of the Initial Guaranty Payment, and issuance of the Letter of Credit, the security interest granted to the Agent hereunder shall be deemed properly perfected without the necessity of filing UCC-1 financing statements or any other documentation.

(a)    Without any further act by or on behalf of the Agent or any other party (including (without limitation) the Lender and Merchant), the Agent's security interests and liens in the Agent Collateral created hereunder are (i) validly created, (ii) effective upon entry of the Approval Order, perfected, and (iii) senior to all other liens and security interests, provided, however, that (i) until the Merchant receives payment in full of the Guaranteed Amount and Merchant's Sharing Amount (if any) due to Merchant hereunder and all Expenses have been paid, the security interest granted to Agent hereunder shall remain junior and subordinate in all respects to the security interests of Lender in the Agent Collateral (other than the Additional Agent Goods and proceeds thereof in which Merchant has no property or other interest and Lender has no security interest or other lien) but solely to the extent and amount of the unpaid portion of the Guaranteed Amount and Merchant's Sharing Amount (if any) and unpaid Expenses and (ii) upon payment in full of  the Guaranteed Amount, Merchant's Sharing Amount (if any), and all Expenses, any security interest or lien of the Lender in the Agent Collateral shall be junior and subordinate in all respects to the security interest and liens of Agent.  Merchant shall cooperate with Agent with respect to all filings (including (without limitation) UUC-1 financing statements) and other actions to the extent reasonably requested by Agent in connection with the security interests and liens granted under this Agreement.

(b)    Merchant will not sell, grant, assign or transfer any security interest in, or permit to exist any encumbrance on, any of the Agent Collateral other than in favor of the Agent and Lender.

(c)    In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)    "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 17.  Bidding and Auction.  In consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) three hundred thousand dollars ($300,000) ("Breakup Fee").  At the Auction: (i) the Breakup Fee shall not be eligible to be "credit bid" by Agent; and (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 74.00%, with successive overbids in increments of not less than 0.25%.  In the event Agent is not the successful bidder at the Auction, the successful bidder shall be permitted to purchase from Agent, and the Agent shall offer, signs ordered by Agent prior to the Auction at Agent's actual cost.  The recovery of the Agent's costs for such signs shall reduce the Breakup Fee by such recovered amount.

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

AGENT:

HILCO MERCHANT RESOURCES, LLC

By:
Name
Title:

GORDON BROTHERS RETAIL PARTNERS, LLC

By:
Name
Title:

ORCHARD SUPPLY HARDWARE LLC:

By:
Name
Title:

      (c)      In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

      (d)      "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 17.  Bidding and Auction.  In consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) three hundred thousand dollars ($300,000) ("Breakup Fee").  At the Auction: (i) the Breakup Fee shall not be eligible to be "credit bid" by Agent; and (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 74.00%, with successive overbids in increments of not less than 0.25%.  In the event Agent is not the successful bidder at the Auction, the successful bidder shall be permitted to purchase from Agent, and the Agent shall offer, signs ordered by Agent prior to the Auction at Agent's actual cost.  The recovery of the Agent's costs for such signs shall reduce the Breakup Fee by such recovered amount.

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

**AGENT:**

**HILCO MERCHANT RESOURCES, LLC**

By:_____
Name
Title:

**GORDON BROTHERS RETAIL PARTNERS, LLC**

By:_____
Name Richard Edwards
Title: Principal & Managing Director

**ORCHARD SUPPLY HARDWARE LLC:**

By:_____
Name
Title:

(c)     In the event of a Default by the Merchant hereunder, in any jurisdiction where the enforcement of its rights hereunder is sought, the Agent shall have, in addition to all other rights and remedies, the rights and remedies of a secured party under the Code.

(d)     "Code" shall mean the Uniform Commercial Code as the same may be in effect from time to time in the State of Delaware.

Section 17. Bidding and Auction. In consideration of Agent conducting its due diligence and entering into this Agreement (which may serve as a base by which other offers may be measured and is subject to higher and better offers by way of an auction process) ("Auction"); then in the event that this Agreement shall not be consummated with Agent because Merchant elects as a consequence of the Auction to pursue an alternative higher/better transaction (whether with another party serving as liquidating agent, as a going concern buyer, or otherwise) Merchant shall pay Agent (on the first business day following the entry of the approval order for such other transaction or such later date as Agent may agree) three hundred thousand dollars ($300,000) ("Breakup Fee"). At the Auction: (i) the Breakup Fee shall not be eligible to be "credit bid" by Agent; and (ii) the first overbid by a competing bidder shall be an amount equal a Guaranty Percentage of not less than 74.00%, with successive overbids in increments of not less than 0.25%. In the event Agent is not the successful bidder at the Auction, the successful bidder shall be permitted to purchase from Agent, and the Agent shall offer, signs ordered by Agent prior to the Auction at Agent's actual cost. The recovery of the Agent's costs for such signs shall reduce the Breakup Fee by such recovered amount.

IN WITNESS WHEREOF, the Agent and the Merchant hereby execute this Agreement by their duly authorized representatives as a sealed instrument as of the day and year first written above.

### AGENT:

### HILCO MERCHANT RESOURCES, LLC

By:_____
Name:
Title:

### GORDON BROTHERS RETAIL PARTNERS, LLC

By:_____
Name:
Title:

### ORCHARD SUPPLY HARDWARE LLC:

By:_____
Name:   Michael W. Fox
Title:   Senior Vice President, General Counsel and Secretary

27

Agreed and Accepted as to Sections
3.3(d), 8.8, 8.10(f), and 16.

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By: _____

Name
Title:    *Jennifer Cann*
          *Managing Director*

## **List of Exhibits**

Exhibit 1 – Store List.
Exhibit 2 – [Intentionally omitted]
Exhibit 3.1(b) – Merchandise Level Adjustment Schedule.
Exhibit 3.1(c) – Cost Factor Threshold Adjustment Schedule
Exhibit 3.4 – Form of Letter of Credit.
Exhibit 4.1(c) – Per Store, Per Diem Occupancy Expenses.
Exhibit 5.1(a) – Inventory Taking Instructions.
Exhibit 7.1 – Excluded FF&E
Exhibit 7.3 – Owned FF&E
Exhibit 8.1 – Sale Guidelines