# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

```
--------------------------------------------------------------x
                                             :
In re:                                       :   Chapter 11
                                             :
Orchard Supply Hardware Stores Corporation,  :   Case No. 13-11565 (_____)
et al.,[1]                                   :
                                             :   (Joint Administration Pending)
              Debtors.                       :
                                             :
--------------------------------------------------------------x
```

## MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION FOR ENTRY OF INTERIM AND FINAL ORDERS PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) AUTHORIZING INCURRENCE BY THE DEBTORS OF POST-PETITION SECURED INDEBTEDNESS WITH PRIORITY OVER ALL SECURED INDEBTEDNESS AND WITH ADMINISTRATIVE SUPERPRIORITY, (2) GRANTING LIENS, (3) AUTHORIZING USE OF CASH COLLATERAL BY THE DEBTORS PURSUANT TO 11 U.S.C. § 363 AND PROVIDING FOR ADEQUATE PROTECTION, (4) MODIFYING THE AUTOMATIC STAY, (5) SCHEDULING A FINAL HEARING AND (6) GRANTING RELATED RELIEF

The above-captioned debtors and debtors-in-possession (collectively, "**Orchard**," the

"**Debtors**" or the "**Company**") hereby submit this motion (the "**Motion**") to the United States

Bankruptcy Court for the District of Delaware (the "**Court**"), pursuant to sections 105(a), 361,

362, 363 and 364 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the

"**Bankruptcy Code**"), Rules 2002, 4001, 6003, 6004 and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Rules of

Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of

Delaware (the "**Local Rules**"), for entry of interim and final orders:  (a) authorizing the Debtors

to obtain financing (the "**DIP Financing**") pursuant to the *Senior Secured, Super-Priority*

---

[1]    The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard Supply Hardware LLC (3395) and OSH Properties LLC (3391).  The mailing address of each of the Debtors, solely for purposes of notices and communications, is 6450 Via Del Oro, San Jose, California 95119.

*Debtor-In-Possession Credit Agreement*, substantially in the form attached hereto as <u>Exhibit B</u> (as may be amended, the "**ABL DIP Credit Agreement**") and the *Second Lien Senior Secured Super-Priority Debtor-In-Possession Credit Agreement*, substantially in the form attached hereto as <u>Exhibit C</u> (as may be amended, the "**Term Lender DIP Credit Agreement**," and together with the ABL DIP Credit Agreement, the "**DIP Credit Agreements**");[2] (b) authorizing the Debtors to utilize Cash Collateral (defined below); (c) granting liens and providing superpriority administrative expense status to the DIP Lenders (defined below); (d) granting adequate protection to the Pre-Petition Secured Parties (defined below); (e) modifying the automatic stay; (f) scheduling a final hearing; and (g) granting related relief.  In support of this Motion, the Debtors incorporate the statements contained in the *Declaration of Chris D. Newman in Support of First Day Pleadings* filed contemporaneously herewith and further respectfully state as follows:

<b><u>Jurisdiction and Venue</u></b>

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

<b><u>Background</u></b>

2.      On June 17, 2013 (the  "**Petition Date**"), each of the Debtors commenced its respective chapter 11 case (collectively, the "**Cases**") by filing with this Court a voluntary petition for relief under the Bankruptcy Code.

3.      Originally founded in San Jose, California in 1931, Orchard Supply Hardware

---

[2]     Capitalized terms used in this Motion but not defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreements.

Stores Corporation and its affiliated debtor subsidiaries operate neighborhood hardware and garden stores.  As of the Petition Date, the Company operates 89 stores in California and two stores in Oregon.

4.      While the Orchard brand has been synonymous with California retailing for over eighty years, a highly leveraged capital structure instituted in 2006, combined with increasingly competitive conditions and a perilous California economy led the Company to experience sales declines of 21% over the three year period from 2007 through 2010.  The Company's extensive debt, combined with the increased costs as the Company transitioned to an independent public company in late 2011 following the Company's spin-off from Sears Holding Corporation ("**Sears**") made it difficult for the Company to comply with its loan covenants under the Existing Term Credit Agreement (defined below) which, if defaulted, would then trigger a cross-default under its asset-backed revolving credit facility Existing ABL Credit Agreement (defined below).

5.      While the Company's new management stemmed the tide of declining sales through the strategic implementation of a number of key initiatives, including the highly successful new store prototype, due to the constraints present in the Company's debt structure, the Company was unable to dedicate the resources necessary to fully transform the Orchard brand in the manner necessary to support the debt structure.

6.      For these reasons, beginning just prior to, and continuing after the Sears spin-off, the Company began to explore and take action against a number of strategic alternatives aimed at, in the short-term, continued compliance with the leverage ratio covenants contained in the Existing Term Credit Agreement (defined below), and, in the long-term, achieving a sustainable capital structure for the Company.  These efforts, some of which were successful in the short-term did not result in a sustainable long-term solution to support the Company's existing debt

WEST\241397179.7

structure.  When it became clear that the existing debt structure rendered it exceedingly difficult to achieve a sustainable capital structure, the Company began to work cooperatively with its lender constituencies toward a deleveraging transaction for the Company.

7.    As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Pre-Petition Term Debt, the Company began to face increased pressure with respect to its suppliers and vendors and, as a result, many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position.  These recent strains in liquidity, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and a looming debt maturity, ultimately resulted in the Company's decision to commence these Cases.

8.    Prior to the filing of these cases, the Debtors determined that the interests of the Company's stakeholders would be best served by a going-concern sale of substantially all of the Debtors' assets pursuant to an auction process in accordance with section 363 of the Bankruptcy Code.  The Debtors undertook a focused marketing process with certain potential purchasers.  As a result of the Debtors' efforts, the Debtors have filed a motion to, among other things, approve certain bid procedures related to a sale pursuant to section 363 of the Bankruptcy Code to sell substantially all of the Debtors' assets and approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser (the "**Stalking Horse Purchaser**").

9.    The Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery while protecting jobs and minimizing the

impact to the substantial majority of the Company's vendors.

**Debtors' Pre-Petition Financing**

10.    <u>Pre-Petition ABL Credit Agreement.</u>  Prior to the commencement of these Cases, Orchard Supply Hardware Stores Corporation and Orchard Supply Hardware LLC were party to (A) the *Third Amended and Restated Senior Secured Credit Agreement* dated as of October 17, 2012 (as amended and in effect, the "**Existing ABL Credit Agreement**") with Wells Fargo Bank, National Association, as administrative agent and collateral agent (in such capacities, the "**Pre-Petition ABL Agent**") for itself, certain lenders and other secured parties (collectively, the "**Pre-Petition ABL Secured Parties**"), and Wells Fargo Bank, National Association, as supplemental term agent (in such capacity, the "**Pre-Petition Supplemental Term Agent**") for itself and certain supplemental term lenders, (B) the *Second Amended and Restated Pledge and Security Agreement* (as amended and in effect, the "**Existing ABL Security Agreement**") by and among Orchard Supply Hardware Stores Corporation and Orchard Supply Hardware LLC and the Pre-Petition ABL Agent, and (C) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Pre-Petition ABL Secured Parties, (collectively, as amended, restated, modified or supplemented and in effect, the "**Pre-Petition ABL Financing Agreements**").

11.    <u>Pre-Petition Term Credit Agreement.</u>  Prior to the commencement of these cases, Orchard Supply Hardware Stores Corporation and Orchard Supply Hardware LLC were also party to (A) the *Amended and Restated Senior Secured Term Loan Agreement* dated as of December 22, 2011 (as amended and in effect, the "**Existing Term Credit Agreement**") with Gleacher Products Corp. (as successor in interest to JPMorgan Chase Bank, N.A.), as administrative agent and collateral agent (in such capacities, the "**Pre-Petition Term Agent**") for itself, certain Lenders and other secured parties collectively, the "**Pre-Petition Term**

**Secured Parties**" and together with the Pre-Petition ABL Secured Parties, the "**Pre-Petition Secured Parties**"), and (B) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of Pre-Petition Term Secured Parties (collectively, as amended, restated, modified or supplemented and in effect, the "**Pre-Petition Term Financing Agreements**" and together with the Pre-Petition ABL Financing Agreements, the "**Pre-Petition Financing Agreements**").[3]

12.     As of the Petition Date, Orchard Supply Hardware Stores Corporation and Orchard Supply Hardware LLC were indebted (A) under the Pre-Petition ABL Financing Agreements, on account of extensions of credit in the approximate principal amount of $118,002,752.93 (constituting $83,333,452.39 comprised of ABL Revolving Loans (as defined in the Existing ABL Credit Agreement), $7,125,000.00 comprised of the FILO Term Loan (as defined in the Existing ABL Credit Agreement) and $17,208,187.50 comprised of the Supplemental Term Loan (as defined in the Existing ABL Credit Agreement) (the "**Pre-Petition Supplemental Term Loan**")), plus letters of credit in the approximate stated amount of not less than $10,336,111.04, plus interest accrued and accruing (at the rates (including, to the extent allowed, the default rate) set forth in the Pre-Petition ABL Financing Agreements), costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, hedging and other banking or financial services, and other obligations, including, without limitation, on account of cash management, credit card, depository, investment, hedging and other banking or financial services secured by the Pre-Petition ABL Financing Agreements (all of the foregoing under this clause (A), collectively, the "**Pre-Petition ABL Debt**"), and (B)

---

[3]     Debtor OSH Properties LLC is not a party to and is not obligated on account of the Pre-Petition Financing Agreements.

under the Pre-Petition Term Financing Agreements on account of a term loan in the approximate

principal amount of $128,994,514.48,  plus interest accrued and accruing (at the rates (including,

to the extent allowed, the default rate) set forth in the Pre-Petition Term Financing Agreements),

costs, expenses, fees (including attorneys' fees and legal expenses) other charges and other

obligations, if any, secured by the Pre-Petition Term Financing Agreements (collectively the

"**Pre-Petition Term Debt**" and together with the Pre-Petition ABL Debt, the "**Pre-Petition**

**Debt**").

      13.     To secure the Pre-Petition Debt, Orchard Supply Hardware Stores Corporation

and Orchard Supply Hardware LLC granted security interests and liens (the "**Pre-Petition**

**Liens**")[4] to each of the Pre-Petition Secured Parties upon substantially all of their property, real

and personal, including (i) all Accounts, (ii) all Chattel Paper, (iii) all Documents, (iv) all

Equipment, (v) all Fixtures, (vi) all General Intangibles (including Intellectual Property), (vii) all

Goods, (viii) all Instruments, (ix) all Inventory, (x) all Investment Property, (xi) all cash or cash

equivalents, (xii) all letters of credit, Letter-of-Credit Rights and Supporting Obligations, (xiii)

all Deposit Accounts with any bank or other financial institution, (xiv) all Commercial Tort

Claims, (xv) all Contracts, (xvi) all Vehicles, (xvi) all property of either Debtor held by the Pre-

Petition ABL Agent, including all property of every description, in the possession or custody of

or in transit to the Pre-Petition ABL Agent for any purpose, including safekeeping, collection or

pledge, for the account of such Debtor or as to which such Debtor may have any right or power,

(xvii) all accessions to, substitutions for and replacements, Proceeds (including Stock Rights),

insurance proceeds and products of the foregoing, together with all books and records, customer

lists, credit files, computer files, programs, printouts and other computer materials and records

related thereto and any General Intangibles at any time evidencing or relating to any of the

---

[4]    The Pre-petition Liens do not include property held by or interests in OSH Properties LLC.

foregoing, and (xviii) all other Goods and personal property of each Debtor, whether tangible or intangible and wherever located (collectively, the "**Pre-Petition Collateral**").  The priority of the Pre-Petition Liens is governed by an Amended and Restated Intercreditor Agreement dated as of January 29, 2010 between the Pre-Petition ABL Agent and the Pre-Petition Term Agent (as amended (including pursuant to that certain First Amendment to Intercreditor Agreement dated as of June 14, 2013, by and among the Pre-Petition ABL Agent, the Pre-Petition Term Agent and the Debtors other than OSH Properties, LLC), supplemented or otherwise modified and in effect, the "**Intercreditor Agreement**").  The Liens of the Pre-Petition Secured Parties have priority over all other liens except any liens which are valid, properly perfected, unavoidable, and senior to the Pre-Petition Liens (the "**Priority Liens**").

