**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

```
-------------------------------------------------------------x
                                        :
In re:                                  :  Chapter 11
                                        :
Orchard Supply Hardware Stores Corporation,  :  Case No. 13-11565 (_____)
et al.,¹                                :
                                        :  (Joint Administration Pending)
              Debtors.                  :
                                        :
-------------------------------------------------------------x
```

**MOTION OF THE DEBTORS AND DEBTORS IN POSSESSION PURSUANT
TO SECTIONS 105(A), 363 AND 365 OF THE BANKRUPTCY CODE FOR AN
ORDER (I)(A) APPROVING AND AUTHORIZING BIDDING PROCEDURES IN
CONNECTION WITH THE SALE OF SUBSTANTIALLY ALL THE ASSETS; (B)
APPROVING THE STALKING HORSE BID PROTECTIONS; (C) APPROVING
THE SALE SUPPORT AGREEMENT; (D) SCHEDULING THE RELATED
AUCTION AND HEARING TO CONSIDER APPROVAL OF THE SALE; (E)
APPROVING PROCEDURES RELATED TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (F) APPROVING THE FORM AND MANNER OF NOTICE THEREOF;
AND (G) GRANTING RELATED RELIEF; AND (II)(A) APPROVING AND
AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS
PURSUANT TO THE SUCCESSFUL BIDDER'S ASSET PURCHASE AGREEMENT
FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER
INTERESTS; (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES RELATED
THERETO; AND (C) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (the "Debtors") hereby move the Court

(the "Motion") for the entry of an order pursuant to sections 105(a), 363 and 365 title 11 of the

United States Code (the "Bankruptcy Code"), Rules 2002, 6005, 6006, 9007 and 9014 of the

Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1

---

¹        The Debtors are the following three entities (the last four digits of their respective taxpayer identification
numbers, if any, follow in parentheses): Orchard Supply Hardware Stores Corporation (4109), Orchard
Supply Hardware LLC (3395) and OSH Properties LLC (3391).  The mailing address of each of the
Debtors, solely for purposes of notices and communications, is 6450 Via Del Oro, San Jose, California
95119.

of the Local Rules Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for an order (i)(a) approving procedures in connection with the sale of substantially all of the Debtors' assets; (b) approving the Stalking Horse Protections (as defined below); (c) approving the Sale Support Agreement (as defined below); (d) scheduling the related auction and hearing to consider approval of sale; (e) approving procedures related to the assumption of certain executory contracts and unexpired leases; (f) approving the form and manner of notice thereof; and (g) granting related relief; and (ii)(a) authorizing the sale of such assets free and clear of all liens, claims, encumbrances and other interests, except as provided in an Asset Purchase Agreement (as defined below); (b) approving the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases related thereto; and (c) granting relief related relief.  In support of this Motion, the Debtors further respectfully state as follows:

### Jurisdiction and Venue

1.      The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware dated as of February 29, 2012.  This is a core proceeding under 28 U.S.C. § 157(b). Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

### Background

2.      On June 17, 2013 (the  "Petition Date"), each of the Debtors filed with this Court voluntary petitions for relief under the Bankruptcy Code.

3.      Originally founded in San Jose, California in 1931, Orchard Supply Hardware Stores Corporation and its affiliated debtor subsidiaries (collectively, "Orchard," the "Debtors" or the "Company"), operate neighborhood hardware and garden stores.  As of the Petition Date, the Company operates 89 stores in California and two stores in Oregon.

2

4.      While the Orchard brand has been synonymous with California retailing for over eighty years, a highly leveraged capital structure instituted in 2006, combined with increasingly competitive conditions and a perilous California economy led the Company to experience sales declines of 21% over the three year period from 2007 through 2010.  The Company's extensive debt, combined with the increased costs as the Company transitioned to an independent public company in late 2011 following the Company's spin-off from Sears Holding Corporation ("Sears") made it difficult for the Company to comply with its loan covenants under the senior secured term loan (the "Senior Secured Term Loan") which, if defaulted, would then trigger a cross-default under its asset-backed revolving credit facility (the "Senior Secured Credit Facility").

5.      While the Company's new management stemmed the tide of declining sales through the strategic implementation of a number of key initiatives, including the highly successful new store prototype, due to the constraints present in the Company's debt structure, the Company was unable to dedicate the resources necessary to fully transform the Orchard brand in the manner necessary to support the debt structure.

6.      For these reasons, beginning just prior to, and continuing after the Sears spin-off, the Company began to explore and take action against a number of strategic alternatives aimed at, in the short-term, continued compliance with the leverage ratio covenants contained in the Senior Secured Term Loan, and, in the long-term, achieving a sustainable capital structure for the Company.  These efforts, some of which were successful in the short-term did not result in a sustainable long-term solution to support the Company's existing debt structure.  When it became clear that the existing debt structure rendered it exceedingly difficult to achieve a

sustainable capital structure, the Company began to work cooperatively with its lender constituencies toward a deleveraging transaction for the Company.

7.     As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors and, as a result, many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position.  These recent strains in liquidity, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and a looming debt maturity, ultimately resulted in the Company's decision to commence these chapter 11 cases.

8.     Prior to the filing of these cases, the Debtors determined that the interests of the Company's stakeholders would be best served by a going-concern sale of substantially all of the Debtors' assets pursuant to an auction process in accordance with section 363 of the Bankruptcy Code.  The Debtors undertook a focused marketing process with certain potential purchasers.  As a result of the Debtors' efforts, the Debtors have filed a motion to, among other things, approve certain bid procedures related to a sale pursuant to section 363 of the Bankruptcy Code to sell substantially all of the Debtors' assets and approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser (the "Stalking Horse Purchaser").

9.     The Debtors believe that the process will culminate in a going-concern sale consisting of most of the Orchard stores and continued employment for the vast majority of the Company's employees enabling the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery while protecting jobs and minimizing the impact to the substantial majority of the Company's vendors.

**Preliminary Statement**

10.     The Debtors have determined, after the exercise of due diligence and in consultation with their investment banker, Moelis & Company, LLC ("Moelis"), that maximizing the value of the Debtors' estates is best accomplished through the sale, free and clear of liabilities, of substantially all of the assets (as described more fully herein, the "Purchased Assets") of the Debtors (the "Sellers").

11.     The Sellers entered into that certain asset purchase agreement, dated June **17**, 2013 between the Sellers on the one hand and an affiliate of Lowe's Home Improvement, LLC (the "Stalking Horse Purchaser"), pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement," a copy of which is attached hereto as Exhibit B).[2]  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.  Pursuant to the terms of the Stalking Horse Agreement, the Stalking Horse Purchaser has agreed to purchase the Purchased Assets for the assumption of certain liabilities and a cash payment of $205,000,000, subject to certain adjustments (the "Stalking Horse Purchase Price").  The Stalking Horse Purchaser, in making this offer, has relied on promises by the Debtors to seek the Court's approval of reimbursement of its reasonable fees, costs and expenses incurred in connection with the transactions contemplated by the Stalking Horse Agreement through the date of termination, subject to a cap of $850,000, and a break-up fee of $6,150,000 (each as described more fully below, together, the "Stalking Horse Protections"), and in reasonable expectation that this Court would enter an

---

[2]     Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

order providing such relief.  The Debtors, in the exercise of their business judgment, believe that the Stalking Horse Protections are a necessary inducement for the Stalking Horse Purchaser, and thus, necessary to establish a "floor" for the sale of the Purchased Assets and ultimately encourage competitive bidding and realization of the highest value for the Purchased Assets.

12.    The sale of the Purchased Assets pursuant to the procedures and on the timeline proposed herein presents the best opportunity to maximize the value of the Purchased Assets for all interested parties.  Moreover, the rapid transition to new ownership will maximize the value of the Purchased Assets.

