# Exhibit 1

**(Bidding Procedures)**

**BIDDING PROCEDURES**

Set forth below are the bidding procedures (the "Bidding Procedures") to be employed in connection with the proposed sale of certain tangible and intangible assets related to the business (the "Purchased Assets") of the Debtors that owns Purchased Assets (the "Subsidiaries", and together with the Debtors, the "Sellers"), in connection with the jointly administered chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), lead case number [13-11565 (___)].

The Sellers entered into that certain asset purchase agreement, dated June 17, 2013 between the Sellers on the one hand and Orchard Supply Company, LLC (the "Stalking Horse Purchaser"), pursuant to which the Stalking Horse Purchaser shall acquire the Purchased Assets on the terms and conditions specified therein (together with the schedules and related documents thereto, the "Stalking Horse Agreement").  The sale transaction pursuant to the Stalking Horse Agreement is subject to competitive bidding as set forth herein.  Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Stalking Horse Agreement.

## I.     ASSETS TO BE SOLD

The Debtors seek to complete a sale of all or substantially all of the Purchased Assets (the "Sale") which include the assets described in Article 1.1 of the Stalking Horse Agreement (the "Assets").  The sale of the Assets is on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by the Seller, its agents or estate, except to the extent set forth in the purchase agreements of the Successful Bidder (as defined herein) as approved by the Bankruptcy Court.  Except as otherwise provided in such approved purchase agreements, all of the Seller's right, title and interest in and to each Asset to be acquired shall be sold free and clear of all liens, claims, interests and encumbrances thereon and there against (collectively, the "Liens"), such Liens to attach solely to the net proceeds of the sale of such Assets

## II.    THE BID PROCEDURES

In order to ensure that the Debtors receive the maximum value for the Purchased Assets, the Stalking Horse Agreement is subject to higher or better offers, and, as such, the Stalking Horse Agreement will serve as the "stalking-horse" bid for the Assets.

### A.    Provisions Governing Qualifications of Bidders

Unless otherwise ordered by the Bankruptcy Court, in order to participate in the bidding process, prior to the Bid Deadline (defined below), each person other than the Stalking Horse Purchaser who wishes to participate in the bidding process (a "Potential Bidder") must deliver the following to the Notice Parties (as defined below):

(i)     a written disclosure of the identity of each entity that will be bidding for the Purchased Assets or otherwise participating in connection with such bid; and

    (ii) an executed confidentiality agreement (to be delivered prior to the distribution of any confidential information by the Sellers to a Potential Bidder) in form and substance satisfactory to the Debtors, in substantially the same form as signed by the Stalking Horse Purchaser and which shall inure to the benefit of any purchaser of the Purchased Assets; without limiting the foregoing, each confidentiality agreement executed by a Potential Bidder shall contain standard non-solicitation provisions.

A Potential Bidder that delivers the documents and information described above and that the Debtors determine in their reasonable business judgment, after consultation with their advisors and with counsel to the lender under the Senior Secured Credit Facility (the "<u>Senior Secured Credit Facility Lender</u>"), is likely (based on availability of financing, experience and other considerations) to be able to consummate the sale, will be deemed a "<u>Qualified Bidder</u>." The Debtors will limit access to due diligence to those parties it believes, in the exercise of their reasonable judgment and after consultation with the Senior Secured Credit Facility Lender, are pursuing the transaction in good faith.

As promptly as practicable after a Potential Bidder delivers all of the materials required above, the Debtors, in consultation with the Senior Secured Credit Facility Lender will determine and will notify the Potential Bidder if such Potential Bidder is a Qualified Bidder.

