transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Body in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Body in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Body, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Law, each of Purchaser, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Body or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Body in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

8.6     Further Assurances.  Each Party shall execute and cause to be delivered to each other Party such instruments and other documents, and shall take such other actions, as such other Party may reasonably request (prior to, at or after the Closing) for the purpose of carrying out or evidencing any of the transactions contemplated by this Agreement.  After the Closing, each Seller shall promptly transfer or deliver to Purchaser cash, checks (which shall be properly endorsed) or other property that any Seller may receive in respect of any deposit, prepaid expense, receivable or other item that constitutes part of the Purchased Assets or relates to the Assumed Liabilities.

8.7     Notification of Certain Matters.  Sellers shall give prompt notice to Purchaser, and Purchaser shall give prompt notice to Sellers, of (i) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement or the Ancillary Documents is not likely to be obtained prior to Closing, (ii) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court and (iii) the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Sellers or Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

8.8     Confidentiality.

(a)     Purchaser acknowledges that the confidential information provided to them in connection with this Agreement, including under Section 8.2, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of the Confidentiality Agreement.

(b)     Following the completion of the Auction, Sellers agree to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' possession or of which Sellers are aware. Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, loss and

theft. In furtherance and not in limitation of the foregoing, Sellers shall not, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.8(b) or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Purchaser, or (b) any of the discussions or negotiations conducted with Purchaser in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), legal proceeding or Governmental Authority, or (iii) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required. Notwithstanding anything in this Section 8.8 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any trade secrets of the Business shall be maintained for so long as such trade secrets continue to be entitled to protection as trade secrets of the Business.

8.9     Preservation of Records.   Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Purchaser agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for a period of three (3) months from the Closing Date and shall make such books and records available to the other Parties (and permit such other Party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such Party in connection with, among other things, any insurance claims by, legal proceedings or Tax audits against or governmental investigations of Sellers or Purchaser or in order to enable Sellers or Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers, on the one hand, or Purchaser, on the other hand, wish to destroy such records during such three (3) month period, such Party shall first give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

8.10    Publicity.   Neither Seller nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other party hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Purchaser or Seller, disclosure is otherwise required by applicable Law or by the Bankruptcy Court with respect to filings to be made with the Bankruptcy Court in connection with this Agreement or by the applicable rules of any stock exchange on which Purchaser or Seller lists securities, provided that the party intending to make such release shall use its best efforts consistent with such applicable Law or Bankruptcy Court requirement to consult with the other party with respect to the text thereof.

8.11    Material Adverse Effect.   Sellers shall promptly inform Purchaser in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect.

8.12    Casualty Loss.   Notwithstanding any provision of this Agreement to the contrary, if, before the Closing, all or any portion of the Purchased Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Seller shall notify Purchaser promptly in writing of such fact, (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Purchaser at the Closing, and (ii) in the case of fire, flood or other casualty, Seller shall assign the insurance proceeds therefrom to Purchaser at Closing.

EAST\57511053. 3

Notwithstanding the foregoing, the provisions of this <u>Section 8.12</u> shall not in any way modify Purchaser's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.13    <u>No Successor Liability</u>.  The Parties intend that, except where expressly prohibited under applicable Law, upon the Closing, Purchaser shall not be deemed to: (i) be the successor of Sellers, (ii) have, *de facto*, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Purchased Assets other than as set forth in this Agreement.  Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the Parties intend that Purchaser shall not be liable for any Encumbrance (other than Assumed Liabilities and Permitted Encumbrances) against Sellers or any of Sellers predecessors or Affiliates, and Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Purchased Assets or any Liabilities of Sellers arising prior to the Closing Date.  The Parties agree that the provisions substantially in the form of this <u>Section 8.13</u> shall be reflected in the Sale Order.

8.14    <u>Change of Name</u>.  Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "Orchard", "Orchard Supply Hardware" and/or "OSH" without the prior written consent of Purchaser, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Cases to be changed to the new names of each Seller as provided in the last sentence of this <u>Section 8.14</u>.  Notwithstanding the above, Sellers and their Subsidiaries may continue to use their current names and any other names or DBA's currently utilized by the Sellers or their subsidiaries in relation to the wind-down of stores or GOB Sales, which will proceed as quickly as possible.

8.15    <u>Receivables</u>.  From and after the Closing, if any Seller receives or collects any funds relating to Accounts Receivable, in respect of the Purchased Assets, such Seller shall remit such funds to Purchaser within Five Business Days after its receipt thereof.

8.16    <u>Antitrust Approvals</u>.  (a) Purchaser and Sellers will (i) make or cause to be made all filings required of each of them or any of their respective Affiliates under the HSR Act or other Antitrust Laws with respect to the transactions contemplated hereby as promptly as practicable and, in any event, within 10 Business Days after the entry of the Bidding Procedure Order in the case of all filings required under the HSR Act and within four weeks in the case of all other filings required by other Antitrust Laws, (ii) comply at the earliest practicable date with any request under the HSR Act or other Antitrust Laws for additional information, documents or other materials received by each of them or any of their respective subsidiaries from Federal Trade Commission (the "*FTC*"), the Antitrust Division of the United States Department of Justice (the "*Antitrust Division*") or any other Governmental Body in respect of such filings or such transactions, and (iii) cooperate with each other in connection with any such filing (including, to the extent permitted by applicable Law and subject to reasonable confidentiality considerations, providing copies of all such documents to the non-filing parties prior to filing and considering all reasonable additions, deletions or changes suggested in connection therewith) and in connection with resolving any investigation or other inquiry of any of the FTC, the Antitrust Division or other Governmental Body under any Antitrust Laws with respect to any such filing or any such transaction. Subject to applicable Law, the Parties hereto will consult and cooperate with one another in connection with any analyses, appearances, presentations, memoranda, briefs, arguments, opinions and

proposals made or submitted by or on behalf of any Party hereto relating to proceedings under the HSR Act or other Antitrust Laws. Sellers and Purchaser may, as each deems advisable and necessary, reasonably designate any competitively sensitive material provided to the other under this Section 8.16 as "outside counsel only." Such materials and the information contained therein will be given only to the outside legal counsel of the recipient and will not be disclosed by such outside counsel to employees, officers or directors of the recipient, unless express written permission is obtained in advance from the source of the materials (Sellers or Purchaser, as the case may be).

(b)     Each of Purchaser and Sellers will use its commercially reasonable efforts to resolve such objections, if any, as may be asserted by any Governmental Body with respect to the transactions contemplated by this Agreement under the HSR Act, the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, and any other United States federal or state or foreign treaties, statutes, rules, regulations, orders, decrees, administrative or judicial doctrines or other Laws that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade (collectively, the "*Antitrust Laws*"). In connection therewith, if any Action is instituted (or threatened to be instituted) challenging any transaction contemplated by this Agreement is in violation of any Antitrust Law, each of Purchaser and Sellers will cooperate and use its commercially reasonable efforts to contest and resist any such Action, and to have vacated, lifted, reversed, or overturned any decree, judgment, injunction or other order whether temporary, preliminary or permanent ("*Antitrust Order*"), that is in effect and that prohibits, prevents, or restricts consummation of the transactions contemplated by this Agreement, including by pursuing all available avenues of administrative and judicial appeal and all available legislative action, unless, by mutual agreement, Purchaser and Sellers decide that litigation is not in their respective best interests. Each of Purchaser and Sellers will use its commercially reasonable efforts to take such action as may be required to cause the expiration of the notice or waiting periods under the HSR Act or other Antitrust Laws with respect to such transactions as promptly as possible after the execution of this Agreement.

(c)     Notwithstanding anything to the contrary with respect to any actions, non-actions, clearances, waivers, consents, approvals or Permits from any Governmental Body with respect to any Antitrust Laws that are required to be obtained in connection with this Agreement, Purchaser and its Affiliates shall not be required to, and the Sellers shall not, without the prior written consent of Purchaser (which may be withheld in Purchaser's sole discretion), (i) enter into any hold separate order, (ii) sell, divest, lease, license, transfer, dispose of or otherwise encumber or hold separate, before or after the Closing Date, any of their respective assets, licenses, operations, rights, businesses or interests therein (or agree to take or consent to any of the foregoing actions) or (iii) agree to any changes or restrictions on, or other impairment of, the ability of Purchaser, the Sellers or any of their Affiliates to own or operate any of their respective assets, licenses, operations, rights, product lines, businesses or interests therein (collectively, the "*Antitrust Condition*").

(d)     Purchaser shall be responsible for the payment of the applicable filing fees under the HSR Act and all other Antitrust laws.

## ARTICLE IX.

### CONDITIONS TO CLOSING

9.1     <u>Conditions Precedent to the Obligations of Purchaser and Sellers</u>. The respective obligations of each Party to this Agreement to consummate the transactions contemplated by this

Agreement are subject to the satisfaction (or to the extent permitted by Law, written waiver by each of the Sellers and Purchaser) on or prior to the Closing Date, of each of the following conditions:

(a)    there shall not be in effect any order, writ, injunction, judgment or decree entered by a Governmental Body of competent jurisdiction, or any Law preventing, enjoining, restraining, making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement or the Ancillary Documents;

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and the Sale Order (as provided in Article VII) and each of such orders shall be a Final Order and in form and substance reasonably satisfactory to Sellers and Purchaser, which orders shall not have been reversed, modified, amended or stayed; and

(c)    any waiting period (including any extension thereof) applicable to the purchase and sale of the Purchased Assets under the HSR Act or under any other applicable Antitrust Laws shall have expired or been terminated.

9.2    Conditions Precedent to the Obligations of Seller.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Sellers in their sole discretion:

(a)    the representations and warranties made by Purchaser in this Agreement or in any Ancillary Document shall be true and correct in all material respects (without giving effect to any materiality or similar qualification contained therein), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date), except where the failure of such representations or warranties to be so true and correct has not had, and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on Purchaser's ability to consummate the transactions contemplated hereby;

(b)    Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date; and

(c)    Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in Section 3.3.

9.3    Conditions Precedent to the Obligations of Purchaser.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by Purchaser in its sole discretion:

(a)    Sellers shall have delivered to Purchaser (i) a certified copy of the Sale Order (which shall contain the terms described in Section 7.3) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers (which service shall comply with Section 7.2(d));

EAST\57511053.3

(b)      the representations and warranties made by Sellers in this Agreement or in any Ancillary Document shall be true and correct in all material respects (provided that any such representation or warranty that is subject to any materiality, Material Adverse Effect or similar qualification shall be true and correct in all respects after giving effect to any such qualification), in each case as of the Agreement Date and as of the Closing Date, with the same force and effect as though all such representations and warranties had been made as of the Closing Date (other than representations and warranties that by their terms address matters only as of another specified date, which shall be so true and correct only as of such other specified date);

(c)      Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date;

(d)      Sellers shall have delivered, or caused to be delivered, to Purchaser, all of the items set forth in Section 3.2; and

(e)      Sellers shall have complied with the sale process deadlines set forth in the Bidding Procedures Order.

## ARTICLE X.

### ADDITIONAL DEFINITIONS

10.1     Definitions.  As used herein:

(a)      "*Accounts Receivable*" shall have the meaning set forth in Section 1.1(c).

(b)      "*Acquired Buildings*" shall have the meaning set forth in Section 1.1(g).

(c)      "*Acquired Owned Real Property*" shall have the meaning set forth in Section 1.1(f).

(d)      "*Action*" means any action, claim, complaint, grievance, summons, suit, litigation, arbitration, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation by or before any Governmental Body.

(e)      "*Affiliate*" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means (i) the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by Contract or otherwise or (ii) an officer, director, or any Person that has the power, directly or indirectly, to vote 5% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person.

(f)      "*Affiliate Agreement*" means any agreement or contract between any director, officer, employee or greater than five percent (5%) stockholder of any Seller or Affiliate of any such Person, on one hand, and any Seller, on the other hand, related to the Business, including any contract providing for the employment of, furnishing of services by, rental of real or personal property

EAST\57511053. 3

from or otherwise requiring payments to any such Person or firm, other than employment-at-will arrangements in the ordinary course of business.

(g)       "*Agreement*" shall have the meaning set forth in the preamble.

(h)       "*Agreement Date*" shall have the meaning set forth in the Recitals.

(i)       "*Allocation*" shall have the meaning set forth in <u>Section 11.2</u>.

(j)       "*Alternative Transaction*" means (i) the approval by the Bankruptcy Court of a sale or sales of a material portion of the Purchased Assets to a Person other than Purchaser, or (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser in accordance with the terms hereof.

