**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

```
-----------------------------------------------------------x
                                                           :
In re:                                                     :  Chapter 11
                                                           :
OSH 1 Liquidating Corporation (f/k/a In re:                :  Case No. 13-11565 (CSS)
Orchard Supply Hardware Stores Corporation),               :
et al.,¹                                                   :  (Jointly Administered)
                                                           :
          Debtors.                                         :  Re: Dkt. No. 618
                                                           :
-----------------------------------------------------------x
```

**DEBTORS' OBJECTION TO FIRST AND FINAL FEE APPLICATION OF
A&G REALTY PARTNERS, LLC AS REAL ESTATE CONSULTANT AND
ADVISOR TO DEBTORS AND DEBTORS IN POSSESSION FROM THE
PETITION DATE THROUGH AUGUST 30, 2013**

OSH 1 Liquidating Corporation and its affiliated debtors, f/k/a Orchard Supply Hardware Stores (collectively, the "Debtors"), by and through their counsel, DLA Piper LLP (US), hereby object (the "Objection") to the *First and Final Fee Application of A&G Realty Partners, LLC as Real Estate Consultant and Advisor to Debtors and Debtors in Possession from the Petition Date Through August 30, 2013* [D.I. 618] (the "Fee Application"). In support of this Objection, the Debtors respectfully represent as follows:

**PRELIMINARY STATEMENT**

1.      A&G Realty Partners, LLC ("A&G") seeks a grossly exorbitant award of *$7,749,428.70* in fees that is not only unsupported by the terms of its engagement and applicable law, but one that could prevent meaningful recoveries to the Debtors' creditors and cause the

---

[1] The Debtors are the following three entities (the last four digits of their respective taxpayer identification numbers, follow in parentheses): OSH 1 Liquidating Corporation f/k/a Orchard Supply Hardware Stores Corporation (4109), OSH 2 Liquidating LLC f/k/a Orchard Supply Hardware LLC (3395) and OSH 3 Liquidating LLC f/k/a OSH Properties LLC (3391). The mailing address of each of the Debtors, solely for purposes of notices and communications, is c/o FTI Consulting, Inc., One Front Street, Suite 1600, San Francisco, CA 94111 (Attn: Andrew J. Hinkelman).

Debtors' estates to become administratively insolvent. At the very least, pursuant to the plain terms of its Engagement Letter (defined below), A&G is not entitled to (i) the $4,666,123.19 A&G seeks with respect to rent savings it asserts that it obtained for lease option terms that have not been exercised under any lease modification document, and (ii) $305,000.00 of the $410,000 it seeks for non-monetary lease modifications for which the Engagement Letter provides for compensation "per transaction." At most, A&G is not entitled to any compensation from the Debtors, as virtually all of the services for which A&G is seeking compensation solely benefited the purchaser of the Debtors' assets, not the Debtors' estates.

2.      In this case, as the evidence will make clear, A&G's efforts were focused exclusively on seeking to reduce leasehold obligations **following** the sale of the Debtors' assets. Although this result was foreseen (and actually desired) at the time of A&G's retention, the manner in which this result was accomplished was unequivocally unforeseen. Indeed, it has become evident that A&G was acting largely at the direction of Lowe's (and without oversight from the Debtors' other professionals), and that A&G's singular focus potentially placed other prospective purchasers at a significant disadvantage by negotiating lease amendments that would only become effective if Lowe's were the successful bidder at the auction. This directly contravenes A&G's duties under the terms of the Engagement Letter to act at the direction of the Debtors.

3.      In the end, A&G's Fee Application is nothing more than a "cash grab" by which it seeks nearly eight million dollars in fees. This amount is comparable to that being sought by **all of the Debtors' professionals combined**, professionals who were actually instrumental in achieving a swift and successful sale of the Debtors' business as a going concern. In short, the Court should deny the Fee Application, or, at a minimum, reduce the amount that may be

awarded by at least $4,971,123.19, because the fees that A&G seeks cannot be countenanced by the terms of A&G's engagement or any guiding principles of bankruptcy law.

**RELEVANT BACKGROUND**

4.     On June 17, 2013 (the "Petition Date"), each of the Debtors filed with this Court a Voluntary Petition for relief under the Bankruptcy Code.  The Debtors are continuing to operate their businesses as debtors in possession.  On June 26, 2013, the Office of the United States Trustee for the District of Delaware (the "US Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee").

5.     Originally founded in San Jose, California in 1931, Orchard Supply Hardware Stores Corporation and its affiliates (collectively, "Orchard" or the "Company"), operated neighborhood hardware and garden stores.  As of the Petition Date, Orchard operated 89 stores in California and two stores in Oregon.

