*THIS IS NOT A SOLICITATION OF ACCEPTANCES OR REJECTIONS OF THE PLAN. ACCEPTANCES OR REJECTIONS MAY NOT BE SOLICITED UNTIL THE DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL TO THE BANKRUPTCY COURT, BUT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT AT THIS TIME.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------x

|  |  |
|---|---|
| In re: | : Chapter 11 |
|  | : |
| OSH 1 Liquidating Corporation., *et al*., (f/k/a Orchard Supply Hardware Stores Corporation, *et al.*,[1] | : Case No. 13-11565 (CSS) |
|  | : (Jointly Administered) |
| Debtors. | : |

-------------------------------------------------------------x

## DISCLOSURE STATEMENT FOR THE DEBTORS' FIRST AMENDED PLAN OF LIQUIDATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE

**DLA PIPER LLP (US)**
Stuart M. Brown (DE 4050)
1201 North Market Street, Suite 2100
Wilmington, Delaware 19801
Telephone:  (302) 468-5700
Facsimile:  (302) 394-2341

        - and –

Richard A. Chesley (IL 6240877)
Chun I. Jang (DE 4790)
Daniel M. Simon (IL 6297629)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois 60601
Telephone: (312) 368-4000
Facsimile: (312) 236-7516

*Attorneys for Debtors and Debtors in Possession*

---

[1]     The Debtors were the following three entities (the last four digits of their respective taxpayer identification numbers, if any, follow in parentheses): OSH 1 Liquidating Corporation f/k/a Orchard Supply Hardware Stores Corporation (4109), OSH 2 Liquidating LLC f/k/a Orchard Supply Hardware LLC (3395) and OSH 3 Liquidating LLC f/k/a OSH Properties LLC (3391).  On August 20, 2013, the Bankruptcy Court entered an order approving the sale of substantially all of the Debtors' assets which provided, among other things, that the Debtors were required to cease using the "Orchard Supply Hardware" name after closing of the sale.

# TABLE OF CONTENTS

**Page**

ARTICLE I.        INTRODUCTION ................................................................. 1

   A.    Holders Of Claims Entitled To Vote ...................................... 2

   B.    Voting Procedures ................................................................ 3

   C.    Confirmation Hearing .......................................................... 4

ARTICLE II.       OVERVIEW OF THE PLAN ................................................. 6

ARTICLE III.      GENERAL INFORMATION ................................................ 10

   A.    Overview Of Bankruptcy Law .............................................. 10

   B.    Overview Of The Debtors ..................................................... 10

   C.    Capital Structure Of The Company ....................................... 12

ARTICLE IV. KEY EVENTS LEADING TO THE  COMMENCEMENT OF THE
                        CHAPTER 11 CASES ................................................. 13

ARTICLE V.        SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES ............. 15

   A.    Retention Of Professionals By The Debtors ............................ 15

   B.    Formation Of The Creditors Committee ................................. 15

   C.    DIP Financing ..................................................................... 15

   D.    GOB Process ....................................................................... 16

   E.    Bidding Procedures And Sale Process ................................... 16

   F.    9019 Settlement Motion Among The Senior Secured Term Lenders,
       Creditors Committee And Debtors ....................................... 17

   G.    Bar Date ............................................................................. 18

ARTICLE VI.       THE PLAN OF LIQUIDATION ........................................... 18

   A.    Introduction ........................................................................ 18

   B.    Classification And Treatment Of Claims And Equity Interests Under The
       Plan Of Liquidation ............................................................ 19

   C.    Means For Implementation Of The Plan ................................ 24

   D.    Provisions Governing Voting And Distributions ..................... 31

   E.    Disputed Claims .................................................................. 36

   F.    Treatment Of Executory Contracts ....................................... 38

   G.    Conditions Precedent To The Effective Date .......................... 40

   H.    Indemnification, Release, Injunctive And Related Provisions ........... 41

   I.    Retention Of Jurisdiction ..................................................... 45

# TABLE OF CONTENTS
### (continued)

**Page**

J. Miscellaneous Provisions........................................................................ 46

ARTICLE VII. CERTAIN FACTORS AFFECTING THE DEBTORS ................................ 50

A. Certain Bankruptcy Law Considerations ................................................ 50

B. Additional Factors To Be Considered..................................................... 51

ARTICLE VIII. CONFIRMATION OF THE PLAN OF LIQUIDATION ............................ 52

A. Confirmation Hearing ............................................................................. 52

B. Requirements For Confirmation Of The Plan Of Liquidation.............................. 53

ARTICLE IX. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF LIQUIDATION .................................................................. 57

A. Liquidation Under Chapter 7 .................................................................. 57

B. Alternative Plan Of Reorganization........................................................ 57

ARTICLE X. CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ........................................................................................................ 57

A. General Consequences To U.S. Holders Of Claims And Equity Interests .......... 59

B. Tax Treatment Of GUC Trust And U.S. Holders Of GUC Trust Beneficial Interests ................................................................................................. 61

C. Information Reporting And Withholding ................................................. 63

ARTICLE XI. DEFINITIONS AND INTERPRETATION ................................................. 63

A. Definitions.............................................................................................. 63

B. Other Terms ........................................................................................... 72

C. Exhibits ................................................................................................. 72

ARTICLE XII. CONCLUSION ........................................................................................ 72

## SUMMARY

The following is a summary of the Debtors' First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code, dated as of October 9, 2013, of OSH 1 Liquidating Corporation, OSH 2 Liquidating LLC and OSH 3 Liquidating LLC f/k/a Orchard Supply Hardware Stores Corporation (collectively, the "Debtors")[2] the debtors and debtors in possession in these chapter 11 cases. This Disclosure Statement describes the Plan and the distributions contemplated thereunder for each of the Debtors. Unless the context requires otherwise, reference to "we," "our," and "us" are to the Debtors (collectively, "Orchard" or the "Company").

The Debtors commenced the Chapter 11 Cases on June 17, 2013. If you are entitled to vote to accept or reject the Plan, the Ballot for acceptance or rejection of the Plan is enclosed with this Disclosure Statement.

**THE DEBTORS AND THE CREDITORS' COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS. THE DEBTORS AND THE CREDITORS' COMMITTEE URGE ALL CREDITORS AND EQUITY INTEREST HOLDERS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.**

## ARTICLE I.

## INTRODUCTION

The Debtors submit this Disclosure Statement pursuant to section 1125 of title 11 of the Bankruptcy Code to holders of Equity Interests in and Claims against the Debtors in connection with (i) the solicitation of acceptances of the Plan filed by the Debtors with the Bankruptcy Court and (ii) a hearing on confirmation of the Plan scheduled for December 20, 2013 at 2:00 p.m. (prevailing Eastern Time) (the "Confirmation Hearing").

A ballot ("Ballot") for the acceptance or rejection of the Plan is enclosed with this Disclosure Statement mailed to the holders of Claims and Equity Interests that the Debtors believe may be entitled to vote to accept or reject the Plan.

On [_____], 2013, after notice and a hearing, the Bankruptcy Court signed an order [Docket No. ___] (the "Disclosure Statement Order", approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical investor of the relevant classes to make an informed judgment whether to accept or reject the

---

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

Plan.   APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.

The Disclosure Statement Order, a copy of which is annexed hereto as <u>Exhibit B</u>, sets forth in detail, among other things, the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan, the record date for voting purposes and the applicable standards for tabulating Ballots.   In addition, detailed voting instructions accompany each Ballot.  Each holder of a Claim entitled to vote on the Plan should read this Disclosure Statement, the Plan, the Disclosure Statement Order and the instructions accompanying the Ballots in their entirety before voting on the Plan.  These documents contain important information concerning the classification of Claims and Equity Interests for voting purposes and the tabulation of votes.  No solicitation of votes to accept the Plan may be made except pursuant to section 1125 of the Bankruptcy Code.

## A.    HOLDERS OF CLAIMS ENTITLED TO VOTE

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired and that are not deemed to have rejected the proposed plan are entitled to vote to accept or reject a proposed plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan.  For a detailed description of the treatment of Claims and Equity Interests under the Plan, see Article VI.B of this Disclosure Statement.

Claims in Class 1 (Senior Secured Term Loan Claims) and Class 3 (General Unsecured Claims) of the Plan are impaired and, to the extent Claims in such Classes are Allowed, the holders of such Claims will receive distributions under the Plan.  As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan.  If and to the extent any other Class identified as being unimpaired is impaired (whether as a result of the terms of the Plan or any modification or amendment thereto), upon such determination, such Class shall then be entitled to vote to accept or reject the Plan.

Claims in Class 2 (Other Secured Claims) are unimpaired by the Plan.  Pursuant to section 1126(f) of the Bankruptcy Code, Class 2 is therefore conclusively presumed to have accepted the Plan and the votes of holders of Claims in Class 2 will therefore not be solicited.

Claims in Class 4 (Equity Interests) are impaired, and the holders of such Claims will receive no distribution under the Plan.  As a result, holders of Claims in Class 4 are deemed to reject the Plan.  As a result, holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by creditors in that class that hold at least two-thirds in dollar amount and more than one-half in number of the claims that cast ballots for acceptance or rejection of the plan.  For a more detailed description of the requirements for confirmation of the Plan, see Article VIII of this Disclosure Statement.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan of reorganization notwithstanding the rejection of a plan by one or more impaired classes of claims or equity interests.  Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  For a more detailed description of the requirements for confirmation of a nonconsensual plan, see Article VIII.B.2 of this Disclosure Statement.

**THE DEBTORS AND THE CREDITORS' COMMITTEE RECOMMEND THAT HOLDERS OF CLAIMS IN CLASSES 1 AND 3 VOTE TO ACCEPT THE PLAN.**

**B.      VOTING PROCEDURES**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan.  If you hold Claims in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots, which must be used for each separate Class of Claims.  The Debtors, with the approval of the Bankruptcy Court, have engaged BMC Group, Inc. ("BMC") to serve as the voting agent with respect to Claims in Classes that are entitled to vote on the Plan.  The voting agent will assist in the solicitation process by, among other things, answering questions, providing additional copies of all solicitation materials, and generally overseeing the solicitation process for Claims.  The voting agent will also process and tabulate ballots for each of the respective Classes that are entitled to vote to accept or reject the Plan and will file a voting report as soon as practicable before the Confirmation Hearing.

Ballots should be returned to:

| By Regular U.S. mail: | By Messenger or overnight courier: |
|---|---|
| BMC Group, Inc. | BMC Group, Inc. |
| Attn: OSH Plan Ballot Processing | Attn: OSH Plan Ballot Processing |
| PO Box 3020 | 18675 Lake Drive East |
| Chanhassen, MN 55317-3020 | Chanhassen, MN 55317 |

**Do not return your notes, securities, or any other documents with your Ballot.**

MORE DETAILED INSTRUCTIONS REGARDING HOW TO VOTE ON THE PLAN ARE CONTAINED ON THE BALLOTS DISTRIBUTED TO HOLDERS OF CLAIMS THAT ARE ENTITLED TO VOTE ON THE PLAN.  TO BE COUNTED, YOUR BALLOT INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY NO LATER THAN 4:00 P.M. (PREVAILING PACIFIC TIME) ON DECEMBER 13, 2013 (THE "VOTING DEADLINE").  ANY EXECUTED BALLOT RECEIVED THAT DOES NOT INDICATE EITHER AN ACCEPTANCE OR A REJECTION OF THE PLAN SHALL NOT BE COUNTED.

Subject to the terms of the Disclosure Statement Order, any Claim in an impaired Class as to which an objection or request for estimation is pending is not entitled to vote unless the

holder of such Claim has obtained an order of the Bankruptcy Court temporarily allowing such Claim for the purpose of voting on the Plan; *provided, however*, that if the Debtors object to a Claim on a reduced and allowed basis, the claimant may, absent a Resolution Event (as defined below), vote such Claim at the amount asserted by the Debtors.  Additionally, subject to the terms of the Disclosure Statement Order, any Claim in an impaired Class that is listed on the Schedules as unliquidated, disputed or contingent is not entitled to vote unless the holder of such Claim has timely filed a proof of claim and no objection has been filed to such proof of claim or if an objection is filed with respect to such proof of claim (a) an order of the Bankruptcy Court is entered allowing such Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order of the Bankruptcy Court is entered temporarily allowing such claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the holder of such Claim and the Debtors resolving the objection and allowing such claim in an agreed upon amount; (d) a stipulation or other agreement is executed between the holder of such claim and the Debtors temporarily allowing the holder of such claim to vote its claim in an agreed upon amount; or (e) the pending objection to such claim is voluntarily withdrawn by the Debtors (each, a "Resolution Event"); provided, however, that if the Debtors object to a claim on a reduced and allowed basis the claimant may, absent a Resolution Event, vote such claim at the amount asserted by the Debtors.

Pursuant to the Disclosure Statement Order, the Bankruptcy Court set November 13, 2013 as the Record Date for holders of Claims entitled to vote on the Plan.  Accordingly, only holders of record as of the applicable record date that otherwise are entitled to vote under the Plan will receive a Ballot and may, subject to the terms of the Disclosure Statement Order, vote on the Plan.

If you are a holder of a Claim entitled to vote on the Plan and you did not receive a Ballot, received a damaged Ballot or lost your Ballot or if you have any questions concerning this Disclosure Statement, the Plan or the procedures for voting on the Plan, please call BMC Group, Inc. at (855) 529-6819.

## C.      CONFIRMATION HEARING

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on December 20, 2013 at 2:00 a.m. (prevailing Eastern Time) before the Honorable Christopher S. Sontchi, Courtroom #6, at the United States Bankruptcy Court for the District of Delaware, 824 Market Street, Wilmington, Delaware 19801.  The Bankruptcy Court has directed that objections, if any, to confirmation of the Plan must be served and filed so that they are received on or before December 13, 2013 at 4:00 p.m. (prevailing Eastern Time) in the manner described below in Article VIII.A of this Disclosure Statement.  The Confirmation Hearing may be adjourned from time to time without further notice except for a notice of the adjournment date filed on the docket of the Chapter 11 Cases or the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT SHALL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED

SINCE THE DATE HEREOF.  HOLDERS OF CLAIMS SHOULD CAREFULLY READ THIS DISCLOSURE STATEMENT IN ITS ENTIRETY, INCLUDING THE PLAN, PRIOR TO VOTING ON THE PLAN.

FOR THE CONVENIENCE OF HOLDERS OF CLAIMS AND EQUITY INTERESTS, THIS DISCLOSURE STATEMENT SUMMARIZES THE TERMS OF THE PLAN.  IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN ARE CONTROLLING.  THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN, AND NOTHING STATED HEREIN SHALL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS OR EQUITY INTERESTS.  CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.

ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER FULLY THE RISK FACTORS SET FORTH IN ARTICLE VII OF THIS DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

SUMMARIES OF CERTAIN PROVISIONS OF AGREEMENTS REFERRED TO IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE COMPLETE AND ARE SUBJECT TO, AND ARE QUALIFIED IN THEIR ENTIRETY BY, REFERENCE TO THE FULL TEXT OF THE APPLICABLE AGREEMENT, INCLUDING THE DEFINITIONS OF TERMS CONTAINED IN SUCH AGREEMENT.

THE DEBTORS AND THE CREDITORS COMMITTEE BELIEVE THAT THE PLAN WILL ENABLE THEM TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11 THROUGH A TIMELY, EFFICIENT AND COST-EFFECTIVE LIQUIDATION AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTORS AND THEIR CREDITORS.  THE DEBTORS AND THE CREDITORS COMMITTEE URGE ALL CREDITORS ENTITLED TO VOTE ON THE PLAN TO ACCEPT THE PLAN.

**IRS CIRCULAR 230 NOTICE:**  TO ENSURE COMPLIANCE WITH IRS CIRCULAR 230, HOLDERS OF CLAIMS AND INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES CONTAINED OR REFERRED TO IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY HOLDERS OF CLAIMS OR INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON THEM UNDER THE INTERNAL REVENUE CODE; (B) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) HOLDERS OF CLAIMS

AND EQUITY INTERESTS SHOULD SEEK ADVICE BASED ON THEIR PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

## ARTICLE II.

## OVERVIEW OF THE PLAN

The following table briefly summarizes the classification and treatment of Administrative Expense Claims, claims for Accrued Professional Compensation, Priority Tax Claims, Other Priority Claims, Senior Secured Term Loan Claims, Other Secured Claims, General Unsecured Claims and Equity Interests under the Plan:

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Allowed Administrative Claims (other than claims for Accrued Professional Compensation) | Paid in full, in Cash, without interest (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Responsible Person; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Responsible Person, in its discretion, chooses to treat such Claims as Administrative Claims. | Undetermined | 100% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| -- | Allowed claims for Accrued Professional Compensation | Paid in full, in Cash, without interest. | Undetermined | 100% |
| -- | Allowed Priority Tax Claims | Paid in full, in Cash, without interest on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non bankruptcy law. | Undetermined | 100% |
| -- | Allowed Other Priority Claims | Paid in full, in Cash, without interest on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law. | Undetermined | 100% |
| 1 | Allowed Senior Secured Term Loan Claims | Impaired.  After (i) payment of Allowed Other Secured Claims in Class 2, (ii) payment to the GUC Trust pursuant to the terms of Article IV.C of the Plan for the benefit of holders of Allowed General Unsecured Claims in Class 3, and (iii) subject to the limitations in Article VI.A of the Plan, reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims, (b) for the Responsible Person to carry out its duties, and (c) to pay outstanding Administrative Claims, Priority Tax Claims and Other Priority Claims in full, each holder of a Senior Secured Term Loan Claim in Class 1 shall receive its *Pro Rata* share of all of the remaining assets of the Debtors, including any and all Cash and the proceeds of the liquidation of assets obtained by | $130,700,000 | 74-86% |

| Class | Type of Claim or Equity Interest | Treatment | Approximate Allowed Amount | Approximate Percentage Recovery |
|---|---|---|---|---|
| | | the Debtors or the Debtors' Estates prior to, on, or after the Effective Date.  Subject to (i), (ii), and (iii) above and Article IV.C of the Plan, (i) on the Effective Date, the Responsible Person shall distribute to the Senior Secured Term Loan Agent, for distribution to the holders of Allowed Senior Secured Term Loan Claims, all of the assets remaining in the Debtors' Estates as of the Effective Date and (ii) after the Effective Date, the Responsible Person shall distribute to the Senior Secured Term Loan Agent, for distribution to the holders of Allowed Senior Secured Term Loan Claims, all Cash and all proceeds of the liquidation of other assets obtained by the Debtors after the Effective Date, including, but not limited to, all assets from the Disputed Claims Reserve returned to the Debtors' Estates pursuant to Article VI.A of the Plan and all Cash collateral securing any outstanding letters of credit, as soon as practicable after such Cash and/or other assets are obtained by the Debtors. | | |

| 2 | Allowed Other Secured Claims | Not impaired.  Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors or the Purchaser prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Other Secured Claim shall receive, at the sole option of the Responsible Person, Cash in the full amount of such Allowed Other Secured Claim or the collateral securing its Allowed Other Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Responsible Person and the holder of the Allowed Other Secured Claim. | $0 | 100% |
| 3 | Allowed General Unsecured Claims | Impaired.  Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors or the Purchaser prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of GUC Trust Distributable Cash from the GUC Trust.  Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the GUC Trustee may determine in its sole discretion. | $25,000,000 to $35,000,000 | 2.1-3% |

| 4 | Equity Interests | No Distribution.  Holders of Equity Interests in Class 4 shall receive no Distribution under the Plan. All equity interest/shares of stock in OSH 1 Liquidating Corporation., (f/k/a Orchard Supply Hardware Stores Corporation) shall be deemed cancelled upon the Effective Date. | $0 | 0% |

## ARTICLE III.

## GENERAL INFORMATION

### A.    OVERVIEW OF BANKRUPTCY LAW

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and its equity interest holders.  In addition to permitting the rehabilitation or liquidation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.  The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the Petition Date.  The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan is the principal objective of a chapter 11 case.  A plan sets forth the means for satisfying claims against and interests in a debtor.  Confirmation of a plan by the bankruptcy court binds the debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor.  Subject to certain limited exceptions, the order approving confirmation of a plan discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

Certain holders of claims against and interests in a debtor are permitted to vote to accept or reject the plan.  Prior to soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare, and obtain bankruptcy court approval of, a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical investor of the relevant classes to make an informed judgment regarding the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against and Equity Interests in the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.    OVERVIEW OF THE DEBTORS

Orchard operated neighborhood hardware and garden stores.  The Company was originally founded as a purchasing cooperative in San Jose, California in 1931.  As of the Petition Date, the Company operated 89 stores in California and 2 stores in Oregon.  In addition,

the Debtors operated a proprietary web site, www.osh.com, which included both marketing material and promotions for the Debtors' physical stores, and also provided online shopping services.  The Debtors' principal executive offices were located in San Jose, California.  The Debtors' stores averaged 36,000 square feet of enclosed retail space and 8,000 square feet of exterior nursery and garden space, carrying a broad assortment of merchandise that primarily was focused on paint, repair and the backyard.