14.    As of the Petition Date, the Debtors believe that (i) the Pre-Petition Liens are valid, binding, enforceable, and perfected first-priority liens, subject only to any Priority Liens and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Financing Agreements (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt exists, and no portion of the Pre-Petition Debt is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt constitutes allowable secured claims.

15.    The Pre-Petition Secured Parties have a security interest in the Cash Collateral (defined below), including all amounts on deposit in the Debtors' banking, checking, or other deposit accounts and all proceeds of Pre-Petition Collateral realized pre-petition or post-petition,

to secure the Pre-Petition Debt and, respectively, to the same extent and order of priority as that which was held by such party pre-petition.

**Relief Requested**

16.    By this Motion, the Debtors seek, among other things:

(a)    authorization under Bankruptcy Code sections 363, 364(c), (d) for the Debtors to obtain superpriority revolving and term loans up to an aggregate principal amount not to exceed $124,333,187.50, on an interim basis pursuant to an interim order (the "**ABL Interim Order**") and until a final order is entered by the Court (the "**ABL Final Order**," and together with the Interim Order, the "**ABL DIP Orders**")) and up to a total aggregate principal amount not to exceed $164,333,187.50 on a final basis, from the ABL DIP Lenders, all pursuant to the ABL DIP Credit Agreement, and subject to the terms and conditions set forth in the ABL DIP Orders;

(b)    authorization under Bankruptcy Code sections 363, 364(c), (d) for the Debtors to obtain superpriority term loans up to an aggregate principal amount not to exceed $6,000,000 on an interim basis pursuant to an interim order (the "**Term Lender Interim Order**") and until a final order is entered by the Court (the "**Term Lender Final Order**," and together with the Term Lender Interim Order, the "**Term Lender DIP Orders**") and up to a total aggregate principal amount not to exceed $12,000,000 on a final basis, from the Term Lender DIP Lenders, all pursuant to the Term Lender DIP Credit Agreement, and subject to the terms and conditions set forth herein (the ABL Interim Order together with the Term Lender Interim Order are referred to herein as the "**Interim Orders**," the ABL Final Order together with the Term Lender Final Order are referred to herein as the "**Final Orders**" and the ABL DIP Order together with the Term Lender DIP Orders are referred to herein as the "**DIP Orders**");

(c)    authorization to use Cash Collateral as described in the DIP Orders;

(d)    approval of the DIP Liens and DIP Superpriority Claims (each as defined below);

(e)    approval of the form and manner of adequate protection to be provided to the Pre-Petition Secured Parties;

(f)    modification of the automatic stay to implement the terms of the DIP Financing;

(g)    finding that notice of this Motion is proper under the circumstances pursuant to Bankruptcy Rules 2002 and 4001(c)(1), and the Local Rules of this Court; and

(h)    authorization of interim relief pursuant to the Interim Orders under Bankruptcy Rule 4001(b) and Local Rule 4001, to schedule a final hearing on this Motion (the "Final Hearing") and the establishment of notice procedures in respect of the Final Hearing to (i) consider entry of a Final Orders authorizing the DIP

Financing and (ii) approve the use of Cash Collateral and the granting of adequate protection to the Pre-Petition Secured Parties on a final basis.

### DIP Financing and Cash Collateral

17.     As mentioned above, the Debtors' obligations with respect to the Pre-Petition Secured Debt are secured by first and second priority liens and security interests in substantially all of the Debtors' property other than property held by or interests in OSH Properties LLC. Those assets constituting the pre-petition collateral, and the proceeds thereof now owned or hereafter acquired by the Debtors other than OSH Properties, LLC, including all of the Debtors' cash, are collectively referred to herein as the "**Pre-Petition Collateral**." Substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any bank accounts, as well as any cash proceeds derived from the disposition of any Pre-Petition Collateral, constitute proceeds of the Pre-Petition Collateral and, therefore, are cash collateral of the Pre-Petition Secured Parties within the meaning of section 363(a) of the Bankruptcy Code (the "**Cash Collateral**").

18.     The Debtors intend to finance their business operations through the continued use of Cash Collateral and additional financing by:

(i)  Obtaining credit and incurring debt, pursuant to Sections 363, 364(c) and 364(d) of the Bankruptcy Code, on an interim basis for a period from the Petition Date through and including the date of a Final Hearing (the "**Interim Period**") up to the aggregate committed amount of $124,333,187.50 and on a final basis up to the aggregate committed amount of $164,333,187.50 (consisting of a $140,000,000 senior secured superpriority revolving credit facility from the ABL Revolver DIP Lenders (as defined below), a $7,100,000 senior secured superpriority first in last out term loan facility from the ABL Revolver DIP Lenders (the foregoing, collectively, the "**ABL Revolver DIP Facility**") and a $17,200,000 senior secured

superpriority term loan facility from the ABL Term DIP Lenders (as defined below) (the "**ABL Term DIP Facility**" or the "**Swingline Loan**" and together with the ABL Revolver DIP Facility, the "**ABL DIP Facilities**") (each on terms and conditions more fully described in the ABL Credit Agreement) secured by first priority, valid, priming, perfected and enforceable liens (as defined in section 101(37) of the Bankruptcy Code on property of the Debtors' estates including OSH Properties, LLC pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and with priority, as to administrative expenses, as provided in section 364(c)(1) of the Bankruptcy Code, subject to the terms and conditions contained herein;

(ii)    (A) establishing the DIP Facilities pursuant to: (1) the ABL DIP Credit Agreement, by and between, among others, Orchard Supply Hardware LLC, as borrower and debtor-in-possession and Orchard Supply Hardware Stores Corporation and OSH Properties, LLC, as guarantors and debtors-in-possession, and Wells Fargo Bank, National Association, as sole administrative agent and collateral agent (in such capacities, the "**ABL DIP Agent**") for the DIP Lenders (as defined below), Wells Fargo Bank, National Association and Bank of America, N.A., as the initial revolving lenders and FILO term lenders (together with their respective affiliates, successors and assigns, the  "**ABL Revolver DIP Lenders**," and collectively with the DIP Agent, the "**ABL Revolver Secured Parties**"), and Wells Fargo Bank, National Association, as supplemental term loan agent (in such capacities, the "**ABL DIP Supplemental Term Agent**"), for the ABL Term DIP Lenders (as defined below), and Wells Fargo Bank, National Association and 1903 Onshore Funding, LLC, as the initial supplemental term lenders under the Term DIP Facility (together with their respective successors and assigns, the "**ABL Term DIP Lenders**," together with the Revolver DIP Lenders, the "**ABL DIP Lenders**," and together with the DIP Supplemental Term Agent and the Revolver Secured Parties, the "**ABL**

11

**DIP Secured Parties**"); and (2) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the ABL DIP Secured Parties, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and Uniform Commercial Code ("**UCC**") financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, restated, modified or supplemented and in effect from time to time, the "**ABL DIP Financing Agreements**"); and (B) incurring the "Obligations" under and as defined in the ABL DIP Credit Agreement (collectively, the "**ABL DIP Obligations**");

        (iii)    (A) establishing a superpriority delayed draw term loan credit facility from certain of the Pre-Petition Term Secured Parties (as defined below) up to the aggregate committed amount of $12,000,000.00 (the "**Term Lender DIP Facility**" and together with the ABL DIP Facility the "**DIP Facilities**") pursuant to: (1) the Term Lender DIP Credit Agreement, by and between, among others, Orchard Supply Hardware LLC, as borrower and debtor-in-possession, Orchard Supply Hardware Stores Corporation, as guarantor and debtor-in-possession, OSH Properties LLC, as guarantor and debtor-in-possession, and Gleacher Products Corp., as sole administrative agent and collateral agent (in such capacities, the "**Term Lender DIP Agent**" and together with the ABL DIP Agent, the "**DIP Agents**") for the Term Lender DIP Lenders (as defined below), certain Pre-Petition Term Secured Parties and Gleacher Products Corp., as lenders thereunder (together with their respective affiliates, successors and assigns, the "**Term Lender DIP Lenders**" and collectively with the Term Lender DIP Agent, the "**Term Lender DIP Secured Parties**"); and (2) all other agreements, documents, notes, certificates, and instruments executed and/or delivered with, to, or in favor of the Term Lender DIP Secured

Parties, including, without limitation, security agreements, pledge agreements, notes, guaranties, mortgages, and UCC financing statements, and all other related agreements, documents, notes, certificates, and instruments executed and/or delivered in connection therewith or related thereto (collectively, as may be amended, restated, modified or supplemented and in effect from time to time, the "**Term Lender DIP Financing Agreements**," and together with the ABL DIP Financing Agreements the "**DIP Financing Agreements**"); and (B) incur the "Obligations" under and as defined in the Term Lender DIP Credit Agreement (collectively, the "**Term Lender DIP Obligations**");

(iv)     Use of the proceeds of the DIP Facilities (net of any amounts used to pay fees, costs and expenses under the DIP Financing Agreements) solely (a) for the payment of fees, expenses and costs incurred in connection with these Cases, for working capital, capital expenditures, and other lawful corporate purposes, (b) upon entry of the ABL Final Order, for repayment of the Pre-Petition ABL Debt, under the Existing ABL Credit Agreement (as defined below), (c) conversion of all letters of credit issued by any Revolving Lender (as defined in the Existing ABL Credit Agreement referred to below) under the Existing ABL Credit Agreement (as defined below) to letters of credit under the ABL DIP Financing Agreements, (d) the payment of transaction expenses, (e) the payment of any adequate protection payments approved in the Interim Orders, (f) working capital, capital expenditures, and other general corporate purposes of the Debtors, (g) the funding of the Pre-Petition ABL Indemnity Account (defined below), and (h) with respect to the ABL Term DIP Facility, upon entry of the ABL Final Order, the repayment of amounts outstanding in respect of the Pre-Petition Supplemental Term Loan and for working capital, capital expenditures, and other general corporate purposes of the Debtors; in each case in a manner consistent with the terms and conditions of the DIP Financing

Agreements, and in accordance with the Budget[5] (as the same may be modified, supplemented or updated from time to time consistent with the terms of the DIP Credit Agreements, the "**Budget**") (subject to any variances thereto permitted under the terms and conditions of the DIP Credit Agreements);

19.     The Debtors believe that this arrangement will meet the Company's financing needs during these Cases.  Specifically, the DIP Financing will provide the Debtors with much needed liquidity, in order to permit, among other things, the orderly continuation of the operation of the business, as well as the implementation and consummation of the store closing and business sales.