### Relief Requested[3]

13.    *First*, the Debtors request entry of an order, attached hereto as Exhibit C (the "Bidding Procedures Order"):  (A) approving procedures (the "Bidding Procedures," the form of which is attached thereto as Exhibit 1) for (i) submitting bids for any or all of the Purchased Assets of the Debtors and (ii) conducting an auction (the "Auction") with respect to the Purchased Assets in the event the Debtors receive at least one additional bid; (B) approving the Stalking Horse Protections; (C) approving the Sale Support Agreement (as defined below), attached hereto as Exhibit D; (D) scheduling the Auction for August 14, 2013 at 10:00 a.m. (prevailing Eastern Time) at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, or at such other place, date and time as may be designated by the Debtors; (E) scheduling a hearing to approve any sale of Purchased Assets with respect to any bid(s) accepted by the Debtors on or before August 20, 2013; (F) approving procedures (the

---

[3]    In compliance with Local Rule 6004-1 and for the convenience of the reader, the salient terms of the transaction as currently set forth in the Stalking Horse Agreement have been summarized and are attached hereto as Exhibit A.

"Cure Procedures"), as set forth below, for the assumption and assignment of certain executory

contracts (the "Contracts") and unexpired leases (the "Leases") of the Debtors to any

purchaser(s) of the Purchased Assets, and to resolve any objections thereto; and (G) approving

(i) the form of notice of the Auction and Sale (the "Procedures Notice"), attached hereto as

Exhibit E, to be served on the Procedures Notice Parties (as defined below) and (ii) the form of

notice to parties holding Contracts and Leases likely to be assumed and assigned in connection

with the sale of Purchased Assets, in the form attached hereto as Exhibit F (the "Cure Notice").

14.     *Second*, the Debtors will request entry of an order in the form attached hereto as

Exhibit G (the "Sale Order"), pursuant to sections 105, 363 and 365 of the Bankruptcy Code:

(i) approving the sale of the Purchased Assets of the Debtors to the purchaser, free and clear of

all liens, claims, encumbrances and liabilities, except as provided in an Asset Purchase

Agreement (as defined below), and (ii) authorizing the Debtors to consummate the Sale (as

defined below) and all documents, agreements and contracts executed in conjunction therewith.

## I.      PROPOSED BID AND SALE PROCEDURES

### Assets to be Sold

15.     As noted above, the Debtors seek to complete a sale (the "Sale") of the

Purchased Assets, which comprise, among other things:

- all of Sellers' properties, rights, claims and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, or licensed, for use in or relating to the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date;

- subject to Section 1.6 of the Stalking Horse Agreement, to the extent assignable pursuant to Section 365 of the Bankruptcy Code, all rights under Contracts, agreements and purchase and sale orders that are not Rejected Contracts (as defined in Section 1.6(a)(i) of the Stalking Horse Agreement), including all rights under any lease for Assumed Leased Real Property and any customer contracts and any contract renewal rights, but excluding obligations under the DIP Financing Agreement and the Excluded Contracts, each as listed on Schedule 1.1(b) of the Stalking Horse Agreement;

- to the extent related to the Business, except as set forth on Schedule 1.1(c) of the Stalking Horse Agreement, all trade and non-trade accounts receivable, notes receivable and negotiable instruments of Sellers, but excluding any intercompany Indebtedness among the Sellers;

- all of each Seller's Cash and Cash Equivalents other than as set forth on Schedule 1.1(d) of the Stalking Horse Agreement;

- all Documents relating to the Purchased Assets or Assumed Liabilities, including, without limitation, customer lists;

- the Owned Real Property listed on Schedule 1.1(f) of the Stalking Horse Agreement;

- the Owned Buildings, subject to ground leases, listed on Schedule 1.1(g) of the Stalking Horse Agreement;

- the Leased Real Property listed on Schedule 1.1(h) of the Stalking Horse Agreement, including any security deposits or other deposits delivered in connection therewith;

- all tangible assets of Sellers relating to the Business, other than the assets set forth on Schedule 1.1(i) of the Stalking Horse Agreement, including, without limitation, the tangible assets of Seller located at any Assumed Leased Real Property or at the Locations listed on Schedule 1.1(i) of the Stalking Horse Agreement;

- all personnel files for Transferred Employees except as required under Law; provided, however, that Sellers have the right to retain copies at Seller's expense to the extent required by Law;

- any chattel paper owned or held by Sellers relating to the Business or the Purchased Assets other than the Excluded Assets;

- any lock boxes to which account debtors of the Sellers remit payment relating to the Business or the Purchased Assets other than the Excluded Assets;

- all other or additional assets, properties, privileges, rights (including prepaid expenses) and interests of Sellers relating to the Business or the Purchased Assets other than the Excluded Assets of every kind and description and wherever located, whether known or unknown, fixed or unfixed, accrued, absolute, contingent or otherwise, and whether or not specifically referred to in this Agreement;

- all Permits and all pending applications therefor;

- all express or implied guarantees, warranties, representations, covenants, indemnities, rights, claims, counterclaims, defenses, credits, causes of action or rights of set off against third parties relating to the Purchased Assets (including, for the avoidance of doubt, those arising under, or otherwise relating to the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities, guaranties and avoidance claims and causes of action under the Bankruptcy Code or applicable Law that are possessed by the Sellers;

- the Intellectual Property;

- all goodwill, payment intangibles and general intangible assets and rights of Seller to the extent associated with the Business or the Purchased Assets other than the Excluded Assets;

- all Inventory, including raw materials, work in process, parts, subassemblies and finished goods, wherever located and whether or not obsolete or carried on the Sellers' books of account, in each case with any transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets to the extent owned by Sellers;

- to the extent permitted by Law, the Sellers' Documents, and without limiting the foregoing, each of the following: financial accounting and other books and records, correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case arising under or relating to the Purchased Assets, the Assumed Liabilities or the Business provided, however, that Sellers have the right to retain copies of all of the foregoing at Purchaser's expense;

- to the extent transferable, all rights and obligations under or arising out of all insurance policies relating to the Business or any of the Purchased Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies);

- all Tax assets net of any liability (including all state and federal Tax refunds (or the right to such state and federal refunds of Taxes, whether claimed or unclaimed) for all taxable periods (or portions thereof), whether ending on, prior to, or after the Closing Date;

- all rights and obligations under non-disclosure or confidentiality, key employee retention plans and similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the filing of the Bankruptcy Cases and the Auction contemplated by the Bidding Procedures Order);

- all Assumed Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) listed on Schedule 1.1(w) of the Stalking Horse Agreement;

- to the extent owned by any Seller, all fixed assets and other personal property and interests related to the Business or Purchased Assets, wherever located, including all vehicles, tools, parts and supplies, fuel, machinery, equipment, furniture, furnishing, appliances, fixtures, office equipment and supplies, owned and licensed computer hardware and related documentation, stored data, communication equipment, trade fixtures and leasehold improvements, in each case with any freely transferable warranty and service rights of the applicable Seller with respect to such Purchased Assets;

- telephone, fax numbers and email addresses;

- all of Sellers' rights to receive refunds, payments or overpayments, clawbacks or other amounts (whether from a workers' compensation administrator or otherwise) in respect of any and all workers' compensation matters, claims, potential claims, purported claims and similar related items with respect to any Transferred Employee;

- all avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws relating to the Purchased Assets and/or Assumed Liabilities, including all actions relating to vendors and service providers used in the Business that are counterparties to Assumed Contracts or relating to Assumed Liabilities;

- except to the extent set forth on Schedule 1.1(bb) of the Stalking Horse Agreement, any and all claims, deposits, prepayments, refunds, rebates, causes of action, rights of recovery, rights of set-off and rights of recoupment relating to or in respect of an Excluded Asset.