  **B.** **<u>Due Diligence</u>**

The Debtors will afford any Qualified Bidder such due diligence access or additional information as the Debtors, in consultation with their advisors, deem appropriate, in their reasonable discretion, which must include differentiations between the diligence provided to strategic and financial bidders, as appropriate, and contractual obligations to limit access to certain proprietary information; <u>provided</u>, <u>however</u>, that with respect to any strategic bidders, the Debtors will, in their reasonable discretion, make reasonable commercial efforts to provide such strategic bidders with the same information provided to the Stalking Horse Purchaser. The Debtors must promptly advise the Stalking Horse Purchaser in the event any other Potential Bidder receives diligence the Stalking Horse Purchaser has not previously received and shall promptly be provided with access to such diligence materials. The due diligence period shall extend through and include the Auction date; <u>provided</u>, <u>however</u>, that any Qualified Bid (as defined below) submitted shall be irrevocable until the selection of the Successful Bidder.

  **C.** **<u>Provisions Governing Qualified Bids</u>**

A bid submitted will be considered a Qualified Bid only if the bid is submitted by a Qualified Bidder and complies with all of the following (a "<u>Qualified Bid</u>"):

    (i) it states that the applicable Qualified Bidder offers to purchase, in cash (or to the extent applicable, credit bid), the Acquired Assets upon the terms and conditions that the Debtors reasonably determine are no less favorable to the Debtors than those set forth in the Stalking Horse Agreement;

    (ii) it includes a signed writing that the Qualified Bidder's offer is irrevocable until the selection of the Successful Bidder, provided that if such

bidder is selected as the Successful Bidder its offer shall remain irrevocable until the earlier of (i) the closing of the sale to the Successful Bidder, and (ii) the date that is fifteen (15) days after the Sale Hearing;

(iii) confirmation that there are no conditions precedent to the Qualified Bidder's ability to enter into a definitive agreement and that all necessary internal and shareholder approvals have been obtained prior to the bid;

(iv) it includes a duly authorized and executed copy of an Asset Purchase Agreement, including the purchase price for the Purchased Assets expressed in U.S. Dollars (the "Purchase Price"), together with all exhibits and schedules thereto, together with copies marked to show any amendments and modifications to the Stalking Horse Agreement ("Marked Agreement") and the proposed orders to approve the sale by the Bankruptcy Court;

(v) it includes written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow the Debtors to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction contemplated by the Asset Purchase Agreement;

(vi) it provides for the repayment of all other costs, simultaneously with the closing of the transaction contemplated under the Asset Purchase Agreement;

(vii) it has a value to the Debtors, in the Debtors' exercise of their reasonable business judgment, after consultation with their advisors, that is greater than or equal to the sum of the value offered under the Stalking Horse Agreement, plus (A) the aggregate amount of the Break-Up Fee and Expense Reimbursement (as defined below), plus (B) $5,000,000;

(viii) it identifies with particularity which executory contracts and unexpired leases the Qualified Bidder wishes to assume, provides details of the Qualified Bidder's proposal for the treatment of related cure costs;

(ix) it includes an acknowledgement and representation that the bidder: (A) has had an opportunity to conduct any and all required due diligence regarding the Purchased Assets prior to making its offer; (B) has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Purchased Assets in making its bid; (C) did not rely upon any written or oral statements, representations, promises, warranties or guaranties whatsoever, whether express or implied (by operation of law or otherwise), regarding the Purchased Assets or the completeness of any information provided in connection therewith or with the Auction (defined below), except as expressly stated in the Asset Purchase Agreement; and (D) is not entitled to any expense reimbursement, break-up fee, or similar type of payment in connection with its bid;

  (x) it includes evidence, in form and substance reasonably satisfactory to the Sellers, of authorization and approval from the Qualified Bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the Asset Purchase Agreement;

  (xi) except in the case of a bidder submitting a Credit Bid (as defined below) it is accompanied by a good faith deposit in the form of a wire transfer (to a bank account specified by the Debtors), certified check or such other form acceptable to the Debtors, payable to the order of the Debtors (or such other party as the Debtors may determine) in an amount equal to $15,000,000;

  (xii) it contains a detailed description of how the Qualified Bidder intends to treat current employees of the Sellers;

  (xiii) it includes an agreement from the Qualified Bidder to assume no less than fifty percent (50%) of the payments approved by Bankruptcy Court pursuant to the Debtors' Motion to Approve a Key Employee Incentive Plan;

  (xiv) it contains sufficient information concerning the Qualified Bidder's ability to provide adequate assurance of performance with respect to executory contracts and unexpired leases;

  (xv) it contains such other information reasonably requested by the Debtors; and

  (xvi) it is received prior to the Bid Deadline.