(k)       "*Ancillary Documents*" means any certificate, agreement, document or other instrument (other than this Agreement) to be executed and delivered by a Party in connection with the consummation of the transactions contemplated this Agreement.

(l)       "*Antitrust Condition*" has the meaning set forth in <u>Section 8.16(c)</u>.

(m)       "*Antitrust Division*" has the meaning set forth in <u>Section 8.16(a)</u>.

(n)       "*Antitrust Laws*" has the meaning set forth in <u>Section 8.16(b)</u>.

(o)       "*Antitrust Order*" has the meaning set forth in <u>Section 8.16(b)</u>.

(p)       "*Arbitrating Accountant*" means (a) a nationally recognized certified public accounting firm jointly selected by Purchaser and the Company that is not then engaged to perform accounting, tax or auditing services for the Company or Purchaser or (b) if the Company and Purchaser are unable to agree on an accountant, then a nationally recognized certified public accounting firm jointly selected by the Company's accounting firm and Purchaser's accounting firm.

(q)       "*Assigned Contracts*" shall have the meaning set forth in <u>Section 1.1(b)</u>.

(r)       "*Assignment and Assumption Agreement*" shall have the meaning set forth in <u>Section 3.2(b)</u>.

(s)       "*Assumed Leased Real Property*" shall have the meaning set forth in <u>Section 1.1(h)</u>.

(t)       "*Assumed Liabilities*" shall have the meaning set forth in <u>Section 1.3</u>.

(u)       "*Assumed Plans*" shall have the meaning set forth in <u>Section 6.1(e)</u>.

(v)       "*Assumption and Assignment of Leases*" shall have the meaning set forth in <u>Section 3.2(h)</u>.

(w)       "*Auction*" has that meaning ascribed to such term by the Bidding Procedures Order.

(x)        "*Audited Financial Statements*" shall have the meaning set forth in Section 4.17(a).

(y)        "*Avoidance Actions*" shall have the meaning set forth in Section 1.1(aa).

(z)        "*Back-up Bidder*" shall have the meaning set forth in Section 7.2(c).

(aa)       "*Bankruptcy Cases*" shall have the meaning set forth in the Recitals.

(bb)       "*Bankruptcy Code*" shall have the meaning set forth in the Recitals.

(cc)       "*Bankruptcy Court*" shall have the meaning set forth in the Recitals.

(dd)       "*Bankruptcy Rules*" shall have the meaning set forth in the Recitals.

(ee)       "*Benefit Plan*" means (i) all "*employee benefit plans*" (including, without limitation, as defined in Section 3(3) of ERISA), including all employee benefit plans which are "*pension plans*" (including, without limitation, as defined in Section 3(2) of ERISA) and any other employee benefit arrangements or payroll practices (including severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life, insurance, fringe benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, stock purchase, equity-based, stock option, stock appreciation rights, restricted stock and phantom stock arrangements or policies) and (ii) all other employment, termination, bonus, severance, change in control, collective bargaining or other similar plans, programs, contracts, or arrangements (whether written or unwritten), in each case, maintained, contributed to, or required to be contributed to by any Seller or any ERISA Affiliate for the benefit of any current or former employee, director, officer or independent contractor of any Seller or under which any Seller or any ERISA Affiliate has any liability.

(ff)       "*Bid Protections*" shall have the meaning set forth in Section 7.1.

(gg)       "*Bidding Procedures Order*" means an order substantially in the form attached hereto as Exhibit E and otherwise in form and substance reasonably satisfactory to Seller and Purchaser.

(hh)       "*Bill of Sale*" shall have the meaning set forth in Section 3.2(a).

(ii)       "*Break-Up Fee*" shall have the meaning set forth in Section 7.1.

(jj)       "*Business*" shall have the meaning set forth in the Section 1.1.

(kk)       "*Business Day*" means any day other than a Saturday, Sunday or other day on which banks in New York City, New York are authorized or required by Law to be closed.

(ll)       "*Cash and Cash Equivalents*" means all of Seller's cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper, security entitlements, securities accounts, commodity Contracts, commodity accounts, government securities and any other cash equivalents, whether on hand, in transit, in banks or other financial

institutions, or otherwise held (but specifically excluding any cash payable by Purchaser to Seller pursuant to this Agreement).

(mm)    *"Cash Payment"* shall have the meaning set forth in <u>Section 2.1(a)</u>.

(nn)    *"Chapter 11 Petition"* shall have the meaning set forth in the Recitals.

(oo)    *"Claim"* has the meaning given that term in Section 101(5) of the Bankruptcy Code and includes, *inter alia,* all rights, claims, causes of action, defenses, debts, demands, damages, offset rights, setoff rights, recoupment right, obligations, and liabilities of any kind or nature under contract, at law or in equity, known or unknown, contingent or matured, liquidated or unliquidated, and all rights and remedies with respect thereto.

(pp)    *"Closing"* shall have the meaning set forth in <u>Section 3.1</u>.

(qq)    *"Closing Date"* means the date on which the Closing occurs.

(rr)    *"Closing Date Payment"* shall have the meaning set forth in <u>Section 2.1(b)</u>.

(ss)    *"Closing Working Capital"* shall have the meaning set forth in <u>Section 2.2(a)</u>.

(tt)    *"Code"* means the United States Internal Revenue Code of 1986, as the same may be amended from time to time.

(uu)    *"Company"* shall have the meaning set forth in the preamble.

(vv)    *"Company Subsidiary"* shall have the meaning set forth in the preamble.

(ww)    *"Competing Bid"* shall have the meaning set forth in <u>Section 7.2(b)</u>.

(xx)    *"Confidentiality Agreement"* means that certain Confidentiality Agreement between the Company and Purchaser dated December 7, 2012.

(yy)    *"Contract"* means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, license, understanding, instrument or other agreement, arrangement or commitment that is binding upon a Person or its property, whether express or implied.

(zz)    *"Cure Costs"* shall have the meaning set forth in <u>Section 1.3(b)</u>.

(aaa)    *"Current Assets"* shall have the meaning set forth in <u>Section 2.2(a)</u>.

(bbb)    *"Current Liabilities"* shall have the meaning set forth in <u>Section 2.2(a)</u>.

(ccc)    *"Deposit"* shall have the meaning set forth in <u>Section 2.4</u>.

(ddd)    *"DIP Financing Agreements"* means the Senior Secured, Super-Priority Debtor-In-Possession Credit Agreement among Orchard Supply Hardware LLC, Orchard Supply Hardware Stores Corporation, OSH Properties LLC, certain subsidiaries of Orchard Supply Hardware LLC, lenders

EAST\57511053. 3

and issuing banks from time to time party thereto, Wells Fargo Bank, National Association (as ABL Administrative Agent and Collateral Agent), Bank of America, N.A. (as Syndication Agent), Wells Fargo Bank, National Association (as Supplemental Term Agent), and Wells Fargo Capital Finance, LLC and Merrill Lynch, Pierce Fenner & Smith Incorporated (as Joint Lead Arrangers and Joint Bookrunners) and post-petition debtor-in-possession financing provided by certain of the lenders party to the Sellers' Amended and Restated Senior Secured Term Loan Agreement dated as of December 22, 2011 with Gleacher Products Corp. (as successor in interest to JPMorgan Chase Bank, N.A.), as administrative agent and collateral agent for itself, certain Lenders and other secured parties.

(eee)    "*DIP Budget*" means the pro forma budget delivered to the Purchaser prior to the date hereof specifying the Sellers' operating budget as debtor-in-possession.

(fff)    "*DIP Order*" means an order or orders entered by the Bankruptcy Court which approve the DIP Financing Agreements on a final basis.

(ggg)    "*Dispute Notice*" means a notice delivered by the Company to Purchaser in which the Company (a) disputes the calculation of Closing Working Capital included in the Working Capital Statement and (b) provides the basis of such dispute in reasonable detail.

(hhh)    "*Distribution Center*" has the meaning set forth in Section 1.1.

(iii)    "*Documents*" means all of Seller's written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental plans and reports, data, Permits and Permit applications, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form relating to the Business.

(jjj)    "*Employee*" means an individual who, as of the applicable date, is employed by any Seller in connection with the Business.

(kkk)    "*Employer*" shall mean any of the Sellers.

(lll)    "*Encumbrance*" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(mmm)    "*Engagement Date*" shall have the meaning set forth in Section 2.3(b).

(nnn)    "*Environmental Law*" means any foreign, federal, state or local statute, regulation, ordinance rule of common law or agency guidance or policies relating to the protection of human health, safety, the environment, natural resources or consumer products.

(ooo)    "*Environmental Liabilities and Obligations*" means all Liabilities arising from any actual or threatened impairment, impact or damage to the environment, health or safety, or any actual or threatened failure to comply with Environmental Law in connection with the prior or ongoing ownership or operation of the Business, the Purchased Assets, or the Assumed Leased Real Property or the Acquired Owned Real Property where the Business is currently located, including Liabilities related to: (i) the transportation, storage, use, arrangement for disposal or disposal of Hazardous Materials; (ii) the Release of Hazardous Materials, including migration onto or from the real property where the Business is located; (iii) any other pollution or contamination of the surface, substrata, soil, air, ground water, surface water or marine environments; (iv) any other obligations imposed under Environmental Law including all applicable Permits; (v) Orders, notices to comply, notices of violation, alleged non-compliance and inspection reports; and (vi) all obligations with respect to personal injury, property damage, wrongful death and other damages and losses arising under applicable Law as a result of any of the matters identified in clauses (i)-(v) of this definition.

(ppp)    "*ERISA*" means the Employee Retirement Income Security Act of 1974, as amended, and the regulations promulgated thereunder.

(qqq)    "*ERISA Affiliate*" means any entity which is a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in Treasury Regulations promulgated under Section 414(o) of the Code, any of which includes or included any Seller.

(rrr)    "*Escrow Agent*" means a third-party entity approved by the parties hereto, which entity will have fiduciary obligations with respect to the transfer of funds related to this Agreement and whose actions will be governed by an escrow agreement approved by the parties hereto.

(sss)    "*Estimated Working Capital*" shall have the meaning set forth in <u>Section 2.2(a)</u>.

(ttt)    "*Estimated Working Capital Statement*" shall have the meaning set forth in <u>Section 2.2(a)</u>.

(uuu)    "*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

(vvv)    "*Excluded Assets*" shall have the meaning set forth in <u>Section 1.2</u>.

(www)    "*Excluded Liabilities*" shall have the meaning set forth in <u>Section 1.4</u>.

(xxx)    "*Expense Reimbursement*" shall mean the reasonable out-of-pocket fees, costs and expenses of the Purchaser, subject to a cap of $850,000.

(yyy)    "*Final Order*" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Seller' Bankruptcy Cases or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (a) the time to appeal, petition for *certiorari,* or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (b) if an appeal, writ of *certiorari* new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to

which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(zzz)     "*Final Working Capital*" shall have the meaning set forth in <u>Section 2.3(a)</u>.

(aaaa)    "*Financial Statements*" shall have the meaning set forth in <u>Section 4.17(a)</u>.

(bbbb)    "*FIRPTA Certificate*" shall have the meaning set forth in <u>Section 11.4</u>.

(cccc)    "*FTC*" has the meaning set forth in <u>Section 8.16(a)</u>.

(dddd)    "*Furnished Reports*" has the meaning set forth in <u>Section 4.17(b)</u>.

(eeee)    "*GAAP*" means United States generally accepted accounting principles as in effect from time to time.

(ffff)    "*GOB Sales*" shall have the meaning set forth in <u>Section 1.2(k)</u>.

(gggg)    "*Governmental Body*" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(hhhh)    "*Ground Lease*" shall have the meaning set forth in <u>Section 4.6(a)</u>.

(iiii)    "*Hazardous Material*" means any substance, material or waste which is regulated by any Governmental Body, including petroleum and its by-products, asbestos, and any material or substance which is defined or identified as a "hazardous waste," "hazardous substance," "hazardous material," "restricted hazardous waste," "industrial waste," "solid waste," "contaminant," "pollutant," "toxic waste" or "toxic substance" or otherwise regulated under or the subject of any provision of Environmental Law.

(jjjj)    "*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the regulations promulgated thereunder.