6.     On June 18, 2013, the Debtors filed the *Application of Debtors and Debtors in Possession Pursuant to Sections 327(a) and 328(a) of the Bankruptcy Code, Bankruptcy Rules 2014(a) and 2016 and Local Bankruptcy Rules 2014-1, 2016-1 and 2016-2, for Entry of an Order Authorizing Them to Retain and Employ A&G Realty Partners, LLC as their Real Estate Consultant and Advisor Nunc Pro Tunc to the Petition Date and to Waive the Information Requirements of Local Rule 2016-2(d)* [D.I. 60] (the "A&G Application"), seeking approval of the Services Agreement between A&G and Orchard Supply Hardware, LLC, dated as of May 14, 2013, and a true and correct copy of which is annexed hereto as Exhibit A (the "Engagement Letter").  On July 11, 2013, the Bankruptcy Court entered an order approving the A&G Application [D.I. 194] (the "Retention Order").

7. The Engagement Letter provided that A&G was to provide the following services to the Debtors: (i) discuss with the Company's representatives the Company's needs, goals, objectives and financial parameters with respect to its lease portfolio; (ii) negotiate the modification of certain leases, as directed by the Company, in order to obtain rent reductions or other advantageous modifications to the leases; prepare and implement a dispositions program, as directed by the Company, that includes (a) soliciting replacement tenants or subtenants; (b) negotiating with landlords as to (x) the assignment or subleasing of leases; (y) termination of certain of the leases and (z) accepting replacement tenants; and (c) making recommendations to the Company as to accepting, rejecting or modifying any offers or proposals; (iv) as directed by the Company, negotiate waivers or reductions of prepetition cure amounts and any claims with respect to any of the Leases pursuant to section 502(b)(6) of the Bankruptcy Code; (v) as directed by the Company, negotiate with landlords to obtain extensions of time to assume or reject leases; (vi) assist the Company in the documentation of proposed transactions; and (vii) report periodically to the Company regarding the status of the foregoing.

8. Upon commencing these chapter 11 cases, the Debtors pursued a bankruptcy auction process with an affiliate of Lowe's Home Improvement Stores ("Lowe's") as their stalking horse purchaser in a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code (the "Sale"). The stalking horse agreement provided for a purchase price of $205 million. On July 8, 2013, the Court approved Lowe's as their stalking horse purchaser and approved certain bid procedures relating to the auction [D.I. 155] (the "Bid Procedures Order"). On August 20, 2013, the Court entered the *Order (A) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, Except as Provided in the Successful Bidder's Asset Purchase Agreement; (B)*

*Authorizing and Approving Purchase Agreement Thereto; (C) Approving the Assumption and Assignment of Certain of the Debtors' Executory Contract and Unexpired Leases Related Thereto; and (D) Granting Related Relief* [Dkt. No. 489] (the "Sale Order"). The Sale Order, among other things, approved the assumption and assignment of the vast majority of unexpired nonresidential real property leases to Lowe's as purchaser ("NewCo"), including those associated with 72 Orchard stores. In addition, of the leases that were assumed and assigned to NewCo, approximately 42 were modified, which decreased Newco's lease obligations following the Sale. The Sale closed on August 30, 2013.

9. On October 9, 2013, A&G filed the Fee Application, seeking approval of $7,749,428.70 in fees in connection with its engagement by the Debtors. The Fee Application seeks fees solely with respect to the renegotiation and modification of leases that were assigned, as modified, to NewCo.

**OBJECTION**

10. Paragraph 3 of the Retention Order states that "the fees and expenses payable to A&G shall be subject to review only pursuant to the standards set forth in section 328(a) of the Bankruptcy Code . . . except by the U.S. Trustee." Section 328(a) provides that a trustee, including a debtor in possession, "may employ … a professional person under section 327 or 1103 of this title, as the case may be, on any reasonable terms and conditions of employment." 11 U.S.C. § 328(a). That section also provides a bankruptcy court with discretion to "allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions." *Id*. As demonstrated below, pursuant to the terms of the Engagement Letter,

A&G may be entitled, at most, to fees in the amount of $2,793,305.51.  Moreover, the Court may exercise its discretion to allow no compensation to A&G, because, despite its obligation under the Engagement Letter to take direction from the Debtors, it acted at the direction of NewCo and its efforts provided a benefit only to NewCo, and not the Debtors' estates.  Thus, because A&G's course of action could not have been anticipated at the time of the fixing of the terms and conditions of the Engagement Letter, a substantial award of fees to A&G would be improvident.