While the Orchard brand had been synonymous with California retailing for over eighty years, the chain had gone through myriad ownership changes.  From the acquisition by W.R. Grace in 1979, to its subsequent purchase by Wickes in 1986 to its initial public offering in 1993, the Company grew to over 40 stores.  Following the initial public offering, the Company acquired seven former Builders Emporium stores, which provided the Company with an initial footprint in the Southern California market.  In 1996, the Company was acquired by Sears Holdings Corporation ("Sears"), which continued to own the Company until 2011, during which the Company more than doubled the overall number of stores.

This growth aside, from 2007 until 2010, the Company's sales fell from almost $850 million to slightly more than $650 million.  This precipitous decline in revenue was caused by three separate factors, (i) the decline in the California economy, (ii) continued competitive openings in the California market by Home Depot and Lowe's, and (iii) chain-wide operational deficiencies, caused in large part by a highly leveraged capital structure.

First, from 2007 through 2010, the California economy experienced a catastrophic decline, led primarily by a significant increase in job loss, as the unemployment rate in California more than doubled from less than 6% to greater than 12%.  The increased unemployment, coupled with rapidly declining property values and a corresponding drop in new home construction, in turn led to a dramatic decrease in the average price of existing home sales in California from its peak of more than $600,000 to less than $300,000.  Needless to say, these macroeconomic factors caused substantial harm to the Company's business, which was heavily focused on discretionary spending by homeowners.  Second, and relatedly, the Company suffered as Orchard's largest competitors, Lowe's and Home Depot were better positioned to weather the financial storm through competitive pricing, product differentiation and a broader marketing blueprint.  During this time the Company decelerated new unit growth.  By the end of 2012, Lowe's and Home Depot collectively had over 340 stores within California, many of which were located in close proximity to Company locations.  The decline in Orchard's business was not singularly tied to external factors, however, as the Company suffered from a number of failures in operational execution, many of which were influenced by the Company's highly leveraged capital structure.  Sales were negatively impacted by low in-stock levels, poor merchandising decisions, a lack of professional store management and significant declines in store investment and maintenance.

By 2010, the Company's sales had declined by 21% in three years.  And, as described further below, the Company's substantial debt due, in part, to significant recapitalization dividends paid to Sears, made it difficult, if not impossible for the Company to right itself.  The ever-present prospect of violating the Company's leverage ratio covenants hampered many of its operational strategies.

### C.    CAPITAL STRUCTURE OF THE COMPANY

On December 30, 2011, Sears spun-off its interest in the Company, which resulted in Sears obtaining, and then distributing all of the Orchard Class A Common Stock and Orchard Series A Preferred Stock to its shareholders.  In addition, Ares Capital obtained all of the Company's Class C Common Stock.  The spin-off resulted in the Company listing its Class A Common Stock on the NASDAQ Capital Market under the symbol "OSH" and its Series A Preferred Stock on the OTCQB under the symbol "OSHSP".

### 1.    _Senior Secured Credit Facility_

In December 2006, the Company entered into an amended and restated five-year, $130.0 million senior secured revolving credit facility (as such agreement was subsequently amended, restated or modified, the "Senior Secured Credit Facility").  The borrower under the Senior Secured Credit Facility is OSH LLC, and its obligations are guaranteed by OSH Corp.  Borrowings under the Senior Secured Credit Facility are collateralized by a first lien on substantially all of the assets of the Company, except (i) the assets of, and equity interests in, OSH Properties, LLC, consisting primarily of owned real property; and (ii) certain furniture, fixtures and equipment, as more fully described and reflected in the Amended and Restated Intercreditor Agreement, dated as of January 29, 2010 whereby the Senior Secured Term Lenders hold a senior lien and the lenders under the Senior Secured Credit Facility hold a junior lien on such assets.

On January 29, 2010, the Company amended, restated and extended the Senior Secured Credit Facility, reducing the revolving commitment to $120 million (which was subsequently further amended to reduce the revolving commitment to $100 million).  On October 17, 2012, the Company amended and restated its Senior Secured Credit Facility to, among other things, increase the credit facility's revolving loan facility from $100 million back to $120 million, decrease the interest rate margins on which interest rates are calculated, and add a first-in-last-out term facility of $7.5 million.  On February 11, 2013, the Company expanded its existing Senior Secured Credit Facility, increasing borrowing capacity to $145 million through the addition of a $17.5 million last-in-last-out term supplemental loan tranche.  Wells Fargo Bank, National Association acts as lender and agent under the Senior Secured Credit Facility.  The Senior Secured Credit Facility matures on the earlier to occur of 90 days prior to the maturity of any portion of the Senior Secured Term Loan (as defined below) and October 17, 2017.  As of the Petition Date, approximately $107 million was outstanding under the Senior Secured Credit Facility.

### 2.    _Senior Secured Term Loan_

On December 21, 2006, the Debtors entered into a $200 million senior secured term loan agreement, which required quarterly principal payments and was set to mature in December 2013.  The Debtors paid down the senior secured term loan obligations to approximately $127 million due, in part, to the application of proceeds received in certain sale leaseback transactions. On December 22, 2011, the Company entered into the Amended and Restated Senior Secured Term Loan Agreement (the "Senior Secured Term Loan"), which split the Senior Secured Term Loan into two tranches with a syndicate of lenders (collectively, the "Senior Secured Term Loan

Lenders"). The first tranche has a maturity date of December 21, 2013, of which $54.7 million was outstanding as of the Petition Date. The second tranche includes an accrued PIK interest component, has a maturity date of December 21, 2015, of which $74.3 million was outstanding as of the Petition Date.

On October 26, 2012, the Debtors and the Senior Secured Term Loan Lenders entered into a Waiver and Amendment No. 1 whereby, among other things, the Senior Secured Term Loan Lenders waived any and all defaults or events of default which would otherwise occur under the Senior Secured Term Loan as a result of any failure by the Debtors to comply with the maximum adjusted leverage ratio covenant contained in the Senior Secured Term Loan for the fiscal quarter ended October 27, 2012. On February 14, 2013, the Debtors and the Senior Secured Term Loan Lenders entered into a Waiver, whereby the Senior Secured Term Loan Lenders, among other things, agreed to waive, subject to the Company's continued compliance with certain terms and conditions of the Waiver and supplemental Side Letter, any and all defaults or events of default, which would otherwise occur under the Senior Secured Term Loan as a result of any failure by the Debtors to comply with the maximum adjusted leverage ratio covenant contained in the Senior Secured Term Loan Agreement for the fiscal quarters ended February 2, 2013 and ending May 4, 2013.

### 3.    *Trade Debt*

As of the Petition Date, the Company had trade payables outstanding in an amount of approximately $40.9 million for expenses incurred in the ordinary course of operating the Company, of which $34.8 are related to the Company's merchandise.

### ARTICLE IV.

### KEY EVENTS LEADING TO THE
### COMMENCEMENT OF THE CHAPTER 11 CASES

As described above, although the Debtors worked to stabilize their business in the months leading up to the Petition Date, a combination of the slow pace of the economic recovery and the Company's balance sheet, made these efforts difficult. As a result of the decline in the Company's operating results in the first three quarters of 2011, coupled with continued economic weakness in the markets in which the Company operates, the Company recognized the critical need to delever its balance sheet in order to avoid violating leverage ratio loan covenants. To this end, in the third quarter of 2011, the Company generated cash proceeds of $21.2 million, net of fees from the sale-leaseback transaction of its distribution center located in Tracy, California, and also entered into an Appliances Agreement with Sears to sell Sears branded appliances at certain of its stores, pursuant to which it also transferred certain inventory to a subsidiary of Sears for approximately $2 million in cash.

In the fourth quarter of 2011, the Company utilized the proceeds of additional sale-leaseback transactions to, among other things, make additional principal payments to the Senior Secured Term Loan. Around the same time, and as more fully described above, the Debtors entered into the amended and restated Senior Secured Term Loan. In doing so, the Company projected a 5% increase in comparable store sales in 2012, which, if achieved, would have

resulted in compliance with the leverage ratio covenants contained in the Senior Secured Term Loan. Unfortunately, the Company's operating results in the first quarter of 2012 significantly declined to the point where management recognized that prospective compliance with the leverage ratio covenants was in serious jeopardy. As a result, the Company sought to remain in compliance with its financing arrangements through additional sale-leaseback transactions in the first and second quarters of 2012, which included provisions for the remodeling of certain of the Company's stores for which the landlord would reimburse the Company for the costs of certain tenant improvements. These improvement allowances allowed the Company to conserve cash while, at the same time, largely with landlord financing, improve their stores by rolling out the rebranded and newly remodeled stores.

Simultaneously with these efforts, the Company continued to examine a number of alternatives with respect to future financial covenant compliance and a looming maturity on the Senior Secured Term Loan, including, among other things, raising additional capital through an equity financing transaction or refinancing. To that end, beginning in the second quarter of 2012, the Debtors' management team held negotiations with certain potential lenders in a strategic effort to refinance the Senior Secured Term Loan. In addition, the Company hired an investment banking services firm to explore a potential private placement offering. When these discussions failed to produce any meaningful results, the Debtors hired Moelis and Company ("Moelis") to pursue a potential rights offering with existing equityholders. Unfortunately, these efforts also proved unsuccessful.

The Company also continued to work cooperatively with the lenders under the Senior Secured Credit Facility and Senior Secured Term Loan to, among other things, examine ways to modify the Company's business plan in a manner that would allow the Company to preserve liquidity, while at the same time work towards modifications of the Senior Secured Credit Facility and Senior Secured Term Loan. To that end, the Company amended the Senior Secured Credit Facility on October 17, 2012 to increase the credit facility's revolving loan facility from $100 million to $127.5 million and on February 11, 2012, the Company further amended its Senior Secured Credit Facility to increase the loan facility by $17.5 million through a last-in-last-out term supplemental loan tranche which increased the total availability to $145 million. The Company also obtained from the Senior Secured Term Loan Lenders a waiver from compliance with the leverage ratio covenant through the fiscal quarter ending May 4, 2013.

As uncertainty mounted with respect to future financial covenant compliance and a looming maturity date on the first tranche of the Senior Secured Term Loan, the Company began to face increased pressure with respect to its suppliers and vendors as many of the Company's most significant suppliers tightened their payment terms, thereby constricting the Company's already-strained liquidity position. Moreover, in the days and weeks leading up to the Petition Date, certain major news media outlets published stories that further instilled a sense of panic in the Debtors' suppliers, leading to certain of the Debtors' major suppliers to stop shipping certain goods to the Debtors. Those recent strains in liquidity and product availability, when combined with the inability of the Company to meet its leverage ratio covenants under the existing debt structure and the looming maturity of one tranche of the Senior Secured Term Loan, ultimately resulted in the Company's decision to commence the Chapter 11 Cases.

Following the considerable, but ultimately unsuccessful efforts to consummate a private placement offering as described above, the Debtors, with the support of their investment banker, Moelis, continued to work toward a consensual restructuring with certain of the Debtors' stakeholders. These efforts included several months of negotiations regarding a new potential rights offering to existing equityholders, which efforts failed under the weight of the Company's balance sheet. Following those efforts, the Company worked with its Senior Secured Term Lenders on a variety of restructuring options, including the sale of substantially all of the Debtors' assets in an attempt to right-size the Debtors' operations and ultimately decrease the Debtors' overall debt load. Simultaneously with those discussions and with the constraints noted above, the Debtors undertook a focused marketing process with certain potential purchasers. In doing so, the Debtors determined that the interests of the Company's stakeholders would be best served by a going concern sale of substantially all of the Debtors' assets. As a result of the Debtors' efforts, the Debtors filed a motion on the Petition Date to, among other things, approve a section 363 of the Bankruptcy Code sale of substantially all of the Debtors' assets, approve an affiliate of Lowe's Home Improvement, LLC as the stalking horse purchaser and approve related bidding procedures. The Debtors believed that the competitive sale process would enable the Debtors to maximize the value of their assets and, ultimately, provide the highest possible recovery to the Debtors' creditors. Indeed, through the extensive efforts of the Debtors and their advisors, the Debtors garnered support from the lenders under the Senior Secured Credit Facility and, through the execution of a sale support agreement, obtained support from the lenders and term administrative agent under the Senior Secured Term Loan of the selection of the stalking horse purchaser. Thus, the Debtors and their key creditor constituents paved the way for the sale of substantially all of the Debtors' assets to a very strong stalking horse purchaser.

## ARTICLE V.

## SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASES

### A.    RETENTION OF PROFESSIONALS BY THE DEBTORS

On July 12, 2013, the Court authorized the Debtors to retain DLA Piper LLP (US) as their attorneys pursuant to section 327(a) of the Bankruptcy Code in connection with these Chapter 11 Cases [D.I. 200]. Additionally, pursuant to sections 327(a) and 328(a) of the Bankruptcy Code, the Court authorized the Debtors to retain Moelis as investment banker [D.I. 221], as well as FTI Consulting, Inc. as the Debtors' financial and strategic communications advisor [D.I. 220].

### B.    FORMATION OF THE CREDITORS COMMITTEE

The Office of the United States Trustee formed the Creditors Committee on June 26, 2013 [D.I. 97]. The Creditors Committee retained Pachulski Stang Ziehl & Jones LLP as counsel [D.I. 309] and Alvarez and Marsal North America, LLC as financial advisor [D.I. 311].

### C.    DIP FINANCING

In order to have sufficient cash to operate their businesses while in bankruptcy, the Debtors sought post-petition financing. On July 19, 2013, over the objection of the Creditors

Committee, the Bankruptcy Court entered the *Order (FINAL) (1) Authorizing Incurrence By the Debtors of Post-Petition Secured Indebtedness from Pre-Petition Term Lenders with Priority Over Certain Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Providing for Adequate Protection, and (4) Modifying the Automatic Stay (Term Lender Final DIP Order)* [D.I. 252] (the "Term DIP Financing Order") and the *Order (FINAL) (1) Authorizing Incurrence By the Debtors of Post-Petition Secured Indebtedness from Pre-Petition ABL and Supplemental Term Lenders with Priority Over Certain Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors and Providing for Adequate Protection, and (4) Modifying the Automatic Stay (ABL DIP Facilities)* [D.I. 253] (together with the Term DIP Financing Order, the "DIP Orders"). Pursuant to the DIP Orders, the Debtors were authorized to obtain post-petition financing and to secure this financing, the post-petition lenders, including the Senior Secured Term Loan Lenders, were granted liens on significantly all of the Debtors' assets, including real property owned by OSH Properties LLC which was previously unencumbered.

### D.    GOB PROCESS

On June 17, 2013, the Debtors filed their Emergency Motion of Debtors and Debtors in Possession for Orders Approving Auction Procedures, Agency Agreement, Store Closing Sales and Related Relief [D.I. 13] (the "GOB Motion").  On June 27, 2013, the Debtors held an auction to select a liquidating agent to conduct store closing sales at certain of the Debtors' stores.  Great American Group WF, LLC ("Great American") was the winning bidder at the auction and the Bankruptcy Court entered an order approving an Agency Agreement (as amended, modified or supplemented from time to time, the "Agency Agreement") between Great American and the Debtors.  Pursuant to the Agency Agreement, the Debtors commenced store closing sales at eight of the Debtors' store locations, which store closing sales ended on or around August 31, 2013.  In addition, pursuant to a put option contained in the Agency Agreement, the Debtors commenced additional store closing sales at nine additional store locations, which store closing sales are intended to end no later than October 31, 2013.

### E.    BIDDING PROCEDURES AND SALE PROCESS

#### 1.    *Proposed Bid Procedures*

On June 17, 2013, the Debtors filed their *Motion of the Debtors and Debtors in Possession Pursuant to Sections 105(a), 363 And 365 of the Bankruptcy Code for an Order (I)(A) Approving and Authorizing Bidding Procedures in Connection with the Sale of Substantially All the Assets; (B) Approving the Stalking Horse Bid Protections; (C) Approving the Sale Support Agreement; (D) Scheduling the Related Auction and Hearing to Consider Approval of the Sale; (E) Approving Procedures Related to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; (F) Approving the Form and Manner of Notice Thereof; and (G) Granting Related Relief; and (II)(A) Approving and Authorizing the Sale of Substantially All of the Assets Pursuant to the Successful Bidders Asset Purchase Agreement Free and Clear of All Liens, Claims, Encumbrances, and Other Interests; (B) Approving the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases Related Thereto; and (C) Granting Related Relief* [D.I. 15] (the "Sale Motion").  The

Sale Motion set forth both the proposed schedule and process, as well as proposed bidding procedures.  The relief requested in the Sale Motion was granted on July 8, 2013 [D.I. 155].

### 2.    *Continued Marketing of the Debtors*

As referenced above, the Debtors and their investment banking professionals conducted an extensive marketing process prior to filing of the Chapter 11 Cases.  This marketing continued after the filing of the Chapter 11 Cases and included: (a) establishing and maintaining a "data room" for prospective purchasers to conduct due diligence; (b) compilation of a "teaser," which was used as a public marketing piece to solicit interest of prospective purchasers.  Moelis contacted 112 parties that were potential purchasers of Orchard, of which 87 reviewed the teaser.  Twenty of these parties were interested in further investigating the opportunity and signed confidentiality agreements to receive a confidential information memorandum that fully described the business and the opportunity.  In the end, the Debtors and Moelis held extensive in-person meetings with two prospective purchasers, none of whom elected to move forward with the sale process.  Despite Moelis' extensive marketing efforts, they were unable to generate further interest in the Debtors' assets.  Consequently, Orchard Supply Company, LLC, a wholly-owned subsidiary of Lowe's, as Stalking Horse Purchaser, agreed to acquire substantially all of the Debtors' assets on terms negotiated between them and the Debtors pursuant to the Final APA (the "Sale").

### 3.    *Approval of Final APA and Closing of the Sale*

On August 20, 2013, the Court held a hearing on the approval of the Final APA and authorization to close the Sale.  The Final APA provided for, among other things, the assumption of more than $50 million in prepetition assumed liabilities which includes, among other things, payment of cure amounts associated with the assumption and assignment of the vast majority of the Debtors' executory contracts and unexpired leases.  In addition, the Final APA included a transition service agreement (the "TSA"), which requires the ongoing assistance from the Purchaser to the Debtors following the closing of the Sale.  The services provided under the TSA include accounting support, claims reconciliation, tax and regulatory compliance, litigation support, GOB human resources services, banking system use and back-office support.  The TSA provides that the Debtors will pay for such services by reimbursing the Purchaser for the time spent by its employees at the employees' salary rate plus a premium (to account for overhead and benefits costs).  The Court entered the Order approving the Sale and the Final APA on August 20, 2013 [D.I. 489].  The Sale to the Purchaser closed on August 30, 2013.

## F.    9019 SETTLEMENT MOTION AMONG THE SENIOR SECURED TERM LENDERS, CREDITORS COMMITTEE AND DEBTORS

Following the approval of the DIP Orders, considerable disputes existed between the Senior Secured Term Loan Lenders and the Creditors Committee.  Indeed, while the Creditors Committee did not prevail at the hearing on approval of the DIP Orders, it had a number of potentially time-consuming and costly litigation options at its disposal.

Recognizing the enormous cost and disruption that litigation could have in connection with the Sale, the Senior Secured Term Loan Lenders, the Creditors Committee and the Debtors

engaged in extensive negotiations to resolve issues regarding the use of the proceeds of the Sale. The Result of those negotiations was the 9019 Settlement.   On September 4, 2013, the Bankruptcy Court entered the Order approving the 9019 Settlement [D.I. 523].  The significant terms of the 9019 Settlement include: (i) the Senior Secured Term Loan Lenders received all proceeds of the Sale that are not used to pay off the debtor in possession financing loans, minus $25,000,000, which amount was left in the Debtors' estates, and $9,400,000, which amount is being held as cash collateral for certain letters of credit; (ii) on the Effective Date of the Plan, $500,000 is to be paid from the Debtors' estates to the GUC Trust for the benefit of holders of Allowed General Unsecured Claims whose prepetition debts were not  assumed by the Purchaser under the Final APA; (iii) on the Effective Date of the Plan (or such later time as they may be monetized), the first $250,000 of any proceeds from the Designation Rights Sale is to be paid to the GUC Trust; and (iv) the Senior Secured Term Loan Agent, the Senior Secured Term Loan Steering Committee, the Creditors Committee and the Debtors agreed to support consummation of a plan that contains full and complete releases to each of the parties, and that does not modify or adversely affect the parties' rights benefits and obligations under the terms of the 9019 Settlement.   The Debtors submit that, based upon, among other things, the facts and circumstances of the 9019 Settlement, each of the Released Parties are entitled to full and complete releases under applicable law.