**Concise Statement and Highlighted Provisions**

20.     Consistent with Bankruptcy Rule 4001(c)(1) and Local Rule 4001-2, the following is a concise statement and summary of the proposed material terms for the Debtors' request for the use of Cash Collateral and the DIP Financing:[6]  As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Cases and should be approved.

**Concise Statement**[7]

| | |
|---|---|
| **Post-Petition Agents:** | Wells Fargo Bank, National Association, as sole administrative agent and collateral agent (the "**ABL DIP Agent**"), Wells Fargo Bank, National Association, as supplemental term loan agent (the "**ABL DIP Supplemental Term Agent**"), Gleacher Products Corp., as sole administrative agent and collateral agent (in such capacities, the "**Term Lender DIP Agent**" and together with the ABL DIP Agent, the "**DIP Agents**") |
| **Lenders:** | The ABL DIP Lenders and the Term Lender DIP Lenders  (collectively the "**DIP Lenders**") |

---

[5]     A copy of the initial Budget is attached hereto as <u>Exhibit A</u>.

[6]     The complete statement of the terms of the use of Cash Collateral and DIP Financing is set forth in the DIP Credit Agreements and this summary is qualified by reference to the DIP Credit Agreements.

[7]     Capitalized Terms used in this Concise Statement not otherwise defined herein, shall have the  meanings ascribed to such terms in the respective DIP Credit Agreement identified.

WEST\241397179.7

**Secured Parties:** The ABL DIP Secured Parties and the Term Lender DIP Secured Parties (collectively, the "**DIP Secured Parties**")

**Borrower:** Orchard Supply Hardware LLC (the "**Borrower**")

**Guarantors:** Orchard Supply Hardware Stores Corporation and OSH Properties LLC (the "**Loan Guarantors**")

**DIP Loans:** Each Revolving Lender agrees to make ABL Revolving Loans to the Borrower from time to time during the Availability Period in an aggregate principal amount that will not result in (i) such Revolving Lender's Revolving Exposure exceeding such Revolving Lender's Revolving Commitment and (ii) the total Revolving Exposure of all Revolving Lenders exceeding the Maximum Revolving Availability, subject to the ABL Administrative Agent's authority, in its Permitted Discretion, to make Protective Advances pursuant to the terms of Section 2.04 of the ABL DIP Credit Agreement. Within the foregoing limits and subject to the terms and conditions set forth herein, the Borrower may borrow, prepay and reborrow ABL Revolving Loans. Notwithstanding anything to the contrary, until the entry by the Court of the ABL Final Order, the total Revolving Exposure of all Revolving Lenders shall not exceed $100,000,000. *ABL DIP Credit Agreement Section 2.01(a)*.

Each FILO Lender agrees, upon the terms and subject to the conditions herein set forth, to extend credit to the Borrower, in the form of the FILO Term Loan and in an amount not to exceed such FILO Lender's FILO Commitment, in each case subject to the following limitations:

    i.   The FILO Term Loan shall be made in a single drawing in the aggregate amount of $7,125,000 on the Effective Date. Upon funding of the FILO Term Loan on the Effective Date, the FILO Commitments shall be reduced to $0.

    ii.   Repayments and prepayments of the FILO Term Loan may not be reborrowed.

    iii.   The FILO Term Loan advance rate shall be the lesser of (A) the product of (x) five percent (5%) <u>multiplied by</u> (y) the appraised Net Orderly Liquidation Value of Eligible Inventory of the Borrower, and (B) $7,125,000. To the extent that the outstanding balance of the FILO Term Loan should ever exceed the amount described in clause (A) above, an Availability Reserve will be implemented in the amount of the shortfall. *ABL DIP Credit Agreement Section 2.01(b)*.

Each Supplemental Term Lender agrees, upon the terms and subject to the conditions herein set forth, to extend credit to the Borrower, in the form of the Supplemental Term Loan and in an amount not to exceed such Supplemental Term Lender's Supplemental Term Commitment, in each case subject to the

following limitations:

  i.   The Supplemental Term Loan shall be made in a single drawing in the aggregate amount of $17,208,187.50 on the Effective Date.  Upon funding of the Supplemental Term Loan on the Effective Date, the Supplemental Term Commitments shall be reduced to $0.

  ii.  Repayments and prepayments of the Supplemental Term Loan may not be reborrowed.  ***ABL DIP Credit Agreement Section 2.01(c)***.

Each Term Lender DIP Lender agrees severally, but not jointly, upon the terms and subject to the conditions herein set forth, to extend credit to the Borrower from time to time, during the period beginning on the Effective Date and ending on the Business Day immediately preceding the Maturity Date, in the form of one or more Term Lender DIP Term Loans and in an aggregate principal amount not to exceed such Term DIP Lender's DIP Term Loan Commitment, in each case, subject to the following limitations:

  i.    The initial Term Lender DIP Term Loan shall be made in a single drawing in an aggregate principal amount equal to $6,000,000 on the Effective Date and no additional Term Lender DIP Term Loans shall be advanced to the Borrower until the date on which the Final Borrowing Order is entered by the Bankruptcy Court.

  ii.   Other than the initial Term Lender DIP Term Loan advanced on the Effective Date, each Term Lender DIP Term Loan shall be in an aggregate principal amount of not less than $500,000, and $100,000 increments in excess thereof, but not in excess of $2,000,000.

  iii.  All Borrowings shall be subject to the terms of Section 2.03 of the Term Lender DIP Credit Agreement.

  iv.   Repayments and prepayments of any Term Lender DIP Term Loan may not be reborrowed.

  v.    No Term Lender DIP Term Loans shall be advanced to the Borrower to the extent that, after giving effect to such Borrowing, the aggregate principal balance of all outstanding DIP Term Loans exceeds the Advance Rate.
        The aggregate principal balance of all outstanding Term Lender DIP Term Loans advanced hereunder shall not exceed the Aggregate DIP Term Loan Commitments. ***Term Lender DIP Credit Agreement Section 2.01(a)***.

Upon the funding of any Term Lender DIP Term Loan, a portion of the Aggregate DIP Term Loan Commitments in an amount equal to the principal amount of such Term Lender DIP Term Loan shall terminate and the Aggregate DIP Term Loan Commitments shall be permanently reduced by the principal amount of such funding.  ***Term Lender DIP Credit Agreement Section 2.01(b)***.

16

No Term Lender DIP Term Loans shall be advanced to the Borrower to the extent that Maximum Combined Availability (as defined in the ABL DIP Credit Agreement) as of the date of the relevant Borrowing Request delivered hereunder is not less than $30,000,000. ***Term Lender DIP Credit Agreement Section 2.01(c)***.

**Maturity Date:** For the ABL Credit Agreement shall mean the earliest of (i) one year following the Effective Date; (ii) ten (10) days after the entry of a Sale Order by the Bankruptcy Court authorizing a Permitted Sale with respect to all or substantially all of the Loan Parties' assets under Section 363 of the Bankruptcy Code; (iii) fourteen (14) days following the entry of an order by the Bankruptcy Court confirming a Plan of Reorganization; (iv) the Consummation Date; and (v) the date of termination of the Aggregate Revolving Commitments and/or acceleration of any outstanding Obligations in accordance with Article VII of the ABL DIP Credit Agreement. ***ABL DIP Credit Agreement Section 1.01***; see also ***ABL Interim Order ¶ 13 (regarding "Commitment Termination Date")***.

For the Term Lender DIP Credit Agreement shall mean the earliest of (i) 120 days following the Petition Date, (ii) ten (10) days after the entry of a Sale Order by the Bankruptcy Court authorizing a Permitted Sale of all or substantially all of the Loan Parties' assets pursuant to Section 363 of the Bankruptcy Code, (iii) fourteen (14) days following the entry of an order by the Bankruptcy Court confirming a Plan of Reorganization, (iv) the Consummation Date and (v) the date of termination by the Administrative Agent of the DIP Term Loan Commitments and/or acceleration of any outstanding Loans following the occurrence and during the continuance of an Event of Default. ***Term Lender DIP Credit Agreement Section 1.01***; see also ***Term Lender Interim Order ¶ 13 (regarding "Commitment Termination Date")***.

**Use of Proceeds:** The proceeds of the ABL DIP Loans and the Letters of Credit (as defined in the ABL DIP Credit Agreement) are being used by the Borrower solely (i) upon the entry of the ABL Final Order, to repay the Pre-Petition Liabilities in full (to the extent not previously paid in full), and (ii) to the extent expressly permitted under the ABL DIP Orders, and solely in strict compliance with the Budget and the ABL DIP Credit Agreement, for general corporate purposes of the Borrower. Upon repayment of the Pre-Petition Liabilities in full, the Pre-Petition Credit Agreement and any other Pre-Petition Loan Documents will be deemed satisfied and terminated (it being acknowledged and agreed that all obligations of the Loan Parties thereunder that survive such termination by their terms (including, without limitation, indemnification obligations) shall remain in full force and effect and shall not be deemed satisfied and terminated). ***ABL DIP Credit Agreement Section 3.18***; <u>see also</u> ***ABL Interim Order ¶ H***.

The proceeds of the Term Lender DIP Term Loans shall be delivered to the

ABL DIP Agents (which delivery may be effected by funding each Borrowing to the Funding Account in accordance with Section 2.07 of the Term Lender DIP Credit Agreement) for application in accordance with the "Interim Borrowing Order" (as defined in the ABL DIP Credit Agreement) and used solely to (a) pay interest, charges, fees and expenses (including attorneys' fees and financial advisory fees) incurred in connection with the DIP Term Facility, (b) fund operating expenses and general corporate needs, including working capital and other general corporate purposes, of the Loan Parties following the Petition Date, (c) pay fees, costs and expenses of the Cases, including the reasonable fees and expenses of Case Professionals, (d) pay critical vendors approved by the Bankruptcy Court and (e) make such other payments as may be expressly permitted under the Term Lender DIP Orders, and solely in strict compliance with the Budget, the Term Lender DIP Orders and the Term Lender DIP Credit Agreement.  In addition, but not in limitation of the foregoing, the proceeds of any Term Lender DIP Term Loan funded to the Funding Account shall be applied by the ABL DIP Agents to pay and reduce the aggregate principal amount of any outstanding borrowings under the ABL DIP Facility (which shall not result in a permanent commitment reduction). **Term Lender DIP Credit Agreement Section 3.18**; see also **Term Lender Interim Order ¶ H**.

| | |
|---|---|
| **DIP Budget:** | The Loan Parties shall strictly perform in accordance with the Budget subject to the following at all times following the Effective Date: (a) the Borrower's actual sales and cash receipts shall not be less than 90% of the projected amounts set forth in the Budget, and (b) the Borrower's actual expenses and cash expenditures shall not be greater than 110% of the projected amounts set forth in the Budget on a line item basis or in the aggregate; <u>provided</u> that the Borrower shall not use funds allocated to a particular line item in the Budget (including line items denominated "Miscellaneous" or "Other", or words of similar import) to pay any expenses under any other line item(s) in the Budget without the prior express written consent of the DIP Agents, which consent may be conditioned, withheld, or delayed in the DIP Agent's sole and exclusive discretion.  **ABL DIP Credit Agreement Section 5.18**; **Term Lender DIP Credit Agreement Section 5.18**; see also **ABL Interim Order ¶ H**; **Term Lender Interim Order ¶ H**. |
| **Interest Rates:** | The ABL Revolving Loans (including each Swingline Loan) made by, and owing to, each Revolving Lender shall bear interest at the Base Rate <u>plus</u> 0.75% |
| | Each Protective Advance made by, and owing to, a Revolving Lender shall bear interest at the Base Rate <u>plus</u> 3.00%. |
| | (i) The FILO Term Loan, or portions thereof, shall bear interest at the Base Rate plus 1.75%.  (ii) The Supplemental Term Loan, or portions thereof, shall bear interest at 9.25% plus the greater of (1) the Adjusted LIBO Rate, or (2) |

0.75%. ***ABL DIP Credit Agreement Section 2.13***.