16.    The Debtors shall entertain either cash bids, or to the extent applicable as described further below, credit bids for the Purchased Assets.  The Purchased Assets shall not include the assets forth in Section 1.2 of the Stalking Horse Agreement (the "Excluded Assets"), including without limitation:

- any asset of Sellers that otherwise would constitute a Purchased Asset but for the fact that it is sold or otherwise disposed of in the Ordinary Course of Business of such Sellers and in conformity with the terms and conditions of this Agreement, during the time from the Agreement Date until the Closing Date, or Purchaser otherwise agrees to such disposition;

- copies of any and all information not relating to the Business that is stored on any Seller's computer systems, data networks or servers;

- all agreements and contracts of Sellers other than the Assigned Contracts;

- all Documents and all personnel records of Seller's employees that any Seller is required by Law to retain and is prohibited by Law from providing a copy thereof to Purchaser;

- the Seller's Organizational Documents, corporate charter, minute and stock record books, Tax Returns, corporate seal, checkbooks and canceled checks;

- all shares of capital stock or other equity interests issued by any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests;

- any avoidance claims or causes of action under the Bankruptcy Code or applicable Law (including, without limitation, any preference or fraudulent conveyance), and all other claims or causes of action under any other provision of the Bankruptcy Code or applicable laws, solely relating to Excluded Assets or Excluded Liabilities;

- all Claims that any of the Sellers may have against any Person solely with respect to any Excluded Assets or any Excluded Liabilities;

- Sellers' rights under this Agreement, the Purchase Price hereunder, any agreement, certificate, instrument or other document executed and delivered by Purchaser to any Seller in connection with the transactions contemplated hereby, or any side agreement between any Seller and Purchaser entered into on or after the Agreement Date;

- all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

- any assets in the store locations listed in Schedule 1.2(j) of the Stalking Horse Agreement, which the Sellers plan to sell in going-out-of business sales;

- any proceeds received by the Sellers from the GOB Sales;

- all deposits or pre-paid amounts funded by the Sellers for the purpose of the Bankruptcy Cases set forth on Schedule 1.2(m); and

- all Benefit Plans (including all assets, trusts, insurance policies and administration service contracts related thereto) except for the Assumed Plans.

17.     Except as otherwise provided in an Asset Purchase Agreement (as defined below), all of the Debtors' rights, title and interest in all of the Purchased Assets shall be sold free and clear of any liens, security interests, claims, charges or encumbrances in accordance with section 363 of the Bankruptcy Code.  The Debtors propose that any such liens, security interests, claims, charges or encumbrances shall attach to the amounts payable to the Debtors' estates resulting from the Sale, net of any transaction fees (the "Sale Proceeds"), in the same order of priority and subject to the rights, claims, defenses, and objections, if any, of all parties with respect thereto, subject to any further order of the Court.

### Summary of Proposed Bidding Procedures

18.     In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

**A.     Provisions Governing Qualifications of Bidders**

19.     Unless otherwise ordered by the Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

(a)     a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

(b)     an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors, in substantially the same form as signed by the Stalking Horse Purchaser and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

20.    A Potential Bidder that delivers the documents and information described above and that the Debtors determine in their reasonable business judgment, after consultation with their advisors and with counsel to the lender under the Senior Secured Credit Facility (the "Senior Secured Credit Facility Lender"), is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "Qualified Bidder."  The Debtors will limit access to due diligence to those parties it believes, in the exercise of their reasonable judgment and after consultation with the Senior Secured Credit Facility Lender, are pursuing the transaction in good faith.

21.    As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors, in consultation with the Senior Secured Credit Facility Lender, will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

**B.    Due Diligence**

22.    The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion, which must include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information; provided, however, that with respect to any strategic bidders, the Debtors will, in their reasonable discretion, make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Purchaser.  The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials.  The due diligence period shall extend through and include the Auction date; provided, however, that any Qualified Bid (as defined below) submitted shall be irrevocable until the selection of the Successful Bidder.

C.      **Provisions Governing Qualified Bids**

23.      A bid submitted will be considered a Qualified Bid only if the bid is submitted

by a Qualified Bidder and complies with all of the following (a "Qualified Bid"):

(a)      it states that the applicable Qualified Bidder offers to purchase, in cash or, if applicable, credit bid, the Purchased Assets upon the terms and conditions that the Debtors reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

(b)      it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is fifteen (15) days after the Sale Hearing;

(c)      confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(d)      it includes a duly authorized and executed copy of an Asset Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement ("Marked Agreement") and the proposed orders to approve the sale by the Bankruptcy Court;

(e)      it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

(f)      it provides for the repayment of all other costs, simultaneously with the closing of the transaction contemplated under the Asset Purchase Agreement;

(g)      it has a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (A) the aggregate amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (B) $5,000,000;

(h)     it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume, provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

(i)     it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Asset Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

(j)     it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

(k)     except in the case of a bidder submitting a Credit Bid (as defined below), it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to $15,000,000 of the Purchase Price;

(l)     it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

(m)     it includes an agreement from the Qualified Bidder to assume no less than fifty percent (50%) of the payments approved by Bankruptcy Court pursuant to the Debtors' Motion to Approve a Key Employee Incentive Plan;

(n)     it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

(o)     it contains such other information reasonably requested by the Debtors; and

(p)     it is received prior to the Bid Deadline.

24.     Notwithstanding the foregoing but subject in all respects to the Sale Support Agreement, the Stalking Horse Purchaser and the Term Administrative Agent under the Senior Secured Term Loan agreement (the "Term Administrative Agent") will each be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the sale.

25.     The Debtors shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided, however, that such notification shall not be given later than two (2) business days following the expiration of the Bid Deadline.

**D.     Bid Deadline**

26.     A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)); (ii) counsel to the Stalking Horse Purchaser: Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202, Attention: Gregory G. Hesse); (iii) counsel to the DIP Lender and Senior Secured Credit Facility Lender: Riemer & Braunstein LLP, 3 Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E. Rothman); (iv) counsel to the Term Administrative Agent and steering committee of lenders under the Senior Secured Term Loan: Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036 (Attn: Michael J. Sage and Scott M. Zimmerman); (v) the Term Administrative Agent under the Senior Secured Term Loan: Gleacher & Company, 1290 Avenue of the

Americas, New York, NY 10104 (Attn: Joanna W. Anderson); (vi) counsel to any statutory committee of unsecured creditors appointed in these cases, so as to be received by the Debtors not later than <u>4:00 p.m. EST on August 9, 2013</u> (the "<u>Bid Deadline</u>").  The Bid Deadline may not be extended without the written consent of the Stalking Horse Purchaser.

**E.     Credit Bidding and Sale Support Agreement**

27.     In connection with the Sale of all or any of the Purchased Assets, the Debtors' lenders holding a perfected security interest in such Purchased Assets, may seek to credit bid some or all of their claims for their respective collateral (a "<u>Credit Bid</u>").  A Credit Bid may be applied only to reduce the cash consideration with respect to those Purchased Assets in which the party submitting such Credit Bid holds a security interest.  In order to be considered a "Qualified Credit Bid" any Credit Bid submitted must provide for the assumption and/or payment of administrative expense claims of the Debtors and satisfy the Bid Protections provided for in the Bidding Procedures.

28.     On June 17, 2013, based upon the bid submitted by the Stalking Horse Purchaser, the Required Term Lenders, the Term Administrative Agent and the Stalking Horse Purchaser, with the consent of the Debtors, entered into the sale support agreement (the "<u>Sale Support Agreement</u>"), attached hereto as <u>Exhibit D</u>.  The Sale Support Agreement provides, among other things, that neither the Term Administrative Agent nor the lenders under the Senior Secured Term Loan shall submit a credit bid under section 363(k) of the Bankruptcy Code; provided, however, that in the event that either (i) the Stalking Horse Purchaser materially defaults or is otherwise in material breach of the Stalking Horse Agreement or (ii) the Debtors deem a Competing Bid to be a Qualified Bid (as those terms are defined below), but the Term Lenders believe in their reasonable judgment that such Competing Bid results in a lesser recovery for the Term Lenders, the Term Administrative Agent and the lenders under the Senior

Secured Term Loan shall be entitled to all rights under section 363(k) of the Bankruptcy Code..

The Sale Support Agreement also contains, among other things, that the Sale Order shall be

entered no later than September 3, 2013.

29.      The Sale Support Agreement was negotiated in good faith between the parties

thereto, and was necessary for the negotiation and execution of the Stalking Horse Agreement.

Without approval of the Sale Support Agreement, the Stalking Horse Purchaser would not have

entered into the Stalking Horse Agreement.  The Debtors believe that approval of the Sale

Support Agreement is necessary to protect the going-concern value of the Debtors' estates, and

will ultimately lead to an Auction that will enable it to obtain the highest and best offer for these

assets (thereby maximizing the value of estates) and is in the best interests of the Debtors'

creditors.