Notwithstanding the foregoing but subject in all respects to the Sale Support Agreement, the Stalking Horse Purchaser and the Term Administrative Agent under the Senior Secured Term Loan agreement (the "Term Administrative Agent") will each be deemed a Qualified Bidder, and the Stalking Horse Agreement will be deemed a Qualified Bid, for all purposes in connection with the Bidding Process, the Auction, and the sale.

The Debtors shall notify the Stalking Horse Purchaser and all Qualified Bidders in writing as to whether or not any bids constitute Qualified Bids (and, with respect to each Qualified Bidder that submitted a bid other than the Stalking Horse Purchaser, whether such Qualified Bidder's bid constitutes a Qualified Bid) promptly after, and in any event on the same day as, the notification to any Qualified Bidder that their bid constitutes a Qualified Bid; provided, however, that such notification shall not be given later than two (2) business days following the expiration of the Bid Deadline.

  D. **Bid Deadline**

A Qualified Bidder that desires to make a bid will deliver written copies of its bid to the following parties (collectively, the "Notice Parties"): (i) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, Illinois 60601 (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)); (ii) counsel to the Stalking Horse Purchaser: Hunton & Williams, LLP, 1445 Ross Avenue, Suite 3700, Dallas, Texas 75202, Attention: Gregory G.

Hesse); (iii) counsel to the DIP Lender and Senior Secured Credit Facility Lender: Riemer & Braunstein LLP, 3 Center Plaza, Boston, Massachusetts 02108 (Attn: Donald E. Rothman); (iv) counsel to the Term Administrative Agent and steering committee of lenders under the Senior Secured Term Loan: Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036 (Attn: Michael J. Sage and Scott M. Zimmerman); (v) the Term Administrative Agent under the Senior Secured Term Loan: Gleacher & Company, 1290 Avenue of the Americas, New York, NY 10104 (Attn: Joanna W. Anderson); (vi) counsel to any statutory committee of unsecured creditors appointed in these cases, so as to be received by the Debtors not later than 4:00 p.m. EST on August 9, 2013 (the "Bid Deadline").  The Bid Deadline may not be extended without the written consent of the Stalking Horse Purchaser.

### E. Credit Bidding and Sale Support Agreement

In connection with the Sale of all or any of the Purchased Assets, the Debtors' lenders holding a perfected security interest in such Purchased Assets, may seek to credit bid some or all of their claims for their respective collateral (a "Credit Bid").  A Credit Bid may be applied only to reduce the cash consideration with respect to those Purchased Assets in which the party submitting such Credit Bid holds a security interest.  In order to be considered a "Qualified Credit Bid" any Credit Bid submitted must provide for the assumption and/or payment of administrative expense claims of the Debtors and satisfy the Bid Protections provided for in the Bidding Procedures.  Notwithstanding anything to the contrary contained herein, the ability to submit a Credit Bid shall be subject to, in all respects, the Sale Support Agreement.  Pursuant to the Sale Support Agreement, neither the Term Administrative Agent nor the lenders under the Senior Secured Term Loan shall submit a credit bid under section 363(k) of the Bankruptcy Code; provided, however, that in the event that either (i) the Stalking Horse Purchaser defaults or is otherwise in breach of the Stalking Horse Agreement (it being understood that such Stalking Horse Agreement shall not be amended, and defaults or breaches thereunder shall not be waived, without the consent of the Term Administrative Agent, in each case, such consent shall not be unreasonably withheld) or (ii) the Debtors deem a Competing Bid to be a Qualified Bid, but the Term Administrative Agent believes in its reasonable judgment that such Competing Bid results in a lesser recovery for the Term Lenders, the Term Administrative Agent and the lenders under the Senior Secured Term Loan shall be entitled to all rights under section 363(k) of the Bankruptcy Code.