(kkkk)    "*Indebtedness*" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person with respect to any Contracts relating to the deferred and unpaid purchase price of property or services, including any interest accrued thereon and prepayment or similar penalties and expenses; (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety

or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

(llll)    "*Intellectual Property*" means all intellectual property and proprietary rights of any kind, including the following:  (i) trademarks, service marks, trade names, slogans, logos, designs, symbols, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, any fictitious names, d/b/a's or similar filings related thereto, or any variant of any of them, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) copyrights and copyrightable subject matter (including any registration and applications for any of the foregoing); (iii) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, intangibles, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, industrial property rights, and methodologies; (iv) computer software, computer programs, and databases (whether in source code, object code or other form); and (v) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

(mmmm)    "*Inventory*" means all inventory (including finished goods, supplies, raw materials, work in progress, spare, replacement and component parts) related to the Business maintained or held by, stored by or on behalf of, or in transit to, any of the Sellers.

(nnnn)    "*IP Assignment and Assumption Agreement*" shall have the meaning set forth in <u>Section 3.2(i)</u>.

(oooo)    "*IRS*" shall have the meaning set forth in <u>Section 4.14(c)</u>.

(pppp)    "*Knowledge*" or ("*Knowledge of Seller*" or "*Seller Knowledge*") means the actual knowledge of a natural person, or, with respect to a Person that is not a natural person, the actual knowledge of the officers or management of any person, in each case, including facts of which any such individual should be aware in the reasonably prudent exercise of his or her duties.

(qqqq)    "*Law*" means any federal, state, local, municipal, foreign or international, multinational or other law, statute, constitution, principle of common law, resolution, ordinance, code, edict, decree, rule, regulation, ruling or requirement issued, enacted, adopted, promulgated, implemented or otherwise put into effect by or under the authority of any Governmental Body, including but not limited to Environmental Laws..

(rrrr)    "*Lease*" shall have the meaning set forth in <u>Section 4.6(a)</u>.

(ssss)    "*Leased Real Property*" means all of the real property leased, subleased, used or occupied by any of the Sellers, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

(tttt)    "*Liability*" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability

EAST\57511053. 3

claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

(uuuu) "*Material Adverse Effect*" means any event, change, occurrence or state of facts that has had, or is reasonably likely to have, individually or in the aggregate, a material adverse effect on the (i) assets, Liabilities, Business, properties, financial condition or results of operations of the Sellers, taken as a whole, <u>provided</u>, <u>however</u>, that in no event shall any of the following, alone or in combination, be deemed to constitute, or be taken into account, in determining whether there has been, or would be, a Material Adverse Effect:  (a) changes in the U.S. economy or capital markets in general but that do not have a disproportionate effect on the Sellers relative to other participants in the industry in which the Sellers conduct the Business, (b) changes that affect generally the industry in which the Sellers operate but that do not have a disproportionate effect on the Sellers relative to other participants in the industry in which the Sellers conduct the Business, (c) changes after the Agreement Date in any applicable Law or GAAP, (d) the commencement of the Bankruptcy Cases and Sellers' inability to pay certain obligations as a result of the filing of the Bankruptcy Cases, (e) any actions taken or proposed to be taken by Purchaser or any of its Affiliates, or (f) any effect resulting the public announcement of this Agreement, compliance with terms of this Agreement or the consummation of the transactions contemplated by this Agreement.

(vvvv) "*Order*" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Body.

(wwww) "*Ordinary Course of Business*" means the ordinary and usual course of normal day to day operations of the Business consistent with past practice.

(xxxx) "*Organizational Documents*" means, with respect to a particular entity Person, (i) if a corporation, the articles or certificate of incorporation and bylaws, (ii) if a general partnership, the partnership agreement and any statement of partnership, (iii) if a limited partnership, the limited partnership agreement and certificate of limited partnership, (iv) if a limited liability company, the articles or certificate of organization or formation and any limited liability company or operating agreement, (v) if another type of Person, all other charter and similar documents adopted or filed in connection with the creation, formation or organization of the Person, and (vi) all amendments or supplements to any of the foregoing.

(yyyy) "*Outside Back-up Date*" shall have the meaning set forth in Section 7.2(c).

(zzzz) "*Outside Date*" shall have the meaning set forth in Section 3.4(b).

(aaaaa) "*Overbid Protection*" shall have the meaning set forth in Section 7.1.

(bbbbb) "*Owned Buildings*" shall have the meaning set forth in Section 4.6(b).

(ccccc) "*Owned Real Property*" shall have the meaning set forth in Section 4.6(b).

(ddddd) "*Party*" shall have the meaning set forth in the preamble.

(eeeee)    "*Pension Plan*" shall have the meaning set forth in <u>Section 4.14(e)</u>.

(fffff)    "*Permits*" means to the fullest extent permitted under applicable law, all notifications, licenses, permits (including environmental, construction and operation permits), franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body to any of the Sellers and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(ggggg)    "*Permitted Encumbrances*" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, individually or in the aggregate, adversely affect the operation of the Business and, in the case of the Owned Real Property and Leased Real Property, which do not, individually or in the aggregate, adversely affect the use or occupancy of such Owned Real Property or Leased Real Property as it relates to the operation of the Business or materially detract from the value of the Owned Real Property or Leased Real Property, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business, (v) licenses granted on a non-exclusive basis , (vi) Encumbrances arising from the transfer of Intellectual Property pursuant to this Agreement relating to the past acts or prior commitments of Seller and all previous owners of such Intellectual Property and (vii) such other Encumbrances or title exceptions as Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, materially and adversely affect the operation of the Business.

(hhhhh)    "*Person*" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(iiiii)    "*Personal Property Leases*" shall have the meaning set forth in <u>Section 4.7</u>.

(jjjjj)    "*Petition Date*" means the date on which the Sellers commenced the Bankruptcy Cases.

(kkkkk)    "*Post-Closing Plans*" shall have the meaning set forth in <u>Section 6.1(b)</u>.

(lllll)    "*Post-Closing Tax Period*" means any taxable period (or portion thereof) beginning after the Closing Date.

(mmmmm)    "*Pre-Closing Period*" means the period commencing on the Agreement Date and ending on the earlier of the date upon which this Agreement is terminated pursuant to <u>Section 3.4</u> or the Closing Date.

(nnnnn)    "*Pre-Closing Tax Period*" means any taxable period (or portion thereof) ending on or before the Closing Date.

(ooooo)    "*Prevailing Bidder*" shall have the meaning set forth in <u>Section 7.2(c)</u>.

(ppppp)    "*Previously Omitted Contract*" shall have the meaning set forth in Section 1.6(b)(i).

(qqqqq)    "*Previously Omitted Contract Designation*" shall have the meaning set forth in Section 1.6(b)(i).

(rrrrr)    "*Previously Omitted Contract Notice*" shall have the meaning set forth in Section 1.6(b)(ii).

(sssss)    "*Prior Agreement*" shall have the meaning set forth in the Recitals.

(ttttt)    "*Purchase Price*" shall have the meaning set forth in Section 2.1(a).

(uuuuu)    "*Purchased Assets*" shall have the meaning set forth in Section 1.1.

(vvvvv)    "*Purchased Intellectual Property*" shall have the meaning set forth in Section 4.8.

(wwwww)    "*Purchaser*" shall have the meaning set forth in the preamble.

(xxxxx)    "*Purchaser Designee*" shall have the meaning set forth in the preamble.

(yyyyy)    "*Regulatory Approvals*" means any consents, waivers, approvals, orders Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement of any Ancillary Document and the consummation of the transactions contemplated hereby and thereby.

(zzzzz)    "*Release*" means any actual or threatened release, spill, emission, leaking, pumping, injection, deposit, disposal, discharge, dispersal or leaching into the indoor or outdoor environment, or including migration to or from a property, including but not limited to any Owned Real Property or Leased Real Property.

(aaaaaa)    "*Remedial Action*" means all actions to (i) investigate, clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release of any Hazardous Material; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) to correct a condition of noncompliance with Environmental Laws.

(bbbbbb)    "*Rejected Contracts*" shall have the meaning set forth in Section 1.6(a)(i).

(cccccc)    "*Representatives*" shall have the meaning set forth in Section 8.2.

(dddddd)    "*Sale and Bidding Procedures Motion*" shall have the meaning set forth in Section 7.2(a).

(eeeeee)    "*Sale Hearing*" means the hearing to approve this Agreement and seeking entry of the Sale Order.

(ffffff)    "*Sale Motion*" means the motion or motions of Seller, in form and substance reasonably acceptable to Seller and Purchaser, seeking approval and entry of the Bidding Procedures Order and Sale Order.

(gggggg)   "*Sale Order*" means an order substantially in the form attached hereto as Exhibit F and otherwise in form and substance reasonably satisfactory to Seller and Purchaser.

(hhhhhh)   "*SEC Documents*" has the meaning set forth in Section 4.17(b).

(iiiiii)   "*Securities Act*" means the Securities Act of 1933, as amended.

(jjjjjj)   "*Sellers*" shall have the meaning set forth in the preamble.

(kkkkkk)   "*Specified Prepaid Expenses*" shall have the meaning set forth in Section 2.2(a).

(llllll)   "*Stores*" has the meaning set forth in Section 1.1.

(mmmmmm)   "*Straddle Period*" shall have the meaning set forth in Section 11.1(b).

(nnnnnn)   "*Subsidiary*" or "*Subsidiaries*" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person (a) beneficially owns, either directly or indirectly, more than fifty percent (50%) of (i) the total combined voting power of all classes of voting securities of such entity, (ii) the total combined equity interests, or (iii) the capital or profit interests, in the case of a partnership; or (b) otherwise has the power to vote or to direct the voting of sufficient securities to elect a majority of the board of directors or similar governing body.

(oooooo)   "*Tax*" and "*Taxes*" mean (a) any and all taxes, including any federal, state, provincial, local, foreign or other income, gross receipts, sales, value added, use, production, ad valorem, transfer, franchise, registration, profits, license, lease, service, service use, withholding, payroll, employment, unemployment, estimated, excise, severance, environmental, stamp, occupation, premium, property (real or personal), real property gains, windfall profits, capital, production, recapture, net worth, surplus, customs, duties, levies, surtaxes or other taxes, fees, assessments, reassessments or charges of any kind whatsoever, together with any interest, additions, installments or penalties with respect thereto and any interest in respect of such additions or penalties, (b) any Liability for the payment of any items described in clause (a) above as a result of being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group (or being included (or being required to be included)) in any Tax Return related to such group (including any Liability pursuant to Section 1.1502-6 of the Treasury Regulations, or any similar provision of state, local or non-U.S. law), and (c) any Liability for the payment of any amounts as a result of any express or implied obligation to indemnify any other Person, or any successor or transferee liability, by contract or otherwise in respect of any items described in clause (a) or (b) above.

(pppppp)   "*Tax Proceeding*" means any action, suit, investigation, audit, Claim, investigation, or other action or proceeding with respect to Taxes.

(qqqqqq)   "*Tax Refunds*" shall have the meaning set forth in Section 1.1(u).

(rrrrrr)   "*Tax Return*" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information) supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(ssssss)   "*Term Lenders*" shall have the meaning set forth in Section 3.2(s).

(tttttt)    "*Transferred Employee*" shall have the meaning set forth in <u>Section 6.1(a)</u>.

(uuuuuu)    "*Transition Services Agreement*" shall have the meaning set forth in <u>Section 3.2(c)</u>.

(vvvvvv)    "*Treasury Regulations*" means the regulations promulgated under the Code by the United States Department of the Treasury (whether in final, proposed or temporary form), as the same may be amended from time to time.

(wwwwww)    "*Unaudited Financial Statements*" shall have the meaning set forth in <u>Section 4.17(a)</u>.

(xxxxxx)    "*WARN Act*" means the United States Worker Adjustment and Retraining Notification Act, and the rules and regulations promulgated thereunder.

(yyyyyy)    "*Working Capital Statement*" shall have the meaning set forth in <u>Section 2.2(b)</u>.

## ARTICLE XI.

## TAXES

11.1    <u>Certain Taxes</u>.

(a)    Except as provided in <u>Section 1.3(h)</u>, any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated hereby, and that are not exempt under Section 1146(a) of the Bankruptcy Code, shall be borne and timely paid by the Sellers. The Sellers shall, at their own expense, timely file any Tax Return or other document required to be filed with respect to such Taxes, and Purchaser shall join in the execution of any such Tax Return if required by Law.