**I.    A&G's Fees Are Inconsistent With The Terms Of Its Engagement.**

A.    A&G's Calculation of Its Fee Based Upon Renegotiating the Monetary Terms of Leases is Grossly Overstated Based Upon the Terms of the Engagement

11.    Under the terms of the Engagement Letter, A&G may seek: (i) an Evaluation Fee (as defined in the Engagement Letter); (ii) fees resulting from both monetary and non-monetary lease modifications; (iii) fees resulting from reductions in bankruptcy claims; (iv) fees relating to the negotiation of extensions of time to assume or reject leases; and (v) fees resulting from the disposition of any applicable lease.  Other than a $15,000 credit for the Evaluation Fee, the entirety of the Application seeks compensation resulting from the modification of leases.

12.    Pursuant to Section 3(b)(i) of the Engagement Letter, A&G shall receive a fee equal to "four percent (4.0%) of Occupancy Cost Savings for the remainder of the current term of the Lease and any option term exercised as part of the Lease renegotiation." Engagement Letter § 3(b)(i). "Occupancy Cost Savings" is defined as "the difference between the original Occupancy Cost and the renegotiated Occupancy Cost for the period from the effective date of a Lease amendment to the end of the Lease term, including any option term exercised as part of the modification." Engagement Letter § 3(a).

13.    Thus, the plain language of the Engagement Letter allows A&G to earn a fee on savings with respect to option terms *only* if those option terms are exercised in the actual lease

modifications negotiated by A&G. Indeed, the fee in Section 3(b)(i) of the Engagement Letter is calculated as a percentage of Occupancy Cost Savings "for the remainder of the current term of the Lease and any option term *exercised as part of the Lease renegotiation*." Engagement Letter § 3(b)(i) (emphasis added). Likewise, "Occupancy Cost Savings" is calculated only "for the period from the effective date of a Lease amendment to the end of the Lease term, including any option term *exercised as part of the modification*." Engagement Letter § 3(a) (emphasis added). None of the lease modifications negotiated by A&G provide for the exercise of any lease option terms. Accordingly, the Engagement Letter expressly forbids A&G from receiving any of the $4,666,123.19 in fees it seeks based on alleged savings for option terms that have not been, and may never be, exercised.[2]

14. Although A&G may attempt to argue that the second sentence of Section 3(b)(i) of the Engagement Letter helps its cause, that is not the case. That provision states that "[i]n no event shall any Fee be payable with respect to option terms that are exercised subsequent to the execution of such Disposition Agreement unless said option terms or Lease payments have been modified as result of the Consultant's actions hereunder." Thus, although this provision may be read to allow for the possibility that A&G could earn fees on option terms exercised in the future, it does not provide for the payment to A&G of the fees on savings in option terms that it seeks. First, even if a fee may be payable to A&G pursuant to that provision, it would only be payable if and when the option terms are, in fact, exercised, which has not occurred and may not occur. Moreover, that provision only allows a fee to be payable if option terms are exercised subsequent to the execution of a "Disposition Agreement." The definition of "Disposition Agreement"

---

[2] It is unknown whether NewCo will exercise any of the option terms contained in the underlying leases, and thus there is no way to know whether any party will ever benefit from any amendment to the rent in those option terms. Thus, it would be highly illogical for the parties to have intended that A&G would earn exorbitant fees for option savings that may never be realized.

expressly excludes "a document that conveys all or substantially all of the Company's assets, including, without limitation, its interests in its Leases." Engagement Letter § 3(a). Here, the final Asset Purchase Agreement (the "APA"), by which the modified leases were assumed and assigned to Lowe's is "a document that conveys all or substantially all of the Company's assets," and therefore is excluded from the definition of a Disposition Agreement. *Id*. No Disposition Agreement was executed, and thus, no fees can be earned by A&G on option terms exercised in the future.[3]

B.  **A&G's Incorrectly Calculates the Fee for Renegotiating Non-Monetary Provisions of Leases**

15.   Section 3(b)(ii) provides as follows: "For renegotiating a non-monetary provision of a Lease, including but not limited to Company's unilateral right to early termination of a Lease, Consultant's Fee shall be $2500 *per transaction*" (emphasis added). Based upon the documentation provided in the Application, A&G seeks a total of $410,000 in fees based upon this provision, claiming that for the 42 modified leases, 164 such non-monetary provisions were renegotiated.