## G.    BAR DATE

On August 16, 2013, the Debtors filed a motion to fix a deadline (the "Bar Date") to file all proofs of claim against the Debtors with respect to any prepetition claims including claims asserted under section 503(b)(9) of the Bankruptcy Code [D.I. 470].  On September 5, 2013, the Bankruptcy Court entered an Order establishing October 25, 2013 as the Bar Date as to non-governmental entities, and December 16, 2013 as to governmental entities [D.I. 540].

## ARTICLE VI.

## THE PLAN OF LIQUIDATION

## A.    INTRODUCTION

The Debtors believe that (i) through the Plan, holders of Allowed Claims will receive a greater recovery from the estates of the Debtors than the recovery that they would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) the Plan will afford the Debtors the opportunity and ability to liquidate its businesses in a timely and efficient manner to preserve value for the Estates.

The Plan is annexed hereto as Exhibit A and forms a part of this Disclosure Statement. The summary of the Plan set forth below is qualified in its entirety by reference to the provisions of the Plan.

Statements as to the rationale underlying the treatment of Claims and Equity Interests under the Plan are not intended to, and shall not, waive, compromise or limit any rights, claims or causes of action in the event the Plan is not confirmed.

**B.      CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN OF LIQUIDATION**

One of the key concepts under the Bankruptcy Code is that only claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an "allowed" claim or "allowed" equity interest simply means that the debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the claim or equity interest, and the amount thereof, is in fact a valid obligation of the Debtors. Section 502(a) of the Bankruptcy Code provides that a timely filed claim or equity interest is automatically "allowed" unless the debtor or other party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in bankruptcy even if a proof of claim is filed. These include, but are not limited to, claims that are unenforceable under the governing agreement between a debtor and the claimant or applicable non-bankruptcy law, claims for unmatured interest, property tax claims in excess of the debtor's equity in the property, claims for services that exceed their reasonable value, real property lease and employment contract rejection damage claims in excess of specified amounts, late-filed claims and contingent claims for contribution and reimbursement. Additionally, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent or unliquidated, if the holder has not filed a proof of claim or equity interest before the established deadline.

The Bankruptcy Code requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the debtor into separate classes based upon their legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which gives rise to different legal rights, the "claims" and "equity interests" themselves, rather than their holders, are classified.

Under a chapter 11 plan of reorganization, the separate classes of claims and equity interests must be designated either as "impaired" (affected by the plan) or "unimpaired" (unaffected by the plan). If a class of claims is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims, such as the right to vote on the plan, and the right to receive, under the chapter 11 plan, no less value than the holder would receive if the debtor were liquidated in a case under chapter 7 of the Bankruptcy Code. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless the plan (i) does not alter the legal, equitable and contractual rights of the holders or (ii) irrespective of the holders' acceleration rights, cures all defaults (other than those arising from the debtor's insolvency, the commencement of the case or nonperformance of a non-monetary obligation), reinstates the maturity of the claims or interests in the class, compensates the holders for actual damages incurred as a result of their reasonable reliance upon any acceleration rights and does not otherwise alter their legal, equitable and contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the consummation date or the date on which amounts owing are actually due and payable. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted the plan.  Accordingly, their votes are not solicited.   Under the Debtors' Plan, the Claims in Class 2 (Other Secured Claims) are unimpaired, and therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan.

Under certain circumstances, a class of claims or equity interests may be deemed to reject a plan of reorganization.  For example, a class is deemed to reject a plan of reorganization under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or equity interests.

Consistent with these requirements, the Plan divides the Allowed Claims against, and Equity Interests in, the Debtors into the following Classes:

| <u>Class</u> | <u>Claim</u> | <u>Status</u> | **Voting Rights** |
|---|---|---|---|
| 1 | Senior Secured Term Loan Claims | Impaired | Entitled to Vote |
| 2 | Other Secured Claims | Unimpaired | Deemed to Accept |
| 3 | General Unsecured Claims | Impaired | Entitled to Vote |
| 4 | Equity Interests | Impaired and No Distribution | Deemed to Reject |

1.      _**Unclassified**_

a.      Administrative Claims

Administrative Claims are the actual and necessary costs and expenses of the Debtors' Chapter 11 Cases that are allowed under and in accordance with sections 330, 365, 503(b), 507(a)(2) and 507(b) of the Bankruptcy Code.  Such expenses will include, but are not limited to, actual and necessary costs and expenses of preserving the Debtors' estates, actual and necessary costs and expenses of operating the Debtors' businesses, indebtedness or obligations incurred or assumed by the Debtors during the Chapter 11 Cases and compensation for professional services rendered and reimbursement of expenses incurred.  Specifically excluded from Administrative Claims are any fees or charges assessed against the estates of the Debtors under § 1930 of chapter 123 of title 28 of the United States Code, which fees or charges, if any, will be paid in accordance with Article V.N of the Plan.

The Responsible Person shall pay, from the assets of the Debtors' Estates each holder of an Allowed Administrative Claim, in satisfaction of such Allowed Administrative Claim, the full unpaid amount of such Allowed Administrative Claim in Cash:  (1) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (2) if such Claim is Allowed after the Effective Date, on the date such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (3) at such time and upon such terms as may be agreed upon by such holder and the Responsible Person; or (4) at such time and upon such terms as set forth in an order of the Bankruptcy Court; provided, however, that Administrative Claims do not include Administrative Claims filed after the Administrative Claims Bar Date or Administrative Claims filed or asserted pursuant to section 503(b)(9) of the Bankruptcy Code after the General Bar Date, unless the Responsible Person, in its discretion, chooses to treat such Claims as Administrative Claims.

b.      Administrative Claims and Administrative Expense Request Deadline

Except as otherwise provided herein, on or before 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date, each holder of an Administrative Claim shall file with the Bankruptcy Court and serve on counsel for (i) the Debtors, (ii) the Senior Secured Term Loan Agent, (iii) the Creditors Committee, and (iv) the Responsible Person, any request for payment of an Administrative Claim.  Requests for payment of an Administrative Claim must include at a minimum: (i) the name of the holder of the Administrative Claim; (ii) the amount of the Administrative Claim; (iii) the basis of the Administrative Claim; and (iv) all supporting documentation for the Administrative Claim.

The request for payment of an Administrative Claim will be timely filed only if it is filed with the Bankruptcy Court by 5:00 p.m., prevailing Eastern time, on the Administrative Claims Bar Date.  Requests for payment of Administrative Claims may **not** be delivered by facsimiles, telecopy, or electronic mail transmission

Notwithstanding anything herein, the Debtors' and the Creditors Committee's Professionals shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses arising under sections 330, 331 or 503(b)(2-5) of the Bankruptcy Code, as such Professionals will instead file final fee applications as required by the Bankruptcy Code, Bankruptcy Rules and the Confirmation Order.  For the avoidance of doubt, any professionals retained by the Senior Secured Term Loan Agent or the Senior Secured Term Loan Steering Committee shall not be required to file a request for payment of any Administrative Claim on or before the Administrative Claims Bar Date for fees and expenses.

c.      Professional Compensation and Reimbursement Claims

The deadline for submission by Professionals for Bankruptcy Court approval of Accrued Professional Compensation shall be sixty (60) days after the Effective Date.  Any Professional or other Person or Entity that is required to file and serve a request for approval of Accrued Professional Compensation and fails to timely file and serve such request on or before such date shall be forever barred, estopped and enjoined from asserting such request or participating in

Distributions under the Plan on account thereof.  All Professionals employed by the Debtors or the Creditors Committee, shall provide to the Debtors an estimate of their Accrued Professional Compensation through the Effective Date (including an estimate for fees and expenses expected to be incurred after the Effective Date to prepare and prosecute allowance of final fee applications) before the Effective Date.

        d.        Priority Tax Claims

A Priority Tax Claim is any Claim of a governmental unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

The Responsible Person shall pay, from the Debtors' assets, each holder of an Allowed Priority Tax Claim, in satisfaction of such Allowed Priority Tax Claim, the full unpaid amount of such Allowed Priority Tax Claim in Cash, on the later of (i) the Effective Date, (ii) the date such Allowed Priority Tax Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Priority Tax Claim is payable under applicable non bankruptcy law.

        e.        Other Priority Claims

An Other Priority Claim is any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim.

The Responsible Person shall pay, from the Debtors' assets, each holder of an Allowed Other Priority Claim, in satisfaction of such Allowed Other Priority Claim, the full unpaid amount of such Allowed Other Priority Claim in Cash, on the later of (i) the Effective Date or as soon as practicable thereafter, (ii) the date such Allowed Other Priority Claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed Other Priority Claim is payable under applicable non-bankruptcy law..

**2.**        *Classified*

        a.        Class 1 (Senior Secured Term Loan Claims) –*Impaired*

Class 1 consists of Senior Secured Term Loan Claims.

Class 1 is Impaired and, therefore, holders of Senior Secured Term Loan Claims in Class 1 are entitled to vote to accept or reject the Plan.

After (i) payment of Allowed Other Secured Claims in Class 2, (ii) payment to the GUC Trust pursuant to the terms of Article IV.C of the Plan for the benefit of holders of Allowed General Unsecured Claims in Class 3, (iii) subject to the limitations in Article VI.A of the Plan, reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims, (b) for the Responsible Person to carry out its duties, and (c) to pay outstanding Administrative Claims, Priority Tax Claims and Other Priority Claims in full, each holder of a Senior Secured Term Loan Claim in Class 1 shall receive its Pro Rata share of all of the remaining assets of the Debtors, including any and all Cash and the proceeds of the liquidation of assets obtained by the Debtors or the Debtors' Estates prior to, on, or after the Effective Date.  Subject to (i), (ii), and (iii) above and Article IV.C of the Plan, (i) on the

Effective Date, the Responsible Person shall distribute to the Senior Secured Term Loan Agent, for distribution to the holders of Allowed Senior Secured Term Loan Claims, all of the assets remaining in the Debtors' Estates as of the Effective Date and (ii) after the Effective Date, the Responsible Person shall distribute to the Senior Secured Term Loan Agent, for distribution to the holders of Allowed Senior Secured Term Loan Claims, all Cash and all proceeds of the liquidation of other assets obtained by the Debtors after the Effective Date, including, but not limited to, all assets from the Disputed Claims Reserve returned to the Debtors' Estates pursuant to Article VI.A of the Plan and all Cash collateral securing any outstanding letters of credit, as soon as practicable after such Cash and/or other assets are obtained by the Debtors.

   b.  Class 2 (Other Secured Claims) – *Unimpaired*

Class 2 consists of Other Secured Claims.

Class 2 is Unimpaired and, therefore, holders of Other Secured Claims in Class 2 are deemed to accept the plan.

Except to the extent that a holder of an Allowed Other Secured Claim has been paid by the Debtors or the Purchaser prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed Other Secured Claim shall receive, at the sole option of the Responsible Person, Cash in the full amount of such Allowed Other Secured Claim or the collateral securing its Allowed Other Secured Claim, on or as soon as practicable after the latest to occur of (i) the Effective Date; (ii) the first Business Day after the date that is ten (10) Business Days after the date such Claim becomes an Allowed Other Secured Claim; and (iii) the date or dates agreed to by the Responsible Person and the holder of the Allowed Other Secured Claim.

   c.  Class 3 (General Unsecured Claims) – *Impaired*

Class 3 consists of General Unsecured Claims.

Class 3 is Impaired and, therefore, holders of General Unsecured Claims in Class 3 are entitled to vote to accept or reject the Plan.

Except to the extent that a holder of an Allowed General Unsecured Claim has been paid by the Debtors or the Purchaser prior to the Effective Date or agrees to a less favorable classification and treatment, each holder of an Allowed General Unsecured Claim shall receive their Pro Rata share of GUC Trust Distributable Cash from the GUC Trust.  Distributions to holders of Allowed General Unsecured Claims shall be made as soon as practicable as the GUC Trustee may determine in its sole discretion.

   d.  Class 4 (Equity Interests) – *Impaired*

Class 4 consists of Equity Interests.

Class 4 will receive no Distribution under the Plan and therefore, holders of Equity Interests in Class 4 are deemed to have rejected the Plan and are not entitled to vote on the Plan.

All equity interest/shares of stock in OSH 1 Liquidating Corporation., (f/k/a Orchard Supply Hardware Stores Corporation) shall be deemed cancelled upon the Effective Date.

Class 4 is Impaired and will receive no Distribution under the Plan.

### 3.  *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' rights with respect to any Unimpaired Claim, including, without limitation, all rights in respect of legal and equitable defenses to or setoffs or recoupments against any such Unimpaired Claim.

### 4.  *Nonconsensual Confirmation*

If any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided in section 1126 of the Bankruptcy Code, the Debtors reserve the right to amend the Plan or to undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to Impaired Classes that are deemed to reject the Plan, the Debtors intend to request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code notwithstanding the deemed rejection of the Plan by such Class of Claims.

## C.  MEANS FOR IMPLEMENTATION OF THE PLAN

The Debtors propose to implement and consummate the Plan on and after the Effective Date.  Prior to the Effective Date, the Debtors shall continue to operate their businesses subject to all applicable requirements of the Bankruptcy Code and the Bankruptcy Rules.

### 1.  *Responsible Person to Effectuate Distributions*

The Responsible Person shall be appointed for the sole purpose of liquidating and distributing the Debtors' assets and with no objective to continue or engage in the conduct of a trade or business.

### 2.  *The GUC Trust*

On or before the Effective Date, the Debtors, on their own behalf and on behalf of the beneficiaries, shall execute the GUC Trust Agreement, in a form reasonably acceptable to the Creditors Committee, and all other necessary steps shall be taken to establish the GUC Trust. The GUC Trust shall be established for the sole purpose of adjudicating General Unsecured Claims and distributing the GUC Trust assets for the benefit of the beneficiaries of the GUC Trust with no objective to continue or engage in the conduct of a trade or business.  The GUC Trust shall be deemed to be a party in interest for purposes of contesting, settling or compromising objections to General Unsecured Claims or Causes of Action.  The GUC Trust shall be vested with all the powers and authority set forth in this Plan and the GUC Trust Agreement.  The GUC Trustee shall be responsible for reconciling and objecting to General Unsecured Claims and making distributions to Allowed General Unsecured Claims.

3.    ***Funding of GUC Trust Pursuant to Settlement Between the Debtors, the Creditors Committee and the Senior Secured Term Loan Lenders***

On the Effective Date, $500,000 will be paid from the Debtors' Estates to the GUC Trust for the benefit of holders of Allowed General Unsecured Claims whose prepetition debts were not assumed by the Purchaser under the Final APA. The GUC Trust shall handle reconciliation of Claims for General Unsecured Claims only, with the GUC Trustee selected by the Creditors Committee. In addition, the first $250,000 of any proceeds from the Designation Rights Sale shall be paid to the GUC Trust on the Effective Date (or such later time as they may be monetized). In the event that the holders of Senior Secured Term Loan Claims receive a total Cash Distribution providing a net recovery of 90% of the Senior Secured Term Loan Claims, the next $1,500,000 of proceeds available for distribution from the Debtors' estates shall be paid to the GUC Trust. The holders of Senior Secured Term Loan Claims shall receive all proceeds of the Sale in excess of the $1,500,000 described above, any proceeds of GOB Sales commenced prior to the closing of the sale to the Purchaser under the Final APA, and all proceeds of the Designation Rights Sale in excess of $250,000 until the holders of the Senior Secured Term Loan Claims receive a net recovery of 100%

4.    ***The Responsible Person and GUC Trustee***

The Responsible Person and GUC Trustee shall be deemed to have been appointed as the respective Estates' representative by the Bankruptcy Court pursuant to section 1123(b)(3)(B) of the Bankruptcy Code. The Responsible Person and GUC Trustee shall be entitled to retain counsel and other professionals to carry out their respective duties.

5.    ***Role of the Responsible Person***

As set forth above, the Senior Secured Term Loan Lenders are entitled to all of the Debtors' assets remaining after (i) payment of Allowed Other Secured Claims in Class 2, (ii) payment to the GUC Trust pursuant to the terms of Article IV.C of the Plan for the benefit of holders of Allowed General Unsecured Claims in Class 3, and (iii) subject to the limitations in Article VI.A of the Plan, reservation of sufficient funds necessary (a) to satisfy the Disputed Claims Reserve with respect to Disputed Claims, (b) for the Responsible Person to carry out its duties, and (c) to pay outstanding Administrative Claims, Priority Tax Claims and Other Priority Claims in full. The Senior Secured Term Loan Lenders are therefore strongly interested in maximizing the value of the Debtors' assets available for distribution to creditors. Accordingly, the Plan provides that the Responsible Person shall be chosen by the Senior Secured Term Loan Steering Committee, the members of which hold, in the aggregate, a majority of the Senior Secured Term Loan Claims. The Senior Secured Term Loan Steering Committee has chosen Bradley Dietz as the Responsible Person.

In furtherance of and consistent with the purpose of the Plan, the Responsible Person shall, among other things, have the rights, powers and duties, subject to the limitations set forth herein: (i) to hold, manage, dispose of, sell, convert to Cash, and distribute the Debtors' assets, including investigating, prosecuting and resolving the Causes of Action of the Debtors, if any; (ii) to hold the Debtors' assets for the benefit of the Creditors that are entitled to Distributions therefrom under the Plan, whether their Claims are Allowed on or after the Effective Date; (iii)

in the Responsible Person's reasonable business judgment, to investigate, prosecute, settle, liquidate, dispose of, and/or abandon the Debtors' assets, including rights, Causes of Action or litigation; (iv) to monitor and enforce the implementation of the Plan; (v) to file all tax and regulatory forms, returns, reports and other documents and financial information required with respect to the Debtors; (vi) in the Responsible Person's reasonable business judgment, to reconcile and object to Claims and Equity Interests, and manage, control, prosecute and/or settle on behalf of the Estates objections to Claims and Equity Interests on account of which the Responsible Person (as Disbursing Agent) will be responsible (if Allowed) for making Distributions under the Plan, (vii) to take all actions necessary, and create any documents necessary, to wind up the affairs and effect a dissolution of the Debtors and implement the Plan; (viii) to hold, manage, and distribute the Debtors' assets obtained through the exercise of its power and authority; (ix) to act as a signatory of the Debtors and for all purposes, including those associated with the novation of contracts or other obligations arising out of the sales of any remaining assets; (x) to dispose of the books and records transferred to the Responsible Person in a manner deemed appropriate by the Responsible Person; provided, however, that the Responsible Person shall not dispose of any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party or that may pertain to General Unsecured Claims without further order of the Bankruptcy Court; (xi) to take all necessary action and file all appropriate motions to obtain an order and a Final Decree closing the Chapter 11 Cases; (xii) to enter into and exercise rights under contracts that are necessary or desirable to the administration of the Debtors and execute any documents or pleadings related to the liquidation of the assets; (xiii) to establish and maintain bank accounts and terminate such accounts as the Responsible Person deems appropriate; (xiv) to bring suits or defend itself against such suits, if any, as the Responsible Person determines in connection with any matter arising from or related to the Plan that affects in any way the rights or obligations of Creditors or holders of Equity Interests; (xvi) to take such other and further actions as are permitted by the Plan and are not inconsistent with the Plan.  In all circumstances, the Responsible Person shall use reasonable best efforts to maximize the value of the assets of the Debtors' Estates in the best interests of all Creditors.

The Responsible Person may resign by giving at least thirty (30) days prior written notice thereof to the Bankruptcy Court.  Such resignation shall become effective on the later to occur of (i) the date specified in such written notice and (ii) the effective date of the appointment of a successor Responsible Person in accordance with the terms hereof and such successor's acceptance of such appointment in accordance with the terms hereof.