Subject to an Event of Default and <u>Section 9.17</u> of the Term Lender DIP Credit Agreement, the outstanding principal balance of all Term Lender DIP Loans shall bear interest at a rate per annum equal to LIBOR <u>plus</u> eight percent (8.0%). ***Term Lender DIP Credit Agreement Section 2.13***.

| | |
|---|---|
| **Post Default Rates** | During the occurrence and continuance of any Event of Default, (i) the ABL Administrative Agent (or, solely with respect to interest and fees owing to the Supplemental Term Lenders, the Supplemental Term Agent) may, at its option, declare that (x) all Loans shall bear interest at 2% plus the rate otherwise applicable to such Loans as provided in the preceding clauses of <u>Section **Error! Reference source not found.**</u> of the ABL DIP Credit Agreement, and/or (y) any fee payable pursuant to <u>Section **Error! Reference source not found.**</u> of the ABL DIP Credit Agreement shall accrue at 2% plus the rate applicable to such fee or other obligation as provided hereunder, and (ii) the Required Revolving Lenders, the Required FILO Lenders or the Required Supplemental Term Lenders, as applicable, may direct the ABL Administrative Agent to declare that such interest and/or fees described in clause (i) above owing to the Revolving Lenders, the FILO Lenders or the Supplemental Term Lenders, as applicable, shall be so increased by 2%. ***ABL DIP Credit Agreement Section 2.13***. |
| | Notwithstanding the foregoing, following the occurrence and during the continuance of any Event of Default, the outstanding principal balance of all Term Lender DIP Loans and other outstanding Obligations shall bear interest at a rate per annum equal to two percent (2.0%) in excess of the interest rate otherwise applicable to such Obligation. ***Term Lender DIP Credit Agreement Section 2.13***. |
| **Security:** | (a) As of the Petition Date, the Debtors believe that (i) the Pre-Petition Liens (as defined in the Interim Orders) are valid, binding, enforceable, and perfected first-priority liens, subject only to any Priority Liens and are not subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, (ii) the Pre-Petition Debt (as defined in the Interim Orders) constitutes legal, valid and binding obligations of the Debtors, enforceable in accordance with the terms of the Pre-Petition Financing Agreements (as defined in the Interim Orders) (other than in respect of the stay of enforcement arising from section 362 of the Bankruptcy Code), no offsets, defenses or counterclaims to any of the Pre-Petition Debt (as defined in the Interim Orders) exists, and no portion of the Pre-Petition Debt (as defined in the Interim Orders) is subject to avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, and (iii) the Pre-Petition Debt (as defined in the Interim Orders) constitutes allowable secured claims, and (b) on the date that the ABL Interim Order is entered, each Debtor has waived, discharged and released the Pre-Petition Secured Parties (as |

defined in the Interim Orders), together with their affiliates, agents, attorneys, officers, directors and employees, of any right any Debtor may have (x) to challenge or object to any of the Pre-Petition Debt (as defined in the Interim Orders), (y) to challenge or object to the security for the Pre-Petition Debt (as defined in the Interim Orders), and (z) to bring or pursue any and all claims, objections, challenges, causes of action and/or choses in action arising out of, based upon or related to the Pre-Petition Financing Agreements (as defined in the Interim Orders) or otherwise. ***ABL Interim Order ¶ E(v)***; ***Term Lender Interim Order ¶ E(v)***.

The ABL DIP Lenders, as provided in the ABL Interim Order, shall have valid liens created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, that are first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral (as defined in the ABL Interim Order), and are subject only to: (i) the Carve Out (as defined in the ABL Interim Order), and (ii) the Priority Liens (as defined in the ABL Interim Order). These liens shall secure all ABL DIP Obligations and the proceeds of the DIP Collateral (as defined in the ABL Interim Order) shall be applied in the same order and priority set forth in the Pre-Petition ABL Financing Agreements, if applicable, and the ABL DIP Credit Agreement. ***ABL Interim Order ¶ 2(f)***.

The Term Lender DIP Lenders, as provided in the Term Interim Order, shall have valid liens created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) are valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the Term Lender DIP Collateral (as defined in the Term Lender Interim Order), and are subject only to: (i) the Carve Out (as defined in the Term Lender Interim Order), (ii) the Senior DIP Liens (as defined in the Term Lender Interim Order), (iii) the liens granted pursuant to the Pre-Petition ABL Agreements (as defined in the Term Lender Interim Order), (iv) the Pre-Petition ABL Replacement Liens (as defined in the Term Lender Interim Order), and (v) the Priority Liens (as defined in the Term Lender Interim Order). ***Term Lender Interim Order ¶ 2(f)***.

The DIP Collateral (as defined in the ABL Interim Order) shall not include (i) bankruptcy recoveries (except for the following: (A) the full amount of any such recovery or settlement thereof to the extent arising under section 549 of the Bankruptcy Code, and (B) all amounts necessary to reimburse the DIP Lenders for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all bankruptcy recoveries), and (ii) any other property to the extent that any Requirement of Law of a Governmental Authority applicable thereto prohibits the creation of a security interest therein, but only, in each case, to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other Requirement of Law and subject to UCC

Sections 9-406, 9-407, 9-408 and 9-409. ***ABL Interim Order ¶ 2(e)***; ***Term Lender Interim Order ¶ 2(e)***.

Subject to the Carve Out (as defined in the ABL Interim Order), all DIP Obligations (as defined in the ABL Interim Order) shall be an allowed superpriority administrative expense claim. ***ABL Interim Order ¶ 2(i)***.

Subject to (i) the Carve Out, (ii) the ABL DIP Lender's claim, and (iii) the Pre-petition ABL superpriority claim, all Term Lender DIP Obligations shall be an allowed superpriority administrative expense claim. ***Term Lender Interim Order ¶ 2(i)***.

Upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any U.S. Trustees appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code. ***ABL Interim Order ¶ G***; ***Term Lender Interim Order ¶ G***.

| | |
|---|---|
| **Adequate Protection:** | The Pre-Petition ABL Secured Parties shall receive adequate protection in the form of (i) upon entry of the Final Order, repayment of the outstanding amount of the Pre-Petition ABL Debt (including, principal, interest, fees, costs, expenses), and (ii) all letters of credit issued by any Revolving Lender (as defined under the Existing ABL Credit Agreement) under the Existing ABL Credit Agreement shall be deemed issued and "Obligations" under the DIP Credit Agreement. ***ABL Interim Order ¶ 4(f)***; ***Term Lender Interim Order ¶ 4(f)***. |

Solely to the extent of the diminution of the value of the interests of the Pre-Secured Parties in the Pre-Petition Collateral, the Pre-Petition Secured Parties shall have additional and replacement security interests and liens in the DIP Collateral allowed superpriority administrative expense claims. ***ABL Interim Order ¶ 4***; ***Term Lender Interim Order ¶ 4***.

| | |
|---|---|
| **Commitment Fees:** | The Borrower agrees to pay to the ABL Administrative Agent for the account of each Revolving Lender a commitment fee, which shall accrue at a rate of 0.50% <u>multiplied by</u> the average daily amount of the Available Revolving Commitment of such Revolving Lender during the period from and including the Effective Date to but excluding the date on which the Revolving Lenders' Revolving Commitments terminate. ***ABL DIP Credit Agreement Section 2.12(a)***. |
| **Closing Fee:** | The Borrower agrees to pay to the ABL Administrative Agent, on the Effective Date, (i) for the account of the Revolving Lenders, a closing fee in the amount of $1,100,000, (ii) for the account of the FILO Lenders, a closing fee in the amount of $53,438, and (iii) for the account of the Supplemental Term Lenders, a closing fee in the amount of $301,143. ***ABL DIP Credit Agreement*** |

21

***Section 2.12(b)***.

| | |
|---|---|
| **Administrative Agent Fee:** | The Borrowers shall pay to the to the ABL DIP Administrative Agent, for its own account, an administrative agent's fee in an amount equal to $75,000 per annum, which fee shall be fully earned on the Effective Date and on each anniversary thereof and shall be payable in monthly installments in the amount of $6,250 per month. ***ABL DIP Credit Agreement Section 2.12(c)***. |
| | The Debtor shall pay to the Term Lender Administrative Agent an agency fee in an amount equal to $45,000 in connection with the execution of the Commitment Letter for the period beginning on the Closing Date and ending on the date that is 120 days thereafter. Further, the Debtor shall also pay to the Term Lender Administrative Agent a syndication fee in an amount equal to $75,000 in connection with the execution of the Commitment Letter with respect to the Agent's management and administration of the syndication process described in the Commitment Letter, including any syndication that may occur following the Closing Date. ***Term Lender DIP Credit Agreement Section 2.12(a)***. |
| **Supplemental Term Agent Fee:** | The Borrowers shall pay ABL Administrative Agent, for the account of the Supplemental Term Agent, a supplemental term agent's fee in an amount equal to $20,000 per annum, which fee shall be fully earned on the Effective Date and on each anniversary thereof and shall be payable in monthly installments in the amount of $1,666.67 per month. ***ABL DIP Credit Agreement Section 2.12(d)***. |
| **Expenses:** | The Debtors shall pay the costs and expenses of the DIP Lenders and the Pre-Petition Secured Parties (including the reasonable fees and expenses of legal counsel (including any local counsel)). ***ABL Interim Order ¶ 19(b)***; ***Term Lender Interim Order ¶ 19(b)***. |
| **Carve-Out:** | Carve-Out means: (a) allowed administrative expenses pursuant to 28 U.S.C. Section 1930(a)(6) for fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee; and (b) professional fees of, and costs and expenses incurred by, professionals or professional firms retained by the Debtors and of any Creditors' Committee (collectively, the "Case Professionals") and allowed by the Bankruptcy Court (whether prior to or after delivery of the "Carve Out Trigger Notice"), but in all events in accordance with and as may be limited by the Budget; provided that to the extent incurred by the Case Professionals after the delivery of the Carve Out Trigger Notice in an aggregate amount not to exceed the sum of $250,000 (the "Post Carve Out Notice Cap") (exclusive of "Reported Fee Accruals" but inclusive of a sublimit for Chapter 7 wind down expenses of $100,000), *plus* (x) Reported Fee Accruals, *plus* (y) any additional fees, costs and expenses accrued or incurred by a Case Professional from the last day included in the prior Reported Fee Accrual of such Case Professional through the date on which the Carve Out |

Trigger Notice shall have been delivered, less, in each case, any amounts actually paid on account thereof, plus (z) $250,000, less, in each case, any amounts actually paid on account thereof and in each case in accordance with and as may be limited by the Budget. ***ABL Interim Order ¶ 8***; ***Term Lender Interim Order ¶ 8***.