30.      Accordingly, the Debtors seek the Court's approval of the Sale Support

Agreement, as well as allowance of credit bidding in connection with any Sale to the full extent

of Bankruptcy Code section 363(k), except to the extent otherwise provided in the Sale Support

Agreement.

**F.       Evaluation of Competing Bids**

31.      A Qualified Bid will be valued based upon several factors including, without

limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating

such bid, (3) any proposed revisions to the Stalking Horse Agreement, and (4) any other factors

deemed relevant by the Debtors in their reasonable discretion.

**G.       No Qualified Bids**

32.      If the Debtors do not receive any Qualified Bids other than the Stalking Horse

Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be

named the Successful Bidder on the Bid Deadline.

**H.      Auction Process**

33.      If the Debtors receive one or more Qualified Bids in addition to the Stalking

Horse Agreement, the Debtors will conduct the Auction of the Purchased Assets, which shall be

transcribed at 10:00 a.m. (EST) on August 14, 2013, at the offices of DLA Piper LLP (US),

1251 Avenue of the Americas, New York, New York 10020, or such other location as shall be

timely communicated to all entities entitled to attend the Auction.  The Auction shall run in

accordance with the following procedures:

> (a)      only the Debtors, the Stalking Horse Purchaser, the Senior Secured Credit Facility Lenders, the lenders under the Senior Secured Term Loan agreement, the Term Administrative Agent and the unsecured creditors committee, and the advisors to each of the foregoing, and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction
>
> (b)      only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;
>
> (c)      each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;
>
> (d)      at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe, in their reasonable discretion after consultation with committee counsel and counsel to the Senior Secured Credit Facility Lender, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders;
>
> (e)      all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing

to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

(f)    the Debtors, after consultation with their advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, <u>provided</u> that such rules are (i) not inconsistent with the Bidding Procedures appended as <u>Exhibit 1</u> to the Bidding Procedures Order, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(g)    bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "Subsequent Bid") providing a net value to the estate of at least an additional $2,000,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with committee counsel and counsel to the Senior Secured Credit Facility Lender, shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "Leading Bid"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Each Qualified Bidder will only have one opportunity to pass. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors will give effect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors.

## I.    Selection of Successful Bid

34.    Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors, and in consultation with committee counsel, counsel to the Senior Secured Credit Facility Lender and counsel to the Agent under the Senior Secured Term Loan, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Purchaser) submitted at the Auction (one or more such bids, collectively the "Successful Bid" and the bidder(s) making such bid, collectively, the "Successful Bidder"), and communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful

Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

35.      Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within two (2) business days after adjournment of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court.

36.      The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing (as defined below).

**J.      Return of Deposits**

37.      All good faith deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

**K.      Back-Up Bidder**

38.      If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until fifteen days after the Sale Hearing.  Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

**L.      The Bid Protections**

39.      In recognition of this expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser (i) an aggregate fee of approximately $6,150,000, which is equal to 3% of the aggregate Stalking Horse Purchase Price, prior to any closing adjustments (the "Break-Up Fee"), and (ii) an amount in cash equal to the aggregate amount of the reasonable fees, costs and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of Stalking Horse Purchaser) paid or incurred by or on behalf of Stalking Horse Purchaser relating to or in connection with its bid (the "Expense Reimbursement"), subject to a cap of $850,000.  The Stalking Horse Purchaser shall provide reasonable documentation of the Expense Reimbursement to the Debtors and the Office of the United States Trustee.  The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

40.      The Debtors have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable within two (2) business days under the terms and conditions of the Stalking Horse Agreement and the Bid Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code; provided, however, that payment of the Break-Up Fee and Expense Reimbursement shall only be made upon payment in full under the DIP Financing Agreements.

**M.      Sale Hearing**

41.      The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before August 20, 2013 (prevailing Eastern Time), to

approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.

### Notice of Sale Hearing

42.     As stated above, the Debtors request that this Court schedule the Sale Hearing for August 20, 2013.  The Debtors propose that any objections to the Sale be filed by 4:00 p.m. (prevailing Eastern Time) on August 9, 2013.

43.     The Debtors also request that the Court approve the form of the Procedures Notice, substantially in the form of <u>Exhibit E</u> hereto.  The Debtors will serve a copy of the Procedures Notice on the following parties:  (a) the U.S. Trustee, (b) the Official Committee of Unsecured Creditors, (c) any parties requesting notices in these cases pursuant to Bankruptcy Rule 2002, (d) all known creditors of the Debtors, (e) counsel to the Stalking Horse Purchaser, and (f) all Potential Bidders (collectively with the parties specified in this paragraph, the "<u>Procedures Notice Parties</u>").

44.     The Debtors propose to serve the Procedures Notice within two (2) business days following entry of the Bidding Procedures Order, by first-class mail, postage prepaid on the Procedures Notice Parties.  The Procedures Notice provides that any party that has not received a copy of the Motion or the Bidding Procedures Order that wishes to obtain a copy of the Motion or the Bidding Procedures Order, including all exhibits thereto, may make such a request in writing to BMC Group, Inc., Attn: OSH Claims Processing, PO Box 3020, Chanhassen, MN 55317-3020, by calling the following toll-free number: (888) 909-0100, or by visiting www.bmcgroup.com/OSH.

45.     The Debtors submit that the foregoing notices comply fully with Bankruptcy Rule 2002 and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, Auction and Sale, and Sale Hearing to the Debtors' creditors and other parties in

interests as well as to those who have expressed an interest or are likely to express an interest in bidding on the Purchased Assets.  Based on the foregoing, the Debtors respectfully request that this Court approve these proposed notice procedures.

### Sale Hearing

46.    At the Sale Hearing, the Debtors will seek Court approval of the Sale to the Successful Bidder, free and clear of all liens, claims and encumbrances pursuant to section 363 of the Bankruptcy Code, with all liens, claims and encumbrances to attach to the Sale Proceeds with the same validity and in the same order of priority as they attached to the Purchased Assets prior to the Sale, including the assumption by the Debtors and assignment to the Successful Bidder of the assumed Contracts and Leases pursuant to section 365 of the Bankruptcy Code. The Debtors will submit and present additional evidence, as necessary, at the Sale Hearing demonstrating that the Sale is fair, reasonable and in the best interest of the Debtors' estates and all interested parties.

### Procedures for the Assumption and Assignment of Assumed Contracts and Leases

47.    As noted above, the Debtors will seek to assume and assign certain Contracts and Leases to be identified on schedules to the Stalking Horse Agreement other than those agreements excluded by the Successful Bidder pursuant to such bidder's Asset Purchase Agreement (collectively, the "Assumed Executory Contracts").

48.    At least initially, the Assumed Executory Contracts will be those Contracts and Leases that the Debtors believe may be assumed and assigned as part of the orderly transfer of the Purchased Assets.  The Successful Bidder may choose to exclude (or to add) certain Contracts or Leases to the list of Assumed Executory Contracts, subject to further notice.

49.    In the interim, the Debtors will serve the Motion and the Cure Notice, substantially in the form of Exhibit F hereto, upon each counterparty to the Assumed Executory

Contracts by no later than five (5) days following entry of the Bid Procedures Order. The Cure

Notice will state the date, time and place of the Sale Hearing as well as the date by which any

objection to the assumption and assignment of Assumed Executory Contracts must be filed and

served. The Cure Notice also will identify the amounts, if any, that the Debtors believe are

owed to each counterparty to an Assumed Executory Contract in order to cure any defaults that

exist under such contract (the "Cure Amounts"). If a Contract or Lease is assumed and assigned

pursuant to Court Order, then unless the Assumed Executory Contract counterparty properly

files and serves an objection to the Cure Amount contained in the Cure Notice, the Assumed

Executory Contract counterparty will receive at the time of the Closing of the sale (or as soon as

reasonably practicable thereafter), the Cure Amount as set forth in the Cure Notice, if any, with

payment to be made pursuant to the terms of the Successful Bidder's Asset Purchase

Agreement. If an objection is filed by a counterparty to an Assumed Executory Contract, the

Debtors propose that such objection must set forth a specific default in any executory contract

or unexpired lease and claim a specific monetary amount that differs from the amount, if any,

specified by the Debtors in the Cure Notice. To the extent there is a contract to be assumed

pursuant to the Successful Bidder's Asset Purchase Agreement, this Motion constitutes a

separate motion to assume and assign that contract to the Successful Bidder pursuant to section

365 of the Bankruptcy Code; each such contract will be listed on an exhibit to the Successful

Bidder's Asset Purchase Agreement, and will be given a separate Cure Notice.