### F. Evaluation of Competing Bids

A Qualified Bid will be valued based upon several factors including, without limitation, (1) the amount of such bid, (2) the risks and timing associated with consummating such bid, (3) any proposed revisions to the Stalking Horse Agreement, and (4) any other factors deemed relevant by the Debtors in their reasonable discretion.

### G. No Qualified Bids

If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction and the Stalking Horse Purchaser will be named the Successful Bidder on the Bid Deadline.

H.   **Auction Process.**

If the Debtors receive one or more Qualified Bids in addition to the Stalking Horse Agreement, the Debtors will conduct an auction (the "Auction") of the Purchased Assets, which shall be transcribed at 10:00 a.m. (EDT) on August 14, 2013, at the offices of DLA Piper LLP (US), 1251 Avenue of the Americas, New York, New York 10020, or such other location as shall be timely communicated to all entities entitled to attend the Auction. The Auction shall run in accordance with the following procedures:

(i)   only the Debtors, the Stalking Horse Purchaser, the Senior Secured Credit Facility Lenders, the lenders under the Senior Secured Term Loan agreement, the Term Administrative Agent and the unsecured creditors committee, and the advisors to each of the foregoing, and any other Qualified Bidder that has timely submitted a Qualified Bid, shall attend the Auction in person, and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any subsequent bids at the Auction;

(ii)   each Qualified Bidder shall be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale;

(iii)   at least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors whether it intends to attend the Auction; provided that in the event a Qualified Bidder elects not to attend the Auction, such Qualified Bidder's Qualified Bid shall nevertheless remain fully enforceable against such Qualified Bidder until the date of the selection of the Successful Bidder and Back-Up Bidder at the conclusion of the Auction.  At least one (1) business day prior to the Auction, the Debtors will provide copies of the Qualified Bid or combination of Qualified Bids which the Debtors believe, in their reasonable discretion after consultation with committee counsel and counsel to the Senior Secured Credit Facility Lender, is the highest or otherwise best offer (the "Starting Bid") to the Stalking Horse Purchaser and all other Qualified Bidders;

(iv)   all Qualified Bidders who have timely submitted Qualified Bids will be entitled to be present for all Subsequent Bids (as defined below) at the Auction and the actual identity of each Qualified Bidder will be disclosed on the record at the Auction; provided that all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder attending the Auction in person;

(v)   the Debtors, after consultation with their advisors, may employ and announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction, provided that such rules are (i) not inconsistent with the Bidding Procedures appended as Exhibit 1 to the Bidding Procedures Order, the Bankruptcy Code, or any order of the Court entered in connection herewith, and (ii) disclosed to each Qualified Bidder at the Auction; and

(vi) bidding at the Auction will begin with the Starting Bid and continue in bidding increments (each a "<u>Subsequent Bid</u>") providing a net value to the estate of at least an additional $2,000,000 above the prior bid. After the first round of bidding and between each subsequent round of bidding, the Debtors, after consultation with committee counsel and counsel to the Senior Secured Credit Facility Lender, shall announce the bid (and the value of such bid) that it believes to be the highest or otherwise better offer (the "<u>Leading Bid</u>"). A round of bidding will conclude after each participating Qualified Bidder has had the opportunity to submit a Subsequent Bid with full knowledge of the Leading Bid. Each Qualified Bidder will only have one opportunity to pass. Except as specifically set forth herein, for the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse Purchaser), the Debtors will give effect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Purchaser under the Stalking Horse Agreement as well as any additional liabilities to be assumed by a Qualified Bidder and any additional costs which may be imposed on the Debtors;