(b)    In the case of any taxable period that begins before, and ends after, the Closing Date (a "*Straddle Period*"), any real property, personal property, ad valorem and similar Taxes allocable to the portion of such Straddle Period ending with the end of the day on the Closing Date shall be equal to the amount of such Taxes for the entire Straddle Period multiplied by a fraction, the numerator of which is the number of days during the Straddle Period that is in the Pre-Closing Tax Period and the denominator of which is the number of days in the entire Straddle Period, which amount shall be an Excluded Liability.

11.2    <u>Allocation of Purchase Price</u>. As soon as reasonably practicable after the Closing Date, the Purchaser shall determine the allocation of (a) the Purchase Price, plus (b) the Assumed Liabilities, plus (c) all other items required to be treated as consideration for federal income Tax purposes, among the Purchased Assets and the agreements provided for herein, for all purposes (including financial, accounting and Tax) (the "*Allocation*"). The Purchaser and the Sellers shall each report the federal, state and local income and other Tax consequences of the transactions contemplated hereby in a manner consistent with the Allocation, including, if applicable, the preparation and filing of Forms 8594 under Section 1060 of the Code (or any successor form or successor provision of any future Tax Law) with their respective federal income Tax Returns for the taxable year which includes the Closing Date, and neither will take any position inconsistent with the Allocation unless otherwise required under applicable Law.

The Sellers shall provide the Purchaser and the Purchaser shall provide Seller with a copy of any information required to be furnished to the Secretary of the Treasury under Code Section 1060.

   11.3   Cooperation on Tax Matters.  The Purchaser and the Sellers agree to provide each other with such information and assistance as is reasonably necessary, including access to records, Tax Returns and personnel, for the preparation of any Tax Returns or for the defense of any Tax claim or assessment, whether in connection with a Tax Proceeding or otherwise.

   11.4   FIRPTA Certificate.  The Sellers shall deliver to the Purchaser on the date hereof a properly executed affidavit of non-foreign status, reasonably satisfactory to Purchaser, that complies with Section 1445 of the Code and Section 1.1445-2(b)(2) of the Treasury Regulations (the "*FIRPTA Certificate*").  If the Purchaser does not so receive a properly executed FIRPTA Certificate from the Sellers, then the Purchaser shall be permitted to withhold from any payment to be made (or deemed to be made) pursuant to this Agreement to the Sellers any required withholding Tax under Section 1445 of the Code as determined by the Purchaser.  Any amounts withheld shall be treated for all purposes of this Agreement as having been paid to the Sellers in respect of which such withholding was made.

   11.5   Tax Refunds.  The Sellers agree to cooperate with the Purchaser in all respects, and take or cause to be taken any steps necessary, in order to apply for and obtain any Tax Refunds with respect to any Seller for any taxable year, provided that the Purchaser pays all reasonable expenses incurred in connection therewith.

ARTICLE XII.

MISCELLANEOUS

   12.1   Payment of Expenses.  Except as otherwise provided in this Agreement (including, but not limited to Section 3.5 and Section 7.1) and whether or not the transactions contemplated hereby are consummated, Sellers and the Purchaser shall bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and the Ancillary Documents and the consummation of the transactions contemplated hereby and thereby.

   12.2   Survival of Representations and Warranties; Survival of Confidentiality.  The Parties agree that the representations and warranties contained in this Agreement shall expire upon the Closing Date.  The Parties agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

   12.3   Entire Agreement; Amendments and Waivers.  This Agreement supersedes the Prior Agreement in its entirety and, together with the Confidentiality Agreement and the Ancillary Documents, represents the entire understanding and agreement between the Parties with respect to the subject matter hereof.  This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought; provided, that the Schedules hereto may be amended in accordance with Section 1.6.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, condition, covenant or agreement contained herein.  The waiver by any Party of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single

EAST\57511053. 3

56

or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

     12.4    <u>Execution of Agreement; Counterparts; Electronic Signatures</u>.

     (a)    This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument, and shall become effective when counterparts have been signed by each of the Parties and delivered to the other Parties; it being understood that all Parties need not sign the same counterparts.

     (b)    The exchange of copies of this Agreement and of signature pages by facsimile transmission (whether directly from one facsimile device to another by means of a dial-up connection or whether mediated by the worldwide web), by electronic mail in "portable document format" ("*.pdf*") form, or by any other electronic means intended to preserve the original graphic and pictorial appearance of a document, or by combination of such means, shall constitute effective execution and delivery of this Agreement as to the Parties and may be used in lieu of the original Agreement for all purposes. Signatures of the Parties transmitted by facsimile shall be deemed to be their original signatures for all purposes.

     12.5    <u>Governing Law</u>. THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE, AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF (EXCEPT FOR ANY LAWS OF THAT STATE WHICH WOULD RENDER SUCH CHOICE OF LAWS INEFFECTIVE), INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

     12.6    <u>Jurisdiction, Waiver of Jury Trial</u>.

     (a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED, HOWEVER</u>, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN MANHATTAN, NEW YORK, NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER AT LAW OR IN EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

     (b)    EACH OF THE PARTIES HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

     12.7    <u>Notices</u>. Unless otherwise set forth herein, any notices, consents, waivers and other communications required or permitted by this Agreement shall be in writing and shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment

EAST\57511053. 3

confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

If to Seller, to:

> Orchard Supply Hardware
> Address: 6450 Via Del Oro
> San Jose, CA 95119
> Fax no.: (408) 365-2799
> Attention: Michael Fox
> Senior Vice President, General Counsel and Secretary
> E-mail address: michael.fox@osh.com

With a copy (which shall not constitute effective notice) to:

> DLA Piper LLP (US)
> 203 North LaSalle Street, Suite 1900
> Chicago, Illinois 60601
> Fax no.: (312) 236-7516
> Attention:   Richard Chesley
>                     Chun Jang
> E-mail address: Richard.Chesley@dlapiper.com
>                         Chun.Jan@dlapiper.com

If to Purchaser, to:

> Orchard Supply Company, LLC
> c/o Lowe's Companies, Inc.
> 1000 Lowe's Boulevard
> Mooresville, NC 28117
> Attention: Business Development Executive
> Mail Code: NB7BD
> Fax no.: 704-757-0805
> E-mail Address: Richard.d.maltsbarger@lowes.com

> and

> Lowe's Companies, Inc.
> 1000 Lowe's Boulevard
> Mooresville, NC 28117
> Attention: Chief Legal Officer, Secretary and Chief Compliance Officer
> Mail Code: NB7LG
> Fax no.: 704-757-0675
> E-mail Address: gaither.m.keener@lowes.com

With a copy (which shall not constitute effective notice) to:

> Hunton & Williams LLP

2200 Pennsylvania Ave., NW
Washington, DC  20037
Fax no.: (202) 778-2201
Attention:  J. Steven Patterson
           Scott H. Kimpel
E-mail address:  spatterson@hunton.com
                skimpel@hunton.com

12.8    Binding Effect; Assignment.  This Agreement shall be binding upon Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Seller, and inure to the benefit of the Parties and their respective successors and permitted assigns, including any trustee or estate representative appointed in the Bankruptcy Cases or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without such required consents shall be void.

12.9    Severability.  Whenever possible, each provision or portion of any provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable Law, but if any provision or portion of any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under any applicable Law in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other provision or portion of any provision in such jurisdiction and in lieu of such invalid, illegal or unenforceable provision or portion of any provision, there will be added automatically as a part of this Agreement a valid legal and enforceable provision as similar in terms to such invalid, illegal or unenforceable provision as may be possible.

12.10   Bulk Sales Laws.  Each Party hereby waives compliance by the Parties with the "*bulk sales*," "*bulk transfers*" or similar Laws and all other similar Laws in all applicable jurisdictions in respect of the transactions contemplated by this Agreement or any Ancillary Document.

12.11   Access and Right to Use.  Purchaser shall, upon reasonable advance notice, afford to Sellers' officers, independent public accountants, attorneys, consultants and other representatives, reasonable access during normal business hours to the Purchased Assets and all records pertaining to the Purchased Assets on a royalty-free basis solely for the purpose of enabling the Sellers to conduct an orderly wind-down of the Sellers' operations until such time as the wind-down is completed on or before the one-year anniversary of this Agreement.  Sellers expressly acknowledge that nothing in this Section is intended to give rise to any contingency to Sellers' obligations to proceed with the transactions contemplated herein.

**[Remainder of page intentionally left blank]**

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the date first above written.

ORCHARD SUPPLY HARDWARE
STORES CORPORATION

By: _____
      Name:
      Title:

ORCHARD SUPPLY HARDWARE LLC

By: _____
      Name:
      Title:

OSH PROPERTIES LLC

By: _____
      Name:
      Title:

ORCHARD SUPPLY COMPANY, LLC

By: _____
      Name:
      Title:

# EXHIBIT A

**EXHIBIT A**

BILL OF SALE

THIS BILL OF SALE (this "*Bill of Sale*") is made on this ____ day of _____, 2013, by and among Orchard Supply Company, LLC, a Delaware limited liability company ("*Purchaser*") and one or more other persons designated by the Purchaser (collectively, the "*Purchaser Designees*" and with the Purchaser, each a "*Purchaser*" and collectively, the "*Purchasers*"), and Orchard Supply Hardware Stores Corporation, a Delaware corporation (the "*Company*"), Orchard Supply Hardware LLC, a Delaware limited liability company and OSH Properties LLC (each a "*Company Subsidiary*" and collectively, the "*Company Subsidiaries*," and together with the Company, each a "*Seller*" and collectively, the "*Sellers*").

WHEREAS, the Sellers have agreed to sell to Purchasers, and Purchasers has agreed to purchase from the Company, for the consideration and upon the terms and conditions set forth in that certain Asset Purchase Agreement, dated as of June 17, 2013 (the "*Purchase Agreement*"), among Purchasers and Sellers , the Purchased Assets; and

WHEREAS, pursuant to the terms of the Purchase Agreement, the Purchaser may assign its rights to purchase any of the Purchased Assets or assume any of the Assumed Liabilities to any Affiliate of Purchaser, and Purchaser desires to assign its rights to purchase certain of the Purchased Assets as set forth herein;

NOW, THEREFORE, pursuant to the Purchase Agreement and in consideration of the mutual promises it contains, and for other good and valuable consideration, the receipt and sufficiency of which the Company and the Company Subsidiaries acknowledge, the Company and the Company Subsidiaries agree for the benefit of Purchasers as follows:

1.    **Defined Terms**.  Capitalized terms used herein but not otherwise defined in this Bill of Sale shall have the meanings ascribed to such terms in the Purchase Agreement.

2.    **Transfer of Purchased Assets**.

a.    With regard to the Purchased Assets generally, the Company and the Company Subsidiaries hereby sell, transfer, assign, convey, grant and deliver to Purchasers, and each of Purchasers' respective successor and assigns, all of the right, title to and interest of the Company and the Company Subsidiaries in all of the Purchased Assets, free and clear of any Encumbrance other than Permitted Encumbrances.

b.    The Company and the Company Subsidiaries do, to the extent provided in the Asset Purchase Agreement, hereby sell, transfer, convey and assign to Purchasers, and each of Purchasers' respective successors and assigns, all of their respective rights, titles and interests of the Company and the Company Subsidiaries in the Purchased Assets, free and clear of any Encumbrance other than Permitted Encumbrances, with such Purchased Assets identified on Exhibit 1 hereto being sold, transferred, conveyed and assigned to the applicable Purchaser noted on Exhibit 1 hereto.

3.    **Excluded Assets and Excluded Liabilities**.  Notwithstanding anything in this Bill of Sale to the contrary, the Company and the Company Subsidiaries are retaining ownership and possession of, and is not selling, transferring, assigning, conveying, granting or delivering to Purchasers hereunder or otherwise, any right, title or interest, legal or equitable, of the Company and the Company Subsidiaries in or to any of the Excluded Assets or the Excluded Liabilities, and Purchasers are not assuming or in any way becoming liable or responsible for any of the Excluded Assets or the Excluded Liabilities.

4.    **Purchase Agreement Controls**. Nothing in this Bill of Sale shall be deemed to supersede, enlarge or modify any of the provisions of the Purchase Agreement, all of which survive the execution and delivery of this Bill of Sale as provided and subject to the limitations set forth in the Purchase Agreement. If any conflict exists between the terms of this Bill of Sale and the terms of the Purchase Agreement, the terms of the Purchase Agreement shall govern and control.

5.    **Governing Law**. This Bill of Sale will be governed and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the internal laws of the State of New York (without giving reference to the principles of conflicts of law).