16.   In the context of amendments of contracts, the term "transaction" is commonly understood to mean the actual execution of the amendment, regardless of how many provisions in the contract are amended. Thus, even if A&G renegotiated multiple non-monetary provisions of a particular lease, the only "transaction" that occurred was the execution of the particular lease modification. Thus, the plain language of the Engagement Letter clearly limits A&G's ability to collect multiple $2,500 fees on each lease modification, notwithstanding that A&G may have

---

[3]  Moreover, Section 3(f) of the Engagement Letter states that the fees are "earned and payable on the earlier to occur of the date that (i) any Bankruptcy Court order approving the modified Lease terms shall be final and non-appealable or (ii) the date the Company begins to receive the benefits of the renegotiation pursuant to a Lease amendment." Because (i) has already occurred, and no options have been exercised, any fees on option savings are not, and cannot be, earned and payable.

renegotiated multiple non-monetary provisions on any single lease.  To hold otherwise would effectively delete any import of the phrase "per transaction" and subvert the express intent of the parties.  *In re Plassein Intern. Corp.*, 377 B.R. 126, 132-133 (Bankr. D. Del. 2007) (holding that in determining the intention of the parties, courts must look at the express language of the agreement in such a way to give effect to all provisions of the agreement); *see also Pac. Emp'r Ins. Co. v. Global Reinsurance Corp. of Am.*, 693 F.3d 417, 426 (3d Cir. 2012) ("'[A]ll provisions in the agreement will be construed together and each will be given effect' because a court 'will not interpret one provision . . . in a manner which results in another portion being annulled'") (quotations omitted).

## II. Under 11 U.S.C. § 328, the Requested Fees Are Unsupportable In Law and Fact, Improvident, and Provides NewCo with a Windfall

17.    A&G takes the position that its Fee Application is virtually immune from review; however, as noted above the Court has discretion under section 328(a) of the Bankruptcy Code to reduce compensation previously approved under section 328 if the court finds that "the original arrangement was improvident due to unanticipated circumstances."  *In re Airspect, Inc.*, 385 F.3d 915, 921 (6th Cir. 2004).  "Further, the bankruptcy court's duty to conduct an independent examination of fee applications for services rendered would be unduly restricted if employment authorization orders were routinely construed as binding the court to particular terms of employment."  *Zolfo, Cooper & Co. v. Sunbeam-Oster Co., Inc.*, 50 F.3d 253, 262 (3d Cir. 1995) (internal citation omitted).

18.    A&G's Application seeks total fees of $7,749,428.70.  The fees sought by A&G reflect an amount similar to the **combined** fees sought by the other Debtors' professionals.  The bankruptcy "estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit

commensurate with the fees sought." *In re Energy Partners, Ltd.*, 409 B.R. 211, 216 (Bankr. S.D. Tex. 2009) (quoting *In re Chas A. Stevens & Co.*, 105 B.R. 866, 871-72 (Bankr. N.D. Ill. 1989). Based upon the circumstances of these chapter 11 cases described below, the subverted attempt by A&G to obtain a fee so grossly excessive must not be countenanced and, in any event, cannot be upheld under section 328 of the Bankruptcy Code. Indeed, while A&G was not required to maintain time records, even if the professionals that worked on this engagement worked full time only on this matter, the hourly rate of their services easily exceed **$10,000 per hour.**

19. Specifically, the Debtors have come to learn that virtually all of A&G's efforts were directed by Lowe's and representatives of the Debtors who were to be retained by Lowe's following the completion of the sale process solely for the purpose of reducing Lowe's leasehold costs in the future. Indeed, the Fee Application reveals that A&G expended virtually no efforts on any other services under their Engagement Agreement, which could have benefited the Debtors' estates, such as the negotiation of waivers or reductions for prepetition cure amounts, or the reduction of any bankruptcy claims against the Debtors. While there is nothing untoward about the reduction in these leasehold expenses, these efforts by A&G inured solely to the benefit of Lowe's, with the Debtors' estates now being asked to bear nearly $8 million in fees.[4] From the outset of its engagement, A&G was directed by Lowe's to drive down overall lease costs for NewCo following the closing of the Sale. In fact, without the intervention of Debtors'

---

[4] For example, A&G participated in twice-weekly conference calls with representatives from Lowe's and the Company, in which Lowe's instructed A&G as to which leases it should attempt to restructure. Indeed, in late July, Debtors' counsel first learned of and began to participate in these telephone conferences between the Company and A&G. Debtors' counsel advised A&G and the Company at that time that any lease modification should be applicable to any potential purchaser. These calls occurred prior to the entry of the Bid Procedures Order, which approved Lowe's as the stalking horse purchaser, and perhaps more critically, during the time that the Debtors' other professionals were in discussions with other potential purchasers regarding the submission of a qualified bid pursuant to the Bid Procedures Order.

counsel, all of the lease modifications being negotiated would have dissipated in the event that Lowe's was not the purchaser.