The Responsible Person may be removed, with cause, and replaced by the Bankruptcy Court upon motion by any interested party, including all holders of Senior Secured Term Loan Claims, duly noticed to the Responsible Person.  Such removal shall become effective on the date specified in such action by the Bankruptcy Court.

The resignation, removal, incompetency, bankruptcy or insolvency of the Responsible Person shall not operate to revoke any existing agency created pursuant to the terms of the Plan, or the Confirmation Order or invalidate any action theretofore taken by the Responsible Person. All fees and expenses incurred by the Responsible Person prior to the resignation, incompetency or removal shall be paid from the assets, unless such fees and expenses are disputed by the successor Responsible Person, in which case the Bankruptcy Court shall resolve the dispute and

any disputed fees and expenses of the predecessor Responsible Person that are subsequently allowed by the Bankruptcy Court shall be paid from the assets.  In the event of the resignation or removal of the Responsible Person, Responsible Person shall:  (a) promptly execute and deliver such documents, instruments and other writings as may be reasonably requested by the successor Responsible Person or directed by the Bankruptcy Court to effect the termination of such Responsible Person's capacity under the Plan and Confirmation Order; (b) promptly deliver to the successor Responsible Person all documents, instruments, records and other writings related to the administration of the assets as may be in the possession of such Responsible Person; provided, however, that such Responsible Person may retain one copy of each of such documents for its purposes, subject to the terms of any joint prosecution and common interest agreement to which the Responsible Person is party; and (c) otherwise assist and cooperate in effecting the assumption of its obligations and functions by such successor Responsible Person.

Any successor Responsible Person appointed hereunder shall execute an instrument accepting its appointment and shall deliver one counterpart thereof to the Bankruptcy Court for filing and, in case of the Responsible Person's resignation, to the resigning Responsible Person. Thereupon, such successor Responsible Person shall, without any further act, become vested with all the liabilities, duties, powers, rights, title, discretion and privileges of its predecessor with like effect as if originally named Responsible Person and shall be deemed appointed pursuant to Bankruptcy Code section 1123(b)(3)(B).  The resigning or removed Responsible Person shall duly assign, transfer and deliver to such successor Responsible Person all property and money held by such resigning or removed Responsible Person hereunder and shall, as directed by the Bankruptcy Court or reasonably requested by such successor Responsible Person, execute and deliver an instrument or instruments conveying and transferring to such successor Responsible Person, all the liabilities, duties, powers, rights, title, discretion and privileges of such resigning or removed Responsible Person.

6.      _**Responsible Person's Tax Powers**_

Following the Effective Date, the Responsible Person shall prepare and file (or cause to be prepared and filed), on behalf of the Debtors all Tax Returns required to be filed or that the Responsible Person otherwise deems appropriate, including the filing of amended Tax Returns or requests for refunds.

The Responsible Person, the Debtors and the Purchaser shall reasonably cooperate with each other, and shall cause their respective officers, employees, agents, auditors and other Representatives to reasonably cooperate, in preparing and filing all Tax Returns (including amended Tax Returns and claims for refunds) and in resolving all disputes and audits with respect to all taxable periods relating to the Debtors.

7.      _**Cash**_

The Responsible Person and GUC Trustee may invest Cash (including any earnings thereon or proceeds therefrom) in any manner permitted to be made by a liquidating trust within the meaning of Treasury Regulation section 301.7701 4(d), as reflected therein, or under applicable Internal Revenue Service guidelines, rulings, or other controlling authorities.

8.      *Costs and Expenses of the Responsible Person and GUC Trustee*

The costs and expenses of the Responsible Person, and its retained professionals, shall be paid out of the Debtors' assets.  The costs and expenses of the GUC Trustee, and its retained professionals, shall be paid from the GUC Trust.

9.      *Retention of Professionals by the Responsible Person and GUC Trustee*

The Responsible Person and GUC Trustee may retain and compensate attorneys and other professionals to assist in their duties on such terms (including on a contingency or hourly basis) as they deem reasonable and appropriate without Bankruptcy Court approval.

10.     *Tax Reporting*

The Responsible Person shall file (or cause to be filed) any statements, returns or disclosures relating to the Debtors that are required by any governmental unit.

The Responsible Person shall be responsible for payment, out of the Debtors' assets, of any taxes imposed on the Debtors or their respective assets, including the applicable Disputed Claims Reserve.  In the event, and to the extent, any Cash retained on account of Disputed Claims in the applicable Disputed Claims Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets allocable to, or retained on account of, Disputed Claims, such taxes shall be (i) reimbursed from any subsequent Cash amounts retained on account of Disputed Claims, or (ii) to the extent such Disputed Claims have subsequently been resolved, deducted from any amounts otherwise distributable by the Responsible Person (as applicable) as a result of the resolution of such Disputed Claims.

11.     *Dissolution*

The Debtors shall be dissolved at the earlier of: (i) all of the Debtors' assets having been distributed pursuant to the Plan or (ii) the Responsible Person determining, in its sole discretion, after consultation with the Senior Secured Term Loan Agent, that the administration of the Debtors' assets is not likely to yield sufficient additional proceeds to justify further pursuit; provided, however, that in no event shall the Debtors be dissolved later than three (3) years from the Effective Date.  If at any time the Responsible Person determines, in reliance upon such professionals as the Responsible Person may retain, that the expense of administering the Debtors' assets, including the making of a final Distribution to its Creditors, is likely to exceed the value of the assets remaining in the Debtors' Estates, the Responsible Person may apply to the Bankruptcy Court for authority to reserve any amounts necessary to dissolve the Debtors, and dissolve the Debtors.

12.     *Indemnification of the Responsible Person and GUC Trustee*

The Indemnified Persons shall be held harmless and shall not be liable for actions taken or omitted in their capacity as, or on behalf of, the Responsible Person or the GUC Trustee (as applicable), except those acts that are determined by Final Order of the Bankruptcy Court to have arisen out of their own intentional fraud, willful misconduct or gross negligence, and each shall be entitled to be indemnified, held harmless, and reimbursed for fees and expenses including,

without limitation, reasonable attorney's fees, which such Persons and Entities may incur or may become subject to or in connection with any action, suit, proceeding or investigation that is brought or threatened against such Persons or Entities in respect of that Person's or Entity's or the Responsible Person's or GUC Trustee's actions or inactions regarding the implementation or administration of this Plan, or the discharge of their duties hereunder, except for any actions or inactions that are determined by Final Order of the Bankruptcy Court to have arisen from intentional fraud, willful misconduct or gross negligence. Any Claim of the Indemnified Persons to be indemnified, held harmless, or reimbursed shall be satisfied from the Debtors' assets, or any applicable insurance coverage.

### 13. *Optional Liquidation Trust*

If, at any time prior to seven (7) days before the deadline for filing of the Plan Supplement, the Senior Secured Term Loan Steering Committee determines, in its sole discretion after consultation with the Debtors, that it is necessary and advisable to establish a trust to liquidate and distribute the Debtors' assets after the Effective Date (the "Liquidation Trust"), the Senior Secured Term Loan Steering Committee shall so notify the Debtors of such determination in writing and file a notice of such determination with the Bankruptcy Court. In that event, the Senior Secured Term Loan Steering Committee shall provide the Debtors with a Liquidation Trust Agreement, which shall be filed as part of the Plan Supplement, and such Liquidating Trust Agreement will appoint the Responsible Person, or such other person as the Senior Secured Term Loan Steering Committee shall select, as trustee (the "Liquidation Trustee") and provide that all of the Debtors' liabilities, assets, title, discretion, privileges, and rights, including, but not limited to rights to obtain assets from third parties and rights to prosecute, settle, or otherwise dispose of Causes of Action shall be transferred to the Liquidation Trust on the Effective Date; *provided, however*, that such assets, privileges and rights shall not include any such assets, privileges and rights to be transferred to the GUC Trust under the Plan. In the event that the Liquidation Trust is established, the Liquidation Trustee shall have all the liabilities, duties, powers, rights, title, discretion and privileges of the Responsible Person hereunder, and all references hereunder to the distribution of the Debtors' assets, other than the assets used to fund the GUC Trust, shall be deemed to refer to the assets of the Liquidation Trust.

### 14. *Cancellation of Existing Securities and Agreements*

Except for purposes of evidencing a right to Distributions under the Plan or as otherwise provided hereunder, on the Effective Date, all agreements and other documents evidencing Claims or rights of any holder of a Claim or Equity Interest against any of the Debtors, including, but not limited to, all indentures, notes, bonds and share certificates evidencing such Claims and Equity Interests and any agreements or guarantees related thereto shall be cancelled, terminated, deemed null and void and satisfied, as against the Debtors but not as against any other Person.

### 15. *Operations of the Debtors Between the Confirmation Date and the Effective Date*

The Debtors shall continue to operate as Debtors in Possession during the period from the Confirmation Date through and until the Effective Date, and as a liquidating estate on and after

the Effective Date.  The retention and employment of the Professionals retained by the Debtors shall terminate as of the Effective Date, provided, however, that the Debtors shall exist, and their Professionals shall be retained, after such date with respect to (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code, (b) motions seeking the enforcement of the provisions of the Plan or the Confirmation Order and (c) such other matters as may be determined by the Debtors or Responsible Person, including without limitation, the filing and prosecuting of objections to Claims solely with respect to Administrative Claims and Priority Claims.

### 16.    *Automatic Stay*

The automatic stay provided for under section 362 of the Bankruptcy Code shall remain in effect in the Chapter 11 Cases until the Effective Date.

### 17.    *The Committee*

Upon the Effective Date, the Creditors Committee shall dissolve, and their members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Chapter 11 Cases.  The retention and employment of the Professionals retained by the Creditors Committee shall terminate as of the Effective Date, provided, however, that the Creditors Committee shall exist, and their Professionals shall be retained, after such date with respect to applications filed pursuant to sections 330 and 331 of the Bankruptcy Code and motions seeking the enforcement of the provisions of the Plan or the Confirmation Order.

### 18.    *Books and Records*

As part of the appointment of the Responsible Person, to the extent not already transferred on the Effective Date, the Debtors shall transfer dominion and control over all of their books and records to the Responsible Person in whatever form, manner or media those books and records existed immediately prior to the transfer thereof to the Responsible Person.  The Responsible Person may abandon all such books and records on or after ninety (90) days from the Effective Date, provided, however, that the Responsible Person shall not dispose or abandon any books and records that are reasonably likely to pertain to pending litigation in which the Debtors or their current or former officers or directors are a party or that pertain to General Unsecured Claims without further order of the Bankruptcy Court.  Pursuant to section 554 of the Bankruptcy Code, Article IV.P of the Plan shall constitute a motion and notice, so that no further notice or Bankruptcy Court filings are required to effectuate the aforementioned abandonment of the books and records of the Debtors.

### 19.    *Substantive Consolidation of the Debtors*

The Plan shall serve as a motion of the Debtors seeking entry of a Bankruptcy Court order approving the substantive consolidation of the Debtors' Estates as provided for herein.  As such, upon the Effective Date, without the need for further order of the Bankruptcy Court or motion of, or notice from, the Debtors, the Responsible Person, or the GUC Trustee, the chapter 11 cases of Debtors OSH 2 Liquidating LLC and OSH 3 Liquidating LLC (Case Nos. 13-11566 (CSS) and 13-11567 (CSS), respectively) shall be deemed closed as of the Effective Date

without prejudice to the rights of any party in interest to seek to reopen such cases pursuant to section 350(b) of the Bankruptcy Code, and (i) all motions, contested matters, adversary proceedings and other matters with respect to those closed cases and those Debtors shall be administered in in the case of Debtor OSH 1 Liquidating Corporation (Case No. 13-11565 (CSS)) without prejudice to the rights of any party in interest, (ii) the caption of the case of OSH 1 Liquidating Corporation shall be amended to reflect that it is the only remaining open case, and (iii) a docket entry shall be made in each of the closed cases that reflects their closure pursuant the Plan.

The Debtors propose substantive consolidation to avoid the inefficiency of proposing and voting in respect of entity-specific Claims for which there would be no impact on distributions. The Debtors submit that no interested party will be materially harmed by the substantive consolidation of the Debtors.

### 20. *D&O Insurance Policies*

No prepaid D&O Insurance Policy shall be cancelled, and the Debtors' directors, officers and employees who have valid claims against the D&O Insurance Policies for indemnification, defense, reimbursement, or limitation of liability may be paid from the D&O Insurance Policies to the extent of the coverage provided by the D&O Insurance Policies. As such, and notwithstanding anything in the Plan to the contrary, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, the D&O Insurance Policies, to the extent the contract providing for such is determined to be an executory contract, shall be deemed assumed by the Debtors. The Debtors' directors shall direct that any monies held in escrow and specifically set aside for D&O Insurance Policy protection be used solely for that purpose.

## D. PROVISIONS GOVERNING VOTING AND DISTRIBUTIONS

### 1. *Voting of Claims*

Each holder of an Allowed Claim in an Impaired Class of Claims that is entitled to vote on the Plan pursuant to Article II and Article III of the Plan shall be entitled to vote separately to accept or reject the Plan, as provided in such order as is entered by the Bankruptcy Court establishing procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, or any other order or orders of the Bankruptcy Court.

### 2. *Distribution Dates*

Distributions to holders of Claims shall be made as provided in Articles II and III of the Plan. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

3.    *__Disbursing Agents__*

All Distributions under the Plan by the Responsible Person or GUC Trustee shall be made by the Responsible Person or GUC Trustee as Disbursing Agent or such other entity designated by the Responsible Person or GUC Trustee as Disbursing Agent.

The Disbursing Agent shall be empowered to (a) effect all actions and execute all agreements, instruments and other documents necessary to perform their duties under the Plan, (b) make all Distributions contemplated by the Plan, (c) employ professionals to represent them with respect to their responsibilities, and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan.

The Disbursing Agent shall only be required to act and make Distributions in accordance with the terms of the Plan and shall have no (x) liability for actions taken in accordance with the Plan or in reliance upon information provided to them in accordance with the Plan or (y) obligation or liability for Distributions under the Plan to any party who does not hold an Allowed Claim at the time of Distribution or who does not otherwise comply with the terms of the Plan.

Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the Responsible Person acting as the Disbursing Agent (including, without limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Debtors in the ordinary course of business.  Except as otherwise ordered by the Bankruptcy Court, any reasonable fees and expenses incurred by the GUC Trustee acting as the Disbursing Agent (including, without limitation, reasonable attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the GUC Trust in the ordinary course of business.

4.    *__Record Date for Distributions__*

Except as otherwise provided in a Final Order of the Bankruptcy Court, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Record Date will be treated as the holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Record Date.  The Responsible Person and the GUC Trustee (as applicable) shall have no obligation to recognize any transfer of any Claim occurring after the Record Date.  In making any Distribution with respect to any Claim, the Responsible Person and the GUC Trustee (as applicable) shall be entitled instead to recognize and deal with, for all purposes hereunder, only the Entity that is listed on the proof of Claim filed with respect thereto or on the Schedules as the holder thereof as of the close of business on the Record Date and upon such other evidence or record of transfer or assignment that was known to the Debtors as of the Record Date and is available to the Responsible Person and the GUC Trustee (as applicable).

5.    *__Delivery of Distributions__*

Subject to Bankruptcy Rule 9010 and except as otherwise provided in the Plan, Distributions to the holders of Allowed Claims shall be made by the Disbursing Agent at (a) the address of each holder as set forth in the Schedules, unless superseded by the address set forth on

proofs of Claim filed by such holder or (b) the last known address of such holder if no proof of Claim is filed or if the Responsible Person and the GUC Trustee (as applicable) have not been notified in writing of a change of address.  The Responsible Person shall make the Distributions described in Article III.B.1 of the Plan by wire transfer upon instructions provided by the Senior Secured Term Loan Agent.

### 6. *Undeliverable and Unclaimed Distributions*

In the event that any Distribution to any holder of an Allowed Claim made by the Responsible Person is returned as undeliverable, the Disbursing Agent shall use commercially reasonable efforts to determine the current address of each holder, but no Distribution to such holder shall be made unless and until the Disbursing Agent has determined the then current address of such holder; provided, however, that all Distributions to holders of Allowed Claims made by the Responsible Person that are unclaimed for a period of one (1) year after Distribution thereof shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and revested in the Debtors' Estates and any entitlement of any holder of any Claims to such Distributions shall be extinguished and forever barred.  The Responsible Person shall have no further obligation to make any Distribution to the holder of such Claim on account of such Claim, and any entitlement of any holder of such Claim to any such Distributions shall be extinguished and forever barred; provided, however, that the holder of such Claim may receive future Distributions on account of such Claim by contacting the Responsible Person at some point prior to the final Distribution.

In the event that any Distribution to any holder of an Allowed General Unsecured Claim is returned as undeliverable to the GUC Trust, no further Distribution to such holder shall be made unless and until the Disbursing Agent has been notified in writing with evidence satisfactory to the GUC Trust of the current address of such holder prior to the time that any Distributions are made by the GUC Trust.  All Distributions to holders of Allowed General Unsecured Claims that are unclaimed for a period of ninety (90) days after any interim Distribution or sixty (60) days after the final Distribution shall be deemed unclaimed property and revested in the GUC Trust.  After such time period, any entitlement of the applicable holder of an Allowed General Unsecured Claim to such Distribution shall be extinguished and forever barred and the GUC Trustee shall have no further obligation to make any Distribution to such holder of any unclaimed Distribution on account of such Allowed General Unsecured Claim.

### 7. *Manner of Cash Payments Under the Plan*

Except as otherwise provided herein or the Plan, Cash payments made pursuant to the Plan shall be in United States dollars by checks drawn on a domestic bank or by wire transfer from a domestic bank, at the option of the Responsible Person and the GUC Trustee (as applicable).

### 8. *Compliance with Tax Requirements*

The Disbursing Agent may withhold and pay to the appropriate taxing authority all amounts required to be withheld pursuant to the Tax Code or any provision of any foreign, state or local tax law with respect to any payment or Distribution on account of Claims.  All such

amounts withheld and paid to the appropriate taxing authority shall be treated as amounts distributed to such holders of the Claims.  The Disbursing Agent shall be authorized to collect such tax information from the holders of Claims (including social security numbers or other tax identification numbers) as it in its sole discretion deems necessary to effectuate the Plan.  In order to receive Distributions under the Plan, all holders of Claims will need to identify themselves to the Disbursing Agent and provide all tax information the Disbursing Agent deems appropriate (including completing the appropriate Form W-8 or Form W-9, as applicable to each holder).  The Disbursing Agent may refuse to make a Distribution to any holder of a Claim that fails to furnish such information within the time period specified by the Disbursing Agent and such Distribution shall be deemed an unclaimed Distribution under the Plan, and, *provided further* that, if the Disbursing Agent fails to withhold in respect of amounts received or distributable with respect to any such holder and such Disbursing Agent is later held liable for the amount of such withholding, such holder shall reimburse the Disbursing Agent for such liability.

### 9.    *No Payments of Fractional Dollars*

Notwithstanding any other provision of the Plan to the contrary, no payment of fractional dollars shall be made pursuant to the Plan. Whenever any payment of a fraction of a dollar under the Plan would otherwise be required, the actual Distribution made shall reflect a rounding down of such fraction to the nearest whole dollar.

### 10.    *Interest on Claims*

Except as specifically provided for in this Plan or the Confirmation Order or required by the Bankruptcy Code, interest shall not accrue on Claims and no holder of a Claim shall be entitled to interest on any Claim accruing on or after the Petition Date.  Interest shall not accrue on any General Unsecured Claim that is a Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made thereon if and after that Disputed Claim becomes an Allowed Claim.  Except as expressly provided in the Plan or in a Final Order of the Bankruptcy Court, no prepetition Claim shall be Allowed to the extent that it is for postpetition interest or similar charges.

### 11.    *No Distribution in Excess of Allowed Amount of Claim*

Notwithstanding anything to the contrary contained in the Plan, no holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of such Claim.

### 12.    *Setoff and Recoupment*

The Responsible Person and the GUC Trustee (as applicable) may setoff against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that any of the Debtors or the Estates may have against the holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtors, the Estates, the Responsible Person or the GUC Trustee of any right of setoff or recoupment that any of them may have against the holder of any Claim.  Any such setoffs or recoupments may be challenged in

Bankruptcy Court.  Notwithstanding any provision in the Plan to the contrary, nothing herein shall bar any creditor from asserting its setoff or recoupment rights to the extent permitted under section 553 or any other provision of the Bankruptcy Code; *provided, however*, that such setoff or recoupment rights are timely asserted; *provided further* that all rights of the Debtors and their estates, the Responsible Person and the GUC Trustee with respect thereto are reserved.