**Events of Default:**

Customary events of default, including, among other things, failure to make required payments, default under other debt agreements, and breach of covenants, representations and warranties. ***ABL DIP Credit Agreement Article VII; Term Lender DIP Credit Agreement Article VII.***

**Remedies on Default:**

Customary remedies, including, without limitation, the following:

The DIP Agents may, and at the request of the DIP Lenders shall, by notice to the Debtors, take either or both of the following actions, at the same or different times: (i) terminate the commitments, and thereupon the commitments under the DIP Loans shall terminate immediately, and (ii) declare the DIP Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the DIP Loans so declared to be due and payable, together with accrued interest thereon and all fees and other obligations of the Debtors, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind. In addition the DIP Agents may require that the Debtors file motions to allow for disposition of the Collateral under section 363 of the Bankruptcy Code. ***ABL DIP Credit Agreement Article VII; Term Lender DIP Credit Agreement Article VII.***

**Automatic Stay:**

Any automatic stay otherwise applicable to the ABL DIP Secured Parties is hereby modified so that (i) after the occurrence of any ABL DIP Order Event of Default and (ii) at any time thereafter during the continuance of such Event of Default, upon three (3) business days' prior written notice of such occurrence, in each case given to each of the Debtors, counsel to the Debtors, counsel for the Creditors' Committee, if any, and the U.S. Trustee, the ABL DIP Secured Parties shall be entitled to exercise their rights and remedies in accordance with the ABL DIP Financing Agreements and the Pre-Petition ABL Financing Agreement.  Immediately following the giving of notice by the DIP Agent of the occurrence of an ABL DIP Order Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral to the DIP Agent as provided in the DIP Credit Agreement, the ABL Interim Order and the Intercreditor Agreement; (ii) the ABL DIP Agent shall continue to apply such proceeds in accordance with the provisions of the ABL Interim Order and of the ABL DIP Credit Agreement; (iii) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the ABL DIP Obligations, the Pre-Petition ABL Debt, and the Carve Out; and (iv) any obligation otherwise imposed on

23

the ABL DIP Agent or the ABL DIP Secured Parties to provide any loan or advance to the Debtors pursuant to the ABL DIP Facilities shall be suspended. Following the giving of written notice by the ABL DIP Agent of the occurrence of a ABL DIP Order Event of Default, the Debtors and any Creditors' Committee, if any, shall be entitled to an emergency hearing before this Court solely for the purpose of contesting whether an ABL DIP Order Event of Default has occurred. If the Debtors or any such Creditors' Committee do not contest the right of the ABL DIP Secured Parties to exercise their remedies based upon whether an ABL DIP Order Event of Default has occurred within such time period, or if the Debtors or any such Creditors' Committee do timely contest the occurrence of an ABL DIP Order Event of Default and the Bankruptcy Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the ABL DIP Secured Parties, shall automatically terminate at the end of such notice period. ***ABL Interim Order ¶ 17(a)***.

Any automatic stay otherwise applicable to the Term Lender DIP Secured Parties is hereby modified so that (i) after the occurrence of any Term Lender DIP Order Event of Default and (ii) at any time thereafter during the continuance of such Event of Default, upon three (3) business days' prior written notice of such occurrence, in each case given to each of the Debtors, counsel to the Debtors, counsel for the Creditors' Committee, if any, the U.S. Trustee, the ABL DIP Agent, and the Term Lender DIP Agent, the Term Lender DIP Secured Parties shall be entitled to exercise their rights and remedies in accordance with the Term Lender DIP Financing Agreements and the Pre-Petition ABL Financing Agreement, and the Intercreditor Agreement. Immediately following the giving of notice by the Term Lender DIP Agent of the occurrence of a Term Lender DIP Order Event of Default: (i) the Debtors shall continue to deliver and cause the delivery of the proceeds of DIP Collateral and Term Lender DIP Collateral to the ABL DIP Agent and Term Lender DIP Agent as provided in the ABL DIP Credit Agreement, the Term Lender DIP Credit Agreement, the ABL Interim DIP Order, this Interim Order and the Intercreditor Agreement; (ii) the ABL DIP Agent and Term Lender DIP Agent shall continue to apply such proceeds in accordance with the provisions of the ABL Interim Order, the Term Lender Interim Order, the ABL DIP Credit Agreement, and the Term Lender DIP Credit Agreement; (iii) the Debtors shall have no right to use any of such proceeds, nor any other Cash Collateral other than towards the satisfaction of the DIP Obligations, the Term Lender DIP Obligations, the Pre-Petition ABL Debt, and the Carve Out; and (iv) any obligation otherwise imposed on the ABL DIP Agent, the Term Lender DIP Agent, the ABL DIP Secured Parties, or the Term Lender DIP Secured Parties to provide any loan or advance to the Debtors pursuant to the ABL DIP Facility and Term Lender DIP Facility shall be suspended. Following the giving of written notice by the Term Lender DIP Agent of the occurrence of a Term Lender DIP Order Event of Default, the Debtors and the Creditors' Committee, if any, shall be entitled to an emergency hearing before

24

this Court solely for the purpose of contesting whether a Term Lender DIP Order Event of Default has occurred.  If the Debtors or any such Creditors' Committee do not contest the right of the Term Lender DIP Secured Parties to exercise their remedies based upon whether a Term Lender DIP Order Event of Default has occurred within such time period, or if the Debtors or any such Creditors' Committee do timely contest the occurrence of a Term Lender DIP Order Event of Default and the Bankruptcy Court after notice and hearing declines to stay the enforcement thereof, the automatic stay, as to the Term lender DIP Secured Parties, shall automatically terminate at the end of such notice period. ***Term Lender Interim Order ¶ 17(a)***.

The automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the ABL DIP Credit Agreement and Term Lender DIP Credit Agreement as necessary to (1) permit the Debtors to grant the Pre-Petition Replacement Liens, the ABL DIP Liens, and the Term Lender DIP Liens, to fund the Pre-Petition ABL Indemnity Account and to incur all liabilities and obligations to the Pre-Petition Secured Parties, the ABL DIP Secured Parties under the ABL DIP Financing Agreements, the Term Lender DIP Secured Parties under the Term Lender DIP Financing Agreements, the ABL DIP Facility, the Term Lender DIP Facility, the Interim Orders, and (2) authorize the ABL DIP Secured Parties, the Term Lender DIP Secured Parties and the Pre-Petition Secured Parties to retain and apply payments under the Interim Orders. ***ABL Interim Order ¶ 17(a)***; ***Term Lender Interim Order ¶ 17(a)***.

**Indemnification:** The Borrower shall indemnify the ABL DIP Administrative Agent, each other Agent, the Supplemental Term Agent, each Issuing Bank and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any Loan or Letter of Credit or the use of the proceeds therefrom (including any refusal by any Issuing Bank to honor a demand for payment under a Letter of Credit if the documents presented in connection with such demand do not strictly comply with the terms of such Letter of Credit), (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability to the extent related in any way to the Borrower or any of its Subsidiaries, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto;

provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any Guarantor against any Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder, if the Borrower or such Guarantor has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction. ***ABL DIP Credit Agreement Section 9.03(b)***.

The Borrower shall indemnify the Term Lender DIP Administrative Agent, the Collateral Agent and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of the Loan Documents or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) any DIP Term Loan or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability to the extent related in any way to the Borrower or any of its Subsidiaries, (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, penalties, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. ***Term Lender DIP Credit Agreement Section 9.03(b)***.

## Highlighted Provisions

21.    Local Rule 4001-2 requires the Debtors to highlight certain provisions included in the DIP Credit Agreements and the DIP Orders. As discussed herein, the Debtors believe these provisions are reasonable in light of the facts and circumstances of these Cases and should be approved. The provisions under Rule 4001-2(a)(i) of the Local Rules included in the DIP Orders and DIP Credit Agreements are as follows:

WEST\241397179.7

Local Rule 4001-2(a)(i)(A).  Certain assets of the Debtors (mainly real estate) that were not Pre-Petition Collateral are included as DIP Collateral.  ***ABL Interim Order ¶ 2(f); Term Lender Interim Order ¶ 2(f).***  The Debtors were unable obtain DIP Financing without inclusion of the Debtors' real estate assets.

Local Rule 4001-2(a)(i)(B).  The Debtors are agreeing to the validity, amount, enforceability, unavoidability and perfection of the Pre-Petition Liens and are waiving all the Debtors' claims against the Pre-Petition Secured Parties.  To the extent that a committee were to obtain standing, a committee could challenge the pre-petition claims and liens.  ***ABL Interim DIP Order ¶ E(iv); Term Lender Interim DIP Order ¶ E(iv).***

Local Rule 4001-2(a)(i)(C).  There is no section 506(c) surcharge provision in the Interim Order.  However, upon entry of the Final Order, the Debtors (and any successors thereto or any representatives thereof, including any U.S. Trustees appointed in the Cases or any Successor Cases) shall be deemed to have waived any rights or benefits of section 506(c) of the Bankruptcy Code.  ***ABL Interim Order ¶ G; Term Lender Interim Order ¶ G.*** The Debtor submits that the § 506(c) waiver is appropriate in the context of the DIP Financing.

Local Rule 4001-2(a)(i)(D).  The Collateral will not include Bankruptcy Recoveries, except for the following, which shall be Collateral: (A) the full amount of any such recovery or settlement thereof to the extent arising under Section 549 of the Bankruptcy Code and (B) all amounts necessary to reimburse the DIP Secured Parties for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all Bankruptcy Recoveries).  ***ABL Interim Order ¶ 2(f); Term Lender Interim Order ¶ 2(f).***

Local Rule 4001-2(a)(i)(G).  The Pre-Petition Secured Parties that will be primed by the liens granted to the DIP Lenders have consented to the relief requested herein.  Any other parties' liens, other than Priority Liens (as defined in the Interim Orders), will be primed.  ***ABL Interim Order ¶¶ 2(f), 19(o); Term Lender Interim Order ¶¶ 2(f), 19(o).***

Local Rule 4001-2(a)(i)(H).  The Interim Orders provide that the DIP Secured Parties and the Pre-Petition Secured Parties shall each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to the DIP Secured Parties or the Pre-Petition Secured Parties with respect to proceeds, product, offspring or profits of any of the Pre-Petition Collateral or the DIP Collateral; <u>provided that</u> the foregoing waiver by the Debtors shall not preclude any other party in interest from asserting the "equities of the case" exception under section 552(b) of the Bankruptcy Code.  ***ABL Interim Order ¶ 19(h); Term Lender Interim Order ¶ 19(g).***

### <u>Post-Petition Liens and Superpriority Status</u>

22.     As a condition for the DIP Financing the Debtors seek to provide the DIP Secured

Parties with post-petition security interests and superpriority status as follows:

(a)    **Post-Petition Liens**.  Effective immediately upon the entry of the Interim Orders, the DIP Secured Parties shall be granted pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, priming first priority (for the ABL DIP Secured Parties and second priority for the Term Lender DIP Secured Parties), continuing, valid, binding, enforceable, non-avoidable and automatically perfected postpetition security interests and liens (collectively, the "**DIP Liens**") senior and superior in priority to all other secured and unsecured creditors of the Debtors' estates except as otherwise provided in the Interim Orders, upon and to all presently owned and hereafter acquired assets and real and personal property of the Debtors (except with respect to any Lien granted to the Agent (as defined in the Store Closing Motion) pursuant to the Store Closing Order (as defined below)) (collectively, the "**DIP Collateral**"), including, without limitation, the following:

    i.    all accounts,

    ii.    all chattel paper,

    iii.    all documents,

    iv.    all equipment,

    v.    all fixtures,

    vi.    all general intangibles (including intellectual property),

    vii.    all goods,

    viii.    all instruments,

    ix.    all inventory,

    x.    all investment property,

    xi.    all deposit accounts, securities account and commodity accounts and any cash or other assets in any such accounts,

xii.    all owned real estate of the Debtors, all proceeds from the disposition of real estate, and all proceeds from the disposition of real estate leases,

xiii.   all letters of credit, letter-of-credit rights and supporting obligations,

xiv.   all deposit accounts with any bank or other financial institution,

xv.    all commercial tort claims,

xvi.   all contracts, including without limitation, the "Agency Agreement" (as defined below) and all amounts payable to the Debtors by the "Agent" (as defined therein) under the Agency Agreement,

xvii.  all vehicles,

xviii. all property of any Debtor held by the DIP Agent, including all property of every description, in the possession or custody of or in transit to the DIP Agent for any purpose, including safekeeping, collection or pledge, for the account of such Debtor or as to which such Debtor may have any right or power,

xix.   all books and records related to any of the foregoing,

xx.    all property and assets, real and personal, which are not subject to a lien securing borrowed money on the date of the commencement of the Bankruptcy Cases, and

xxi.   all accessions to, substitutions for and replacements, proceeds (including stock rights), insurance proceeds and products of the foregoing, together with all books and records, customer lists, credit files, computer files, programs, printouts and other computer materials and records related thereto and any General Intangibles at any time evidencing or relating to any of the foregoing;

provided, however, that the DIP Collateral shall not include (i) bankruptcy recoveries (except for the following, which shall be DIP Collateral: (A) the full amount of any such recovery or

settlement thereof to the extent arising under section 549 of the Bankruptcy Code, and (B) all amounts necessary to reimburse the DIP Secured Parties for the amount of the Carve Out, if any, used to finance the pursuit of such recovery or settlement with respect to all bankruptcy recoveries), and (ii) any other property to the extent that any Requirement of Law of a Governmental Authority applicable thereto prohibits the creation of a security interest therein, but only, in each case, to the extent, and for so long as, such prohibition is not terminated or rendered unenforceable or otherwise deemed ineffective by the UCC or any other Requirement of Law and subject to UCC Sections 9-406, 9-407, 9-408 and 9-409.

       (b)    **DIP Lien Priority**.  The ABL DIP Liens to be created and granted to the ABL DIP Secured Parties, (a) will be created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) will be first, valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the DIP Collateral, and are subject only to: (i) the Carve Out, and (ii) the Priority Liens.  The ABL DIP Liens shall secure all ABL DIP Obligations and the proceeds of the DIP Collateral shall be applied in the same order and priority set forth in the Pre-Petition ABL Financing Agreements, if applicable, and the ABL DIP Credit Agreements.  The Term Lender DIP Liens to be created and granted to the Term Lender DIP Secured Parties, (a) will be created pursuant to sections 364(c)(2), 364(c)(3) and 364(d) of the Bankruptcy Code, and (b) will be valid, prior, perfected, unavoidable, and superior to any security, mortgage, or collateral interest or lien or claim to the Term Lender DIP Collateral, and are subject only to: (i) the Carve Out, (ii) the ABL DIP Liens, (iii) the liens granted pursuant to the Pre-Petition ABL Agreements, (iv) the Pre-Petition ABL Replacement Liens, and (v) the Priority Liens.  The Term Lender DIP Liens shall secure all Term Lender DIP Obligations and the proceeds of the Term Lender DIP Collateral shall be

WEST\241397179.7

applied in the same order and priority set forth in the Term Lender DIP Credit Agreement.  The

DIP Liens shall not be made subject to or *pari passu* with any lien or security interest by any

court order heretofore or hereafter entered in the Cases and shall be valid and enforceable against

any trustee  appointed in the Cases, upon the conversion of any of the Cases to a case under

Chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing

(any "**Successor Cases**"), and/or upon the dismissal of any of the Cases.  The DIP Liens shall

not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code or the "equities of the

case" exception of section 552 of the Bankruptcy Code (provided that, the foregoing waiver by

the Debtors shall not preclude any other party in interest from asserting the "equities of the case"

exception under section 552(b) of the Bankruptcy Code), or if approved in the Final Order,

section 506(c) of the Bankruptcy Code.

(c)    **Superpriority Administrative Claim Status.**

(i)    Subject to the Carve Out, all ABL DIP Obligations shall be an allowed

superpriority administrative expense claims (the "**ABL DIP Superpriority Claims**" and,

together with the DIP Liens, the "**ABL DIP Protections**") with priority  in all of the Cases under

sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all

administrative expense claims and unsecured claims against the Debtors and their estates, now

existing or hereafter arising, of any kind or nature whatsoever including, without limitation,

administrative expenses of the kinds specified in, arising, or ordered pursuant to sections 105,

326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726, 1113, and 1114

of the Bankruptcy Code, and, upon entry of the Final Order, section 506(c) of the Bankruptcy

Code, whether or not such expenses or claims may become secured by a judgment lien or other

non-consensual lien, levy or attachment. Other than the Carve Out, no costs or expenses of

administration, including, without limitation, professional fees allowed and payable under

Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in

these proceedings, or in any Successor Cases, and no priority claims are, or will be, senior to,

prior to or on a parity with the ABL DIP Protections or the ABL DIP Obligations, or with any

other claims of the DIP Secured Parties arising under the ABL DIP Orders.

(ii)     Subject to (i) the Carve Out, (ii) the ABL DIP Superpriority Claim, and

(iii) the Pre-Petition ABL Superpriority Claim, all Term Lender DIP Obligations shall be an

allowed superpriority administrative expense claim (the "**Term Lender DIP Superpriority**

**Claim**" and, together with the Term Lender DIP Liens, the "**Term Lender DIP Protections**")

(the Term Lender DIP Superpriority Claims together with the ABL DIP Superpriority Claims is

referred to herein as "**DIP Superpriority Claims**" and the Term Lender DIP Protections

together with the ABL DIP Protections are referred to herein as the "**DIP Protections**") with

priority in all of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code

and otherwise over all administrative expense claims and unsecured claims against the Debtors

and their estates, now existing or hereafter arising, of any kind or nature whatsoever including,

without limitation, administrative expenses of the kinds specified in, arising, or ordered pursuant

to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552(b), 726,

1113, and 1114 of the Bankruptcy Code, whether or not such expenses or claims may become

secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the

Carve Out, no costs or expenses of administration, including, without limitation, professional

fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that

have been or may be incurred in these proceedings, or in any Successor Cases, and no priority

claims other than the ABL DIP Superpriority Claim, and the Pre-Petition ABL Superpriority

Claim are, or will be, senior to, prior to or on a parity with the Term Lender DIP Protections or the Term Lender DIP Obligations, or with any other claims of the Term Lender DIP Secured Parties arising under the Term Lender DIP Orders.

**Adequate Protection of Pre-Petition Secured Parties**

23.     As adequate protection to guard against the diminution in the value of the interests of the Pre-Petition Secured Parties in the Pre-Petition Collateral (including Cash Collateral) on account of the granting of the DIP Liens, subordination to the Carve Out, the Debtors' use of Cash Collateral and other decline in value arising out of the automatic stay or the Debtors' use, sale, depreciation, or disposition of the Pre-Petition Collateral, the Debtors will provide adequate protection to the Pre-Petition Secured Parties as follows:

(a)     **Pre-Petition ABL Replacement Liens**.  Solely to the extent of the diminution of the value of the interest of the Pre-Petition ABL Secured Parties in the Pre-Petition Collateral, the Pre-Petition ABL Secured Parties shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and liens in the DIP Collateral (the "**Pre-Petition ABL Replacement Liens**") which shall be junior only to the ABL DIP Liens, the ABL DIP Superpriority Claim, and the Carve Out.

(b)     **Pre-Petition ABL Superpriority Claim**.  Solely to the extent of the diminution of the value of the interests of the Pre-Petition ABL Secured Parties in the Pre-Petition Collateral, the Pre-Petition ABL Secured Parties shall have an allowed superpriority administrative expense claim (the "**Pre-Petition ABL Superpriority Claim**") which shall have priority (except with respect to (a) the ABL DIP Liens, (b) the ABL DIP Superpriority Claim, and (c) the Carve Out), in all of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims

33

against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, _provided_, _however_, that administrative expenses of the Debtors, including post sale wind-down expenses shall be included in the Budget.  Other than the ABL DIP Liens, the ABL DIP Superpriority Claim, and the Carve Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Pre-Petition ABL Superpriority Claim.

(c)    **Pre-Petition ABL Indemnity Account**.  Incidental to the payment in full in cash of the Pre-Petition ABL Debt in accordance with the terms of the ABL Interim Order, the Debtors shall establish an account in the "control" (as defined in the UCC) of the Pre-Petition ABL Agent (the "**Pre-Petition ABL Indemnity Account**"), into which the sum of $250,000 shall be deposited as security for any reimbursement, indemnification or similar continuing obligations of the Debtors in favor of the Pre-Petition ABL Secured Parties under the Existing ABL Credit Agreement (the "**Pre-Petition ABL Indemnity Obligations**"); provided, however, that the Pre-Petition ABL Indemnity Account shall terminate and all remaining amounts held therein shall be released to the Debtors if the Pre-Petition ABL Debt shall have been indefeasibly paid in full in cash and the earliest to occur of:  (i) the Challenge Period Termination Date (as

defined below) if, as of such date, no party has filed or asserted an adversary proceeding, cause of action, objection, claim, defense, or other challenge as contemplated in paragraph 7 of the ABL Interim Order providing for such release; or (ii) the date this Court enters a final order closing the Cases. The Pre-Petition ABL Indemnity Obligations shall be secured by a first priority lien on the Pre-Petition ABL Indemnity Account. The Pre-Petition ABL Indemnity Account and the amounts therein shall remain property of the Debtors and the Debtors' estates under section 541 of the Bankruptcy Code and shall secure payment of the Pre-Petition ABL Indemnity Obligations and the Pre-Petition ABL Debt.

(d)    **Pre-Petition Term Replacement Liens**.  Solely to the extent of the diminution of the value of the interest of the Pre-Petition Term Secured Parties in the Pre-Petition Collateral, the Pre-Petition Term Secured Parties shall have, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code additional and replacement security interests and liens in the DIP Collateral (the "**Pre-Petition Term Replacement Liens**" and together with the Pre-Petition ABL Replacement Liens, the "**Pre-Petition Replacement Liens**") which shall be junior only to the ABL DIP Liens, the Term Lender DIP Liens, the ABL DIP Superpriority Claim, the Term Lender DIP Superpriority Claim, the Carve Out, the Pre-Petition ABL Replacement Liens, the Pre-Petition ABL Superpriority Claim, and, with respect to the ABL Facility Primary Collateral (as defined in the Intercreditor Agreement), the Liens securing the Revolver DIP Facility and the Pre-Petition ABL Debt.