50.     If any counterparty objects for any reason to the assumption and assignment of

an Assumed Executory Contract (a "Cure Amount Objection"), the Debtors propose that the

counterparty must file the objection by no later than (i) 4:00 p.m. (prevailing Eastern Time) on

August 9, 2013 or (ii) the date otherwise specified in the Cure Notice (or, alternatively, the date

set forth in the motion to assume such Assumed Executory Contract if such contract is to be assumed and assigned after the Auction), provided, however, that any counterparty may raise at the Sale Hearing an objection to the assumption and assignment of the Assumed Executory Contract solely with respect to the Successful Bidder's ability to provide adequate assurance of future performance under the Assumed Executory Contract.  After receipt of a Cure Amount Objection, the Debtors will attempt to reconcile any differences in the Cure Amount.  In the event that the Debtors and the non-debtor party cannot resolve the Cure Amount Objection, and the Court does not otherwise make a determination at the Sale Hearing, the Debtors may, in their discretion, segregate any disputed Cure Amounts pending the resolution of any such disputes by the Court or mutual agreement of the parties.

51.     The Successful Bidder shall be responsible for satisfying any requirements regarding adequate assurance of future performance that may be imposed under section 365(b) of the Bankruptcy Code in connection with the proposed assignment of any Assumed Executory Contract, and the failure to provide adequate assurance of future performance to any counterparty to any Assumed Executory Contract shall not excuse the Successful Bidder from performance of any and all of its obligations pursuant to the Successful Bidder's Asset Purchase Agreement.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Assumed Executory Contacts pursuant to section 365(b) of the Bankruptcy Code at the Sale Hearing.  Cure Amounts disputed by any counterparty will be resolved by the Court at the Sale Hearing or such later date as may be agreed to or ordered by the Court.

52.     Except to the extent otherwise provided in the Successful Bidder's Asset Purchase Agreement, the Debtors and the Debtors' estates shall be relieved of all liability

accruing or arising after the assumption and assignment of the Assumed Executory Contracts pursuant to section 365(k) of the Bankruptcy Code.

## II.    APPLICABLE AUTHORITY

### A.    The Sale of the Purchased Assets is Authorized by Section 363 as a Sound Exercise of the Debtors' Business Judgment

53.    In accordance with Bankruptcy Rule 6004, sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Debtors have determined that the Sale of the Purchased Assets by public auction will enable it to obtain the highest and best offer for these assets (thereby maximizing the value of estates) and is in the best interests of the Debtors' creditors.  In particular, the Stalking Horse Agreement and is the result of comprehensive, arm's length negotiations for the Sale of the Purchased Assets, and the Sale pursuant to the terms of the Stalking Horse Agreement, subject to higher or otherwise better offers at the Auction, will provide a greater recovery for the Debtors' creditors than would be provided by any other existing alternative.

54.    Section 363 of the Bankruptcy Code provides that a trustee, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b).  Although section 363 of the Bankruptcy Code does not specify a standard for determining when it is appropriate for a court to authorize the use, sale or lease of property of the estate, a sale of a debtor's assets should be authorized if a sound business purpose exists for doing so.  See, e.g., Meyers v. Martin (In re Martin), 91 F.3d 289, 295 (3d Cir. 1996); In re Abbotts Dairies of Pennsylvania, Inc., 788 P.2d 143 (2d Cir. 1986); In re Titusville Country Club, 128 BR. 396 (W.D. Pa. 1991); In re Delaware & Hudson Ry. Co., 124 BR. 169, 176 D. Del. 1991); see also Official Committee of Unsecured Creditors v. The LTV Corp. (In re Chateaugay Corp.), 973 F.2d 141, 143 (2d Cir. 1992); Committee of Equity Sec.

Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Committee of

Asbestos-Related Litigants and/or Creditors v. Johns-Manville Corp. (In re Johns-Manville

Corp.), 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986).

       55.     The paramount goal in any proposed sale of property of the estate is to maximize

the proceeds received by the estate.  See, e.g., In re Food Barn Stores, Inc., 107 F.3d 558,

564-65 (8th Cir. 1997) (finding that in bankruptcy sales, "a primary objective of the Code [is] to

enhance the value of the estate at hand"); Integrated Resources, 147 B.R. at 659 ("It is a

well-established principle of bankruptcy law that the . . . [trustee's] duty with respect to such

sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting

In re Atlanta Packaging Prods., Inc., 99 BR. 124, 130 (Bankr. N.D. Ga. 1988)).  As long as the

sale appears to enhance a debtor's estate, court approval of a trustee's decision to sell should

only be withheld if the trustee's judgment is clearly erroneous, too speculative, or contrary to

the provisions of the Bankruptcy Code.  GBL Holding Co., Inc. v. Blackburn/Travis/Cole, Ltd.,

331 B.R. 251, 255 (N.D. Tex. 2005); In re Lajijani, 325 B.R. 282, 289 (9th Cir. B.A.P. 2005); In

re WPRV-TV, Inc., 143 B.R. 315, 319 (D. P.R. 1991) ("The trustee has ample discretion to

administer the estate, including authority to conduct public or private sales of estate property.

Courts have much discretion on whether to approve proposed sales, but the trustee's business

judgment is subject to great judicial deference.").

       56.     Applying section 363, the proposed Sale of the Purchased Assets should be

approved.  As set forth above, the Debtors have determined that the best method of maximizing

the recovery of the Debtors' creditors would be through the Sale of the Purchased Assets.  The

fairness and reasonableness of the consideration to be paid by the purchaser(s) will be

demonstrated by adequate "market exposure" and an open and fair auction process — the best

means for establishing whether a fair and reasonable price is being paid. In order to ensure a fair auction process, the Debtors have and will continue to solicit interest from numerous potential purchasers.

57. Further, the Debtors believe that the value the Debtors' estates—and, thus, the Debtors' creditors—will receive for the Sale of the Purchased Assets as a going concern exceeds any value the Debtors' estates could get for the Purchased Assets if the Debtors were required to liquidate their assets piecemeal. The Debtors also believe that the value of the consideration likely to be received for the Purchased Assets under an Asset Purchase Agreement is fair and reasonable. As further assurance of value, however, bids will be tested through the Auction consistent with the requirements of the Bankruptcy Code, the Bankruptcy Rules, and pursuant to the Bidding Procedures approved by the Court. Consequently, the fairness and reasonableness of the consideration to be paid by the Successful Bidder ultimately will be demonstrated by adequate "market exposure" and an open and fair auction process — the best means, under the circumstances, for establishing whether a fair and reasonable price is being paid.

58. The Debtors and their investment banker believe that the timeline for the marketing and sale of the Purchased Assets is adequate, and balances the need to fully market the Purchased Assets and maintain continuity in the operation of the business for vendors, customers and employees. The Debtors' investment banker is prepared to quickly contact potential interested parties and determine the level of interest in a potential acquisition and provide them access to a confidential business overview management presentation and access to a data room that has been assembled upon the execution of an appropriate confidentiality agreement. There is a limited universe of potential acquirers of the Purchased Assets, and,

during the latter half of 2012, the Debtors and their investment banker had preliminary

discussions with many of these potential purchasers.

**B.      The Bidding Procedures Are Appropriate and Will Maximize the Value Received
         for the Purchased Assets.**

59.      As noted above, the paramount goal in any proposed sale of property of the

estate is to maximize the proceeds received by the estate.  To that end, courts uniformly

recognize that procedures intended to enhance competitive bidding are consistent with the goal

of maximizing the value received by the estate and therefore are appropriate in the context of

bankruptcy sales.  See, e.g., In re Fin'l News Network, Inc., 126 B.R. 152, 156 (Bankr.