### I. **Selection of Successful Bid**

Prior to the conclusion of the Auction, the Debtors, in consultation with their advisors, and in consultation with committee counsel, counsel to the Senior Secured Credit Facility Lender and counsel to the Agent under the Senior Secured Term Loan, will review and evaluate each Qualified Bid in accordance with the procedures set forth herein and determine which offer is the highest or otherwise best offer from among the Qualified Bidders (including the Stalking Horse Purchaser) submitted at the Auction (one or more such bids, collectively the "<u>Successful Bid</u>" and the bidder(s) making such bid, collectively, the "<u>Successful Bidder</u>"), and communicate to the Stalking Horse Purchaser and the other Qualified Bidders the identity of the Successful Bidder and the details of the Successful Bid. The determination of the Successful Bid by the Debtors at the conclusion of the Auction shall be final, subject only to approval by the Bankruptcy Court.

Within two (2) business days after adjournment of the Auction, the Successful Bidder shall complete and execute all agreements, contracts, instruments and other documents evidencing and containing the terms and conditions upon which the Successful Bid was made. Within two (2) business days after adjournment of the Auction, the Debtors shall file a notice identifying the Successful Bidder with the Bankruptcy Court.

The Debtors will sell the Purchased Assets to the Successful Bidder pursuant to the terms of the Successful Bid upon the approval of such Successful Bid by the Bankruptcy Court at the Sale Hearing (as defined below).

### J. **Return of Deposits**

All deposits shall be returned to each bidder not selected by the Debtors as the Successful Bidder or the Back-Up Bidder (as defined below) no later than five (5) business days following the conclusion of the Auction.

### K.     Back-Up Bidder

If an Auction is conducted, the Qualified Bidder or Qualified Bidders with the next highest or otherwise best Qualified Bid, as determined by the Debtors in the exercise of their business judgment, at the Auction shall be required to serve as a back-up bidder (the "Back-Up Bidder") and keep such bid open and irrevocable until fifteen days after the Sale Hearing. Following the Sale Hearing, if the Successful Bidder fails to consummate the approved sale because of a breach or failure to perform on the part of such Successful Bidder, the Back-Up Bidder will be deemed to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the sale with the Back-Up Bidder without further order of the Bankruptcy Court.

### III.    THE BID PROTECTIONS

In recognition of this expenditure of time, energy, and resources, the Debtors have agreed that if the Stalking Horse Purchaser is not the Successful Bidder, the Debtors will pay the Stalking Horse Purchaser (i) an aggregate fee of approximately $6,150,000, which is equal to 3% of the aggregate Stalking Horse Purchase Price, prior to any closing adjustments (the "Break-Up Fee"), and (ii) an amount in cash equal to the aggregate amount of the reasonable fees, costs and expenses (including, without limitation, all reasonable fees, expenses and disbursements of any representatives of Stalking Horse Purchaser) paid or incurred by or on behalf of Stalking Horse Purchaser relating to or in connection with its bid (the "Expense Reimbursement"), subject to a cap of $850,000. The Stalking Horse Purchaser shall provide reasonable documentation of the Expense Reimbursement to the Debtors and the Office of the United States Trustee. The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Stalking Horse Agreement.

The Debtors have further agreed that their obligation to pay the Break-Up Fee and Expense Reimbursement pursuant to the Stalking Horse Agreement shall survive termination of the Stalking Horse Agreement, shall, to the extent owed by the Debtors, constitute an administrative expense claim under section 503(b) of the Bankruptcy Code and shall be payable within two (2) business days under the terms and conditions of the Stalking Horse Agreement and the Bid Procedures Order, notwithstanding section 507(a) of the Bankruptcy Code; provided, however, that payment of the Break-Up Fee and Expense Reimbursement shall only be made upon payment in full under the DIP Financing Agreements.

### IV.    Sale Hearing

The Debtors will seek entry of an order from the Bankruptcy Court at a hearing (the "Sale Hearing") to begin on or before August 20, 2013 (prevailing Eastern Time), to approve and authorize the sale transaction to the Successful Bidder on terms and conditions determined in accordance with the Bid Procedures.