6.    **Further Assurance**. The Company and the Company Subsidiaries hereby covenant that, at any time or from time to time after the date hereof, the Company and the Company Subsidiaries will take all further actions and execute and deliver all further documents that are necessary to sell, transfer, convey, assign, grant and deliver to Purchasers, and to confirm such Purchaser's title to, all of such Purchaser's right, title and interest in and to the Purchased Assets, and to put such Purchaser in actual possession of such rights, title and interest in and to the Purchased Assets and assist such Purchaser in exercising all rights with respect thereto.

7.    **Successors and Assigns**. This Bill of Sale shall be binding upon the Company and the Company Subsidiaries and their successors and assigns and shall inure to the benefit of Purchasers and their respective successors and assigns.

8.    **Closing Date**. This Bill of Sale is to be effective as of the Closing Date.

9.    **Counterparts**. This Bill of Sale may be executed in any number of counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

10.    **Amendment and Waiver**. This Bill of Sale may not be amended or modified in any manner other than by an agreement in writing signed by the parties hereto or their respective successors or permitted assigns. No waiver under this Bill of Sale shall be valid or binding unless set forth in a writing duly executed and delivered by the party against whom enforcement of such waiver is sought. Neither the waiver by any of the parties of a breach or default under any of the provisions of this Bill of Sale, nor the failure by any of the parties, on one or more occasions, to enforce any of the provisions of this Bill of Sale or to exercise any right or privilege hereunder, shall be construed as a waiver of any other breach or default of a similar nature, or as a waiver of any of such provisions, rights or privileges hereunder.

11.    **Notice**. Any notice given pursuant to this Bill of Sale shall be given in the same manner as stated in Section 12.7 of the Purchase Agreement.

*[Signature Page Follows]*

WEST\241401306.3

**IN WITNESS WHEREOF**, the undersigned parties have caused this Bill of Sale to be executed and delivered as of the date first above written.

PURCHASER:

ORCHARD SUPPLY COMPANY, LLC

By:_____
Name: Richard D. Maltsbarger
Title:  Manager

COMPANY:

ORCHARD SUPPLY HARDWARE STORES
CORPORATION

By:_____
Name:
Title:

COMPANY SUBSIDIARIES:

ORCHARD SUPPLY HARDWARE LLC

By:_____
Name:
Title:

OSH PROPERTIES LLC

By:_____
Name:
Title:

[Signature Page to Bill of Sale]

EXHIBIT 1

PURCHASED ASSETS

| Purchased Asset | Purchaser Entity |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

# EXHIBIT B

**EXHIBIT B**

## ASSIGNMENT and ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT (the "Assignment"), dated as of _____, 2013, by and among Orchard Supply Company, LLC, a Delaware Limited Liability Company ("*Purchaser*") and one or more other persons designated by the Purchaser (collectively, the "*Purchaser Designees*" and with the Purchaser, each a "*Purchaser*" and collectively, the "*Purchasers*"), and Orchard Supply Hardware Stores Corporation, a Delaware corporation (the "*Company*"), Orchard Supply Hardware LLC, a Delaware limited liability company and OSH Properties LLC (each a "*Company Subsidiary*" and collectively, the "*Company Subsidiaries*," and together with the Company, each a "*Seller*" and collectively, the "*Sellers*")

WHEREAS, pursuant to that certain Asset Purchase Agreement, dated as of June 17, 2013 (the "Asset Purchase Agreement"), by and among Purchasers and Sellers, Sellers have agreed to sell, assign, transfer and deliver to Purchasers and Purchasers have agreed to purchase, acquire and accept from Sellers the Assigned Contracts.

WHEREAS, all capitalized terms used and not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and of other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.      Sellers hereby sell, assign, transfer and deliver to Purchasers, their successors and assigns, and Purchasers, their successors and assigns, hereby purchase, acquire and accept from Sellers, all of the right, title and interest of Sellers in and to the Assigned Contracts set forth on Exhibit 1 hereto free and clear of all Encumbrances, other than the Permitted Encumbrances with such Assigned Contracts identified on Exhibit A hereto being sold, transferred, conveyed and assigned to the applicable Purchaser noted on Exhibit A hereto.  Notwithstanding the foregoing, nothing in this Assignment shall constitute or be construed as selling, assigning, transferring, or delivering to the Purchasers, and the Purchasers shall not acquire hereby, any right, title or interest to or in any of the Excluded Assets, and Purchasers are not assuming or in any way becoming liable or responsible for any of the Excluded Liabilities.

2.      This Assignment is in all respects subject to the provisions of the Asset Purchase Agreement and is not intended in any way to supersede, limit, or qualify any provision of the Asset Purchase Agreement.  If any conflict exists between the terms of this Assignment and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and control.

3.      This Assignment and the covenants and agreements herein contained shall inure to the benefit of and shall bind the respective parties hereto and their respective successors and permitted assigns.

4.      This Assignment shall be construed in accordance with, and governed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the internal laws of the State of New York (without giving reference to the principles of conflicts of law).

5.      This Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document.  Counterparts of this Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

6.      This Assignment may only be modified by a written agreement duly signed by the parties hereto.

7.      The parties hereto agree that the assignment of each of the Assigned Contracts shall be construed as being separable and divisible from the assignment of every other Assigned Contract.  The unenforceability or invalidity of this Assignment with respect to any one Assigned Contract shall not limit the enforceability or validity, in whole or in part, with respect to any other Assigned Contract.

8.      The parties hereto agree to execute and deliver such further documentation, instruments, and the like and to take such further action as is reasonably required to carry out the intentions or to facilitate the performance of the terms of this Assignment.

**[Signature Page Follows]**

**EXHIBIT B**

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be duly executed, as of the date first written above.

PURCHASER:

ORCHARD SUPPLY COMPANY, LLC

By:_____
Name:  Richard D. Maltsbarger
Title:  Manager

COMPANY:

ORCHARD SUPPLY HARDWARE STORES CORPORATION

By:_____
Name:
Title:

COMPANY SUBSIDIARIES:

ORCHARD SUPPLY HARDWARE LLC

By:_____
Name:
Title:

OSH PROPERTIES LLC

By:_____
Name:
Title:

[Signature Page to Assignment and Assumption Agreement]

WEST\241404759.3

EXHIBIT 1

ASSIGNED CONTRACTS

# EXHIBIT C

**Exhibit C**

## ASSUMPTION AND ASSIGNMENT OF LEASE

THIS ASSUMPTION AND ASSIGNMENT OF LEASE (this **"Assignment"**) is made and entered into as of _____, 2013, by and between the entities shown as Tenant on Exhibit 1 attached hereto (collectively, "Assignor") and Orchard Supply Company, LLC ("Assignee").

### RECITALS:

A.    Assignor is a tenant or sub-tenant to those premises listed in Exhibit 1 hereto under the applicable leases or sub-leases listed in Exhibit 1 (as each may have been amended, modified, supplemented, renewed, restated, and/or replaced on or prior to the Execution Date, as hereinafter defined, each a **"Lease"** and collectively, the **"Leases"**).

B.    Assignor desires to assign to Assignee, and Assignee desires to assume from Assignor, all of Assignor's right, title and interest in, to and under the Leases.

### AGREEMENT:

NOW, THEREFORE, in consideration of the mutual covenants and agreements contained herein and other good and valuable consideration, the parties agree as follows:

1.    Assignment.  Assignor hereby assigns and transfers to Assignee all of Assignor's right, title, and interest in, to and under the Leases from and after the date of execution of this Assignment (the **"Execution Date"**), including, without limitation, any improvements made by Assignor to the underlying properties that are the subject of the Leases.

2.    Assumption.  Assignee hereby assumes all of the obligations of Assignor under the Leases to be performed by Assignor as the tenant under the Leases from and after the Execution Date, and agrees to be bound by all of the terms, covenants, conditions, and provisions of the Leases from and after the Execution Date for the remainder of the term of the Leases.

3.    Governing Law.  This Assignment and the rights and obligations of the parties hereunder shall in all respects be governed and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the internal laws of the State of California (without giving reference to the principles of conflicts of law).

4.    Interpretation.  This Assignment shall be interpreted in accordance with the common meaning of its terms and shall not be interpreted strictly for or against either party.

5.    Counterparts.  This Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document. Counterparts of this Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

1

**Exhibit C**

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the day and year first above written.

ASSIGNOR:

[ORCHARD TENANT ENTITY]

By:_____
Name: _____
Title: _____

ASSIGNEE:

[PURCHASER TENANT ENTITY]

By:_____
Name: _____
Title: _____

EXHIBIT 1

LEASES

# EXHIBIT D

## IP ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS IP ASSIGNMENT AND ASSUMPTION AGREEMENT (this "*Assignment*") is made and entered into as of _____, 2013 by and among Orchard Supply Company, LLC, a Delaware limited liability company ("*Purchaser*") and one or more other persons designated by the Purchaser (collectively, the "*Purchaser Designees*" and with the Purchaser, each a "*Purchaser*" and collectively, the "*Purchasers*"), and Orchard Supply Hardware Stores Corporation, a Delaware corporation (the "*Company*"), Orchard Supply Hardware LLC, a Delaware limited liability company and OSH Properties LLC (each a "*Company Subsidiary*" and collectively, the "*Company Subsidiaries*," and together with the Company, each a "*Seller*" and collectively, the "*Sellers*").

WHEREAS, Sellers have agreed to sell to Purchasers and Purchasers have agreed to purchase from Sellers various assets, including without limitation, the Purchased Intellectual Property and the goodwill of the business associated therewith; and

WHEREAS, Purchasers desire to acquire Sellers' entire right, title and interest in and to such Purchased Intellectual Property;

NOW THEREFORE, in consideration of the mutual covenants and agreements set forth below and in the Asset Purchase Agreement, dated June 17, 2013, by and among Purchaser and Sellers (the "*Asset Purchase Agreement*") and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.   Assignment.  Sellers hereby irrevocably and unconditionally grant, convey, transfer and assign to Purchasers all of Sellers' right, title and interest in and to the Purchased Intellectual Property set forth on Exhibit 1 hereto and the goodwill and all rights associated therewith, and all other corresponding rights that are or may be secured under the laws of the United States, any jurisdiction thereof, any foreign country or any multinational jurisdiction now or hereafter in effect, the same to be held by Purchasers for Purchasers' own use and enjoyment, and for the use and enjoyment of Purchasers' successors and assigns and other legal representatives, together with all rights to income, royalties and license fees deriving from the Purchased Intellectual Property, all claims for damages by reason of past, present and future infringements or unauthorized uses of the Purchased Intellectual Property and the right to sue for and collect such damages, as permitted under the applicable laws of any jurisdiction or country in which such claims may be asserted for the use and benefit of Purchasers and each Purchaser's successors, assigns and other legal representatives.

2.   Assistance.  Subject to Section 3, Sellers and Purchasers shall execute and deliver such instruments and take such other actions as may reasonably be required in order to carry out the intent of this Assignment and to evidence and effectuate the transactions contemplated herein.

3.   Relation to Asset Purchase Agreement.  This Assignment is intended only to effect the transfer of the Purchased Intellectual Property, including the rights therein as provided in Section 1 of this Assignment, and nothing contained herein shall in any way supersede,

modify, replace, amend, change, rescind, waive, exceed, expand, enlarge or in any way affect the provisions, including the warranties, covenants, agreements, conditions, representations or, in general any of the rights and remedies, and any of the obligations and indemnifications of any party set forth in the Asset Purchase Agreement. In the event of any conflict or inconsistency between the terms of the Asset Purchase Agreement and the terms hereof, the terms of the Asset Purchase Agreement shall govern.

4. General.

4.1     Severability; Amendment.  Any provision in this Assignment which is illegal, invalid or unenforceable shall be ineffective to the extent of such illegality, invalidity or unenforceability, without affecting in any way the remaining provisions hereof.   This Assignment may not be amended except by execution and delivery of an instrument in writing signed by officers of Sellers and Purchasers on behalf of Sellers and Purchasers.

4.2     Entire Agreement; No Third-Party Beneficiaries.  This Assignment, including the Exhibits and other documents attached or referred to herein, which form a part hereof, embodies the entire agreement and understanding of the parties hereof, and supersedes all prior or contemporaneous agreements or understandings (whether written or oral) among the parties, in respect to the subject matter contained herein. If any conflict exists between the terms of this Assignment and the terms of the Asset Purchase Agreement, the terms of the Asset Purchase Agreement shall govern and control. This Assignment and the obligations hereunder are not intended to confer any rights or remedies to any third party and are not intended to operate, in anyway, as an agreement for the benefit of any third party.