20. A&G argues to the contrary and states that "[a]s a direct result of the savings obtained by A&G, Lowe's increased its purchase price by $15,000,000." (Fee App. at ¶ 12.) This statement simply is wrong. First, there is absolutely no mention of any leasehold savings in any document or pleading relating to the Sale. Rather, it appears that A&G is attempting to bolster its position based upon the fact that Lowe's increased their purchase price by $15 million, from $190 million to the ultimate purchase price of $205 million. As has been shown in testimony before this Court, this increase occurred in the days *prior* to the Petition Date and was directly attributable to the extensive efforts of Debtors' management and professionals, and the Senior Secured Term Loan Lenders and their professionals. In fact, A&G had not even begun renegotiating any lease at the time that Lowe's increased the purchase price. Indeed, if A&G had achieved not a single dollar of leasehold savings, Lowe's remained obligated to close on the transaction at $205 million. Moreover, even if it were true that A&G's efforts led to a $15 million increase in the purchase price, that does not lead to the conclusion that a payment of more than half of that increase to A&G is in any way appropriate.

21. At the time of the approval of the Application, it was not, and could not have been, anticipated that A&G would renegotiate the leases for the sole benefit of Lowe's at Lowe's direction, nor that A&G would seek fees dwarfing those of the professionals that worked to negotiate and eventually consummate the transaction with Lowe's. Had these developments been anticipated at the time, the Debtors would not have engaged A&G under the terms of the Engagement Letter. Indeed, there was no benefit to the estate from A&G's lease renegotiations, and the fees to support those efforts should not be borne by the Debtors' estates. *See In re Busy*

*Beaver Bldg. Centers, Inc.*, 19 F.3d 833, 844 (3d Cir. 1994) ("Disagreeable as the chore may be, the bankruptcy court must protect the estate, lest overreaching attorneys or other professionals drain it of wealth which by right should inure to the benefit of unsecured creditors.").

### III.   A&G's Assertion That Its Fee Request Was Validated By Chris Newman Is Irrelevant

22.   A&G's allegation that "[t]he calculation of term savings, option term savings, and non-monetary items was validated by Chris Newman, the Debtors' former Chief Financial Officer who worked closely with both A&G and Lowe's during the Compensation Period," Application at ¶ 10, is irrelevant to the Court's analysis of whether A&G is entitled to the compensation it seeks.  It appears that A&G is attempting to offer Mr. Newman's alleged validation as extrinsic evidence of the intent of the parties.  However, as explained above, A&G is not entitled to the bulk of the fees sought pursuant to the plain and unambiguous language of the Engagement Letter.  Thus, extrinsic evidence is not necessary for the Court to make a determination regarding A&G's fees.  *In re Plassein Intern. Corp.*, 377 B.R. 126, 133 (Bankr. D. Del. 2007) ("The Court should not look outside the four corners of the contract and the clear and unequivocal language in the absence of an ambiguity.").

23.   Even if, however, the Court were to consider Mr. Newman's alleged validation, A&G states, in Exhibit C to the Application, that the calculations of savings were agreed to by Mr. Newman on September 4, 2013, several days after the closing on the sale of all of the Debtors' assets and at a time when Mr. Newman was an employee of NewCo, and not the Debtors.  Thus, if Mr. Newman had provided some kind of approval of the nearly $8 million in fees sought by A&G, not only was such approval not on behalf of the Debtors, but it was done at a time where there is every reason to question Mr. Newman's motivation for providing such approval.  Accordingly, Mr. Newman's alleged approval has no probative value in support of

A&G's Application. Moreover, even if the Court were to consider this alleged approval, it should find that it supports the Debtors' argument that A&G's efforts inured only to benefit Lowe's and NewCo, with no concern on the part of former employees of the Debtors that were retained by NewCo regarding the excessive expense that A&G now requests that the Debtors' estates bear.

*[remainder of page intentionally left blank]*

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that this Court deny the Fee Application and grant such other and further relief as the Court deems just and equitable.

Dated: November 5, 2013  
Wilmington, Delaware

Respectfully submitted,

 /s/ Stuart M. Brown
Stuart M. Brown (DE 4050)
DLA PIPER LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Telephone: (302) 468-5700
Facsimile: (302) 394-2341
Email: stuart.brown@dlapiper.com

-and-

Richard A. Chesley (IL 6240877)
Chun I. Jang (DE 4790)
Daniel M. Simon (IL 6297629)
DLA PIPER LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516
Email:  richard.chesley@dlapiper.com
           chun.jang@dlapiper.com
           daniel.simon@dlapiper.com

ATTORNEYS FOR DEBTORS AND DEBTORS IN POSSESSION

EAST\63345742.4