13.    *De Minimis Distributions; Charitable Donation*

Notwithstanding anything to the contrary therein, the Responsible Person and the GUC Trustee (as applicable) shall not be required to make a Distribution to any Creditor if the dollar amount of the Distribution is less than $25 or otherwise so small that the cost of making that Distribution exceeds the dollar amount of such Distribution.  On or about the time that the final Distribution is made, the Responsible Person and the GUC Trustee (as applicable) may make a charitable donation with undistributed funds if, in the reasonable judgment of the Responsible Person and the GUC Trustee (as applicable), the cost of calculating and making the final Distribution of the remaining funds is excessive in relation to the benefits to the or holders of Claims who would otherwise be entitled to such Distributions, and such charitable donation is provided to an entity not otherwise related to the Debtors or the Responsible Person and the GUC Trustee (as applicable).

14.    *United States Trustee Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code prior to the Effective Date shall be paid by the Debtors.  On and after the Effective Date, the Responsible Person shall pay any and all such fees payable by the Debtors, when due and payable, and shall file with the Bankruptcy Court quarterly reports for each of the Debtors, in a form reasonably acceptable to the U.S. Trustee.  Notwithstanding the substantive consolidation of the Debtors under the Plan, each Debtor shall remain obligated to pay quarterly fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed (whether closed pursuant to Article IV.R of this Plan or otherwise), dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.

15.    *Withholding from Distributions*

Any federal, state or local withholding taxes or other amounts required to be withheld under applicable law shall be deducted from Distributions pursuant to the Plan.  The Responsible Person and the GUC Trustee (as applicable) may withhold from amounts distributable pursuant to the Plan to any Person or Entity any and all amounts, determined in the sole and reasonable discretion of the Responsible Person and the GUC Trustee (as applicable), required to be withheld by any law, regulation, rule, ruling, directive, or other governmental requirement.

16.    *No Distributions on Late-Filed Claims*

Except as otherwise provided in a Final Order of the Bankruptcy Court, any Claim as to which a proof of Claim was required to be filed and was first filed after the later of (i) the applicable bar date in the Chapter 11 Cases, including, without limitation, the General Bar Date and any bar date established in the Plan or in the Confirmation Order and (ii) the date that is ten (10) days prior to the Confirmation Date, shall automatically be deemed a late-filed Claim that is

disallowed in the Chapter 11 Cases, without the need for (a) any further action by the Responsible Person or the GUC Trustee (as applicable) or (b) an order of the Bankruptcy Court. Nothing in this paragraph is intended to expand or modify the applicable bar dates or any orders of the Bankruptcy Court relating thereto.

### E.    DISPUTED CLAIMS

#### 1.    *Disputed Claims Reserve*

After the Effective Date, the Disputed Claims Reserve shall be managed by the Responsible Person for the treatment of Disputed Administrative Claims, Priority Tax Claims and Other Priority Claims.  On each Distribution date after the Effective Date in which the Responsible Person makes Distributions to holders of Administrative Claims, Priority Tax Claims or Other Priority Claims, the Responsible Person shall retain on account of Disputed Claims an amount the Responsible Person estimates is necessary to fund the Pro Rata Share of such Distributions to holders of Disputed Claims if such Claims were Allowed, with any Disputed Administrative Claims, Priority Tax Claims and Other Priority Claims that are unliquidated or contingent being reserved in an amount reasonably determined by the Responsible Person; *provided*, *however*, that in no event shall the Disputed Claims Reserve managed by the Responsible Person exceed $3,700,000.  Cash retained on account of such Disputed Claims shall be retained in the Disputed Claims Reserve for the benefit of the holders of Disputed Administrative Claims, Priority Tax Claims and Other Priority Claims pending a determination of their entitlement thereto under the terms of the Plan.  If any Disputed Administrative Claims, Priority Tax Claims or Other Priority Claims is disallowed or Allowed in an amount that is lower than the aggregate assets retained on account of such Disputed Claim, then the Responsible Person shall within fifteen (15) days after such disallowance or allowance return the assets that exceed the Allowed amount of such Claim to the Debtors' Estates.

#### 2.    *Resolution of Disputed Claims*

The Responsible Person, in the case of all Claims other than General Unsecured Claims, and the GUC Trustee, in the case of General Unsecured Claims, shall have the right to make and file objections to Claims in the Bankruptcy Court.  Unless otherwise ordered by the Bankruptcy Court after notice and a hearing, all Disputed Claims shall be subject to the exclusive jurisdiction of the Bankruptcy Court.

#### 3.    *Objection Deadline*

All objections to Disputed Claims shall be filed no later than the Claims Objection Bar Date, unless otherwise ordered by the Bankruptcy Court after notice and a hearing, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002.

#### 4.    *Estimation of Claims*

At any time, the Responsible Person, in the case of all Claims other General Unsecured Claims, or the GUC Trustee, in the case of General Unsecured Claims, may request that the Bankruptcy Court estimate any contingent or unliquidated Claim to the extent permitted by

section 502(c) of the Bankruptcy Code regardless of whether the Responsible Person, the GUC Trustee or the Debtors have previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall have jurisdiction to estimate any Claim at any time during litigation concerning any objection to such Claim, including during the pendency of any appeal relating to any such objection.  If the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on the Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the Claim, the Responsible Person or the GUC Trustee (as applicable) may elect to pursue supplemental proceedings to object to the ultimate allowance of the Claim.  All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

### 5.   *No Distributions Pending Allowance*

Notwithstanding any other provision in the Plan, if any portion of a Claim is disputed, no payment or Distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, Distributions (if any) shall be made to the holder of such Allowed Claim in accordance with the provisions of the Plan.  Upon allowance, a holder of the Allowed Disputed Claim shall receive any Distributions that would have been made up to the date of allowance to such holder under the Plan had the Disputed Claim been allowed on the Effective Date.

### 6.   *Resolution of Claims*

On and after the Effective Date, the Responsible Person, in the case of all Claims other than General Unsecured Claims, and the GUC Trustee, in the case of General Unsecured Claims, shall have the authority to compromise, settle, otherwise resolve or withdraw any objections to Claims, and to compromise, settle, or otherwise resolve any Disputed Claims without approval of the Bankruptcy Court.

## F.   TREATMENT OF EXECUTORY CONTRACTS

### 1.   *Assumption or Rejection of Executory Contracts and Unexpired Leases*

Pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, upon the Effective Date, all executory contracts and unexpired leases that exist between the Debtors and any Person or Entity shall be deemed rejected by the Debtors, except for any executory contract or unexpired leases (i) that has been assumed or rejected pursuant to an order of the Bankruptcy Court entered prior to the Effective Date or (ii) as to which a motion for approval of the assumption of such executory contract or unexpired lease has been filed and served prior to the Effective Date. Subject to the occurrence of the Effective Date, entry of the Confirmation Order shall constitute approval of such rejection pursuant to section 365(a) of the Bankruptcy Code and a finding by the Bankruptcy Court that each such rejection is in the best interests of the Debtors, their Estates, and all parties in interest in the Chapter 11 Cases.

### 2. *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article VII.A of the Plan, must be filed with the Bankruptcy Court and served on the Debtors, the Responsible Person and the GUC Trustee no later than thirty (30) days after service of notice of the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article VII.A of the Plan for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtors, the Estates, the Responsible Person, the GUC Trustee, their successors and assigns, and their assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in Article IX.F of the Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan and shall be subject to the provisions of Article III of the Plan.

### 3. *Indemnification and Reimbursement*

Subject to the occurrence of the Effective Date, all Allowed Claims against the Debtors for indemnification, defense, reimbursement, or limitation of liability of current or former directors, officers, or employees of the Debtors against any Claims, costs, liabilities or causes of action as provided in the Debtors' articles of organization, certificates of incorporation, bylaws, other organizational documents, or applicable law, shall, to the extent such indemnification, defense, reimbursement, or limitation is owed in connection with one or more events or omissions occurring before the Petition Date, be (i) paid only to the extent of any applicable insurance coverage, and (ii) to the extent a proof of Claim has been timely filed and is Allowed, treated as Allowed General Unsecured Claims to the extent such Claims are not covered by any applicable insurance, including deductibles. Nothing contained herein shall affect the rights of directors, officers or employees under any insurance policy or coverage with respect to such Claims, costs, liabilities or Causes of Action or limit the rights of the Debtors, the Responsible Person, the GUC Trustee or the Debtors' Estates to object to, seek to subordinate or otherwise contest or challenge Claims or rights asserted by any current or former officer, director or employee of the Debtors.

### 4. *Certain Insurance Policy Matters*

Notwithstanding anything to the contrary in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, the Plan Supplement, any other Plan documents or any other order of the Bankruptcy Court (including, without limitation, any provision that purports to be preemptory or supervening or grants and injunction or release or sets a bar date), on the Effective Date, (i) all insurance policies issued (or providing coverage at any time) to the Debtors and all related agreements shall be transferred to and shall vest in the post-Effective Date Debtors or if the Liquidation Trust is established, the Liquidation Trust and (ii) the post-Effective Date Debtors or if the Liquidation Trust is established, the Liquidation Trust shall be liable for all of the Debtors' obligations thereunder (including, but not limited to, the duty to provide collateral and security, pay self-insured retentions, and pay in full (or reimburse in full the insurer for) deductibles and other costs and fees), whether now existing or hereafter arising, without the requirement or need for insurers to file proofs of claim or requests for payment of

Administrative Claim. Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan, any other Plan document or any other order of the Bankruptcy Court (including, without limitation, any provision that purports to be preemptory or supervening or grants an injunction or release), shall in any way operate to, or have the effect of, impairing, expanding or altering in any respect the legal, equitable or contractual rights and defenses, if any, of the insureds, the Debtors or any insurer with respect to any insurance policies and related agreements.  The rights and obligations of the insureds, the post-Effective Date Debtors or, if the Liquidation Trust is established,  or Liquidation Trustee, and insurers shall be determined under (i) the insurance policies and related agreements (including all terms, conditions, limitations and exclusions thereof) which shall remain in full force and effect subject to the terms thereof and (ii) applicable non-bankruptcy law.  Nothing in the Disclosure Statement, the Plan, the Confirmation Order, any exhibit to the Plan or any other Plan document (including any provision that purports to be preemptory or supervening or grants an injunction or release), shall in any way (i) limit the post-Effective Date Debtors or, if the Liquidation Trust is established, the Liquidation Trustee from asserting a right or claim to the proceeds of any insurance policy that insures any Debtor, was issued to any Debtor or was transferred to the post-Effective Date Debtor or Liquidation Trust  by operation of the Plan, nor (ii) limit any right of any other party to challenge such right or claim; provided, however that the insurers and the post-Effective Date Debtors or, if the Liquidation Trust is established, the Liquidation Trustee, reserve and preserve any right to seek arbitration of disputes arising under the insurance policies and related agreements.

The automatic stay of Bankruptcy Code section 362(a) and the injunctions set forth in Article IX of the Plan, if and to the extent applicable, shall be deemed lifted without further order of the Bankruptcy Court, solely to permit: (A) claimants with valid workers' compensation claims covered by the workers' compensation policies to proceed with their claims; (B) the insurers (and/or third party administrators) to administer, handle, defend, settle, and/or pay, in the  ordinary course of business and without further order of this Bankruptcy Court, (i) all valid workers' compensation claims arising under the workers' compensation policies issued by any of the insurers, (ii) all claims where a claimant asserts a direct claim against the insurers under applicable law, the claimant has been awarded a judgment and the applicable policy contains an MCS-90 endorsement, or an order has been entered by the Bankruptcy Court granting a claimant with a pre-Effective Date claim relief from the automatic stay or the injunctions set forth in Article IX of the Plan to (1) proceed with its claim nominally against the Debtors and (2) collect insurance proceeds pursuant to the insurance policies and related agreements and (iii) all costs in relation to each of the foregoing; and (C) the insurers and/or third party administrators to draw against, hold and/or apply any or all of the collateral or security provided to the insurers and/or third party administrators by or on behalf of the Debtors at any time..

## G.    CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

### 1.    *Conditions Precedent*

The following are conditions precedent to the Effective Date that must be satisfied or waived:

a.    The Bankruptcy Court shall have entered the Confirmation Order.

b.      There shall be no stay or injunction in effect with respect to the Confirmation Order, which such Confirmation Order shall contain approval of the releases provided for herein.

c.      The appointment of the Responsible Person and the GUC Trustee shall have been confirmed by order of the Bankruptcy Court.

d.      All invoiced and unpaid fees and expenses of attorneys and financial advisors to the Senior Secured Term Loan Agent and Senior Secured Term Loan Steering Committee have been paid in full in Cash from the Debtors' assets.

e.      All agreements and instruments that are exhibits to the Plan shall be in a form reasonably acceptable to the Debtors, the Creditors Committee and Senior Secured Term Loan Steering Committee, and have been duly executed and delivered; *provided*, *however*, that no party to any such agreements and instruments may unreasonably withhold its execution and delivery of such documents to prevent this condition precedent from occurring.

f.      The payments payable to the GUC Trust on the Effective Date shall have been made.

### 2.      *Waiver*

Notwithstanding the foregoing conditions in Article VIII.A, the Debtors, with the written consent of the Senior Secured Term Loan Agent, reserve, in their sole discretion, the right to waive the occurrence of any condition precedent or to modify any of the foregoing conditions precedent.  Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than the written consent of the Senior Secured Term Loan Agent and proceeding to consummate the Plan; provided, however, the Committee shall have the right to be consulted on and consent to any proposed modification of the Confirmation Order and the Plan that adversely affects the rights of holders of General Unsecured Claims, the GUC Trust or the GUC Trustee.  Any actions required to be taken on the Effective Date or Confirmation Date (as applicable) shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## H.      INDEMNIFICATION, RELEASE, INJUNCTIVE AND RELATED PROVISIONS

### 1.      *Compromise and Settlement*

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests.  The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtors, the Estates and holders of Claims and Equity Interests.

2.    *Releases*

**Releases by the Debtors and their Estates.  Notwithstanding anything contained in the Plan to the contrary, as of the Effective Date, for the good and valuable consideration provided by each of the Released Parties, each of the Debtors and their current and former affiliates and Representatives and the Estates shall be deemed to have provided a full, complete, unconditional and irrevocable release to the Released Parties (and each such Released Party so released shall be deemed released by the Debtors and their current and former affiliates and Representatives, the Estates and the Creditors Committee and its members but solely in their capacity as members of the Creditors Committee and not in their individual capacities), from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors, including, without limitation, those that any of the Debtors would have been legally entitled to assert or that any holder of a Claim or Equity Interest or other Entity would have been legally entitled to assert for or on behalf of any of the Debtors or the Estates, including those in any way related to the Chapter 11 Cases or the Plan; provided, however, that the foregoing release shall not prohibit the Debtors, the Estates, the Responsible Person, the GUC Trust or the GUC Trustee from asserting any and all defenses and counterclaims in respect of any Disputed Claim asserted by any Released Parties.**

**Releases by Holders of Claims.  Except as otherwise provided in Article XI.B of the Plan, each Person, other than any of the Debtors, who votes to accept the Plan and does not mark such ballot to indicate their refusal to grant the release provided for in this paragraph, shall be deemed to fully, completely, unconditionally, irrevocably, and forever release the Released Parties of and from any and all Claims and Causes of Action and any other debts, obligations, rights, suits, damages, actions, remedies and liabilities whatsoever, whether accrued or unaccrued, whether known or unknown, foreseen or unforeseen, existing before the Effective Date, as of the Effective Date or arising thereafter, in law, at equity, whether for tort, contract, violations of statutes (including but not limited to the federal or state securities laws), or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtors and their current and former affiliates and Representatives, whether direct, derivative, accrued or unaccrued, liquidated or unliquidated, fixed or contingent, matured or unmatured, disputed or undisputed, known or unknown, foreseen or unforeseen, in law, equity or otherwise.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the releases set forth in Article IX.B of the Plan pursuant to Bankruptcy Rule 9019 and its finding that they are:  (a) in exchange for good and valuable consideration, representing a good faith settlement and compromise of the Claims and Causes of Action released by**

this Plan; (b) in the best interests of the Debtors and all holders of Claims and Equity Interests; (c) fair, equitable and reasonable; (d) approved after due notice and opportunity for hearing; and (e) a bar to the assertion of any Claim or Cause of Action thereby released.

### 3.    *Exculpation*

Notwithstanding anything contained in the Plan to the contrary, the Released Parties, the Creditors Committee, the Creditors Committee's members (but solely in their capacity as members of the Creditors Committee and not in their individual capacities) and the Creditors Committee's Professionals shall neither have nor incur any liability relating to these Chapter 11 Cases to any Entity for any and all Claims and Causes of Action arising after the Petition Date and through the Effective Date, including any act taken or omitted to be taken in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or consummating the Plan, the Disclosure Statement, or any other contract, instrument, release or other agreement or document created or entered into in connection with the Plan or any other postpetition act taken or omitted to be taken in connection with the Chapter 11 Cases; *provided, however*, that the foregoing provisions of Article IX.C of the Plan shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct.

### 4.    *Withdrawal and Release of Certain Claims*

Upon the Effective Date, the Senior Secured Term Loan Lenders and the Senior Secured Term Loan Agent shall be deemed to have waived any unsecured deficiency claim resulting from a Distribution less than a par recovery of the Senior Secured Term Loan Claims.

### 5.    *Preservation of Causes of Action*

#### a.    Vesting of Causes of Action

Except as otherwise provided in the Plan or Confirmation Order, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that the Debtors and the Estates may hold against any Entity shall remain with the Debtors and the Estates on and after the Effective Date.

Except as otherwise provided in the Plan or Confirmation Order, after the Effective Date, the Responsible Person shall have the exclusive right to institute, prosecute, abandon, settle or compromise any Causes of Action that were held by the Debtors and the Estates, in its sole discretion and without further order of the Bankruptcy Court, in any court or other tribunal, including, without limitation, in an adversary proceeding filed in one or more of the Chapter 11 Cases.

#### b.    Preservation of All Causes of Action Not Expressly Settled or Released

Unless a Cause of Action against a holder or other Entity is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order (including the Confirmation Order) of the Bankruptcy Court, the Debtors and their Estates expressly reserve such Cause of Action for later adjudication or administration by the Responsible Person (including, without limitation, Causes of Action not specifically identified or described in the Plan or elsewhere or of which the Debtors may presently be unaware or which may arise or exist by reason of additional facts or circumstances unknown to the Debtors at this time or facts or circumstances which may change or be different from those the Debtors now believe to exist) and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches shall apply to such Causes of Action upon or after the entry of the Confirmation Order or Effective Date based on the Disclosure Statement, Plan or Confirmation Order, except where such Causes of Action have been released in the Plan (including, without limitation, and for the avoidance of doubt, the releases contained in Article IX.B.1 of the Plan) or any other Final Order (including the Confirmation Order).  In addition, the Debtors and their Estates expressly reserve the right of the Responsible Person to pursue or adopt any claims alleged in any lawsuit in which the Debtors are a defendant or an interested party, against any Entity, including, without limitation, the plaintiffs or co-defendants in such lawsuits.

Subject to the immediately preceding paragraph, any Entity to whom the Debtors have incurred an obligation (whether on account of services, purchase or sale of goods or otherwise), or who has received services from the Debtors or a transfer of money or property of the Debtors, or who has transacted business with the Debtors, or leased equipment or property from the Debtors should assume that any such obligation, transfer, or transaction may be reviewed by the Responsible Person subsequent to the Effective Date and may be the subject of an action after the Effective Date, regardless of whether:  (i) such Entity has filed a proof of Claim against the Debtors in the Chapter 11 Cases; (ii) the Debtors have objected to any such Entity's proof of Claim; (iii) any such Entity's Claim was included in the Schedules; (iv) the Debtors have objected to any such Entity's scheduled Claim; or (v) any such Entity's scheduled Claim has been identified by the Debtors as disputed, contingent or unliquidated.

### 6.   _Injunction_

From and after the Effective Date, all Entities are permanently enjoined from commencing or continuing in any manner against the Debtors, the Estates, the Responsible Person, the Creditors Committee, the GUC Trust, and the GUC Trustee, and their successors and assigns, and their assets and properties, as the case may be, any suit, action or other proceeding, on account of or respecting any Claim or Equity Interest, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or satisfied or to be released or satisfied pursuant to the Plan or the Confirmation Order.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, from and after the Effective Date, all Entities shall be precluded from asserting against the Debtors, the Estates, the Responsible Person, the Creditors Committee, the GUC Trust, and the GUC Trustee, and their successors and assigns and their assets and properties, any other Claims or Equity Interests based upon any documents, instruments, or any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date, solely

to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order.