(e)    **Pre-Petition Term Superpriority Claim**.  Solely to the extent of the diminution of the value of the interests of the Pre-Petition Term Secured Parties in the Pre-Petition Collateral, the Pre-Petition Term Secured Parties shall have an allowed superpriority administrative expense claim (the "**Pre-Petition Term Superpriority Claim**") which shall have

35

priority (except with respect to (a) the ABL DIP Liens, (b) the ABL DIP Superpriority Claims, (c) the Carve Out, (d) the Pre-Petition ABL Replacement Liens, (e) the Term Lender DIP Liens, (f) the Term Lender DIP Superpriority Claim, and (g) the Pre-Petition ABL Superpriority Claim), in all of the Cases under sections 364(c)(1), 503(b) and 507(b) of the Bankruptcy Code and otherwise over all administrative expense claims and unsecured claims against the Debtors and their estates, now existing or hereafter arising, of any kind or nature whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546(c), 546(d), 552, 726, 1113, and 1114 of the Bankruptcy Code, and, if approved in the Final Order, section 506(c) of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment. Other than the ABL DIP Liens, the ABL DIP Superpriority Claim, the Pre-Petition ABL Replacement Liens, the Pre-Petition ABL Superpriority Claim, the Term Lender DIP Liens, the Term Lender DIP Superpriority Claim, and the Carve Out, (i) no costs or expenses of administration, including, without limitation, professional fees allowed and payable under Bankruptcy Code sections 328, 330, and 331, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Cases, and (ii) no priority claims are, or will be, senior to, prior to or on a parity with the Pre-Petition Term Superpriority Claim.

(f)    **ABL Adequate Protection Payment**.  The Pre-Petition ABL Secured Parties shall receive adequate protection in the form of (i) upon entry of the ABL Final Order, repayment of the outstanding amount of the Pre-Petition ABL Debt (including, principal, interest, fees, costs, expenses), and (ii) all letters of credit issued by any Revolving Lender (as defined under the Existing ABL Credit Agreement) under the Existing ABL Credit Agreement

36

shall be deemed issued and "Obligations" under the ABL DIP Credit Agreement.  Before entry

of the Final Order, all proceeds from collections and sales shall pay down the Pre-Petition ABL

Debt (including, principal, interest, fees, costs, expenses), in accordance with the Pre-Petition

ABL Financing Agreements, and upon entry of the Final Order, all such proceeds shall be used

to repay the Pre-Petition ABL Debt and the ABL DIP Obligations pursuant to the terms of the

ABL DIP Credit Agreement.

(g)    **Term Adequate Protection Payment**.  The Pre-Petition Term Secured

Parties shall receive adequate protection in the form of the current payment of the reasonable

documented out-of-pocket costs and expenses of their attorneys and financial advisors, including

such fees and expenses incurred prior to the Petition Date.

(h)    **Adequate Protection Upon Sale of Collateral**.  Except as otherwise

provided in the Store Closing Motion (as defined below), upon the sale of any Pre-Petition

Collateral pursuant to section 363 of the Bankruptcy Code, any such Pre-Petition Collateral shall

be sold free and clear of the Pre-Petition Liens and the Pre-Petition Replacement Liens, provided

however, that such Pre-Petition Liens and Pre-Petition Replacement Liens shall attach to the

proceeds of any such sale in the order and priority as set forth in the ABL Interim Order, and the

proceeds shall be used to repay the Pre-Petition ABL Debt, and the DIP Obligations pursuant to

the terms of the DIP Credit Agreements.  In the event the DIP Obligations and the Pre-Petition

ABL Debt have been Paid in Full, such proceeds will be paid to the Term Lender DIP Agent for

application to the Term Lender DIP Obligations.

(i)    **Adequate Protection with respect to Store Closing Program**.

Contemporaneously herewith, the Debtors have filed a motion with this Court seeking

authorization to, among other things, close certain retail store locations and enter into an agency

agreement (the "**Agency Agreement**") providing for the liquidation of merchandise inventory and other assets with the successful bidder at the auction described therein (the "**Store Closing Motion**").  Upon entry of an order (the "**Store Closing Order**") by this Court providing such authorization, all proceeds payable to the Debtors by the Agent (as defined in the Store Closing Motion) under the Agency Agreement shall be paid to the DIP Agent for application to the DIP Obligations, the Pre-Petition ABL Debt and as otherwise as set forth herein.  Pending entry of the Store Closing Order, the Debtors, the Agent, and the DIP Agent shall enter into a "Collateral Assignment of Agency Agreement" in form and substance reasonably satisfactory to each of the parties thereto.

**Basis for Relief Requested**

I.    **The DIP Financing Should Be Approved**

24.    Prior to the filing of these Cases, the Debtors reached out to their lenders as well as other potential lenders about providing the requisite financing to implement their  chapter 11 strategy.  The Pre-Petition Secured Parties were not willing to provide any additional liquidity, without a new debtor-in-possession financing arrangement and would not consent to being primed by an outside lender.  The Pre-Petition Secured Parties were the most rational choice to provide the DIP Financing given (a) their senior position in the Company's capital structure and their unwillingness to be primed, (b) their familiarity with the Company, and (c) the fact that the terms provided under DIP Credit Agreements were superior to any other terms received by the Debtors.

25.    The DIP Credit Agreements have been negotiated in good faith and at arm's length by and among the Debtors, the DIP Agents and the DIP Lenders.  The Debtors submit that the terms thereof, the use of Cash Collateral, and all other financial accommodations provided under the DIP Credit Agreements and the DIP Orders are fair and reasonable, and reflect the

38

Debtors' exercise of prudent business judgment consistent with their fiduciary duties.  The Debtors have, in their business judgment, determined that entering into the DIP Credit Agreements will give the Company the financing needed to operate its business with minimum interruption or disruption to its operations and thus preserve the going concern value of the Debtors' estates.  In addition, the Debtors have, in their business judgment, determined that the DIP Financing provides the Debtors with the greatest degree of flexibility to implement their chapter 11 strategy.

26.    As described above, the Debtors' chapter 11 efforts hinge upon use of Cash Collateral and obtaining access to post-petition financing.  Bankruptcy Code § 364 distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business, and (c) obtaining credit with specialized priority or on a secured basis.  If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, pursuant to § 364(c), the court may authorize such debtor to obtain credit or incur debt that is entitled to superpriority administrative expense status and/or secured by a senior lien on unencumbered property, a junior lien on encumbered property or a combination of the foregoing.  In addition, pursuant to § 364(d), absent consent from affected secured parties, a court may authorize post-petition credit secured by a senior or equal lien on encumbered property (i.e., a "priming" lien) when a debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.

A.    **Incurrence of Secured Superpriority Debt Under Bankruptcy Code §§ 364(c) and 364(d)**

27.    Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that debtors-in-possession cannot "obtain unsecured credit allowable under Bankruptcy Code § 503(b)(1) as an administrative expense."  See Pearl-Phil GMT (Far East)

39

Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses

authorized where debtor could not obtain credit as an administrative expense); In re Klein Sleep

Prods., Inc., 173 B.R. 296, 297-98 (S.D.N.Y. 1994) (same); In re Ames Dept. Stores, Inc., 115

B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990) (debtor must show that it made reasonable efforts to seek

other sources of financing under §§ 364(a) and (b)); In re Garland Corp., 6 B.R. 456, 461 (1st

Cir. BAP 1980) (secured credit under § 364(c)(2) authorized, after notice and a hearing, upon

showing that unsecured credit unobtainable); In re Crouse Group, Inc., 71 B.R. 544, 549 (Bankr.

E.D. Pa. 1987) (debtor seeking unsecured credit under § 364(c) of the Bankruptcy Code must

prove that it cannot obtain unsecured credit pursuant to § 364(b)).

28.      In addition, Bankruptcy Code § 364(d)(1), which governs the incurrence of post-

petition debt secured by senior or "priming" liens, provides that the court may, after notice and a

hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or
> equal lien on property of the estate that is subject to a lien only if –
>
> (A)      the trustee is unable to obtain credit otherwise; and
>
> (B)      there is adequate protection of the interest of the holder of the lien
> on the property of the estate on which such senior or equal lien is
> proposed to be granted.

11 U.S.C. 364(d)(1).

29.      A debtor need only demonstrate "by a good faith effort that credit was not

available" without the protections afforded to potential lenders by Bankruptcy Code §§ 364(c) or

364(d). Mosello, 195 B.R. at 289 (citing In re Snowshoe Co., 789 F.2d 1085, 1088 (4th Cir.

1986)).  Thus, "[t]he statute imposes no duty to seek credit from every possible lender before

concluding that such credit is unavailable." Ames, 115 B.R. at 40 (holding that debtor made

reasonable effort to secure financing when it selected the least onerous financing option from the

remaining two lenders).  Moreover, where few lenders likely can or will extend the necessary

credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an

exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga.

1988), aff'd sub nom., Anchor Savings Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4

(N.D. Ga. 1989).

30.    As mentioned above, the Debtors selected the DIP Financing provided by the DIP

Lenders only after carefully examining all of its options.  In the end, it was not feasible for the

Debtors to obtain a loan on equal to or better terms that afforded the Company sufficient

liquidity to operate its business.  In addition, the Debtors were unable to obtain financing on an

unsecured basis or obtain an equity investment from any potential strategic partner.

31.    In the end, the DIP Lenders provided the only viable source of funding.

Accordingly, the Debtors commenced vigorous, arm's length and good faith negotiations with

the DIP Lenders for the DIP Financing.

32.    After fully considering the DIP Financing proposals, and whether other more

advantageous financing alternatives would be available to the Debtors, the Debtors, exercising

their sound business judgment, decided to accept the DIP Financing with the DIP Lenders.  The

DIP Financing provides significant advantages and favorable terms that the Debtors believe

would be unavailable through other lenders.  Further, the Debtors note that the Pre-Petition

Secured Parties that will be primed by the liens granted to the DIP Lenders have consented to the

relief requested herein (subject to the adequate protection described above).

### B.    Adequate Protection Under Bankruptcy Code §§ 364(d) and 361

33.    In connection with the DIP Financing, the Debtors propose providing the Pre-

Petition Secured Parties with adequate protection in accordance with sections 364(d) and 361 of

the Bankruptcy Code.[8]  To that end, the Debtors and the Pre-Petition Secured Parties have

negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain

protections of the Pre-Petition Secured Parties' interests in the Pre-Petition Collateral from any

diminution in value of each of their respective interests in the Pre-Petition Collateral resulting

from the Debtors' use, sale or lease of such collateral, and the imposition of the automatic stay.

34.     Pursuant to Bankruptcy Code § 363(c)(2), a debtor-in-possession may not use

cash collateral without the consent of the secured party or court approval.  Bankruptcy Code

§ 363(e) provides that, upon request of an entity that has an interest in property to be used by a

debtor, the court shall prohibit or condition such use as necessary to provide adequate protection

of such interest.  Under Bankruptcy Code § 364(d), a debtor may obtain credit secured by a

senior or equal lien if an existing secured creditor's interest in the collateral security is

adequately protected.

35.     What constitutes adequate protection is decided on a case-by-case basis.  See In re

Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); In re Swedeland Dev. Group, Inc., 16 F.3d

552, 56 (3d Cir. 1994); In re Realty Southwest Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In

re Beker Indus. Corp., 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also In re O'Connor, 808 F.2d

1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985).  By adequate protection,

the Code seeks to shield a secured creditor from diminution in the value of its interest in the

particular collateral during the period of use.  See In re 495 Central Park Avenue Corp., 136 B.R.

626, 631 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. at 736; In re Hubbard Power

& Light, 202 B.R. 680 (Bankr. E.D.N.Y. 1996).  When priming of liens is sought pursuant to

section 364(d) of the Bankruptcy Code, courts also examine whether the pre-petition secured

---

[8]     Bankruptcy Code section 364(d) requires that adequate protection be provided where the liens of secured
creditors are being primed to secure the obligations under a debtor-in-possession financing facility.  See 11
U.S.C. § 364(d).

creditors are being provided adequate protection for the value of their liens.  Beker, 58 B.R. at

737.  Because all of these tests are satisfied here and the Debtors have met all of their obligations

under section 364 of the Bankruptcy Code, the Motion should be granted and the DIP Financing

Agreements should be approved.