S.D.N.Y. 1991) ("Court-imposed rules for the disposition of assets . . . [should] provide an

adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution

of bankrupt estates").

60.      Procedures to dispose of assets, similar to the proposed Bidding Procedures,

have been approved in other large, complex bankruptcy cases.  See, e.g., In re Conex Holdings

LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2011); In re Barnes Bay Development

Ltd., Case No. 11-10792 (PJW) (Bankr. D. Del. May 19, 2011); In re East West Resort

Development V, L.P., L.L.L.P., Case No. 10-10452 (BLS) (Bankr. D. Del. March 31, 2010); In

re Dana Corp., Case No. 06-10354 (Bankr. S.D.N.Y. Oct. 19, 2006); In re Delphi Corp., Case

No. 05-44481 (Bankr. S.D.N.Y. June 22, 2006); In re Oxford Automotive, Inc., Case No. 04-

74377 (Bankr. E.D. Mich. Jan. 24, 2005); see also In re Calpine Corp., Case No. 05-60200

(Bankr. S.D.N.Y. Dec. 6, 2006).

61.      The Debtors believe that the Bidding Procedures will establish the parameters

under which the value of the Purchased Assets may be tested at an auction and through the

ensuing Sale Hearing.  Such procedures will increase the likelihood that the Debtors' creditors

will receive the greatest possible consideration for their assets because they will ensure a

competitive and fair bidding process.  They also allow the Debtors to undertake an auction in as

expeditious and efficient manner as possible, which the Debtors believe is essential to

maximizing the value of the Debtors' estates for their creditors.

62.     The Debtors also believe that the proposed Bidding Procedures will promote

active bidding from seriously interested parties and will dispel any doubt as to the best and

highest offer reasonably available for the Debtors' assets.  In particular, the proposed Bidding

Procedures will allow the Debtors to conduct an auction in a controlled, fair and open fashion

that will encourage participation by financially capable bidders who demonstrate the ability to

close a transaction.

63.     In sum, the Debtors believe that the Bidding Procedures will encourage bidding

for the Purchased Assets and are consistent with the relevant standards governing auction

proceedings and bidding incentives in bankruptcy proceedings.  Accordingly, the proposed

Bidding Procedures are reasonable, appropriate and within the Debtors' sound business

judgment.

**C.      Credit Bidding Should be Authorized and the Sale Support Agreement Should be Approved.**

64.     A secured creditor is allowed to "credit bid" the amount of its claim in a sale.

Section 363(k) of the Bankruptcy Code provides, in relevant part, that in a sale under section

363 of the Bankruptcy Code, unless the court for cause orders otherwise, the holder of a claim

secured by property that is the subject of the sale "may bid at such sale, and, if the holder of

such claim purchases such property, such holder may offset such claim against the purchase

price of such property."  11 U.S.C. § 363(k).  Even if a secured creditor is undersecured, as

determined in accordance with section 506(a) of the Bankruptcy Code, section 363(k) allows

such secured creditor to bid the total face value of its claim on its collateralized assets and does not limit the credit bid to the claim's economic value.  See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sys. Corp.), 432 F.3d 448, 459-60 (3d Cir. 2006) (explaining that "[i]t is well settled among district and bankruptcy courts that creditors can bid the full face value of their secured claims under § 363(k)").

65.     Pursuant to the Bidding Procedures, the Debtors' secured lenders are entitled to credit bid some or all of their claims for their respective collateral pursuant to section 363(k) of the Bankruptcy Code.  Because the Secured Lenders hold claims that are secured by certain of the Purchased Assets, such lenders should be allowed to credit bid the face value of their secured claims in order to purchase such assets.

66.     Notwithstanding the foregoing, the Sale Support Agreement is a necessary component to the Stalking Horse Agreement and the believe that approval of the Sale Support Agreement is necessary to protect the going-concern value of the Debtors' estates, and will ultimately lead to an Auction that will enable it to obtain the highest and best offer for these assets (thereby maximizing the value of estates) and is in the best interests of the Debtors' creditors.  Accordingly, the Debtors believe that the Court should approve the Sale Support Agreement.

**D.     The Sale of the Purchased Assets Free and Clear of Liens and Other Interests is Authorized by Sections 363(f)**

67.     The Debtors further submit that it is appropriate to sell the Purchased Assets free and clear of liens pursuant to section 363(f) of the Bankruptcy Code, with any such liens attaching to the Sale Proceeds of the Purchased Assets to the extent applicable.  Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests and encumbrances if:

(1)     applicable nonbankruptcy law permits sale of such property free and clear of such interests;

(2)     such entity consents;

(3)     such interest is a lien and the price at which such property is to be sold is greater than the value of all liens on such property;

(4)     such interest is in bona fide dispute; or

(5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f).

68.     This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a).

69.     Because section 363(f) of the Bankruptcy Code is drafted in the disjunctive, satisfaction of any one of its five requirements will suffice to permit the sale of the Purchased Assets "free and clear" of liens and interests.  In re Dundee Equity Corp., 1992 Bankr. LEXIS 436, at *12 (Bankr. S.D.N.Y. March 6, 1992) ("[s]ection 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met."); In re Bygaph, Inc., 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same); Michigan Employment Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.), 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (stating that Bankruptcy Code section 363(f) is written in the disjunctive; holding that the court may approve the sale "free and clear" provided at least one of the subsections of Bankruptcy Code section 363(f) is met).

70.     The Debtors believe that one or more of the tests of section 363(f) are satisfied with respect to the transfer of the Purchased Assets pursuant to the Stalking Horse Agreement. In particular, the Debtors believe that the Senior Secured Credit Agreement Lender and the lenders under the Senior Secured Term Loan will consent to the sale free and clear under

section 363(f)(2).  Where that may not be the case, a sale free and clear can proceed pursuant to

section 363(f)(5) of the Bankruptcy Code because such lenders' liens will attach to the proceeds

of the sale and the Debtors will establish at the Sale Hearing that such lenders can be compelled

to accept a monetary satisfaction of their Claims.  Additionally, the Senior Secured Credit

Agreement Lender and the lenders under the Senior Secured Term Loan will have the right to

credit bid pursuant to section 363(k) of the Bankruptcy Code, subject in all respects to the Sale

Support Agreement.  Accordingly, section 363(f) authorizes the transfer and conveyance of the

Debtors' assets free and clear of any such claims, interests, liabilities or liens.

71.    Although section 363(f) of the Bankruptcy Code provides for the sale of assets

"free and clear of any interests," the term "any interest" is not defined anywhere in the

Bankruptcy Code.  Folger Adam Security v. DeMatteis/MacGregor JV, 209 F.3d 252, 257 (3d

Cir. 2000).  In the case of In re Trans World Airlines, Inc.,  322 F.3d 283, 288-89 (3d Cir.

2003), the Third Circuit specifically addressed the scope of the term "any interest."  The Third

Circuit observed that while some courts have "narrowly interpreted that phrase to mean only in

rem interests in property," the trend in modern cases is towards "a more expansive reading of

'interests in property' which 'encompasses other obligations that may flow from ownership of

the property.'"  Id. at 289 (citing 3 Collier on Bankruptcy 15th Ed. Rev., ¶ 363.06[1] (L. King,

15th rev. ed. 1988)).  As determined by the Fourth Circuit in In re Leckie Smokeless Coal Co.,

99 F.3d 573, 581-582 (4th Cir. 1996), a case cited with approval and extensively by the Third

Circuit in Folger, supra, the scope of section 363(f) is not limited to in rem interests.  Thus, the

Third Circuit in Folger stated that Leckie held that the debtors "could sell their assets under

§ 363(f) free and clear of successor liability that otherwise would have arisen under federal

statute."  Folger, 209 F.3d at 258.