4.3     Successors and Assigns.  This Assignment shall inure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.  This Assignment and the rights and obligations hereunder shall not be assignable by Sellers without the prior written consent of Purchasers, and any such purported assignment without such consent shall be void.  This Assignment and the rights and obligations hereunder shall be assignable by Purchasers without the written consent of Sellers.

4.4     Governing Law.  This Assignment governed and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the internal laws of the State of New York (without giving reference to the principles of conflicts of law).

4.5     Defined Terms.  All capitalized terms not defined herein shall have the meaning assigned to them in the Asset Purchase Agreement.

4.6     Counterparts.  This Assignment may be executed in any number of counterparts, all of which, taken together, shall constitute one document.  Counterparts of this Assignment (or applicable signature pages hereof) that are manually signed and delivered by facsimile or other electronic transmission shall be deemed to constitute signed original counterparts hereof and shall bind the parties signing and delivering in such manner.

*[Signature Page Follows]*

-2-

IN WITNESS WHEREOF, the undersigned have caused this Assignment to be executed, as of the date first written above.

COMPANY:

ORCHARD SUPPLY HARDWARE STORES
CORPORATION

By:_____
Name:
Title:

COMPANY SUBSIDIARIES:

ORCHARD SUPPLY HARDWARE LLC

By:_____
Name:
Title:

OSH PROPERTIES LLC

By:_____
Name:
Title:

PURCHASER:

ORCHARD SUPPLY COMPANY, LLC

By:_____
Name:  Richard D. Maltsbarger
Title:  Manager

PURCHASER DESIGNEE:

LF, LLC

By:_____
Name:
Title:

[Signature Page to IP Assignment and Assumption Agreement]

EXHIBIT 1

PURCHASED INTELLECTUAL PROPERTY

*U.S. Copyright Registrations*

| Registration No. | Title | Claimant |
|---|---|---|
| VA0000518731 | Columbus, OSH | Orchard Supply Hardware LLC |
| VA0000518495 | Handyman OSH | Orchard Supply Hardware LLC |
| VA0000518730 | OSH the cupid | Orchard Supply Hardware LLC |
| VA0000518496 | OSH the gardener | Orchard Supply Hardware LLC |
| V3581D192 | No titles given | Orchard Supply Hardware LLC |
| V3581D196 | Handyman OSH & 3 other titles | Orchard Supply Hardware LLC |
| V3578D054 | Handyman OSH & 3 other titles | Orchard Supply Hardware LLC |
| V3578D055 | Handyman OSH & 3 other titles | Orchard Supply Hardware LLC |

*Trademark and Service Mark Applications and Registrations*

| Mark | Serial No. | Registration No. | Goods/Services | Owner |
|---|---|---|---|---|
| Aqua Vista | 77-727,476 | 3,926,325 | Faucets | Orchard Supply Hardware LLC |
| Aqua Vista | 85-395300 | Pending | Toilets, toilet seats | Orchard Supply Hardware LLC |
| Backyard Pro | 78-245,656 | 2,918,132 | Hand operated pruning tools, namely pruners, loppers, hedge shears and grass shears | Orchard Supply Hardware LLC |
| Blue Ridge | 78-693,472 | 3,200,849 | Electric holiday lights; artificial garlands, wreaths and flower arrangements; artificial Christmas trees | Orchard Supply Hardware LLC |
| Bridgewater | 78-153,859 | 2,776,948 | Faucets | Orchard Supply Hardware LLC |
| Complete Hardware & Garden | 75-203,175 | 2,200,708 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Earth Friendly Earth Friendly and Design | 77-111,992 | 3,635,800 | Retail store services featuring items sold in a hardware store, namely, garden, nursery, electrical, hardware, plumbing, outdoor power, paint, appliance and houseware products | Orchard Supply Hardware LLC |
| Home Accents | 85198426 | 4155885 | Faucets | Orchard Supply Hardware LLC |
| Las Soluciones Existen. Nosotros Te Ayudamos A Encontrarlas | 78-136,272 | 2,704,813 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Lifetime Plant Guarantee & Design | 78-427,038 | 2,967,061 | Retail store services featuring live plants and flowers | Orchard Supply Hardware LLC |
| Mission | 85-753981 | Pending | Grills for outdoor cooking | Orchard Supply Hardware LLC |
| Morro | 85198393 | 4106668 | Faucets | Orchard Supply Hardware LLC |

| Orchard | 85-342,407 | 4,095,995 | Retail store services in the field of hardware and home improvement; online retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
|---|---|---|---|---|
| Orchard Est. 1931 | 77-725,981 | 4,096,521 | Lawn and garden chemicals, namely, fertilizers; planting soil; potting soil; grass seeds | Orchard Supply Hardware LLC |
| Orchard Super Hardware | 77-413,986 | 3,511,974 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Orchard Supply Hardware | 78-186,264 | 2,775,762 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Orchard Supply Hardware Est. 1931 and Design | 77-810,204 | 3,958,656 | Retail store services in the field of hardware and home improvement; online retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Orchard Supply Hardware Est. 1931 and Design | 77-810,212 | 3,958,657 | Retail store services in the field of hardware and home improvement; online retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Orchard Supply Hardware Est. 1931 and Design | 85-337,824 | 4,149,029 | Retail store services in the field of hardware and home improvement; online retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Orchard's Pride | 78-755,985 | 3,478,056 | Roses | Orchard Supply Hardware LLC |
| OSH | 78-186,009 | 2,766,925 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| OSH Orchard Supply Hardware and Design | 76-282,064 | 2,638,912 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |
| Pacific Bay | 77-053,610 | 3,900,869 | Ceiling Fans; landscape light fixtures; floor and table lamps; low voltage and solar powered light fixtures for residential, garden and patio use; electric lanterns; light chandeliers | Orchard Supply Hardware LLC |
| Pacific Bay | 85-205938 | 3,994,025 | Patio umbrellas, patio furniture; fitted fabric furniture covers for patio furniture; flower pots | Orchard Supply Hardware LLC |
| Season's Traditions | 85-023214 | Pending | Electric lights for Christmas trees; outdoor lighted Christmas ornaments, etc. | Orchard Supply Hardware LLC |
| Super Select | 85-142,154 | 4,165,239 | Grass seeds | Orchard Supply Hardware LLC |
| Supertuf | 85-142,164 | 4,161,817 | Grass seeds | Orchard Supply Hardware LLC |
| Sweet San Carlos | 78-755,991 | 3,478,057 | Roses | Orchard Supply Hardware LLC |
| The Answers Are Out There. We'll Help You Find Them. | 76-409,915 | 2,683,582 | Retail store services in the field of hardware and home improvement | Orchard Supply Hardware LLC |

| Western Hawk | 78-954,897 | 3,667,934 | Hand tools, namely screw drivers; rulers, namely tape rulers | Orchard Supply Hardware LLC |
|---|---|---|---|---|

| Domain Names | Owner | Registrar | Expiration Date |
|---|---|---|---|
| orchardhardware.com | Orchard Supply Hardware LLC | Register.com | 06/13/2014 |
| orchardhomeimprovement.com | Orchard Supply Hardware LLC | Register.com | 06/05/2014 |
| orchardsupply.com | Orchard Supply Hardware LLC | Register.com | 05/27/2014 |
| orchardsupplyhardware.biz | Orchard Supply Hardware LLC | Register.com | 02/19/2014 |
| orchardsupplyhardware.com | Orchard Supply Hardware LLC | Register.com | 10/06/2013 |
| osh.biz | Orchard Supply Hardware LLC | Register.com | 11/18/2013 |
| osh.com | Orchard Supply Hardware LLC | Register.com | 09/19/2014 |
| osh.info | Orchard Supply Hardware LLC | Register.com | 09/19/2013 |
| osh.us | Orchard Supply Hardware LLC | Register.com | 05/15/2014 |

# EXHIBIT E

See Docket No. 155 in Case No. 13-11565.

# EXHIBIT G

See Exhibit D to Docket No. 15 in Case No. 13-11565.

# EXHIBIT H

**EXHIBIT H**

## TRANSITION SERVICES AGREEMENT

THIS TRANSITION SERVICES AGREEMENT (this "*Agreement*") is made effective as of the ___ day of August, 2013 (the "*Effective Date*"), by and between Orchard Supply Company, LLC, a Delaware limited liability company ("*Purchaser*") and Orchard Supply Hardware Stores Corporation, a Delaware corporation (the "*Seller*"). Seller and Purchaser may each be referred to as a "*Party*" and together as the "*Parties*."

### Recitals

WHEREAS, the Parties have entered into that certain Asset Purchase Agreement dated June 17, 2013 (the "*APA*") providing for Seller's sale to Purchaser, and Purchaser's purchase from Seller, of the assets of the Business (as defined in the APA); and

WHEREAS, the Parties require Purchaser to provide certain services during a limited transitional period in order to facilitate the continued operation of the bankruptcy estates in the Bankruptcy Cases with minimal disruption;

NOW, THEREFORE, for good and valuable consideration, receipt of which is hereby acknowledged, the Parties agree as follows:

### Agreement

1.     <u>Definitions</u>. Capitalized terms will have the meanings ascribed to them in this section or elsewhere in this Agreement. Those capitalized terms that are not otherwise defined in this Agreement shall have the same meanings as those ascribed to them in the APA.

1.1     "<u>Affiliate</u>" of a Party hereto means any Person directly or indirectly controlling, controlled by, or under common control with such Party.

1.2     "<u>Services</u>" means the services, functions, and tasks of Purchaser described in the Service Schedule or identified elsewhere in this Agreement. If any service, function, or responsibility not specifically described in this Agreement is an inherent part of the performance of the Services, it will be deemed included within the scope of the Services.

1.3     "<u>Service Schedule</u>" means the schedule attached to this Agreement as <u>Schedule A</u> **(Service Schedule)**, which describes the Services to be performed under this Agreement.

2.     <u>Services</u>

2.1     <u>Provision of Services</u>. Purchaser will provide, and as necessary will cause its Affiliates to provide, the Services to Seller (or at Seller's direction, to Seller's Affiliates or any assignee under this Agreement) during the term of this Agreement. Except as otherwise expressly provided in this Agreement, Purchaser will be responsible for providing the facilities, personnel, and other resources required for performance of the Services. Consistent with this, Purchaser will provide Seller personnel with access to an office and office support services in the building located at 6450 Via Del Oro, San Jose, CA 95119 during regular business hours at no

additional cost. Except as otherwise provided in this Agreement, each Party will bear its own expenses in connection with performance of its obligations under this Agreement. As part of the Services, to the extent it has legal and contractual authority to do so, Purchaser grants (or, as applicable, will cause its Affiliates to grant) to Seller a fully-paid, non-transferable license (with no right to sublicense) to use any equipment and software identified, described, or referenced in the Service Schedule during the term of this Agreement for the sole purpose of receiving the benefit of the Services hereunder.

2.2     General Standard of Performance.  Purchaser will use commercially reasonable efforts to provide (and cause its Affiliates to provide) the Services with at least the same level of skill, quality, care, timeliness, and cost-effectiveness as such services, functions, and tasks were performed prior to the date of execution of the APA.  Seller understands that Purchaser is providing the Services solely as an accommodation to the Seller and that the provisions of such Services is not in the ordinary course of Purchaser's business.

2.3     Reduction in Services.  Seller may elect to suspend or not to receive any of the Services at any time upon written notice to Purchaser.

2.4     Additional Services.  If Seller reasonably requests that Purchaser perform additional services not included within the scope of the Services, then the Parties will promptly negotiate in good faith with a view toward adding such additional services to the Service Schedule.

2.5     Good Faith Cooperation.  The Parties will use good faith efforts to cooperate with each other in all matters relating to the provision and receipt of Services.  Such cooperation shall include, to the extent applicable, exchanging information, providing electronic access to systems used in connection with Services, and performing true ups and adjustments.

3.    Compensation

3.1     Charges.  Schedule B (**Service Fees**) shall identify the payments due to Purchaser in consideration of its performance of the Services, and the Service Schedule shall identify which payments are applicable to which Service.  Seller agrees to pay Purchaser the amounts set forth in Schedule B (**Service Fees**) for the performance of the applicable Services.  Seller will not be required to pay any amounts in connection with the Services other than as set forth on Schedule B (**Service Fees**) and in this Section 3 (**Compensation**).