The rights afforded in the Plan and the treatment of all Claims and Equity Interests in the Plan shall be in exchange for and in complete satisfaction of Claims and Equity Interests against the Debtors or any of their assets or properties solely to the extent that (a) such Claims or Equity Interests have been released or satisfied pursuant to this Plan or the Confirmation Order or (b) such Claims, Equity Interests, actions or assertions of Liens relate to property that will be distributed pursuant to this Plan or the Confirmation Order.  On the Effective Date, all such Claims against, and Equity Interests in, the Debtors shall be satisfied and released in full.

Except as otherwise expressly provided for in the Plan or in obligations issued pursuant to the Plan, all Persons and Entities are permanently enjoined, on and after the Effective Date, on account of any Claim or Equity Interest satisfied and released pursuant to the Plan or Confirmation Order, from:

> (i)     commencing or continuing in any manner any action or other proceeding of any kind against any Debtor, any Estate, the Responsible Person, the Creditors Committee, the GUC Trust, and the GUC Trustee, and their successors and assigns and their assets and properties;

> (ii)     enforcing, attaching, collecting or recovering by any manner or means any judgment, award, decree or order against any Debtor, any Estate, the Responsible Person, the Creditors Committee, the GUC Trust, and the GUC Trustee, and their successors and assigns and their assets and properties;

> (iii)     creating, perfecting or enforcing any encumbrance of any kind against any Debtor, any Estate, the Responsible Person, the Creditors Committee, the GUC Trust, and the GUC Trustee and their successors and assigns and their assets and properties; and

> (iv)     commencing or continuing in any manner any action or other proceeding of any kind in respect of any Claim or Equity Interest or Cause of Action released or settled hereunder.

**7.**     ***Releases of Liens***

Except as otherwise provided in the Plan or in any contract, instrument, release or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges or other security interests against property of the Estates distributed under the Plan shall be fully released and discharged and all of the right, title and interest of any holder of such mortgages, deeds of trust, Liens, pledges or other security interest shall revert to the Debtors.

## I.        RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall, after the Effective Date, retain such jurisdiction over the Chapter 11 Cases and all Entities with respect to all matters related to the Chapter 11 Cases, the Debtors and the Plan as is legally permissible, including, without limitation, jurisdiction to:

a.        allow, disallow, determine, liquidate, classify, estimate or establish the priority or secured or unsecured status of any Claim or Equity Interest against the Debtors, including the resolution of any request for payment of any Administrative Claim and the resolution of any and all objections to the allowance or priority of Claims;

b.        grant, deny or otherwise resolve any and all applications of Professionals or Persons retained in the Chapter 11 Cases by the Debtors or the Creditors Committee for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan, for periods ending on or before the Effective Date;

c.        resolve any matters related to the assumption, assignment or rejection of any executory contract or unexpired leases to which a Debtor is party or with respect to which a Debtor may be liable and to hear, determine and, if necessary, liquidate, any Claims arising therefrom;

d.        ensure that Distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan, including by resolving any disputes regarding the Debtors' entitlement to recover assets held by third parties and the use of Cash held in escrow pursuant to the Escrow Agreement;

e.        decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving a Debtor that may be pending on the Effective Date or instituted by the Responsible Person after the Effective Date;

f.        enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all other contracts, instruments, releases, indentures and other agreements or documents adopted in connection with the Plan or the Disclosure Statement;

g.        resolve any cases, controversies, suits or disputes that may arise in connection with the Effective Date, interpretation or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

h.        issue injunctions, enforce them, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with the Effective Date or enforcement of the Plan, except as otherwise provided in the Plan;

i.        enforce Article IX.A, Article IX.B, Article IX.C and Article IX.D of the Plan;

j.        enforce the Injunction set forth in Article IX.F of the Plan;

k.      resolve any cases, controversies, suits or disputes with respect to the releases, injunction and other provisions contained in Article IX of the Plan, and enter such orders as may be necessary or appropriate to implement or enforce all such releases, injunctions and other provisions;

l.      enter and implement such orders as necessary or appropriate if the Confirmation Order is modified, stayed, reversed, revoked or vacated;

m.      resolve any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order, the Final APA, or any contract, instrument, release, indenture or other agreement or document adopted in connection with the Plan or the Disclosure Statement or the Final APA;

n.      resolve any disputes that have or may arise with the Purchaser in connection with the transactions contemplated under or in connection with the Final APA; and

o.      enter an order and a Final Decree closing the Chapter 11 Cases.

## J.      MISCELLANEOUS PROVISIONS

### 1.      *Modification of Plan*

Subject to the limitations contained in the Plan and <u>provided</u> that the Committee shall have the right to be consulted on and consent to any proposed modification of the Confirmation Order and the Plan that adversely affects the rights of holders of General Unsecured Claims, the GUC Trust or the GUC Trustee:  (1) the Debtors, with the consent of the Senior Secured Term Loan Agent and, solely with respect to Articles III.B.3, IV.B, IV.C, IV.D, IV.I, IV.L, IV.P, VI, IX.B and IX.C of the Plan, the Creditors Committee, reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code; *provided, however*, that any pre-Confirmation Date amendments shall not materially or adversely affect the interests, rights or treatment of any Allowed Claims or Equity Interests under the Plan; and (2) after the entry of the Confirmation Order, the Debtors, Responsible Person or the GUC Trustee may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, or remedy any defect or omission or reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan.

### 2.      *Revocation of Plan*

The Debtors reserve the right to revoke or withdraw the Plan prior to the entry of the Confirmation Order, and to file subsequent chapter 11 plans.  If the Debtors revoke or withdraw the Plan or if entry of the Confirmation Order or the Effective Date does not occur, then:  (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan, assumption or rejection of executory contracts effected by the Plan, and any document or agreement executed pursuant hereto shall be deemed null and void; and (3) nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims by or against, or any Equity Interests in, such Debtor or any other Entity; (b) prejudice in any manner the rights of the

Debtors or any other Entity; or (c) constitute an admission of any sort by the Debtors or any other Entity.

### 3. *Binding Effect*

On the Effective Date, the provisions of the Plan shall bind any holder of a Claim against, or Equity Interest in, a Debtor and such holder's respective successors and assigns, whether or not the Claim or Equity Interest of such holder is Impaired under the Plan, whether or not such holder has accepted the Plan and whether or not such holder is entitled to a Distribution under the Plan.

### 4. *Successors and Assigns*

The rights, benefits and obligations of any Entity named or referred to herein shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor or assign of such Entity.

### 5. *Governing Law*

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, unless otherwise stated, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the state of Delaware without giving effect to the principles of conflict of laws thereof.

### 6. *Reservation of Rights*

Except as expressly set forth herein, the Plan shall have no force or effect unless and until the Effective Date occurs.  Neither the filing of the Plan, any statement or provision contained herein, nor the taking of any action by a Debtor or any Entity with respect to the Plan shall be or shall be deemed to be an admission or waiver of any rights of:  (1) any Debtor with respect to the holders of Claims or Equity Interests or other parties in interest; or (2) any holder of a Claim or other party in interest prior to the Effective Date.

### 7. *Article 1146 Exemption*

Pursuant to section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct the appropriate state or local governmental officials or agents to forego the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.

### 8. *Section 1125(e) Good Faith Compliance*

Confirmation of the Plan shall act as a finding by the Court that the Debtors and each of their respective Representatives have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

9.      *Further Assurances*

The Debtors, the Responsible Person and the GUC Trustee, all holders of Claims receiving Distributions hereunder and all other parties in interest shall, from time to time, prepare, execute and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan or the Confirmation Order.

10.     *Service of Documents*

Any pleading, notice or other document required by the Plan to be served on or delivered to the Debtors shall be sent by first class U.S. mail, postage prepaid as follows:

**To the Debtors:**

OSH 1 Liquidating Corporation
c/o FTI Consulting, Inc.
One Front Street
Suite 1600
San Francisco, CA 94111
Attn.:  Andrew Hinkelman

*with a copy to:*

DLA Piper, LLP (US)
203 N. LaSalle Street, Suite 1900
Chicago, Illinois  60601
Attn:  Richard A. Chesley
Chun I. Jang
Daniel M. Simon

- and -

DLA Piper, LLP (US)
919 North Market Street, Suite 1500
Wilmington, Delaware 19801
Attn:  Stuart M. Brown

**To the Responsible Person:**

Bradley Dietz
136 East 64th Street
Apartment 8C
New York, NY 10065

*with a copy to:*

Dechert LLP
1095 Avenue of the Americas
New York, NY 10036
Attn: Michael J. Sage

**To the GUC Trustee:**

Solution Trust
Attn: Peter S. Kravitz
29209 Canwood Street
Suite 210
Agoura Hills, CA 91301

*with a copy to:*

Pachulski Stang Ziehl & Jones, LLP
919 North Market Street
17th Floor
Wilmington, DE 19801
Attn: Bradford J. Sandler and Shirley S. Cho

### 11.     *Filing of Additional Documents*

On or before the Effective Date, the Debtors may file with the Bankruptcy Court all agreements and other documents that may be necessary or appropriate to effectuate and further evidence the terms and conditions hereof.

### 12.     *No Stay of Confirmation Order*

The Debtors shall request that the Court waive stay of enforcement of the Confirmation Order otherwise applicable, including pursuant to Federal Rules of Bankruptcy Procedure 3020(e), 6004(h) and 7062.

## ARTICLE VII.

## CERTAIN FACTORS AFFECTING THE DEBTORS

### A.    CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1.     *Risk of Non-Confirmation of the Plan of Liquidation*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate resolicitation of votes.

2. *__Non-Consensual Confirmation__*

In the event any impaired class of claims or equity interests does not accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired Classes. Because Class 4 (Equity Interests) is deemed to reject the Plan, these requirements must be satisfied with respect to such Class.  The Debtors believe that the Plan satisfies these requirements.

3. *__Risk of Delay in Confirmation of the Plan__*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to such timing.  In addition, as with any judicial proceeding, there are risks of unavoidable delay with a chapter 11 proceeding and there are risks of objections from certain stakeholders.  Any material delay in the confirmation of the Plan, or the threat of rejection of the Plan by the Bankruptcy Court, would add substantial expense and uncertainty to the process.

**B.    ADDITIONAL FACTORS TO BE CONSIDERED**

1. *__The Debtors Have No Duty to Update__*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

2. *__No Representations Outside This Disclosure Statement Are Authorized__*

No representations concerning or related to the Debtors, the Chapter 11 Cases or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

3. *__Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary__*

Certain of the information contained in this Disclosure Statement is, by nature, forward looking and contains estimates and assumptions which might ultimately prove to be incorrect and projections which may be materially different from actual future experiences.  There are uncertainties associated with any projections and estimates, and the projections and estimates herein should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be allowed.

### 4.    *Debtors Could Withdraw the Plan*

Under the Plan, the Debtors could withdraw the Plan at any time.

### 5.    *No Legal or Tax Advice Is Provided to You by This Disclosure Statement*

The contents of this Disclosure Statement should <u>not</u> be construed as legal, business or tax advice.  Each creditor or equity interest holder should consult his, her or its own legal counsel and accountant as to legal, tax and other matters concerning his, her or its Claim or Equity Interest.

This Disclosure Statement is <u>not</u> legal advice to you.  This Disclosure Statement may <u>not</u> be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### 6.    <u>*No Admission Made*</u>

Nothing contained herein shall constitute an admission of, or be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Equity Interests.

## ARTICLE VIII.

## <u>CONFIRMATION OF THE PLAN OF LIQUIDATION</u>

**A.    CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on confirmation of a plan of liquidation.  The Bankruptcy Court has scheduled the confirmation hearing for December 20, 2013.  The confirmation hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement of the adjourned date made at the confirmation hearing or any subsequent adjourned confirmation hearing.

Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules, must set forth the name of the objector, the nature and amount of Claims or interests held or asserted by the objector against the Debtors' estate(s) or property, the basis for the objection and the specific grounds therefor, and must be filed with the Bankruptcy Court, with a copy to Chambers, together with proof of service thereof, and served upon (a) counsel to the Debtors: DLA Piper LLP (US), 203 N. LaSalle Street, Suite 1900, Chicago, IL 60601 (Fax: 312-236-7516) (Attn: Richard A. Chesley, Esq. (richard.chesley@dlapiper.com)) and DLA Piper LLP (US), 919 N. Market Street, Suite 1500, Wilmington, DE 19801 (Fax: 302-394-2341) (Attn: Stuart M. Brown, Esq. (stuart.brown@dlapiper.com)); (b) counsel to the Official Committee of Unsecured Creditors:  Pachulski Stang Ziehl & Jones, LLP,  919 North Market Street, 17th Floor, Wilmington, Delaware 19801 (Attn: Bradford J. Sandler (bsandler@pszjlaw.com)); (c) counsel to the Senior Secured Term Loan Administrative Agent:  Dechert LLP, 1095 Avenue of the Americas, New York, NY 10036 (Attn: Michael J. Sage, Esq. (michael.sage@dechert.com)); and (d) the Office of the United States Trustee: US Trustee, 844 King Street, Suite 2207, Lockbox #35, Wilmington, Delaware, 19899-0035 (Fax: 302-573-6497) (Attn:  Tiiara Patton,

Esq. (tiiara.patton@usdoj.gov)), so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on December 13, 2013.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.  UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

**B.**     **REQUIREMENTS FOR CONFIRMATION OF THE PLAN OF LIQUIDATION**

**1.**     ***Requirements of Section 1129(a) of the Bankruptcy Code***

a.     General Requirements

At the confirmation hearing, the Bankruptcy Court will determine, among others, whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied:

1.     The Plan complies with the applicable provisions of the Bankruptcy Code.

2.     The Debtors have complied with the applicable provisions of the Bankruptcy Code.

3.     The Plan has been proposed in good faith and not by any means proscribed by law.

4.     Any payment made or promised by the Debtors or by a Person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable.

5.     The Debtors have disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Debtors, an affiliate of the Debtors participating in a Plan with the Debtors or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy, and the Debtors have disclosed the identity of any insider that will be employed or retained by the Debtors and the nature of any compensation for such insider.

6.     With respect to each class of claims or equity interests, each holder of an impaired claim or impaired equity interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's claim or equity interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code. See discussion of "Best Interests Test" below.

7.      Except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each class of claims or equity interests has either accepted the Plan or is not impaired under the Plan.

8.      Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, subject to Article II of the Plan, the Plan generally provides that administrative expenses and priority claims will be paid in full on the later of (i) the Effective Date, (ii) the date such claim becomes Allowed or as soon as practicable thereafter and (iii) the date such Allowed claim is payable under applicable non-bankruptcy law.

9.      At least one class of impaired claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a claim in such class.

10.     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.  See discussion of "Feasibility" below.

        b.      Best Interests Test

        Each holder of a Claim or Equity Interest in an Impaired Class must either (i) accept the Plan or (ii) receive or retain under the Plan Cash or property of a value, as of the Effective Date of the Plan, that is not less than the value such holder of a Claim or Equity Interest would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  The Bankruptcy Court will determine whether the Cash and property issued under the Plan to each Class equals or exceeds the value that would be allocated to such holders of Claims or Equity Interests in a liquidation under chapter 7 of the Bankruptcy Code.  The Debtors believe the holders of Claims against and Equity Interests in the Debtors will have an equal or greater recovery as a result of the liquidation of the Debtors' assets as discussed herein and under the Plan than could be realized in a chapter 7 liquidation for the following reasons.

        The Plan is a liquidating plan and, therefore, is not seeking to require Creditors to accept non-Cash consideration so that the Estates could pursue going concern value.  Accordingly, the only question is whether the Creditors will have recovered more (or at least as much) under the Plan than they would recover through an asset liquidation by a chapter 7 trustee.

        To determine the value that a holder of a Claim or Equity Interest in an Impaired Class would receive if the Debtors were liquidated under chapter 7, the Bankruptcy Court must determine the aggregate dollar amount that would be generated from the liquidation of the Debtors' assets if the Debtors' Chapter 11 Cases had been converted to a chapter 7 liquidation case and the Debtors' assets were liquidated by a chapter 7 trustee.  The liquidation value would consist of the net proceeds from the disposition of the Debtors' assets, augmented by Cash held by the Debtors and reduced by certain increased costs and Claims that arise in a chapter 7 liquidation case that do not arise in a chapter 11 reorganization case.

        As explained below, the liquidation value available for satisfaction of Claims and Equity Interests in the Debtors would be reduced by:  (a) the costs, fees and expenses of the liquidation

under chapter 7, which would include disposition expenses and the compensation of a trustee and his or her counsel and other professionals retained, (b) the fees of the chapter 7 trustee and (c) certain other costs arising from conversion of the Chapter 11 Cases to chapter 7.

In addition, converting the Chapter 11 Cases to a chapter 7 liquidation at this stage of the winddown would result in an immense waste of the Debtors' resources that were already expended in connection with the sale of the Debtors' assets and would delay converting the remaining assets to Cash.  It would also result in substantial additional claims against the Estates.

Moreover, under the Plan, the Debtors will avoid the increased costs and expenses of a chapter 7 liquidation, including the fees payable to a chapter 7 trustee and his or her professionals.  Although the Debtors have already incurred many of the expenses associated with generating the proceeds, the Cash to be distributed to Creditors would be reduced by the chapter 7 trustee's statutory fee, which is calculated on a sliding scale from which the maximum compensation is determined based on the total amount of moneys disbursed or turned over by the chapter 7 trustee.  Section 326(a) of the Bankruptcy Code permits reasonable compensation not to exceed 3% of the proceeds in excess of $1 million distributable to creditors.[3]  The chapter 7 trustee's professionals, including legal counsel and accountants, would add substantial administrative expenses that would be entitled to be paid ahead of Allowed Claims against the Debtors.   Moreover, these chapter 7 trustee fees would reduce the assets available for distribution to the Estates' Creditors from additional recoveries such as preferential payments, expunged administrative claims and the proceeds of successful Estate litigation or settlement.  In contrast, the Responsible Person and GUC Trustee will be highly familiar with the Debtors' operations and the issues pertaining thereto and, therefore, the Estates will avoid the significant administrative burden associated with the familiarization process of a chapter 7 trustee and his or her legal and accounting professionals.

It is also anticipated that a chapter 7 liquidation would result in a significant delay in payments being made to creditors.  Bankruptcy Rule 3002(c) provides that conversion of chapter 11 cases to chapter 7 will trigger a new bar date for filing claims against the Estates, and that the new bar date will be more than 90 days after the chapter 11 cases convert.  Not only would a chapter 7 liquidation delay distribution to creditors, but it is possible that additional claims that were not asserted in the Chapter 11 Cases, or were late-filed, could be filed against the Estates.  The Debtors have received and are analyzing late-filed claims and may file claims objections in the near future.  Reopening the bar date in connection with conversion to chapter 7 would provide these and other claimants an additional opportunity to timely file claims against the Estates.  Moreover, the Debtors would lose the benefit of having an established Administrative Claims Bar Date.

Attached hereto as <u>Exhibit C</u> is the Debtors' liquidation analysis and recovery summary.

---

[3]    Section 326(a) of the Bankruptcy Code permits a chapter 7 trustee to receive 25% of the first $5,000 distributed to creditors, 10% of additional amounts up to $50,000, 5% of additional distributions up to $1 million and reasonable compensation up to 3% of distributions in excess of $1 million.

For the reasons set forth above and in the liquidation analysis set forth on <u>Exhibit C</u>, the Debtors believe that the Plan provides a superior recovery for holders of Claims and Equity Interests, and the Plan meets the requirements of the Best Interest Test.

c.    Feasibility

The Bankruptcy Code requires a debtor to demonstrate that confirmation of a plan of reorganization is not likely to be followed by the liquidation or the need for further financial reorganization of a debtor unless so provided by the plan of reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their financial obligations as contemplated thereunder. These projections are based upon the assumption that the Plan will be confirmed by the Bankruptcy Court, and for projection purposes, that the Effective Date of the Plan and its substantial consummation will take place on or before December 31, 2013. The Debtors believe they will be able to make all payments required to be made pursuant to the Plan.

**2.    <u>*Requirements of Section 1129(b) of the Bankruptcy Code*</u>**

The Bankruptcy Court may confirm the Plan over the rejection or deemed rejection of the Plan by a class of claims or equity interests if the Plan "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

*No Unfair Discrimination*. This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under a plan of reorganization. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."