36.     Section 361(2)-(3) of the Bankruptcy Code expressly describes replacement liens

and administrative claim status as appropriate forms of adequate protection.  Thus, the provision

of these forms of adequate protection is appropriate.  Further, payment of reasonable and

documented out-of-pocket fees, costs and expenses often serves as a form of adequate protection

for secured creditors.  Agreeing to pay the reasonable and documented out-of-pocket fees, costs

and expenses offers meaningful additional protection to any diminution in the value of the Pre-

Petition Collateral.  Accordingly, the Debtors believe that the adequate protection described

above is fair, reasonable, and sufficient to protect any diminution in the value of the Pre-Petition

Secured Parties' interests in the Pre-Petition Collateral during the period their collateral is used

by the Debtors.

**C.      The DIP Financing is Necessary to Preserve the Assets of the Debtors'
          Estates**

37.     The Debtors must immediately instill the Company's employees, vendors, service

providers and customers with confidence that these Cases will not erode the Company's overall

value.  The Debtors believe that it must provide the Company's various constituents with

confidence in its ability to seamlessly transition the Company into chapter 11, operate the

Company's business normally in that environment and ultimately to sell the business in a

successful and expedient manner.  The DIP Financing will provide the working capital necessary

to allow the Debtors to, among other things, continue operating the Company's business in the

ordinary course of business, which in turn will help maintain value for the benefit of all creditors

and parties in interest.

38.     The initial success of the Cases at the outset depends on the confidence of the

Debtors' constituents, which in turn depends upon the Debtors' ability to minimize the disruption

of the bankruptcy filings.  Approval and implementation of the DIP Financing will assure

continued functioning of the Debtors and preserve the going concern value of their estates.

**D.     The Terms of the DIP Financing are Fair, Reasonable and Appropriate**

39.     After appropriate investigation and analysis, the Debtors' management has

concluded that the DIP Financing presents the best alternative available under the circumstances.

Bankruptcy courts routinely defer to a debtor's business judgment on most business decisions,

including the decision to borrow money, unless such decision fails the arbitrary and capricious

standard.  See Ames 115 B.R. at 40 (courts should approve borrowings pursuant to 364(c) and

(d) if the debtors was within its business judgment); In re Mid-State Raceway, Inc., 323 B.R. 40,

58-59 (Bankr. N.D.N.Y. 2005) (same); In re Trans World Airlines, Inc., 163 B.R. 964, 974

(Bankr. D. Del. 1994) (noting that approval of interim loan, receivables facility and asset-based

facility "reflect[ed] sound and prudent business judgment...[was] reasonable under the

circumstances and in the best interest of [the debtor] and its creditors"); cf. Group of Institutional

Investors v. Chicago, Mil., St. P. & Pac. Ry., 318 U.S. 523, 550 (1943) (holding that decisions

regarding assumption or rejection of leases are left to business judgment of the debtor); In re

Simasko Prods. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("[b]usiness judgments should be left to

the board room and not to this Court").  Indeed, "more exacting scrutiny [of the debtor's business

decisions] would slow the administration of the Debtor's estate and increase its cost, interfere

with the Bankruptcy Code's provision for private control of administration of the estate and

threaten the court's ability to control a case impartially."  Richmond Leasing Co. v. Capital

Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).

40.     The terms and conditions of the DIP Financing are fair and reasonable and were negotiated by the parties in good faith and at arms' length.  In the reasonable exercise of the Debtors' business judgment, the DIP Financing is the best financing option available under the present circumstances.  As discussed above, the Debtors, with the assistance of its advisors, assessed their financing needs and the DIP Financing proposal.  After fully considering the DIP Financing proposals, and whether other more advantageous financing alternatives were available to the Debtors, the Debtors decided to accept the DIP Financing with the DIP Lenders.

41.     Further, the proposed DIP Financing subjects the security interests and administrative expense claims of the DIP Lenders to the Carve-Out, as described above, thereby ensuring that in the event of a default under the DIP Credit Agreements, the Debtors' estates or other parties-in-interest are not directly or indirectly deprived of possible rights and powers by restricting the services for which professionals may be paid in these cases.  In Ames Dept. Stores, the court found such carve-outs for professional fees not only reasonable but necessary to ensure that official committees and debtors' estates can retain assistance from counsel.  See Ames, 115 B.R. at 38, 40 (observing that courts insist on carve-outs for professionals representing parties-in-interest because "absent such protection, the collective rights and expectation of all parties-in-interest are sorely prejudiced").

## II.     Interim Approval Should Be Granted

42.     The Debtors bring this Motion to obtain authorization to use Cash Collateral and borrow under the DIP Credit Agreements on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estates if the Debtors cannot obtain the financing needed to sustain the Company's business as a going concern while it implements and consummates the Sale.  The Debtors have an immediate need to obtain the DIP Financing and use Cash Collateral to permit them, in addition to financing the administration of these Cases, to

(a) operate the Company's business, (b) maintain business relationships with vendors, suppliers and customers, (c) pay employee wages in the ordinary course, (d) make necessary capital expenditures, and (e) satisfy other working capital and operational needs, all of which are necessary to preserve the Company's going-concern value.

43.     Without the use of Cash Collateral and the additional liquidity, the Debtors will not be able to meet their day-to-day operational needs.  If unable to meet the day-to-day operational needs, the Debtors would have to halt their operations which would drastically erode the overall value of the Company.  Further, the Debtors must demonstrate to the Company's customers and vendors that the Company has sufficient capital to ensure ongoing operations in the ordinary course – thereby assuaging any potential fears among the constituents of the Company that these Cases will negatively affect the Company's operations.  Therefore, the Debtors request approval of the DIP Financing on an expedited basis due to the immediate and irreparable harm that would be suffered by the Debtors' estate if the Debtors cannot obtain the financing needed to sustain the Company's business.

44.     Rule 4001(c) of the Bankruptcy Rules permits a court to approve a debtor's request for financing during the 15-day period following the filing of a motion requesting authorization to obtain post-petition financing "only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  In examining requests under this rule, courts apply the same business judgment standard as is applicable to other business decisions. See, e.g., Ames, 115 B.R. at 38.  After the 15-day period, the rule does not limit the request to those amounts necessary to avoid immediate and irreparable harm, and the debtor can borrow those amounts it views as prudent to the operation of its business. Id. at 36.

45.     The Debtors request that the Court conduct an expedited preliminary hearing on

the Motion and authorize the Debtors from and after the entry of the Interim Orders until the Final Hearing to obtain credit under the ABL DIP Credit Agreement in the amount of not more than $124,333,187.50, and under the Term Lender DIP Credit Agreement in the amount of not more than $6 million, which the Debtors shall use to, among other things, provide working capital for the Debtors and pay expenses for these Cases.  This authority will allow the Debtors to maintain ongoing operations and avoid immediate and irreparable harm and prejudice to their estates and all parties-in-interest pending the conclusion of the Final Hearing.

46.    Absent this Court's approval of the interim relief sought in this Motion, the Debtors face a substantial risk of severe disruption to the Company's business operations and irreparable damage to its relationships with its customers and vendors—the result of which would be a catastrophic erosion of the value of the Debtors' estates.  Simply put, the relief sought herein will allow the Debtors to ensure that the Company continues to operate during the Cases.

**III.    Request for Final Hearing**

47.    Pursuant to Rules 4001(b)(2) and 4001(c)(2) of the Bankruptcy Rules, the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable but in no event later than 30 days following the Petition Date.  At the Final Hearing, the Debtors will request Court authority to obtain up to obtain credit under the ABL DIP Credit Agreement in the amount of not more than $164,333,187.50 million in the aggregate, and under the Term Lender DIP Credit Agreement in the amount of not more than $12 million in the aggregate.

48.    The Debtors request authorization to serve a copy of the signed Interim Orders, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties (defined below).  The Debtors request that the Court consider such notice of the Final Hearing to be sufficient notice under Rule 4001 of the Bankruptcy Rules.

## Modification of the Automatic Stay

49.     Bankruptcy Code section 362 provides for an automatic stay upon the filing of a bankruptcy petition.  The DIP Financing Agreements require a modification of the automatic stay to implement the terms of the DIP Financing Agreements.

50.     Stay modification provisions of this kind are ordinary and standard features of post-petition debtor-in-possession financing facilities and, in the Debtors' business judgment, are reasonable under the present circumstances.  As noted above, the Debtors are unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code in an amount sufficient and readily available to maintain ongoing operations.  Nor have the Debtors been able to obtain debtor-in-possession financing on terms more favorable than those proposed herein.  The terms and conditions of the DIP Financing, including the modification of the automatic stay described above, are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arm's length.  In these circumstances, and importantly, in light of the material benefits afforded to the Debtors by the DIP Financing, the modification of the automatic stay is more than warranted.

## Request for Waiver of Stay

51.     The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Rule 6004(h) of the Bankruptcy Rules, "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  As set forth above, the DIP Financing is essential to prevent potentially irreparable damage to the Debtors' operations, value and ability to reorganize.  Accordingly, the Debtors submit that ample cause exists to justify a waiver of the fourteen-day stay imposed by Rule 6004(h) of the Bankruptcy Rules, to the extent it applies.

**Notice**

52.    Notice of this Application shall be provided to:  (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the agent under the Senior Secured Credit Facility; (d) counsel to the lenders under the Senior Secured Term Loan; (e) agent under the Senior Secured Term Loan; (f) counsel to the DIP Lenders; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; and (i) the Securities and Exchange Commission. As this Motion is seeking first-day relief, notice of this Motion and any order entered hereon will be served on all parties required by Del. Bankr. L.R. 9013-1(m).  Due to the urgency of the circumstances surrounding this Motion and the nature of the relief herein, the Debtors respectfully submit that no further notice of this Motion is required.

**No Prior Request**

53.     No prior Motion for the relief requested herein has been made to this Court or any

other court.

WHEREFORE, the Debtors respectfully request entry of the Interim Orders attached

hereto as Exhibit D, and Exhibit E, and Final Orders, granting the relief requested herein, and

granting such other and further relief as is just and proper.

Dated:   June 17, 2013                          Respectfully submitted,
            Wilmington, Delaware
                                                /s/ Stuart M. Brown
                                                Stuart M. Brown (DE 4050)
                                                DLA PIPER LLP (US)
                                                919 North Market Street, Suite 1500
                                                Wilmington, Delaware 19801
                                                Telephone:  (302) 468-5700
                                                Facsimile:  (302) 394-2341
                                                Email:  stuart.brown@dlapiper.com

                                                    -and-

                                                Richard A. Chesley (IL 6240877)
                                                Chun I. Jang (DE 4790)
                                                Daniel M. Simon (IL 6297629)
                                                DLA PIPER LLP (US)
                                                203 N. LaSalle Street, Suite 1900
                                                Chicago, Illinois 60601
                                                Telephone:  (312) 368-4000
                                                Facsimile:  (312) 236-7516
                                                Email:   richard.chesley@dlapiper.com
                                                         chun.jang@dlapiper.com
                                                         daniel.simon@dlapiper.com

                                                PROPOSED ATTORNEYS FOR DEBTORS AND
                                                DEBTORS IN POSSESSION