72.    Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes such assets free from successor liability resulting from pre-existing claims.  See The Ninth Avenue Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996) (stating that a bankruptcy court has the power to sell assets free and clear of any interest that could be brought against the bankruptcy estate during the bankruptcy); MacArthur Company v. Johns-Manville Corp. (In re Johns-Manville Corp.), 837 F.2d 89, 93-94 (2d Cir. 1988) (channeling of claims to proceeds consistent with intent of sale free and clear under section 363(f) of the Bankruptcy Code); In re New England Fish Co., 19 B.R. 323, 329 (Bankr. W.D. Wash. 1982) (transfer of property in free and clear sale included free and clear of Title VII employment discrimination and civil rights claims of debtor's employees); In re Hoffman, 53 B.R. 874, 876 (Bankr. D.R.I. 1985) (transfer of liquor license free and clear of any interest permissible even though the estate had unpaid taxes); American Living Systems v. Bonapfel (In re All Am. Of Ashburn, Inc.), 56 B.R. 186, 190 (Bankr. N.D. Ga. 1986) (product liability claims precluded on successor doctrine in a sale of assets free and clear); WBO Partnership v. Virginia Dept. of Medical Assistance Servs. (In re WBO Partnership), 189 B.R. 97, 104-05 (Bankr. E.D. Va. 1995) (Commonwealth of Virginia's right to recapture depreciation is an "interest" as used in section 363(f)).[4]  The purpose of an order purporting to authorize the transfer of assets free and clear of all "interests" would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against the purchaser arising from the Debtors' pre-sale conduct.  Under section 363(f) of the Bankruptcy Code, the purchaser is

---

[4]        Some courts, concluding that section 363(f) of the Bankruptcy Code does not empower them to convey assets free and clear of claims, have nevertheless found that section 105(a) of the Bankruptcy Code provides such authority.  See, e.g., Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.), 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) (stating that the absence of specific authority to sell assets free and clear of claims poses no impediment to such a sale, as such authority is implicit in the court's equitable powers when necessary to carry out the provisions of title 11).

entitled to know that the Debtors' assets are not infected with latent claims that will be asserted

against the purchaser after the proposed transaction is completed.  Accordingly, consistent with

the above-cited case law, the order approving the Sale should state that the Successful Bidder is

not liable as a successor under any theory of successor liability, for claims that encumber or

relate to the Purchased Assets.

**E.    The Proposed Notice of Bidding Procedures and Auction Is Appropriate**

73.    The Debtors believe that they will obtain the maximum recovery for creditors of

the Debtors' estates if the Purchased Assets of the Debtors are sold through a well-advertised

sale and auction.  The Debtors have already taken significant steps to identify potential

purchasers.

74.    Under Bankruptcy Rules 2002(a) and (c), the Debtors are required to notify

creditors of the proposed sale of the Debtors' assets, including a disclosure of the time and place

of an auction, the terms and conditions of a sale, and the deadline for filing any objections.  The

Debtors submit that the notice procedures herein comply fully with Bankruptcy Rule 2002 and

are reasonably calculated to provide timely and adequate notice of the sale by auction to the

Debtors' creditors and other interested parties, as well as to those parties who have expressed an

interest, or may express an interest, in bidding on the Purchased Assets.  The proposed time

frame between the filing of this Motion, the commencement of the bidding process and the

Auction should provide interested purchasers ample time to participate in the Auction.

**F.    The Stalking Horse Protections Are Appropriate Under the Circumstances**

75.    As noted above, the Stalking Horse Purchaser proceeded in reliance on promises

by the Debtors to seek the Stalking Horse Protections and in reasonable expectation that this

Court would enter an order providing such relief.  The Debtors submit that the Stalking Horse

Protections are a normal and oftentimes necessary component of sales outside the ordinary

course of business under section 363 of the Bankruptcy Code.  In particular, such protections

encourage a potential purchaser to invest the requisite time, money and effort to conduct due

diligence and sale negotiations with a debtor despite the inherent risks and uncertainties of the

chapter 11 process.  See, e.g., In re Comdisco, Inc., Case No. 01-24795 (RB) (Bankr. N.D. Ill.

Aug. 9, 2002) (approving a termination fee as, inter alia, an actual and necessary cost and

expense of preserving the debtor's estate, of substantial benefit to the debtor's estate and a

necessary inducement for, and a condition to, the proposed purchaser's entry into the purchase

agreement); Integrated Resources, 147 B.R. at 660 (noting that fees may be legitimately

necessary to convince a "white knight" to offer an initial bid by providing some form of

compensation for the expenses such bidder incurs and the risks such bidder faces by having its

offer held open, subject to higher and better offers); In re Hupp Indus., 140 B.R. 191, 194

(Bankr. N.D. Ohio 1997) (without any reimbursement, "bidders would be reluctant to make an

initial bid for fear that their first bid will be shopped around for a higher bid from another bidder

who would capitalize on the initial bidder's. . . due diligence"); In re Marrose Corp., 1992 WL

33848, at *5 (Bankr. S.D.N.Y. 1992) (stating that "agreements to provide reimbursement of fees

and expenses are meant to compensate the potential acquirer who serves as a catalyst or

'stalking horse' which attracts more favorable offers"); In re 995 Fifth Ave.  Assocs., 96 B.R.

24, 28 (Bankr. S.D.N.Y. 1989) (finding that bidding incentives may be "legitimately necessary

to convince a white knight to enter the bidding by providing some form of compensation for the

risks it is undertaking") (citations omitted).

76.    Moreover, bid protections, similar to the Stalking Horse Protections sought to be

approved by this Motion, have been approved in other chapter 11 cases in this Court.  See, e.g.,

In re Conex Holdings, LLC, Case No. 11-10501 (CSS) (Bankr. D. Del. Sept. 14, 2012)

(approving break-up fee of 3% of final purchase price); <u>In re Nortel Networks Inc.</u>, Case No. 09-10138 (KG) (Bankr. D. Del. Feb. 27, 2009) (approving $650,000 break-up fee in connection with $17.65 million sale, or 5.9%); <u>In re Tallygenicom, L.P.</u>, Case No. 09-10266 (CSS) (Bankr. D. Del. Feb. 19, 2009) (approving $2 million break-up fee in connection with $36.6275 million sale, or 5.5%); <u>In re Fluid Routing Solutions Intermediate Holding Corp.</u>, Case No. 09-10384 (CSS) (Bankr. D. Del. Feb. 19, 2009) (court approved expense reimbursement of up to $1.25 million in connection with a $11 million sale, or up to 11.4%); <u>In re Archway Cookies, LLC</u>, Case No. 08-12323 (CSS) (Bankr. D. Del. Dec. 3, 2008) (approving $750,000 break-up fee in connection with a $25 million sale, or 3.8%); <u>In re Wickes Holdings, LLC, et al.</u>, Case No. 08-10212 (KJC) (Bankr. D. Del. Feb. 19, 2008) (authorizing debtor to enter into stalking horse agreement providing break-up fee of up to 3%); <u>In re Tweeter Home Entm't Group, Inc.</u>, Ch. 11 Case No. 07-10787 (PJW) (Bankr. D. Del. July 13, 2007) (authorizing debtor to pay stalking horse's termination fee); <u>In re Radnor Holdings</u>, Case No. 06-10110 (CSS) (Bankr. D. Del. Sept. 22, 2006) (aggregate fee and expense reimbursement of 3% permitted).

77.    A proposed bidding incentive, such as the Break-Up Fee and Expense Reimbursement, should be approved when it is in the best interests of the estate.  <u>In re S.N.A. Nut Co.</u>, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995); see also <u>In re America West Airlines, Inc.</u>, 166 B.R. 908 (Bankr. D. Ariz. 1994); <u>In re Hupp Indus., Inc.</u>, 140 B.R. 191 (Bankr. N.D. Ohio 1992).  Typically, this requires that the bidding incentive provide some benefit to the debtor's estate. <u>Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.</u>), 181 F.3d 527, 533 (3d Cir. 1999) (holding even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context).

78.     In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy),

the Third Circuit found that whether break-up fees and expenses could be paid to Calpine Corp.

("Calpine") as a "stalking horse" depended on whether such fees were necessary to preserve the

value of the estate.  O'Brien Envtl. Energy, 181 F.3d at 536.  The court determined that

Calpine's right to break-up fees and expenses depended on whether it provided a benefit to the

debtor's estate by promoting competitive bidding or researching the value of the assets at issue

to increase the likelihood that the selling price reflected the true value of the company.  Id. at

537.  The Debtors believe that approval of the Stalking Horse Protections will create such a

competitive bidding process.