3.2     Other Expenses.  The Parties agree and acknowledge that the payments identified in Schedule B (**Service Fees**) are intended to be inclusive of all expenses incurred by Purchaser in the performance of the Services.  If Purchaser believes that it has incurred an unexpected material expense that was not considered by the Parties in the negotiation of the fees and charges set forth in Schedule B (**Service Fees**), Purchaser may give written notice to Seller and the Parties shall discuss in good faith how to handle such expense.

3.3     Invoicing and Payment.  Purchaser will invoice Seller monthly at the end of each month for the amount due under this Agreement for that month.  Such invoices will clearly specify amounts due for each of the Services.  Each such invoice will be accompanied by such

23797.001248 EMF_US 46875775v2

supporting documentation as Seller may reasonably require.  Undisputed amounts of each invoice will be due within thirty (30) days after Seller's receipt of the invoice.

     3.4   <u>Records</u>.  Purchaser will maintain (and, as applicable, cause its Affiliates to maintain) accurate and complete records regarding its activities relating to this Agreement and the means of calculating the amounts billed to Seller hereunder.  Purchaser will retain (and, as applicable, cause its Affiliates to retain) all such records until two (2) years after any termination or expiration of this Agreement, unless otherwise directed by Seller.

4.    <u>Confidentiality</u>

     4.1   <u>Purchaser Information</u>

        (a)   <u>Purchaser Information Defined</u>.  The Parties acknowledge that, in the course of performing the Services, Seller and Seller personnel may receive, observe, and otherwise have access to confidential and proprietary information of Purchaser or its Affiliates (whether in tangible or electronic form or otherwise) related to Purchaser or its Affiliates or their respective products, tools, technology, processes, business plans, and customers that at the time of disclosure or that should reasonably be considered under the circumstances of its disclosure to be confidential to Purchaser (the "***Purchaser Information***")  Notwithstanding the foregoing, Purchaser Information does not include information that: (i) is in the public domain, through no fault of Seller; (ii) was known to Seller prior to being disclosed by Purchaser to Seller; (iii) is disclosed to Seller by a third party who is entitled to so disclose the information; or (iv) is developed by Seller employees without reference to Purchaser Information.

        (b)   <u>Confidentiality Obligations</u>.  Seller agrees that:

        (i)   Seller will not use, reproduce, or exploit Purchaser Information for any purpose other than receiving the Services and exercising its rights as contemplated under this Agreement;

        (ii)   Seller will hold all Purchaser Information in strict confidence and will not disclose or otherwise make available Purchaser Information to any third party, and Seller will restrict access to Purchaser Information to those of its representatives who have a need to know such information in order to receive the Services or exercise Seller's rights hereunder;

        (iii)   Seller will take all reasonable and necessary steps to protect the Purchaser Information from inadvertent or unintentional disclosure to third parties and will protect the Purchaser Information from unauthorized access, disclosure, or use with at least the same degree of care as Seller uses to protect its own trade secret information of equivalent importance, and in any event no less than reasonable care;

        (iv)   Seller will reproduce, on all copies of documents and materials containing Purchaser Information made by Seller or its employees, agents, or contractors, all proprietary rights notices of Purchaser appearing on the original copy of such document or material; and

3

(v)      Seller will, at Purchaser's request, promptly return to Purchaser or destroy all documents and materials in tangible form, and permanently erase all data in electronic form, containing any Purchaser Information, and certify in writing signed by an executive officer of Seller that Seller has fully complied with this obligation.

4.2      Seller Information

(a)      Seller Information Defined.  The Parties acknowledge that, in the course of performing the Services, Purchaser and the employees and agents of Purchaser and its Affiliates (collectively, **"Purchaser Personnel"**) will receive, observe, and otherwise have access to confidential and proprietary information (whether in tangible or electronic form or otherwise) related to Seller, its Affiliates, and their respective products, tools, technology, processes, business plans, and customers that at the time of disclosure or that should reasonably be considered under the circumstances of its disclosure to be confidential to Seller (the "**Seller Information**").  Without limiting the foregoing, Seller Information includes all accounting, financial, technical, business, and other data related to Seller's business and stored on the computer or telecommunications systems of Purchaser.  Notwithstanding the foregoing, Seller Information does not include information that: (i) is in the public domain, through no fault of Purchaser; (ii) was known to Purchaser prior to being disclosed by Seller to Purchaser; (iii) is disclosed to Purchaser by a third party who is entitled to so disclose the information; (iv) is developed by Purchaser employees without reference to Seller Information; or (v) constitutes a Purchased Asset or Assumed Liability under the APA.

(b)      Confidentiality Obligations.  Purchaser agrees that:

(i)      Purchaser will not use, reproduce, or exploit Seller Information for any purpose other than performing Services as contemplated under this Agreement;

(ii)      Purchaser will hold all Seller Information in strict confidence and will not disclose or otherwise make available Seller Information to any third party, and Purchaser will restrict access to Seller Information to those of its employees who have a need to know such information in order to perform the Services;

(iii)      Purchaser will take all reasonable and necessary steps to protect Seller Information from inadvertent or unintentional disclosure to third parties and will protect Seller Information from unauthorized access, disclosure, or use with at least the same degree of care as Purchaser uses to protect its own trade secret information of equivalent importance, and in any event no less than reasonable care;

(iv)      Purchaser will reproduce, on all copies of documents and materials containing Seller Information made by Purchaser or its employees, agents, or contractors, all proprietary rights notices of Seller appearing on the original copy of such document or material; and

(v)      Purchaser will, at Seller's request, promptly return to Seller or destroy all documents and materials in tangible form, and permanently erase all data in electronic

4

form, containing any Seller Information, and certify in writing signed by an executive officer of Purchaser that Purchaser has fully complied with this obligation.

      4.3    Access.  Upon Seller's request from time to time or upon the expiration or termination of this Agreement or, with respect to any particular Seller Information, on such earlier date that the same will be no longer required by Purchaser in order to render the Services hereunder, Purchaser will promptly provide an electronic copy of all Seller Information in Purchaser's (or its Affiliates') possession or control to Seller, in the format reasonably requested by Seller.  If Seller requests at any time, Purchaser will destroy (and, as applicable, cause its Affiliates to destroy) all copies of Seller Information in Purchaser's (or its Affiliates') possession or control.

      4.4    Injunctive Relief.  Each Party acknowledges and agrees that the other Party would suffer irreparable harm for which monetary damages would be an inadequate remedy if there were a breach by such Party of obligations under this Section 4 (**Confidentiality**).  Each Party further acknowledges and agrees that equitable relief, including injunctive relief, would be appropriate to protect the non-breaching Party's rights and interests if such a breach were to arise, be threatened, or be asserted, and the non-breaching Party will be entitled to the entry of an order for immediate injunctive relief.

5.    Personnel

      5.1    Compensation and Benefits.  All Purchaser Personnel providing Services under this Agreement will be deemed to be employees or representatives solely of Purchaser (or its Affiliates) for purposes of all compensation and employee benefits and not to be employees or representatives of Seller.  Purchaser (or its Affiliates) will be solely responsible for payment of (a) all income, disability, withholding, and other employment taxes; and (b) all medical benefit premiums, vacation pay, sick pay, or other fringe benefits for any employees, agents, or contractors of Purchaser who perform Services.  Purchaser will indemnify, defend and hold Seller harmless against any liability for premiums, contributions or taxes payable under workers' compensation, unemployment compensation, disability benefit, old age benefit, or tax withholding for which Seller may be adjudged liable as an employer with respect to any Purchaser Personnel who perform Services from and after the date of this Agreement.  All Purchaser Personnel will be under the direction, control, and supervision of Purchaser, and Purchaser will have the sole right to exercise all authority with respect to the employment, termination, assignment, and compensation of such Purchaser Personnel.

      5.2    Subcontractors.  Purchaser may use any subcontractor or other third-party designee to perform all or any part of any Service.

6.    Warranty

      6.1    No Warranty; Exclusive Remedy.

        (a)    The Parties both acknowledge and agree that Purchaser has agreed to provide or cause to be provided the Services hereunder as an accommodation to Seller. THE SERVICES TO BE PROVIDED UNDER THIS AGREEMENT ARE FURNISHED AS IS,

5

WHERE IS, WITH ALL FAULTS.  NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESSED OR IMPLIED ARE MADE BY THE PURCHASER WITH RESPECT TO THE PROVISION OF TRANSITION SERVICES UNDER THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY REPRESENTATION OR WARRANTY IN REGARD TO QUALITY, PERFORMANCE, NONINFRINGEMENT, COMMERCIAL UTILITY, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.  TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ALL SUCH REPRESENTATIONS OR WARRANTIES ARE HEREBY WAIVED AND DISCLAIMED.

(b)     Other than in the event of Purchaser's gross negligence or willful misconduct for which Seller shall have a right to seek indemnity hereunder (and without limiting the indemnification rights under Section 6.2(b)), the sole and exclusive remedy of Seller with respect to any and all damages caused by or arising from the performance or non-performance of any Services by Seller (either directly or indirectly) will be the termination of this Agreement in accordance with Article 7 hereof.

6.2     Remedies. The Parties agree that irreparable damage may occur in the event that any of the provisions of this Agreement are not performed in accordance with their specific terms or are otherwise breached. It is accordingly agreed that each of the Parties shall be entitled to seek equitable relief to prevent or remedy breaches of this Agreement, without the proof of actual damages, including in the form of an injunction or injunctions or orders for specific performance in respect of such breaches. Each Party agrees to waive any requirement for the security or posting of any bond in connection with any such equitable remedies.  NEITHER PARTY SHALL BE LIABLE TO THE OTHER FOR ANY EXEMPLARY, SPECIAL, INDIRECT, PUNITIVE, INCIDENTAL OR CONSEQUENTIAL LOSSES, DAMAGES OR EXPENSES, INCLUDING BUT NOT LIMITED TO DAMAGES IN RESPECT OF BUSINESS INTERRUPTION OR LOSS OF PROFITS.

7.     Term and Termination

7.1     Term.  This Agreement will enter into effect on the Effective Date and continue until the earlier of (a) one (1) year from the Effective Date, (b) the date the  Services to be provided per the attached Schedules are fully performed, or (c) the date this Agreement is terminated pursuant to this Section 7 **(Term and Termination);** *provided, however,* that Seller shall have the right to extend the term of this Agreement, or the duration of any Services provided hereunder, upon sixty (60) days written notice to Purchaser, for a period not to extend beyond 180 days from the Effective Date.

7.2     Termination for Convenience.  Seller may terminate this Agreement, or all or any part of the Services to be provided hereunder, with or without cause at any time by providing Purchaser with thirty (30) days prior written notice.  If Seller terminates part of the Services, the charges payable by Seller under this Agreement will be equitably reduced to account for the reduction in Services provided.

7.3     Termination for Breach.  Each Party will have the right to terminate this Agreement in its entirety by giving to the other Party written notice of termination if (a) the other Party fails to substantially comply with the material obligations imposed upon it under this

6

Agreement resulting in direct damages to the other Party, (b) the non-breaching Party serves the breaching Party with a written notice of such failure, which notice states with particularity the nature of the failure, (c) the breaching Party does not cure the failure within ninety (90) days following receipt of the notice, and (d) such breach is continuing at the time that the non-breaching Party delivers its notice of termination.

      7.4    <u>Survival</u>.    Sections <u>1</u> **(Definitions)**, <u>3.4</u> **(Records and Audits)**, <u>4</u> **(Confidentiality)**, <u>5.1</u> **(Compensation and Benefits)**, <u>7.4</u> **(Survival)**, and <u>8</u> **(General)** of this Agreement will survive the termination or expiration of this Agreement.

8.    <u>General</u>

      8.1    <u>Further Assurances</u>.  Each Party agrees to take such actions and execute such documents as are reasonably requested by the other Party (including providing executed documents in such recordable form as is deemed required or necessary by the other Party) to effect the purposes of this Agreement (including the transition of the Services to Seller).

      8.2    <u>Continued Performance</u>.  Each Party agrees to continue performing its obligations under this Agreement while any dispute is being resolved unless and until the term of this Agreement ends.

      8.3    <u>Relationship of the Parties</u>.  Each Party will be deemed to be an independent contractor and not an agent, joint venturer, partner, or representative of the other Party.  Neither Party may create any obligations or responsibilities on behalf of or in the name of the other Party.  Neither Party will hold itself out to be a partner, employee, franchisee, representative, servant, or agent of the other Party.