*Fair and Equitable Test*. This test applies to classes of different priority (e.g., unsecured versus secured) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. As to the dissenting class, the test sets different standards, depending on the type of claims or interests in such class:

*Unsecured Claims*. Either (i) each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed unsecured claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive or retain any property under the plan of reorganization.

*Equity Interests*. Either (i) each equity interest holder will receive or retain under the plan of reorganization property of a value equal to the greater of (a) the fixed liquidation preference or redemption price, if any, of such stock and (b) the value of the stock or (ii) the holders of interests that are junior to the equity interests of the dissenting class will not receive or retain any property under the plan of reorganization.

The Debtors believe the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" requirement, notwithstanding that Class 4 will receive no Distribution, because as to such Class, there is no class of equal priority receiving more favorable treatment and no class that is junior to such a dissenting class will receive or retain any property on account of the Equity Interests in such class.

## ARTICLE IX.

## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN OF LIQUIDATION

If the Plan is not confirmed and consummated, the alternatives to the Plan include (i) liquidation of the Debtors under chapter 7 of the Bankruptcy Code and (ii) an alternative chapter 11 plan of reorganization.

### A.   LIQUIDATION UNDER CHAPTER 7

If no plan can be confirmed, the Debtors' chapter 11 cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.   The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to creditors than those provided for in the Plan because of (i) the likelihood that the assets of the Debtors would have to be sold or otherwise disposed of in a less orderly fashion over a shorter period of time, (ii) additional administrative expenses involved in the appointment of a trustee and (iii) additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other executory contracts in connection with a cessation of the Debtors' operations.

### B.   ALTERNATIVE PLAN OF REORGANIZATION

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different chapter 11 plan of reorganization.   Such a plan of reorganization might involve either a reorganization and continuation of the Debtors' business or an orderly liquidation of their assets under chapter 11.   With respect to an alternative plan, the Debtors have explored various alternatives in connection with the formulation and development of the Plan.   The Debtors believe that the Plan, as described herein, enables creditors and equity holders to realize the most value under the circumstances.

## ARTICLE X.

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following is a summary of certain U.S. federal income tax consequences of the Plan to certain holders of Claims and Equity Interests. This summary is based on the Tax Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change, with possible retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained, and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. Events occurring after the date of the Disclosure Statement, including changes in law and changes in

administrative positions, could affect the U.S. federal income tax consequences described herein. There can be no assurance that the IRS will not challenge one or more of the tax consequences of the Plan described below.

This summary does not apply to holders of Claims or Equity Interests that are otherwise subject to special treatment under U.S. federal income tax law (including, for example, banks, governmental authorities or agencies, financial institutions, insurance companies, pass-through entities, tax-exempt organizations, brokers and dealers in securities, mutual funds, small business investment companies, employees, persons who receive their Claims or Equity Interests pursuant to the exercise of an employee stock option or otherwise as compensation, persons holding Claims or Equity Interests that are a hedge against, or that are hedged against, currency risk or that are part of a straddle, constructive sale, or conversion transaction and regulated investment companies). The following discussion assumes that holders of Allowed Claims hold such Claims as "capital assets" within the meaning of section 1221 of the Tax Code. Moreover, this summary does not purport to cover all aspects of U.S. federal income taxation that may apply to holders of Allowed Claims based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than U.S. federal income tax law, including under state, local, or foreign tax law.

For purposes of this summary, a "U.S. Holder" means a holder of Claims or Equity Interests that, in any case, is, for U.S. federal income tax purposes: (i) an individual who is a citizen or resident of the United States; (ii) a corporation, or other entity treated as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia; (iii) an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or (iv) a trust (x) if a court within the United States is able to exercise primary supervision over its administration and one or more U.S. persons have the authority to control all of the substantial decisions of such trust or (y) that has a valid election in effect under applicable Treasury Regulations to be treated as a U.S. person.

A "Non-US Holder" means a holder of Claims that is not a U.S. Holder and is, for U.S. federal income tax purposes, an individual, corporation (or other entity treated as a corporation for U.S. federal income tax purposes), estate or trust.

If an entity taxable as a partnership for U.S. federal income tax purposes holds Claims, the U.S. federal income tax treatment of a partner (or other owner) of the entity generally will depend on the status of the partner (or other owner) and the activities of the entity. Such partner (or other owner) should consult its tax advisor as to the tax consequences of the entity's ownership or disposition of Claims.

The U.S. federal income tax consequences of the Plan are complex. The following summary is for information purposes only and is not a substitute for careful tax planning and advice based on the particular circumstances of each holder of a Claim or Equity Interest. Each holder of a Claim or Equity Interest is urged to consult his, her, or its own tax advisors as to the U.S. federal income tax consequences, as well as other tax consequences, including under any applicable state, local, and foreign law, upon implementation of the Plan.

IRS CIRCULAR 230 DISCLOSURE: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE TAX CODE. THE TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ATTACHMENTS) WAS WRITTEN TO SUPPORT THE PROMOTION OR MARKETING OF THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR

## A.   GENERAL CONSEQUENCES TO U.S. HOLDERS OF CLAIMS AND EQUITY INTERESTS

### 1.   *Realization and Recognition of Gain or Loss, In General*

The federal income tax consequences of the implementation of the Plan to a U.S. Holder of a Claim or Equity Interest will depend, among other things, upon the origin of the holder's Claim, when the holder receives payment in respect of such Claim or Equity Interest, whether the U.S. Holder reports income using the accrual or cash method of tax accounting, whether the holder acquired its Claim at a discount, and whether the U.S. Holder has taken a bad debt deduction or worthless security deduction with respect to such Claim or Equity Interest. A U.S. Holder of an Equity Interest should consult its tax advisor regarding the timing and amount of any potential worthless stock loss.

Generally, a U.S. Holder of an Allowed Claim will realize gain or loss on the exchange under the Plan of its Allowed Claim for Cash, in an amount equal to the difference between (i) the sum of the amount of any Cash and the fair market value on the date of the exchange of any other property received by the U.S. Holder, and (ii) the adjusted tax basis of the Allowed Claim exchanged therefor (other than basis attributable to accrued but unpaid interest previously included in the U.S. Holder's taxable income). With respect to the treatment of accrued but unpaid interest and amounts allocable thereto, see section X.A.3 — "Allocation of Consideration to Interest" below.

When gain or loss is recognized as discussed below, such gain or loss may be long-term capital gain or loss if the Claim or Equity Interest disposed of is a capital asset in the hands of the U.S. Holder and has been held for more than one year. Each U.S. Holder of an Allowed Claim or Equity Interest should consult its own tax advisor to determine whether gain or loss recognized by such holder will be long-term capital gain or loss and the specific tax effect thereof on such holder.

### 2.   *Holders of Claims in All Classes Except Class 4*

Except for Class 4, the Plan provides, in certain circumstances, for a distribution of Cash, as distributed from time to time (but in no instance to exceed the amount of the Allowed Claim) to each Allowed Claim against the Debtors.  A U.S. Holder of an Allowed Claim in the foregoing Classes generally will realize gain or loss in an amount equal to the difference, if any,

between (a) the amount of Cash and the fair market value of any other property received in the exchange (other than amounts allocable to accrued but unpaid interest) and (b) the U.S. Holder's adjusted tax basis in the Claim (other than in respect of accrued but unpaid interest). It is possible that any loss, or a portion of any gain, realized by a holder of a Claim may have to be deferred until all of the distributions to such holder are received.

As discussed in the next section, the amount of Cash or other property received in respect of Claims for accrued but unpaid interest will be taxed as ordinary income, except to the extent previously included in income by a U.S. Holder under such holder's method of tax accounting.

### 3. *Allocation of Consideration to Interest*

All distributions in respect of Allowed Claims will be allocated first to the principal amount of the Allowed Claim (as determined for federal income tax purposes), with any excess allocated to accrued but unpaid interest (but solely to the extent that interest is an allowable portion of such Allowed Claim). However, there is no assurance that such allocation would be respected by the IRS for federal income tax purposes. In general, to the extent any amount received by a U.S. Holder of a debt instrument is received in satisfaction of accrued interest during its holding period, such amount will be taxable to the holder as interest income (if not previously included in the holder's gross income under the holder's normal method of accounting). Conversely, a holder generally recognizes a deductible loss to the extent any accrued interest claimed was previously included in its gross income and is not paid in full. Each U.S. Holder of an Allowed Claim is urged to consult its own tax advisor regarding the allocation of consideration and the taxation or deductibility of unpaid interest for tax purposes.

### 4. *Market Discount*

A U.S. Holder will be considered to have acquired a Claim at a market discount if its tax basis in the Claim immediately after acquisition is less than the sum of all amounts payable thereon (other than payments of qualified stated interest, as defined in the Tax Code) after the acquisition date, subject to a statutorily-defined "de minimis" exception. Market discount generally accrues on a straight line basis from the acquisition date over the remaining term of the obligation or, at the U.S. Holder's election, under a constant yield method. A U.S. Holder that acquired a Claim at a market discount previously may have elected to include the market discount in income as it accrued over the term of the Claim.

A U.S. Holder that acquires a Claim at a market discount generally is required to treat any gain realized on the disposition of the instrument as ordinary income (instead of capital gain) to the extent of accrued market discount not previously included in gross income by the holder.

### 5. *Bad Debt Deduction and Worthless Securities Deduction*

A U.S. Holder of an Allowed Claim that is not a security for purposes of section 165(g) of the Tax Code who receives, pursuant to the Plan, an amount less than such holder's tax basis in that Allowed Claim may be entitled in the year of receipt (or in an earlier year) to a bad debt deduction under section 166(a) of the Tax Code or may be entitled to a loss under section 165(a) in the year of receipt. A U.S. Holder of a security, the Allowed Claim with respect to which is

wholly worthless, may be entitled to a worthless securities deduction under sections 165(g) and 165(a) of the Tax Code. A worthless securities deduction is generally treated as a loss from the sale or exchange of a capital asset. U.S. Holders should consult their own tax advisers as to the appropriate tax year in which to claim a worthless securities deduction. The rules governing the timing and amount of deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a loss or deduction is claimed. Such loss or deduction would be limited to the U.S. Holder's adjusted tax basis in the indebtedness underlying its Allowed Claim. U.S. Holders of Allowed Claims are urged to consult their own tax advisors with respect to their ability to take any loss or deduction described above.

### 6.    _Limitation on Use of Capital Losses_

A U.S. Holder of a Claim who recognizes capital losses as a result of the distributions under the Plan or as a result of a deduction described in the preceding paragraph will be subject to limits on the use of such capital losses. For a non-corporate holder, capital losses may be used to offset any capital gains (without regard to holding periods), and also ordinary income to the extent of (1) $3,000 ($1,500 for married individuals filing separate returns) or (2) the excess of the capital losses over the capital gains. A non-corporate holder may carry over unused capital losses and apply them against future capital gains and a portion of their ordinary income for an unlimited number of years. For corporate holders, capital losses may only be used to offset capital gains. A corporate holder that has more capital losses than may be used in a tax year may carry back unused capital losses to the three years preceding the capital loss year, but may carry over unused capital losses for the five years following the capital loss year

### B.    TAX TREATMENT OF GUC TRUST AND U.S. HOLDERS OF GUC TRUST BENEFICIAL INTERESTS

### 1.    _Classification of the GUC Trust_

The GUC Trust is intended to qualify as a "liquidating trust" for U.S. federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for U.S. federal income tax purposes as a "grantor trust" (i.e., all income and loss is taxed directly to the liquidating trust beneficiaries). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for U.S. federal income tax purposes. The IRS, in Revenue Procedure 94-45, 1994-2 C.B. 684, set forth the general criteria for obtaining an IRS ruling as to the grantor trust status of a liquidating trust under a chapter 11 plan.  The GUC Trust will be structured to comply with such general criteria.  Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties (including, without limitation, the Debtors, the GUC Trustee, and holders of Allowed General Unsecured Claims) will be required to treat, for U.S. federal income tax purposes, the GUC Trust as a grantor trust of which holders of Allowed General Unsecured Claims are the owners and grantors. The following discussion assumes that the GUC Trust will be so respected for U.S. federal income tax purposes. However, no opinion of counsel has been requested, and the GUC Trustee may or may not obtain a ruling from the IRS, concerning the tax status of the GUC Trust as a grantor trust.  Accordingly, there can be no assurance that the IRS would not take a contrary position.  If the IRS were to challenge successfully the classification of the GUC Trust, the U.S. federal income tax consequences to the

GUC Trust could vary from those discussed herein (including the potential for an entity-level tax on income of the GUC Trust).

### 2.    *General Tax Reporting by the GUC Trust and GUC Trust Beneficiaries*

For all U.S. federal income tax purposes, all parties (including, without limitation, the Debtors, the GUC Trustee and holders of Allowed General Unsecured Claims) shall treat the transfer of the assets to the GUC Trust in accordance with the terms of the Plan. Pursuant to the Plan, the GUC Trust assets (other than assets allocable to Disputed Claims) shall be treated, for U.S. federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Claims (with each holder receiving an undivided interest in such assets in accordance with their economic interests in such assets), followed by the transfer by the holders of such assets to the GUC Trust. Accordingly, all parties shall treat the GUC Trust as a grantor trust of which the holders of Allowed General Unsecured Claims are the owners and grantors, and treat such holders as the direct owners of an undivided interest in the GUC Trust assets (other than any assets allocable to Disputed Claims), consistent with their economic interests therein, for all U.S. federal income tax purposes.

Allocations of taxable income of the GUC Trust (other than taxable income allocable to any assets allocable to, or retained on account of, Disputed Claims) shall be determined by reference to the manner in which an amount of cash equal to such taxable income would be distributed (were such cash permitted to be distributed at such time) if, immediately prior to such deemed distribution, the GUC Trust had distributed all its assets (valued at their tax book value, and other than assets allocable to Disputed Claims) to the holders of Allowed General Unsecured Claims, adjusted for prior taxable income and loss and taking into account all prior and concurrent distributions from the GUC Trust. Similarly, taxable loss of the GUC Trust shall be allocated by reference to the manner in which an economic loss would be borne immediately after a liquidating distribution of the remaining GUC Trust assets. The tax book value of the GUC Trust assets for this purpose shall equal their fair market value on the date of the transfer of the GUC Trust assets to the GUC Trust, adjusted in accordance with tax accounting principles prescribed by the Tax Code, applicable Treasury Regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the GUC Trust assets to the GUC Trust, the GUC Trustee shall make a good faith valuation of the GUC Trust assets. All parties to the GUC Trust must consistently use such valuation for all U.S. federal income tax purposes. The valuation will be made available from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a holder of an Allowed General Unsecured Claim will be treated as income or loss with respect to such holder's undivided interest in the GUC Trust assets, and not as income or loss with respect to its prior Allowed Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the holder.

The U.S. federal income tax obligations of a U.S. Holder with respect to its GUC Trust beneficial interest are not dependent on the GUC Trust distributing any cash or other proceeds. Thus, a holder may incur a U.S. federal income tax liability with respect to its allocable share of

the GUC Trust's income even if the GUC Trust does not make a concurrent distribution to the holder. In general, other than in respect of Cash retained on account of Disputed Claims and distributions resulting from undeliverable distributions (the subsequent distribution of which still relates to a holder's Allowed Claim), a distribution of cash by the GUC Trust will not be separately taxable to a GUC Trust beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the GUC Trust). Holders are urged to consult their tax advisors regarding the appropriate federal income tax treatment of any subsequent distributions of cash originally retained by the GUC Trust on account of Disputed Claims.

## C.    INFORMATION REPORTING AND WITHHOLDING

Distributions under the Plan are subject to applicable tax reporting and withholding. Under federal income tax law, interest, dividends and other reportable payments may, under certain circumstances, be subject to "backup withholding" at then applicable rates (currently 28%). Backup withholding generally applies if the U.S. Holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN it provided is correct and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax, provided the required information is timely provided to the IRS. Certain persons are exempt from backup withholding, including, in most circumstances, corporations and financial institutions.

Treasury Regulations generally require a taxpayer to disclose certain transactions on its federal income tax return, including, among others, certain transactions that result in a taxpayer claiming a loss in excess of a specified threshold. Holders are urged to consult their tax advisors as to whether the transactions contemplated by the Plan would be subject to these or other disclosure or information reporting requirements. The foregoing summary is provided for informational purposes only. U.S. Holders of Claims are urged to consult their tax advisors concerning the federal, state, local and foreign tax consequences of the Plan.

### ARTICLE XI.

### DEFINITIONS AND INTERPRETATION

## A.    DEFINITIONS

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:

a.    "*Accrued Professional Compensation*" means, at any given moment, all accrued and/or unpaid fees and expenses (including, without limitation, fees or expenses allowed or awarded by a Final Order of the Bankruptcy Court) for legal, financial advisory, accounting, liquidation and other professional services and reimbursement of expenses of such professionals that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code, or

otherwise rendered prior to the Effective Date, including in connection with (a) applications filed pursuant to sections 330 and 331 of the Bankruptcy Code; (b) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Chapter 11 Cases that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount; and (c) applications for allowance of Administrative Expenses arising under sections 503(b)(2), 503(b)(3), 503(b)(4) or 503(b)(6) of the Bankruptcy Code.  To the extent the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

"*Administrative Claims*" means Claims that have been timely filed before the Administrative Claims Bar Date, pursuant to the deadline and procedure set forth in the Confirmation Order (except as otherwise provided by a separate order of the Bankruptcy Court), for costs and expenses of administration under sections 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (such as wages, salaries or commissions for services and payments for goods and other services and leased premises).  Any fees or charges assessed against the estates of the Debtors under section 1930 of chapter 123 of title 28 of the United States Code are excluded from the definition of Administrative Expense Claim and shall be paid in accordance with Article V.N of the Plan.  Notwithstanding anything to the contrary herein, the filing of an Administrative Claim shall not be required in order to receive payment for any tax liability described in sections 503(b)(1)(B) and (C) in accordance with section 503(b)(1)(D) of the Bankruptcy Code.

"*Administrative Claims Bar Date*" means the first Business Day that is thirty (30) days after the Effective Date and is the deadline for a holder of an Administrative Claim to file a request with the Bankruptcy Court for payment of such Administrative Claim in the manner indicated in Article II herein.

"*Agency Agreement*" has the meaning set forth in Article V.

"*Allowed*" means, with respect to any Claim against the Debtors, except as otherwise provided herein:  (a) a Claim that has been scheduled by the Debtors in their Schedules filed in the Chapter 11 Cases as other than disputed, contingent or unliquidated and as to which the Debtors or other parties-in-interest have not filed an objection by the Claims Objection Bar Date; (b) a Claim filed in the Chapter 11 Cases and that either is not Disputed or has been allowed by a Final Order; or (c) a Claim filed in the Chapter 11 Cases that is allowed:  (i)  in any stipulation of amount and nature of Claim executed prior to the Effective Date and approved by the Bankruptcy Court; (ii) in any stipulation  or written agreement with the Responsible Person or GUC Trustee, as applicable, of amount and nature of Claim executed on or after the Effective Date; or (iii) in or pursuant to any contract, instrument or other agreement entered into or assumed in connection herewith; (d) a Claim that is allowed pursuant to the terms of the Plan or (e) a Disputed Claim that the Debtors, Responsible Person and/or the GUC Trustee (as applicable) ultimately determine will not be objected to (such claim being deemed Allowed at the time such determination is made).

"*Ballot*" has the meaning set forth in Article I.

"*Bankruptcy Code*" means Articles 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

"*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Delaware.

"*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure, promulgated under 28 U.S.C. § 2075, the Local Rules of Bankruptcy Practice and Procedure of the U.S. Bankruptcy Court for the District of Delaware, the Local Rules of Civil Practice and Procedure of the U.S. District Court for the District of Delaware, and general orders and chambers procedures of the Bankruptcy Court, each as applicable to the Chapter 11 Cases and as amended from time to time.

"*Bar Date*" has the meaning set forth in Article V.

"*Bar Date Order*" means that certain order of the Bankruptcy Court dated as of September 5, 2013 [D.I. 540], establishing October 25, 2013 as the general bar date for filing proofs of Claim in the Chapter 11 Cases, with only those exceptions permitted thereby.

"*BMC*" means BMC Group, Inc., the Debtors' Claims Agent.

"*Books and Records*" means, with respect to the Debtors, all books and records of such Debtor(s), including, without limitation, all documents and communications of any kind, whether physical or electronic.