79.     First, the Break-Up Fee induced the Stalking Horse Purchaser to submit a bid

that will serve as a minimum floor bid upon which other bidders may rely.  Therefore, the

Stalking Horse Purchaser has provided a material benefit to the Debtors, their estates and their

respective creditors by encouraging bidding and increasing the likelihood that the best possible

price for the Purchased Assets will be received.  See, e.g., In re Comdisco, Inc., Case No.

01-24795 (RB) (Bankr. 8. N.D. Ill. Aug. 9, 2002) (finding proposed termination fee to be of

substantial benefit to the debtor's estate); In re Kmart Corp., Case No. 02-02474 (SPS) (Bankr.

N.D. Ill. May 10, 2002); Integrated Resources, 147 B.R. at 659 (noting that termination

payment is an "important tool to encourage bidding and to maximize the value of the debtor's

assets").

80.     Second, the Debtors believe that the proposed Expense Reimbursement is fair

and reasonably compensates the Stalking Horse Purchaser for taking actions that will benefit the

Debtors' estates.  The Expense Reimbursement compensates the Stalking Horse Purchaser for

diligence and professional fees incurred in negotiating the terms of the Stalking Horse Agreement on an expedited timeline.

81.     Third, the proposed Stalking Horse Protections are the result of an arm's-length negotiated agreement between the Debtors and the Stalking Horse Purchaser.  There is no evidence or reason to believe that the relationship between the Debtors and the Stalking Horse Purchaser has been tainted by self-dealing or manipulation.

82.     Fourth, the Debtors do not believe that the Stalking Horse Protections will have a chilling effect on the sale process.  Rather, the Stalking Horse Purchaser has increased the likelihood that the best possible price for the Purchased Assets will be received, by permitting other qualified bidders to rely on the diligence performed by the Stalking Horse Purchaser, and moreover, by allowing qualified bidders to utilize the Stalking Horse Agreement as a platform for negotiations and modifications in the context of a competitive bidding process.

83.     Finally, the Stalking Horse Protections will be paid only if, among other things, the Debtors enter into a transaction with a bidder other than the Stalking Horse Purchaser.  Accordingly, no Stalking Horse Protections will be paid unless a higher and better offer is achieved and consummated.

84.     In sum, the Stalking Horse Protections are reasonable under the circumstances and will enable the Debtors to maximize the value for the Purchased Assets while limiting any chilling effect in the sale process.  The Break-Up Fee, in the amount of $6,150,000, represents 3% of the Stalking Horse Purchase Price.  The Stalking Horse Protections not only compensate the Debtors for the risk that they assume in foregoing a known, willing and able purchaser for a new potential acquirer, but also ensure that there is an increase in the net proceeds received by

their estates, after deducting the Stalking Horse Protections to be paid to the Stalking Horse

Purchaser in the event of a prevailing overbid.

### G.    Assumption and Assignment of Certain Executory Contracts and Unexpired Leases

85.    Section 365(a) of the Bankruptcy Code provides that, subject to the court's

approval, a trustee "may assume or reject any executory contracts or unexpired leases of the

debtor." 11 U.S.C. § 365(a). Upon finding that a trustee has exercised its sound business

judgment in determining to assume an executory contract or unexpired lease, courts will

approve the assumption under section 365(a) of the Bankruptcy Code. See Nostas Assocs. v.

Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v.

Showtime Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

86.    Pursuant to section 365(f)(2) of the Bankruptcy Code, a trustee may assign an

executory contract or unexpired lease of nonresidential real property if:

> (A)    the trustee assumes such contract or lease in accordance with the
> provisions of this section; and

> (B)    adequate assurance of future performance by the assignee of such
> contract or lease is provided, whether or not there has been a default in such
> contract or lease.

11 U.S.C. § 365(f)(2).

87.    The meaning of "adequate assurance of future performance" depends on the facts

and circumstances of each case, but should be given "practical, pragmatic construction." See

Carlisle Homes, Inc. v. Arrari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J.

1989); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate

assurance of future performance does not mean absolute assurance that debtor will thrive and

pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)

("Although no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").

88.     Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding; chief determinant of adequate assurance is whether rent will be paid).

89.     The Debtors and the Successful Bidder will present evidence at the Sale Hearing to prove the financial credibility, willingness and ability of the Successful Bidder to perform under the Contracts or Leases.  The Court and other interested parties therefore will have the opportunity to evaluate the ability of any Successful Bidder to provide adequate assurance of future performance under the Contracts or Leases, as required by section 365(b)(1)(C) of the Bankruptcy Code.

90.     In addition, the Cure Procedures are appropriate and consistent with section 365 of the Bankruptcy Code.  To the extent that any defaults exist under any Assumed Executory Contracts, any such defaults will be cured pursuant to the Successful Bidder's Asset Purchase Agreement.  Any provision in the Assumed Executory Contracts that would restrict, condition, or prohibit an assignment of such contracts will be deemed unenforceable pursuant to section 365(f)(1) of the Bankruptcy Code.

91.     Accordingly, the Debtors submit that the Cure Procedures for effectuating the assumption and assignment of the Assigned Contracts as set forth herein are appropriate and should be approved.

**H.     The Successful Bidder should be Afforded All Protections Under Section 363(m) as A Good Faith Purchaser**

92.     Section 363(m) of the Bankruptcy Code protects a good-faith purchaser's interest in property purchased from the debtor's estate notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal.  Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] . . . does not affect the validity of a sale . . . to an entity that purchased . . . such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) "fosters the 'policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely.'"  In re Chateaugay Corp., 1993 U.S. Dist. Lexis 6130, *9 (S.D.N.Y. 1993) (quoting In re Abbotts Dairies of Penn., Inc., 788 F.2d 143, 147 (3d Cir. 1986)); see also Allstate Ins. Co. v. Hughes, 174 BR. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

93.     The selection of the Successful Bidder will be the product of arm's-length, good faith negotiations in an anticipated competitive purchasing process.  The Debtors intend to request at the Sale Hearing a finding that the Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code.

**I.**     **Relief from the Fourteen Day Waiting Period Under Bankruptcy Rules 6004(h) and 6006(d) is Appropriate.**

94.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors request that the Order be effective immediately by providing that the ten (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

95.     The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented.  See Advisory Committee Notes to Fed. R. Bankr. P. 6004(h) and 6006(d).  Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the fourteen (14) day stay period, Collier suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure."  Collier on Bankruptcy P 6004.11 (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).  Furthermore, Collier provides that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. Id.

96.     The Debtors hereby request that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d) or, in the alternative, if an objection to the Sale is filed, reduce the stay period to the minimum amount of time needed by the objecting party to file its appeal.

**Notice**

97.    Notice of this Motion shall be provided to: (a) the Office of the United States Trustee for the District of Delaware; (b) the Debtors' twenty largest unsecured creditors on a consolidated basis; (c) counsel to the agent under the Senior Secured Credit Facility; (d) counsel to the lenders under the Senior Secured Term Loan; (e) agent under the Senior Secured Term Loan; (f) counsel to the lenders under the proposed debtor-in-possession financing; (g) the United States Attorney's Office for the District of Delaware; (h) the Internal Revenue Service; (i) the Securities and Exchange Commission; (j) counsel to the Stalking Horse Purchaser; and (k) those parties requesting notice pursuant to Bankruptcy Rule 2002.

*[remainder of page intentionally left blank]*

WHEREFORE, the Debtors respectfully request that the Court enter orders substantially

in the form attached hereto as Exhibit C and Exhibit G: (a) granting the relief requested herein

and (b) granting to the Debtors such other and further relief as the Court may deem proper.

Dated:  June 17, 2013
          Wilmington, Delaware

Respectfully submitted,

 /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341
Email:  stuart.brown@dlapiper.com

            -and-

Richard A. Chesley (IL 6240877)
Chun I. Jang (IL 6270388)
Daniel M. Simon (IL 6297629)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone:  (312) 368-4000
Facsimile:  (312) 236-7516
Email:    richard.chesley@dlapiper.com
              chun.jang@dlapiper.com
              daniel.simon@dlapiper.com

PROPOSED ATTORNEYS FOR DEBTORS AND
DEBTORS IN POSSESSION