      8.4    <u>Notices</u>.  All notices and other communications required or permitted under this Agreement shall be deemed given to a Party when (a) delivered to the appropriate address by hand or by nationally recognized overnight courier service (costs prepaid), or (b) sent by facsimile or e-mail, in each case, if sent during the normal business hours of the recipient, with confirmation of transmission by the transmitting equipment confirmed with a copy delivered as provided in clause (a), in the case of each of clauses (a) and (b), to the following addresses, facsimile numbers or e-mail addresses and marked to the attention of the person (by name or title) designated below (or to such other address, facsimile number, e-mail address or person as a Party may designate by notice to the other Parties):

7

If to Seller:

> Orchard Supply Hardware Stores Corporation
> c/o FTI Consulting, Inc.
> One Front Street
> Suite 1600
> San Francisco, CA  94111
> Fax no: (415) 293-4497
> Attention:    Andrew Hinkelman
> E-mail address:  Andrew.Hinkelman@fticonsulting.com

With a copy (which shall not constitute effective notice) to:

> DLA Piper LLP (US)
> 203 North LaSalle Street, Suite 1900
> Chicago, Illinois 60601
> Fax no.:  (312) 236-7516
> Attention:    Richard Chesley
>                        Chun Jang
> E-mail address:        Richard.Chesley@dlapiper.com
>                                  Chun.Jang@dlapiper.com

If to Purchaser:

> Orchard Supply Company, LLC
> c/o Lowe's Companies, Inc.
> 1000 Lowe's Boulevard
> Mooresville, NC 28117
> Attention:  Business Development Executive
> Mail Code:  NB7BD
> Fax no.:  704-757-0805
> E-mail Address:        Richard.d.maltsbarger@lowes.com

> and

> Lowe's Companies, Inc.
> 1000 Lowe's Boulevard
> Mooresville, NC 28117
> Attention:  Chief Legal Officer, Secretary and Chief Compliance Officer
> Mail Code:  NB7LG
> Fax no.:  704-757-0675
> E-mail Address:        gaither.m.keener@lowes.com

23797.001248 EMF_US 46875775v2

With a copy (which shall not constitute effective notice) to:

> Hunton & Williams LLP
> 2200 Pennsylvania Ave., NW
> Washington, DC  20037
> Fax no.: (202) 778-2201
> Attention:     J. Steven Patterson
>                Scott H. Kimpel
> E-mail address:     spatterson@hunton.com
>                     skimpel@hunton.com

or to such other respective addresses and/or fax number as each Party may designate by notice given in accordance with the provisions of this Section 8.4 (**Notices**).

8.5     Fees and Expenses.  Except as otherwise explicitly provided in this Agreement, each Party will bear all fees and expenses (including financial advisors', attorneys', accountants' and other professional fees and expenses) incurred by such Party in connection with, arising from or relating to the negotiation, execution, delivery and performance of this Agreement.

8.6     Entire Agreement.  This Agreement constitutes the complete agreement and understanding among the Parties regarding the subject matter of this Agreement and supersedes any prior agreement, understanding or representation regarding the subject matter of this Agreement.

8.7     Amendments.  This Agreement may not be amended or modified except by an instrument in writing signed by or on behalf of each of the Parties hereto.

8.8     Non-Waiver.  The Parties' respective rights and remedies under this Agreement are cumulative and not alternative.  Neither the failure nor any delay by any Party in exercising any right, power or privilege under this Agreement will operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power or privilege will preclude any other or further exercise of such right, power or privilege or the exercise of any other right, power or privilege.  No waiver will be effective unless it is in writing and signed by an authorized representative of the waiving Party.  No waiver given will be applicable except in the specific instance for which it was given.  No notice to or demand on a Party will constitute a waiver of any obligation of such Party or the right of the Party giving such notice or demand to take further action without notice or demand as provided in this Agreement.

8.9     Assignment.  Seller may not assign or transfer any or all of its rights under this Agreement to one or more parties without the consent of Purchaser, which consent may be withheld or denied in Purchaser's sole discretion.  Purchaser may assign or transfer its rights under this Agreement, or delegate any of its obligations or duties under this Agreement (by operation of law or otherwise).  Any attempted assignment, transfer, or delegation in violation of this Agreement will be null and void.  This Agreement will be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns.

8.10    Binding Effect; Benefit.  This Agreement will inure to the benefit of and bind the Parties and their respective successors and permitted assigns.  Nothing in this Agreement, express or implied, may be construed to give any Person other than the Parties and their respective successors and permitted assigns any right, remedy, claim, obligation or liability arising from or related to this Agreement.  This Agreement and all of its provisions and conditions are for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns.

8.11    Severability.  If any court of competent jurisdiction holds any provision of this Agreement invalid or unenforceable, then the other provisions of this Agreement will remain in full force and effect.  Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

8.12    References.  The headings of Sections are provided for convenience only and will not affect the construction or interpretation of this Agreement.  Unless otherwise provided, references to "Section(s)" and "Exhibit(s)" refer to the corresponding article(s), section(s) and exhibit(s) of or to this Agreement.  Each Exhibit is hereby incorporated into this Agreement by reference.  Reference to a statute refers to the statute, any amendments or successor legislation and all rules and regulations promulgated under or implementing the statute, as in effect at the relevant time.  Reference to a contract, instrument or other document as of a given date means the contract, instrument or other document as amended, supplemented and modified from time to time through such date.

8.13    Construction.  Each Party participated in the negotiation and drafting of this Agreement, assisted by such legal and tax counsel as it desired, and contributed to its revisions.  Any ambiguities with respect to any provision of this Agreement will be construed fairly as to all Parties and not in favor of or against any Party.  All pronouns and any variation thereof will be construed to refer to such gender and number as the identity of the subject may require.  The terms "include" and "including" indicate examples of a predicate word or clause and not a limitation on that word or clause.

8.14    Governing Law.  This agreement is to be governed by and construed in accordance with federal bankruptcy law, to the extent applicable, and where state law is implicated, the laws of the state of New York shall govern, without giving effect to the choice of law principles thereof (except for any laws of that state which would render such choice of laws ineffective), including all matters of construction, validity and performance.

8.15    Consent to Jurisdiction.  With respect to any legal action or other legal proceeding commenced after the Petition Date, each party hereby (a) agrees to the jurisdiction of the Bankruptcy Court with respect to any claim or cause of action arising under or relating to this Agreement, (b) waives any objection based on *forum non conveniens* and waives any objection to venue of any such suit, action or proceeding, (c) waives personal service of any and process upon it, and (d) consents that all services of process be made by registered or certified mail (postage prepaid, return receipt requested) directed to it at its address stated in Section 8.4 (**Notices**) and service so made will be complete when received.  Nothing in this Section 8.15 (**Consent to Jurisdiction**) will affect the rights of the Parties to serve legal process in any other manner permitted by law.

10

8.16    <u>Waiver of Trial by Jury</u>.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO TRIAL BY JURY IN CONNECTION WITH ANY LITIGATION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

8.17    <u>Counterparts</u>.  This Agreement may be executed by facsimile or electronic (.pdf) delivery of original signatures, and in counterparts, both of which shall be considered one and the same agreement, and shall become effective when such counterparts have been signed by each Party and delivered, including by facsimile or other electronic means, to the other Party. No Party may raise (a) the use of a facsimile or email transmission to deliver a signature or (b) the fact that any signature, agreement or instrument was signed and subsequently transmitted or communicated through the use of a facsimile or email transmission as a defense to the formation or enforceability of a contract, and each Party forever waives any such defense.

11

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives.

ORCHARD SUPPLY HARDWARE
STORES CORPORATION


By:_____
Name:
Title:

[Signature Page to Transition Services Agreement]

ORCHARD SUPPLY COMPANY, LLC

By:_____
Name:  Richard D. Maltsbarger
Title:   Manager

[Signature Page to Transition Services Agreement]

## Schedule A

## Services Exhibit

**A.    General Description of Services**

| Service | Purchaser Responsibilities | Commence Date | End Date |
|---|---|---|---|
| Accounting Support | Accounting support services as needed to assist with the processing of accounting records, accounts payable, financial reporting and systems, and transitions post Closing. | Effective Date | One Year from Effective Date |
| Claims Reconciliation | a. Providing information and reasonable assistance in updating outstanding amounts payable,<br><br>b. Providing information and reasonable assistance in the segregation between pre- and post-sale amounts.<br><br>c. Providing information and reasonable assistance for FTI/BMC in the research and adjudication of variances after the bar date. | Effective Date | One Year from Effective Date |
| Tax Compliance | Support services as needed to assist with Sellers' Tax reporting obligations, other than the preparation of any tax return, tax filing or tax statement. | Effective Date | One Year from Effective Date |
| Litigation Support | Access to records and information pertaining to litigation or claims against Sellers. | Effective Date | One Year from Effective Date |
| GOB HR Services | Support services as needed to assist with Sellers' human resource obligations pertaining to employees employed or formerly employed in GOB Sales stores. | Effective Date | One Year from Effective Date |

A-1

B.     Key Personnel. *List all critical Purchaser personnel who should be involved in performing the Services.*

| Name |
| --- |
| Michael Fox |
| Chris Newman |
| Deirdre Dawson |
| Stephan Penn |
| Carnie Asimakopoulos |
| Shanon Williamson |
| Mark Rodriguez |
| Jeff Maloney |
| Laura Ho |
| Julie Do |
| Anita Haws |
| Marian Robinson |
| Stacey Dimich |
| Michael Williams |
| Laura Golding |
| Loren Pofahl |
| Richard Marano |

C.     Compensation. In consideration of the Services described in this Schedule A, Seller shall pay to Purchaser the Employee Charges for each Purchaser employee engaged in providing such Services, as described in Schedule B **(Service Fees)**.

A-2

## Schedule B

### Service Fees

A.    <u>Employee Charges (Non-GOB HR Services)</u>.    The charges under this <u>Section A</u> shall apply to the Services described in Schedule A, other than GOB HR Services.

For each employee of Purchaser engaged to perform Services under this Agreement, Seller will pay to Purchaser an hourly charge (the "***Employee Charge***") that is equal to:

(1/2000) * (the annual base salary for such employee) * 1.25( markup for fringe benefits, building and utilities, and supervisory/overhead costs).

The Seller will reimburse the Purchaser for reasonable costs related to travel required to be undertaken in the performance of the Services.

B.    <u>Charges (GOB Services)</u>.    For GOB HR Services described in Schedule A, Seller will reimburse Purchaser for out-of-pocket costs incurred by Purchaser in the delivery of such services.

B-1

DISCLOSURE SCHEDULES

to

AMENDED AND RESTATED ASSET PURCHASE AGREEMENT

Dated as of August 20, 2013

By and Between

Orchard Supply Company, LLC

as Purchaser,

and

Orchard Supply Hardware Stores Corporation

as Seller.

and

Orchard Supply Hardware LLC and OSH Properties LLC

as Seller Subsidiaries

**General Terms of the Disclosure Schedules**

Unless the context otherwise requires, any terms used herein but not defined herein shall have the meanings ascribed thereto in the Amended and Restated Asset Purchase Agreement, dated as of August 20, 2013 (the "*Agreement*"), by and among Orchard Supply Company, LLC ("*Purchaser*"), and Orchard Supply Hardware Stores Corporation, a Delaware corporation (the "*Seller*" or "*Company*"), Orchard Supply Hardware LLC, a Delaware limited liability company and OSH Properties LLC (each, a "*Company Subsidiary*" and collectively, the "*Company Subsidiaries*," and together with the Seller, the "*Sellers*"). Capitalized terms used herein but not otherwise defined in these Disclosure Schedules shall have the meanings ascribed to such terms in the Agreement.

The following Disclosure Schedules are qualified in their entirety by reference to the specific provisions of the Agreement and are not intended to constitute, and shall not be construed as constituting, representations or warranties of the parties, except as and to the extent provided in the Agreement. Inclusion of information herein shall not be construed as indicating that such matter is required to be disclosed nor shall such disclosure be construed as an admission that such information is material to the Seller or the Seller Subsidiaries and the parties to the Agreement.

Headings and introductory language have been inserted on the Sections of the Disclosure Schedules for convenience of reference only and shall not have the effect of amending and shall not be used to construe the representations and warranties set forth in the Agreement.

The information in the following Disclosure Schedules is being provided as required under the Agreement. In disclosing this information, the Seller and each of the Seller Subsidiaries expressly does not waive any attorney-client privilege associated with any such information or any protection afforded by the "work product doctrine" with respect to any of the matters disclosed or discussed herein.