"*Business Day*" means any day, other than a Saturday, Sunday or "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)).

"*Cash*" means cash and cash equivalents in certified or immediately available U.S. funds, including but not limited to bank deposits, checks and similar items.

"*Causes of Action*" means all claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of setoff, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and crossclaims (including, without limitation, all claims and any avoidance, preference, recovery, subordination or other actions against insiders and/or any other entities under the Bankruptcy Code) against any Person or Entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

"*Chapter 11 Cases*" means the chapter 11 cases commenced when the Debtors each filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on the Petition Date and with the following case numbers:  13-11565 (CSS), 13-11566 (CSS) and 13-11567 (CSS), which are jointly administered under case number 13-11565 (CSS).

"*Claim*" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal,

equitable, secured, or unsecured; or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured; or (c) any other claim, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Claims Agent*" means BMC Group, Inc., the Bankruptcy Court appointed claims, and noticing agent in these jointly administered Chapter 11 Cases.

"*Claims Objection Bar Date*" means the bar date for objecting to proofs of Claim, which shall be one hundred twenty (120) days after the Effective Date; *provided*, *however*, that the Debtors, the Responsible Person or the GUC Trustee may seek additional extensions of this date from the Bankruptcy Court, with notice only to those parties entitled to notice in the Chapter 11 Cases pursuant to Bankruptcy Rule 2002. A party requesting to extend the Claims Objection Bar Date may specify which entities may benefit from such an extension.

"*Class*" means a category of holders of Claims or Equity Interests as set forth in **Error! Reference source not found.** herein and pursuant to section 1122(a) of the Bankruptcy Code.

"*Company*" has the meaning set forth in the Summary.

"*Confirmation Date*" means the date on which the Confirmation Order is entered by the Bankruptcy Court.

"*Confirmation Hearing*" means the hearing held by the Bankruptcy Court, pursuant to section 1128 of the Bankruptcy Code, to consider the confirmation of the Plan under section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

"*Confirmation Order*" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code in form and substance satisfactory to the Senior Secured Term Loan Lenders and, solely with respect to the provisions of the Confirmation Order approving Articles III.B.3, IV.B, IV.C, IV.D, IV.I, IV.L, IV.P, VI, IX.B and IX.C of the Plan, the Creditors Committee; provided however, the Creditors Committee shall have the right to be consulted on and consent to any proposed modification of the Confirmation Order that adversely affects the rights of holders of General Unsecured Claims, the GUC Trust or the GUC Trustee.

"*Creditor*" shall have the meaning in section 101(10) of the Bankruptcy Code.

"*Creditors Committee*" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the U.S. Trustee.

"*Debtors*" means collectively, OSH 1 Liquidating Corporation, OSH 2 Liquidating LLC and OSH 3 Liquidating LLC and where applicable, the Estates thereof.

"Designation Rights Sale" means the sale to a purchaser of the Debtors' rights to assume and assign the Debtors' real property leases not assumed by the Purchaser under the Final APA.

"*DIP Financing*" means the postpetition financing provided to the Debtors by the DIP Lenders pursuant to and under the DIP Orders.

"*DIP Lenders*" means the lenders party to the DIP Financing under the DIP Orders.

"*DIP Orders*" means, collectively, means, collectively, the *Final Order Pursuant to 11 U.S.C Sections 105, 361, 362, 363 and 363 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness from Pre-Petition ABL and Supplemental Term Lenders with Priority Over All Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Authorizing Use of Cash Collateral by the Debtors Pursuant to 11 U.S.C. Section 363 and Providing for Adequate Protection, and (4) Modifying the Automatic Stay* [D.I. 253] and *Final Order Pursuant to 11 U.S.C Sections 105, 361, 362, 363 and 363 and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (1) Authorizing Incurrence by the Debtors of Post-Petition Secured Indebtedness from Pre-Petition Term Lenders with Priority Over All Secured Indebtedness and with Administrative Superpriority, (2) Granting Liens, (3) Providing for Adequate Protection, and (4) Modifying the Automatic Stay* [D.I. 254].

"*Disbursing Agent*" means the person or entity empowered and authorized to make all Distributions pursuant to Article V.C herein.

"*Disclosure Statement*" means the *Disclosure Statement for the Debtors' First Amended Plan of Liquidation under Chapter 11 of the Bankruptcy Code*, dated October 9, 2013, prepared and distributed in accordance with the Bankruptcy Code, the Bankruptcy Rules and any other applicable law, and approved by the Bankruptcy Court, as amended, supplemented or modified from time to time.

"*Disputed*" means, with respect to any Claim:  (a) listed on the Schedules as unliquidated, disputed or contingent, unless a proof of Claim has been filed in a liquidated, non-contingent amount; (b) as to which the Debtors, the Responsible Person, the GUC Trustee or any other party in interest, has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules; or (c) as otherwise disputed in accordance with applicable bankruptcy or insolvency law, which objection, request for estimation or dispute has not been withdrawn or determined by a Final Order.

"*Disputed Claims Reserve*" means the reserve funds created pursuant to Article VI.A. herein.

"*Distributions*" means the distributions of Cash to be made in accordance with the Plan.

"*Effective Date*" means a Business Day selected by the Debtors and the Senior Secured Term Loan Lenders that is on or after the date by which all conditions precedent specified in **Error! Reference source not found.** of the Plan have been satisfied or waived.  Within five (5) Business days of the Effective Date, notice of the Effective Date shall be filed in the Bankruptcy Court.

"*Entity*" has the meaning set forth in section 101(15) of the Bankruptcy Code.

"*Equity Interest*" means any equity interest in a Debtor that existed immediately prior to the Petition Date.

"*Escrow Agreement*" means that certain agreement dated as of October 28, 2013 between Citibank, N.A., as Escrow Agent, OSH 1 Liquidating Corporation and Zolfo Cooper LLC.

"*Estates*" means the Debtors' estates created pursuant to section 541 of the Bankruptcy Code upon the filing of the Chapter 11 Cases.

"*Final APA*" means that certain Amended and Restated Asset Purchase Agreement dated as of August 20, 2013, by and among Orchard Supply Company, LLC as Purchaser and Orchard Supply Hardware Stores Corporation as Seller and Orchard Supply Hardware LLC and OSH Properties LLC as Company Subsidiaries.

"*Final Decree*" means the decree contemplated under Bankruptcy Rule 3022.

"*Final Order*" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to file an appeal, motion for reconsideration or rehearing, or request for a stay has expired with no appeal, motion for reconsideration or rehearing, or request for a stay having been timely filed.

"*General Bar Date*" means October 25, 2013 as established in the Bar Date Order.

"*General Unsecured Claims*" "*General Unsecured Claims*" means Claims against any Debtor that are not Administrative Claims, Accrued Professional Compensation Claims, Senior Secured Term Loan Claims, Other Secured Claims, Priority Tax Claims, Other Priority Claims, or Equity Interests.  For the avoidance of doubt, General Unsecured Claims shall not include any unsecured deficiency claims of the Senior Secured Term Loan Claims pursuant to Article IX.D of the Plan.

"*GOB Motion*" has the meaning set forth in Article V.

"GOB Sales" means store closing sales conducted by Great, as the Debtors' liquidating agent at the Debtors' store locations not included in the Final APA.

"*Great American*" means Great American Group WF, LLC.

"*GUC Trust*" means the liquidating trust created pursuant to the Plan and the GUC Trust Agreement.

"*GUC Trust Agreement*" means the agreement establishing the GUC Trust, dated as of the Effective Date, and which shall be filed as part of the Plan Supplement.

"*GUC Trust Distributable Cash*" means the Cash to be funded into the GUC Trust pursuant to Article IV.C of the Plan and any other assets of the GUC Trust reduced to Cash net of all expenses and costs of operating the GUC Trust and establishing any reserves as the GUC

Trustee may determine is necessary in its sole discretion pursuant to the terms of the GUC Trust Agreement.

"*GUC Trust Distribution*" means the distributions of GUC Trust Distributable Cash to be made by the GUC Trustee in accordance with the terms of the Plan and the GUC Trust Agreement.

"*GUC Trustee*" means Sltn Trust LLC (dba Solution Trust) or such other Person as may be designated by the Creditors Committee in the Plan Supplement and any successor to such Person.

"*Impaired*" means "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

"*Indemnified Persons*" means the Responsible Person and the GUC Trustee, and the Responsible Person's and GUC Trustee's employees, officers, directors, agents, Representatives, and Professionals, as the case may be.

"*Intercreditor Agreement*" has the meaning set forth in Article III.

"*Lien*" shall mean any lien, mortgage, charge, security interest, pledge or other encumbrance against or interest in property to secure payment or performance of a claim, debt or litigation.

"*Liquidation Trust*" shall have the meaning set forth in Article IV.M of the Plan.

"*Liquidation Trust Agreement*" means an agreement establishing the Liquidation Trust, dated as of the Effective Date, which may be filed as part of the Plan Supplement.

"*Liquidation Trustee*" shall have the meaning set forth in Article IV.M of the Plan.

"*Moelis*" means Moelis & Company, the Debtors' investment banker.

"*Orchard*" has the meaning set forth in the Summary

"*Other Priority Claims*" means Claims accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than Priority Tax Claims.

"*Other Secured Claim*" means, other than Senior Secured Term Loan Claims, any Claim secured by a Lien on collateral, which is not void or voidable under the Bankruptcy Code or any other applicable law, to the extent of the value of such Collateral, as determined in accordance with section 506(a) of the Bankruptcy Code, or, in the event that such Claim is subject to a permissible setoff under section 553 of the Bankruptcy Code, to the extent of such permissible setoff.

"*Person*" means an individual, partnership, corporation, limited liability company, cooperative, trust, estate, unincorporated organization, association, joint venture, government unit or agency or political subdivision thereof or any other form of legal entity or enterprise.

"*Petition Date*" means June 17, 2013, the date on which the Debtors filed the Chapter 11 Cases.

"*Plan*" means this Debtors' First Amended Plan of Liquidation Under Chapter 11 of the Bankruptcy Code including exhibits and supplements, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Bankruptcy Code or the Bankruptcy Rules.

"*Plan Supplement*" means the supplement to the Plan containing certain documents and forms of documents specified in the Plan, which documents and forms shall be filed with the Bankruptcy Court no later than fourteen (14) days prior to the commencement of the hearing on confirmation of the Plan.

"*Priority Tax Claims*" means Claims of governmental units of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"*Pro Rata*" shall mean the proportion that the amount of a Claim in a particular Class or Classes bears to the aggregate amount of all Claims (including Disputed Claims, but excluding disallowed Claims) in such Class or Classes, unless this Plan provides otherwise.

"*Professionals*" means any Person employed in the Chapter 11 Cases pursuant to a Final Order in accordance with sections 327, 328 or 1103 of the Bankruptcy Code, and to be compensated for services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.

"*Purchaser*" means Orchard Supply Company, LLC, a Delaware limited liability company.

"*Record Date*" means the date that the Disclosure Statement is approved by the Bankruptcy Court.

"*Released Parties*" means, collectively, the Debtors, the Debtors' current and former directors and officers, the Debtors' Professionals, the Senior Secured Term Loan Lenders and their current and former affiliates, the Senior Secured Term Loan Agent and their current and former affiliates, and the DIP Lenders, and the current and former Representatives of each of the foregoing.  For the avoidance of doubt, the Released Parties shall not include Purchaser or its affiliates.

"*Representatives*" means, with regard to an Entity (including the Debtors), any current or former officers, directors, employees, attorneys, Professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, independent contractors, members and professionals).

"*Resolution Event*" has the meaning set forth in Article I.

"*Responsible Person*" shall mean Bradley Dietz, or such other person as the Senior Secured Term Loan Steering Committee may choose in their sole discretion.

"*Sale*" has the meaning set forth in Article V.

"*Sale Motion*" has the meaning set forth in Article V.

"*Schedules*" mean the schedules of assets and liabilities, schedules of executory contracts and statements of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, as may be amended, modified or supplemented from time to time.

"*Sears*" has the meaning set forth in Article III.

"*Secured Claims*" means Claim(s) against the Debtors that are secured by a Lien on property in which the Estates have an interest, which Liens are valid, perfected and enforceable under applicable law or by reason of a Final Order, or that are subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim holder's interest in the Estates' interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

"*Senior Secured Credit Facility*" has the meaning set forth in Article III.

"*Senior Secured Term Loan*" means that certain Amended and Restated Senior Secured Term Loan Agreement dated as of December 22, 2011 and all documents and instruments executed in connection therewith.

"*Senior Secured Term Loan Agent*" means Cortland Products Corp. f/k/a Gleacher Products Corp., as administrative and collateral agent under the Senior Secured Term Loan.

"*Senior Secured Term Loan Claims*" means those Claims asserted in connection with the Senior Secured Term Loan.

"*Senior Secured Term Loan Lenders*" means the lenders under the Senior Secured Term Loan.

"*Senior Secured Term Loan Steering Committee*" means, collectively, ACA CLO 2006-1 Ltd., ACA CLO 2006-2 Ltd., ACA CLO 2007-1 Ltd., Apidos CDO I, Apidos CDO II, Apidos CDO III, Apidos CDO IV, Apidos CDO V, Apidos Cinco CDO, Apidos Quattro CDO, San Gabriel CLO I Ltd., Shasta CLO I Ltd., Sierra CLO II Ltd., Whitney CLO I Ltd., ECP CLO 2008-1, Ltd., Comstock Funding Ltd., Cannington Funding Ltd., Greens Creek Funding Ltd., Credit Suisse Loan Funding LLC, Grace Bay Holdings II LLC, Baker Street CLO II Ltd., Baker Street Funding CLO 2005-1 Ltd., Mountain View CLO II Ltd., Mountain View CLO III Ltd., and Mountain View Funding CLO 2006-1, Ltd., each of which is a Senior Secured Term Loan Lender.

"*Tax Code*" means the United States Internal Revenue Code of 1986, as amended.

"*Tax Returns*" means all tax returns, reports, certificates, forms or similar statements or documents, including amended tax returns or requests for refunds.

"*Term DIP Financing Order*" has the meaning set forth in Article V.

"*TSA*" has the meaning set forth in Article V.

"*U.S. Trustee*" means the United States Trustee appointed under Article 591 of title 28 of the United States Code to serve in the District of Delaware.

"*Unimpaired*" means not "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests.

"*Voting Deadline*" means 4:00 p.m. (Prevailing Pacific Time) on December 13, 2013.


B.    **OTHER TERMS**

The words "herein," "hereof," "hereto," "hereunder" and others of similar import refer to the Plan as a whole and not to any particular article, section or clause contained in the Plan.  A reference to an "Article" refers to an Article, or referenced portion thereof, of the Plan.  A term used herein that is not defined herein shall have the meaning ascribed to that term, if any, in or by the Bankruptcy Code.  The rules of construction set forth in section 102 of the Bankruptcy Code shall apply in constructing the Plan.

C.    **EXHIBITS**

All Exhibits to the Plan and the Plan Supplement are incorporated by reference into and are made a part of the Plan as if set forth in full herein.

**ARTICLE XII.**

**<u>CONCLUSION</u>**

The Debtors believe that confirmation and implementation of the Plan is in the best interests of all creditors, and urge holders of Impaired Claims in Classes 1 and 3 to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received no later than 4:00 p.m. (prevailing Pacific Time) on December 13, 2013.

Dated: November 12, 2013

Wilmington, Delaware

Respectfully submitted,

**OSH 1 Liquidating Corporation**

By:_____
   Name:
   Title:

**OSH 2 Liquidating LLC**

By:_____
   Name:
   Title:

**OSH 3 Liquidating LLC**

By:_____
   Name:
   Title:

**Exhibit A**
**Debtors' Chapter 11 Plan**

A-1

**Exhibit B**
**Disclosure Statement Order**

**Exhibit C**
**Liquidation Analysis**

APPENDIX C

LIQUIDATION ANALYSIS

This analysis has been prepared by management based on the Company's best estimates and knowledge of events as of 9/27/13. Although the estimates and assumptions that were made in preparing the analysis are considered reasonable by management, they are inherently subject to significant uncertainties and contingencies. Accordingly, there can be no assurance that the estimates shown below will be realized. Actual results may therefore vary materially from those presented.

| ($ in 000's) | Note | Chapter 7 Estimated Proceeds Available to be Distributed under Chapter 7 | | Chapter 11 Estimated Proceeds Available to be Distributed under Chapter 11 | |
| --- | --- | --- | --- | --- | --- |
| | | Low | High | Low | High |
| **A. Estimated Proceeds From Sale of Assets** | | | | | |
| Cash and cash equivalents | *1* | 22,500 | 22,500 | 22,500 | 22,500 |
| Other Asset Recoveries | *2* | 1,600 | 7,400 | 1,600 | 7,400 |
| *Subtotal* | | *24,100* | *29,900* | *24,100* | *29,900* |
| | | | | | |
| **B. Wind Down Expenses / Assumed Liabilities** | | | | | |
| Estimated Wind Down Professional Fees | *3* | 4,000 | 3,000 | 3,000 | 2,000 |
| Estimated Operating Expenses | *4* | 3,500 | 2,500 | 3,500 | 2,500 |
| Estimated Chapter 7 Trustee Fees | *5* | 700 | 900 | - | - |
| Accrued / Unpaid Professional Fees | *6* | 11,300 | 10,300 | 11,300 | 10,300 |
| Post-Closing Adjustments | *7* | 3,300 | (3,400) | 3,300 | (3,400) |
| Other | *8* | 1,000 | 500 | 1,000 | 500 |
| *Subtotal* | | *23,800* | *13,800* | *22,100* | *11,900* |
| | | | | | |
| ***Net Estimated Proceeds Before Initial Distribution*** | | ***300*** | ***16,100*** | ***2,000*** | ***18,000*** |
| | | | | | |
| **D. Term Lender Claim** | *9* | 130,700 | 130,700 | 130,700 | 130,700 |
| Initial Dividend | *10* | 95,400 | 95,400 | 95,400 | 95,400 |
| Plus: Remaining Cash | | 300 | 16,100 | 2,000 | 18,000 |
| Less: Unsecured Holdback | *11* | - | - | (750) | (750) |
| *Amount Available for Term Lenders* | | *95,700* | *111,500* | *96,650* | *112,650* |
| *% Recovery for Term Lenders* | | *73%* | *85%* | *74%* | *86%* |
| | | | | | |
| Amount Available for Unsecured Claims | | - | - | 750 | 750 |
| | | | | | |
| **E. Unsecured Claims** | *12* | 70,000 | 44,200 | 35,000 | 25,000 |
| *% Recovery for Unsecured Claims* | | *0.0%* | *0.0%* | *2.1%* | *3.0%* |

**Assumptions**

The following notes describe the significant assumptions that were applied to individual assets within the broader asset categories.

*Note 1*

The Debtors' estimated cash and cash equivalents are $22.5 million, consisting of $21 million in the Citibank escrow account and $1.5 million in the Old Company bank accounts.

*Note 2*

Other asset recoveries include net PP&E, letter of credits, prepaid expenses and other prepaid assets.

*Note 3*

Estimated professional fees include financial advisors, attorneys and other professionals.

*Note 4*

Operating expenses assume a wind down period through the end of calendar 2013. Operating expenses include remaining insurance payments; GOB shut down costs; and estimated TSA payments of, among other remaining expenses.

*Note 5*

Chapter 7 trustee fees are estimated at 3% of the estimated proceeds from sale of assets.

*Note 6*

The accrued and unpaid professional fees  include; financial advisors, attorneys and other professionals, as of the close date of 8/30/13.

*Note 7*

Post-Closing adjustments include other assumed liabilities and contingent liabilities.

*Note 8*

Placeholder for other administrative claims.

*Note 9*

Term lender claim is $130.7 million.

*Note 10*

Initial dividend to term lender was $95.4 million and was paid out on September 5, 2013.

*Note 11*

Under a chapter 7, the unsecured creditors do not receive any recovery. Under chapter 11, the unsecured creditors receive a total of $750 thousand which includes a $500 thousand payment and $250 thousand from lease designations.

*Note 12*

Estimates for unsecured creditor claims is comprised of known pre-petition liabilities not assumed by Lowe's as well as estimated lease rejection claims. Lease rejection claims are calculated as the greater of (i) on year's rent or (ii) 15% of the remaining term of the lease not to exceed three years. All unsecured claims are estimates only and the amounts may be materially different after a claim

reconciliation process is completed. The Chapter 7 case includes the term loan deficiency claim of $19.2 million to $35.0 million.