## <u>EXHIBIT C</u>

***In re Building Materials Holding Corp.*, Case No. 09-12074**
**Transcript of October 7, 2009 Hearing**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE


| | | |
|---|---|---|
| IN RE: | . | Chapter 11 |
| | . | |
| BUILDING MATERIALS HOLDING | . | Case No. 09-12074(KJC) |
| CORPORATION, *et al.,* | . | |
| | . | Oct. 7, 2009 (11:01 a.m.) |
| Debtors. | . | Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE KEVIN J. CAREY
UNITED STATES BANKRUPTCY COURT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Debtors: | Sean M. Beach, Esq. |
| | Young, Conaway, Stargatt & Taylor |
| | Michael A. Rosenthal, Esq. |
| | Mitchell Karlan, Esq. |
| | Jeremy Graves, Esq. |
| | Gibson, Dunn & Crutcher LLP |
| | |
| For the Committee: | Christopher J. Giaimo, Esq. |
| | Arent Fox |
| | |
| For Pedro Alvarado: | Kate Buck, Esq. |
| | McCarter & English |
| | James R. Hawkins, Esq. |
| | James Hawkins APLC |
| | |
| For Wells Fargo: | Tomas Kent, Esq. |
| | Paul Hastings |

| | |
|---|---|
| <u>Audio Operator</u>: | Al Lugano |
| | |
| <u>Transcriber</u>: | Elaine M. Ryan |
| | (302) 683-0221 |

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: Please rise.

2          THE COURT: Good morning, all.

3          All: Good morning, Your Honor.

4          MR. BEACH: Good morning, Your Honor.  May it please

5    the Court, Sean Beach from Young, Conaway on behalf of the

6    debtors.  Your Honor, before we begin, I'd like to make just

7    a few introductions.  Thank you for executing the *pro hac*

8    *vice* motions for Mitch Karlan who's in the courtroom today,

9    as well as Richard Falek.  I believe you signed those last

10   night.  Also from Gibson, Dunn is Mr. Michael Rosenthal and

11   Jeremy Graves.

12         THE COURT: Good morning.

13         ALL: Good morning, Your Honor.

14         MR. BEACH: Your Honor, we also have Paul Street,

15   he's the general counsel for Building Materials in the

16   courtroom and two representatives from Peter J. Solomon, Mr.

17   Brad Deitz and Paul Croci.  Your Honor, there's one

18   housekeeping item that I wanted to take care of before we

19   started today, it's with respect to the removal motion which

20   is item number 5 on the agenda.  Your Honor entered that

21   order and on the same day Your Honor entered that order we

22   saw that two letters were docketed.  If I may approach, I can

23   give you copies of those letters.  They're styled as

24   objections, but they're not truly objections.

25         THE COURT: Okay.  Thank you.

1      MR. BEACH: Your Honor, I pause here simply to bring

2  this to your attention since they were styled as objections.

3  They were filed, or at least docketed, after the order was

4  approved.  As you can see it's with respect to a creditor who

5  I believe thought that this was some kind of a claim

6  objection type of motion when it was a simple extension of

7  the removal deadline.

8      THE COURT: Okay.  It's two pieces of paper, but

9  they're identical as far as I can tell; are they not?

10      MR. BEACH: Yes, Your Honor, they are identical,

11  they are two separate docket numbers which is why I handed

12  both of them to you.

13      THE COURT: Alright.  Do this please, communicate

14  with claimant letting her know the order's been entered, that

15  you brought to the Court's attention her letters today, but

16  the order's been entered and I'm not inclined to do anything

17  unless asked to do so by the movant.  You may tell her that

18  she may consider, if she wishes to press it, filing a motion

19  for reconsideration or other relief.

20      MR. BEACH: We'll so advise her, Your Honor.

21      THE COURT: Okay.  But I tend to agree with the

22  debtors' characterization that it's not really an objection

23  to the substance of the relief that was requested.

24      MR. BEACH: I think that's right, Your Honor.

25      THE COURT: Okay.

1        MR. BEACH: Thank you, Your Honor, which brings us

2    to the agenda.  Your Honor, the first 7 items on the agenda

3    have either been adjourned or Your Honor has entered an order

4    on those.  Items 8 and 9 are the disclosure statement and the

5    solicitation procedures motion, and I think before we address

6    those items, Your Honor, we would need to turn to item number

7    11 on the agenda, which is the expedited motion filed by the

8    Committee requesting a continuance of the disclosure

9    statement hearing, and if it's acceptable to Your Honor, I

10   will cede the podium to the Committee to present that motion.

11       THE COURT: Alright.  I have one question before you

12   do that and that is, from the debtors' standpoint, have all

13   the parts stopped moving?

14       MR. BEACH: Yes, Your Honor.  I can cede the podium

15   to Mr. Rosenthal, but we do have some minor changes, as is

16   very typical, obviously, to the disclosure statement, some

17   late requests that we got but again, only minor changes that

18   we were going to present to Your Honor today.

19       MR. ROSENTHAL: Yes, that's correct, Your Honor.  We

20   filed yesterday at about 2:30 an amended plan and disclosure

21   statement, and then since then we added substantially in a

22   couple of places to conform with requests from the IRS.

23   There was one paragraph in the disclosure statement that

24   needed a clarification and conforming to the amount of the

25   claims for employee-related claims.  We changed the number

1    from 1.1 to 1.3 million for deferred compensation, and then

2    someone asked us to change performance bonds to surety bonds,

3    so there are basically 5 or 6 changes.

4              THE COURT: Okay, but with that, the debtor has come

5    to rest, so to speak -

6              MR. ROSENTHAL: Yes, Your Honor.

7              THE COURT:  - with the terms of a proposed plan.

8              MR. ROSENTHAL: Yes, Your Honor.

9              THE COURT: Alright, thank you.  I'll hear from the

10   Committee.

11             MR. GIAIMO: Good morning, Your Honor.  Chris Giaimo

12   from Arent Fox.  With me today is Katie Lane, also from Arent

13   Fox, and co-counsel, Brad Sandler from Benesch Friedlander.

14   We also have Robert Garcia, Chairman of the Committee,

15   joining us today.  I'd like to start by thanking the Court

16   for hearing us on an expedited basis.  The majority of what I

17   have to say, Your Honor, is kind of set forth in our papers,

18   and we think that the facts are pretty much undisputed.  What

19   we have here is four months ago we started off with a

20   prepackaged plan, with the plan and disclosure statement

21   filed on the first day.  That plan provided for a present

22   value of 56 percent to unsecured creditors, kind of sold as a

23   hundred percent distribution as of the formation meeting.

24   There's a trust for unsecured creditors, $10 million cash

25   payment percentage of cashflow.  The professionals for the

1   debtor and the lender spent nearly $4 million putting that

2   together prior to the petition date, and when we got into the

3   case, we assumed that that was the plan we were dealing with.

4    So, we worked under that assumption for nearly 4 months,

5   day-in and day-out.  There was no requirement in the plan or

6   the disclosure statement for third-party investments or a

7   sale.  So, we continued to discuss the disclosure statement

8   and the various plan provisions with the debtor.  The debtor

9   did indicate several months ago that they were in discussions

10  with third parties for either exit financing, some sort of

11  equity participation, or something that would better the

12  treatment under the plan.  Of course, we're all for that, but

13  we weren't provided any details, and we asked for details and

14  we asked to be included.  Counsel said that they were

15  confidential.  So, okay, we went along with it from that

16  point on.  So, we kept operating under the assumption that it

17  was the original plan and disclosure statement for nearly 4

18  months.  We marked up the disclosure statement.  We were

19  negotiating the disclosure statement with debtor's counsel.

20  We understood that the disclosure statement was continued for

21  several reasons, one of which was their continuing

22  participation with third parties but at the same time, the

23  only document that we had was for 56 percent, the trust, the

24  $10 million cashflow.  In August we went up to New York to

25  have a discussion with lender's counsel about tweaking the

1    plan, and the plan wasn't that bad to begin with, but we

2    wanted to see if we could tweak it for the benefit of the

3    unsecured creditors.  We had very frank and open in what I

4    thought were very productive discussions with lender's

5    counsel and they said that they understood our position, that

6    we weren't being overly greedy, and that they appreciated

7    that, and we weren't threatening any litigation, that they

8    would go back and speak to their clients and get back to us.

9    So we waited patiently.  Beginning of September, we had the

10   disclosure statement hearing deadlines coming up.  At that

11   time we spent a significant amount of time going through and

12   marking up what was the original disclosure statement and

13   were discussing that with debtor's counsel.  They agreed to a

14   majority of our changes, and we were getting to a point where

15   if they agreed to all of that, while we didn't necessarily

16   agree with certain claim provisions that we were alright with

17   the disclosure statement, and we would have conceivably

18   withdrawn our objection, but we proceeded with the objection

19   because no formal agreement was ever entered into, and then

20   we kind of sat for several weeks in complete radio silence.

21   Come mid-September, right before I was scheduled to go on a

22   trip to Italy, I had a discussion with debtor's counsel.

23   They informed us that they were once again considering the

24   disclosure statement to today.  I said, that's fine.  We

25   understood you're still discussing with third parties.

1    Again, we said, the Committee needs to be involved in those

2    discussions.  You can't blind side us with some sort of new

3    plan, some sort of sale.  We want to know what's going on and

4    quite frankly, we might be helpful in trying to broker a deal

5    on behalf of the entire estate.  They said, We agree.  We're

6    concerned with confidentiality.  They said, this is just

7    September 15th.   I said, attorney's eyes only, for

8    professional eyes only, won't even go to the Committee, we'll

9    keep it confidential.  Says, that's fine.  We'll do that.  I

10   said, that's great, because we really need to know what's

11   going on.  We've been in the dark for too long.  We ended the

12   phone call saying, I'm leaving tomorrow, please don't let

13   anything happen while I'm away, just kind of jokingly.  So, I

14   went on vacation, thought, alright, we're still in the realm

15   of the 56 percent plan, the 100 percent distribution, all

16   these great things.  I'm literally getting off the plane, I

17   get an email.  That plan is scrapped.  You're going to get 10

18   percent, there's no trust, no cashflow, it's a one-time

19   payment, and you're done.  You can imagine my reaction.  I

20   said, Wait a minute.  You just cut our distribution 75

21   percent and you're expecting me just to say, Okay.  I need

22   explanations.  This is the exact scenario that I was worried

23   about when I said you need to keep us involved.  We just got

24   sandbagged, 75 percent reduction without any notice.  I said,

25   well, I need to know what happened.  Well, the third-party

1    investors fell through.  Well, the original plan didn't

2    require third-party investors.  So, I need something more

3    than that.   Well, there is no more than that.  There's some

4    lender discord, you know, within the lender group.  We

5    understood that from the beginning, from day one, when we had

6    our meeting with the lenders.  So now we're faced with what

7    was on Wednesday night, this past Wednesday night, I received

8    emails from the debtor attaching all the revised documents.

9    It was a 9.9 percent distribution.  So I took that and began

10   analyzing it as fast as I could.  I said, You're not going to

11   go forward with this one on Wednesday; are you?  Well, yeah,

12   we are.  I said, How can you possibly go forward with this

13   entirely new plan.  Well, the facts are still the same, and

14   you know what, the facts are still the same.  It's still BMC

15   West and BMC Select and they do provide building materials.

16   Other than that, you know, there's no trust, no 56 percent,

17   no cashflow, nothing.  I said, you know, I have to chuckle.

18   It makes me think of the saying, you know, Other than that,

19   Mrs. Lincoln, how did you like the play?  I said, this can't

20   go forward.  I said, we need time.  No.  Okay, so I take that

21   9.9 percent plan, I start to scurry around and try to review

22   it.  Well, it turns out on Thursday night, there's another

23   disclosure statement and plan filed.  That one was

24   fundamentally different than the one they provided the night

25   before.  That's 13.1 and several other provisions have

1    changed.  Unfortunately for me, I only discovered that last

2    night in discussing it with my colleague again.  We

3    apparently were reading two different plans.  I was never

4    notified that they filed the plan and disclosure statement

5    that was filed.  There's no blacklines provided.  So, come

6    Thursday, all of a sudden now, everyone wants to negotiate

7    with us.  The negotiation was, Here's the deal, take it.  The

8    case is administratively insolvent on a liquidated basis.  I

9    said, You expect me to go back to my Committee and say we now

10   have 3 business days to cut this entirely new deal to try to

11   get support for the current plan.  I said, I'm not doing

12   that.  I don't know what transpired.  We need more notice,

13   this is an entirely new plan.  Having us go forward today

14   violates 3017 and the Local Rule 9006.   The plan is not the

15   same.  It's entirely different.  It's a 75 percent reduction

16   and taking away other provisions that benefitted the

17   unsecured.  If the plan is not the same, the disclosure

18   statement can't be the same.  Again, I was inundated with,

19   Come on, negotiate, accept the deal.  They said, We're

20   available all weekend.  Well where was everybody for the

21   first 4 months?  What they're trying to do, Your Honor, is

22   put a deadline on us of 3 days so we have nothing to do but

23   accept it.  Well, I'm not willing to do that.  They said,

24   Well, we're going to liquidate instead.  I don't think so.

25   I don't think they're going to throw it away because we're

1    asking for 30 days.  That's all we're asking for.  We want 30

2    days to consider this entirely new plan, have the disclosure

3    statement mid-November with a confirmation in mid-December.

4    I understand that their financing, which we haven't even had

5    the opportunity to analyze, expires December 31st, and I

6    appreciate that deadline, and I don't think that having a

7    confirmation hearing mid-December will jeopardize that.  We

8    need time to figure out what the heck just happened and what

9    we can do to either support it or not.  We've had 3 business

10   days.  It's completely unreasonable.  Thank you.

11          THE COURT: There really are two - at least two

12   dynamics at play here, only one of which may be relevant for

13   purposes of today.  Let me start with an issue that I think

14   is clearly relevant today, and that has to do with the

15   debtors' position as it's explained in its objection to the

16   motion to continue that while you complain that the Committee

17   hasn't been properly consulted or has sufficient time to

18   continue to discuss the terms of what might be a consensual

19   plan, it doesn't say the disclosure statement that's been

20   presented for approval today is inaccurate.  Do you disagree

21   with that proposition?

22          MR. GIAIMO: I have no idea whether it's accurate or

23   not, Your Honor.  I got one on Wednesday night, one on

24   Thursday, and they filed one last night.  I have no idea.  I

25   wish I did.

1          THE COURT: Let's assume, for the moment, that the

2    debtor has the absolute and unfettered right to propose,

3    consistent with confirmation standards, whatever plan it

4    wants to propose, and here, let's assume, it's proposed a

5    plan contrary to all of the Committee's expectations, a

6    distribution far less generous than that which was originally

7    proposed, and let's assume, also, that, you know, it's been

8    changing unilaterally the deal, supposedly.  Doesn't it have

9    the right to do that?

10          MR. GIAIMO: It absolutely does, Your Honor, but we

11    absolutely have the right for proper notice under the rules.

12          THE COURT: Okay, so let's say, given more time, not

13    for plan negotiations but for vetting the disclosure

14    statement, what would you do?

15          MR. GIAIMO: I'm not sure I understand Your

16    question.

17          THE COURT: Well, the relevant exercise for the

18    Court in determining whether a disclosure statement should be

19    approved is not whether the Committee likes the plan, it's

20    whether it contains adequate information.

21          MR. GIAIMO: Uh-huh.

22          THE COURT: So, if the Court were to give you more

23    time, what would it do in connection with determining what

24    position it should take on whether the proposed disclosure

25    statement contains adequate information?

1          MR. GIAIMO: Well, I'm not sure that you can

2    necessarily easily separate those two because having adequate

3    information in a disclosure statement, if we come to a

4    conclusion that it does contain accurate information, then

5    we'll understand the plan better, and that's the purpose of

6    the disclosure statement, but obviously we need time.  Things

7    have changed.  If this was the first time we were seeing this

8    disclosure statement, it would be whatever it is, and I would

9    completely agree with you, but what we have here is a

10   situation where they presented something for 4 months and

11   then on the eve of this hearing, they're saying everything

12   has now changed.  So those are disclosure statement issues.

13   We need to find out what changed, what happened, why is

14   feasibility and the liquidation analysis now fundamentally

15   different.  We need to know was accurate then or now or vice

16   versa.  These are all issues that we need to figure out

17   before we can say this is their disclosure statement.

18          THE COURT: I don't disagree with you in principal.

19          MR. GIAIMO: Uh-huh.

20          THE COURT: But, for the Court to determine whether

21   you should have more time and if so what amount of time, I

22   need you to tell me what exercise will you be undertaking.

23          MR. GIAIMO: Well, we need to carefully and

24   methodically review the disclosure statement, the

25   attachments, look behind the documents that were used to

1    formulate those numbers.

2          THE COURT: Okay, so that usually means some form of

3    formal or informal discovery.

4          MR. GIAIMO: Correct, Your Honor.

5          THE COURT: Okay.  And would that involve just

6    document discovery or do you want to depose somebody, and if

7    so, who?

8          MR. GIAIMO: We've attempted to engage in some

9    informal document discovery, Your Honor.  We've had what I

10   would say mild success in that, so, you're right, we would

11   provide for formal discovery and I think depending on the

12   results of the document production, we would have to judge

13   whether we want to exercise engaging oral depositions and

14   discovery.  My hope would be that the document production

15   would be sufficient, but I have my doubts on that.  So, we

16   would probably be seeking 2004 exams.

17         THE COURT: Okay.  Anything else?

18         MR. GIAIMO: I think that's it, Your Honor.  Again,

19   it depends on the level of cooperation.  Obviously, we've

20   heard a lot about these third-party investors.  We don't know

21   what was proposed, what was rejected.  Again, somewhat out of

22   the blue, we'd like to find out what information we have from

23   those parties as well.

24         THE COURT: Alright, thank you.

25         MR. GIAIMO: Thank you.

1          THE COURT: Let me hear from the debtor.

2          MR. KARLAN: Good morning, Your Honor.  Mitchell

3    Karlan from Gibson, Dunn & Crutcher.  Your Honor, the tone of

4    Your Honor's questions suggests to me that you understand

5    that whether you agree with it or not, I don't know, but you

6    seem to understand the argument that the debtors are putting

7    forward, so I'm going to be brief.  The chronology that we

8    were given by the Creditors Committee counsel, I would

9    suggest, needs to be supplemented somewhat, and let me just

10   do that quickly.  I think it's clear from the Creditor

11   Committee's counsel's presentation that there was a

12   disclosure statement filed on the day the case was filed.

13   There were objections to that disclosure statement,

14   traditional, what I would call normal disclosure statement

15   objections filed by the Committee's counsel and by his

16   silence, I would respectfully suggest, that he has implicitly

17   acknowledged that all of those objections have been addressed

18   in the amended disclosure statement which we would like to

19   have a hearing on today.  We've given the Court and all of

20   the parties a blackline version of the disclosure statement

21   which shows the changes that have been made between the

22   initial disclosure statement that was filed on the day the

23   case was filed and the disclosure statement we are proposing

24   the Court approve today.  The vast majority of those

25   blacklines have to do with the Committee's original

1   objections, each of which we have tried out best and I think

2   successfully have dealt with.  I do not understand there to

3   be today any, what I would call, traditional, legitimate

4   disclosure statement objections to the disclosure statement

5   from the Committee or from anyone else.  The complaint which

6   was delivered with some passion and I think heartfelt passion

7   by counsel is that his constituency is not doing as well as

8   they would like to do under the proposed plan.  That's a goal

9   that we share.  We wish everybody were getting paid in full,

10  but I have not heard any claim by Committee counsel that

11  there's anything in the disclosure statement that is hard to

12  understand, that inaccurately describes the proposed plan as

13  it is now proposed.  Indeed, many of what used to be somewhat

14  complicated - well, somewhat more complicated types of issues

15  that were in the original plan, like for example, there was a

16  liquidating trust and there was going to be a tail of

17  payments that was going to be made, hopefully made to the

18  creditors after confirmation.  That's all be eliminated, all

19  that sort of complicated lawyer stuff.  It's just a one time

20  cash payment that's going to be made one time.  So, we hope

21  that there will be a consensual plan in this case.  If it

22  turns out to be a different plan -

23          THE COURT: Do you think this is the best way to go

24  about that?

25          MR. KARLAN: I'm sorry, Your Honor.

1      THE COURT: Do you think this is the best way to go

2   about that?

3      MR. KARLAN: Here's what we have to do, Judge.

4   We're middle men here to some respect.  We wish we had been

5   able to obtain the financing that we hoped to get on the day

6   we filed the plan.  As we've described in our objection to

7   today's motion, like many other people in the last year and a

8   half in this country, things haven't turned out as well with

9   our lenders as we had hoped they might.

10      THE COURT: I hear that a lot.

11      MR. KARLAN: What we've got is what we've got, and

12   the best we've got is the commitments for which terminate on

13   December 31st.  Now, I gather there's been sort of an oral

14   modification to the motion just now.  The written motion asks

15   for a much more substantial adjournment of today's hearing

16   than I guess is now being sought.  Let me just pause for a

17   moment and say, that, as written in the written motion, I

18   would respectfully suggest that's just a nonstarter because

19   the request in the written motion would require that the

20   Court hold a confirmation hearing after the time when the

21   commitments for our exit financing will have expired.  We do

22   have, Your Honor, a date before you of - Oh, I've lost it in

23   my notes here.  Where is it?  October 22nd.  That is the date

24   where we have the application for Your Honor to approve the

25   exit financing commitments.  I don't know what Your Honor's

1   calendar is for the rest of this year, but what we don't

2   want,  a) we absolutely -

3           THE COURT: Full of all kinds of interesting things.

4           MR. KARLAN: I'm sure.  Something told me I was not

5   your only case, and I suspect Your Honor may or may not have

6   some plans for the holidays at the end of the year.  So, what

7   we absolutely can't have is a situation where we lose the

8   December 31st date.  I suspect even the Committee's counsel

9   would agree with me on that proposition.  I don't pretend to

10  know what Your Honor has available in December for

11  confirmation hearings, but I do know that this may be a

12  contested plan.  There may need to be a trial.   There may

13  need to be live testimony.  Your Honor may need to write an

14  opinion.  There may need to be a complicated order generated,

15  and I suspect your chambers and staff would like to take some

16  time off at the end of the year, so -

17          THE COURT: We traditionally give them some time.

18          MR. KARLAN: I appreciate that.  So, of course, we

19  at Gibson, Dunn don't take any time off.  So that's not

20  necessary.  You need not think of us, but -

21          THE COURT: Oh, I'm always concerned about the

22  parties' counsel.

23          MR. KARLAN: Your Honor, I would respectfully

24  suggest that we're hopeful there's going to be a consensual

25  plan.  We hope that the exit financing people and the senior

1   lenders and the unsecured creditors will come to an

2   agreement.  We are largely indifferent on that.  We just want

3   a plan.  If we can get one consensually, that's great, but we

4   can't blow this deadline, and I would respectfully suggest

5   that the reasons for adjourning the disclosure statement

6   hearing that has been proposed and proffered by Committee's

7   counsel today, and I don't mean this to sound provocative,

8   they are not legitimate reasons.  I'm not suggesting they're

9   not important to him and his constituency, but they are not

10  reasons that fall under the rubric of what a disclosure

11  statement hearing is supposed to be about.

12          THE COURT: You know, you're right, you're right,

13  but the problem is, and I know that you recognize it, is the

14  Committee, I think, for some very good reasons feels as if it

15  was sandbagged, in counsel's words, and basically being

16  railroaded, my words.  And it's not that a debtor doesn't

17  have the weapons with which perhaps to railroad some class or

18  classes of creditors in connection with a Chapter 11 plan,

19  but it seems to me not an unfair request as a matter of

20  process to give the Committee some brief period of time to

21  collect itself and to address specifically the disclosure

22  statement, and if other issues get addressed in the interim,

23  sobeit, and I'm not suggesting anybody has to do anything.

24  So, actually, I'm looking at my calendar, and I see that the

25  22nd hearing already shows disclosure statement.  I don't know

1   how that happened, our error, I guess.  Maybe it was just one

2   of the possible dates mentioned and we just calendared them

3   all.  I don't know what else is scheduled for the 22nd other

4   than the motion to approve payment of a Committee fee?  That

5   shows up -

6          MR. KARLAN: No, I understand - Go ahead, Mike.

7          MR. ROSENTHAL: That's right, Your Honor.  It's the

8   motion to approve payment of the commitment fee -

9          THE COURT: Commitment fee, okay, because it says -

10  Oh, it does say commitment fee, I misread it.  My fault.  And

11  I set that specially -

12         MR. ROSENTHAL: Yes, we did, Your Honor.

13         THE COURT:  - on the day after I get back from

14  NCBJ, but I promise to be alert and ready to go.

15         MR. ROSENTHAL: I think a number of us are going.

16  Mr. Giaimo mentioned that to me as well.

17         THE COURT: Alright.  Well, I'm inclined, just as a

18  matter of process, to push this hearing over to that date.

19         MR. KARLAN: October 22nd, Your Honor?

20         THE COURT: Yeah, and it seems to me that assuming

21  the Court would approve the disclosure statement on that

22  date, and I'll say what I say to parties who object to

23  disclosure statements, there's going to be one that's

24  approved.  I mean, except in the extraordinary circumstance,

25  and I think in the almost 9 years on the bench, I've only

1   done it once, found that a plan was patently un-confirmable,

2   a disclosure statement will be approved.  So to the extent

3   the Committee disagrees with the debtors' view that it's

4   satisfied all the previously filed objections, try to work

5   out some language if that's appropriate.  If not, I'll make

6   whatever resolution of any remaining dispute there is on that

7   date, but it seems to me that's a date that still would work

8   within the debtors' time frame in connection with its exit

9   financing.  Now, I'll say just one other thing, this is not

10  the first case I've had in which the debtor has been pressed

11  to conclude a confirmation and get a decision from a court on

12  a contested confirmation prior to the expiration of a

13  financing deadline.  If that scenario should develop, I will

14  give you what I think my resources will allow or not, and the

15  parties will just have to find a way, as they usually do, to

16  do a workaround, but we're not there yet, and I'm hopeful we

17  won't get there yet.

18          MR. KARLAN: Your Honor, may we know what you have

19  in mind for a confirmation hearing?

20          THE COURT: Well, let's take a look.

21          MR. KARLAN:  I know I don't get to necessarily vote

22  on this, Judge, but it's been whispered in my ear that the

23  3rd, 4th, 7th, or 8th would be good for us.

24          THE COURT: Of December.

25          MR. KARLAN: Of December, yes, Judge.

1          THE COURT: Okay, let's take a look.

2          MR. GIAIMO: Your Honor, the Committee would like a

3  little bit more time than that, preferably the week of the

4  14th or the 18th.  That gives 2 weeks before the financing

5  expires.

6          THE COURT: Well, I'm not inclined to make that

7  decision at this point.  I tentatively -

8          MR. GIAIMO: I do note that there's a hearing on the

9  15th already scheduled at 1 o'clock.

10         THE COURT: I know that.  I tentatively have a 3-day

11  trial set for the 2nd, 3rd, and 4th of December.  I think,

12  however, that may come off, but I'm not yet in a position to

13  tell you that it will for sure.  For reasons which I don't

14  understand, Wednesday, December 9th is completely open, but

15  I'm thinking what I'd like to do is just between now and the

16  22nd see how things develop and maybe I can be a little more

17  flexible with my timing.

18         MR. KAPLAN: Very good, Your Honor.

19         THE COURT: And maybe the parties could come to some

20  agreement on when it should be.  That's always a possibility.

21  Alright, anything further on the disclosure statement.

22         MR. KARLAN: Not on the motion to adjourn the

23  hearing, Your Honor.

24         MR. GIAIMO: Actually, Your Honor, since we have the

25  October 22nd date and as you discussed, discovery will be

1   necessary, I think it might be appropriate to enter a

2   discovery schedule so we don't have to worry about bumping up

3   against that date and not having the opportunity to get

4   responses.

5       THE COURT: I don't disagree with that, and what I

6   will do is before you leave here today, give counsel the

7   opportunity to confer and see if they can make an agreement

8   about that and I'll see that that's done before you go and

9   before I go, I'll be here all day, and to the extent the

10  parties can't agree, I'll resolve any issues you have.

11      MR. GIAIMO: Thank you, Your Honor.

12      MR. ROSENTHAL: Yes, Your Honor, I'm sure we'll be

13  able to agree, and we had intended to raise a related point

14  as well about providing the information on the third-party

15  bidders but in a way that - because there's some

16  confidentiality agreements and business-related reasons why

17  the names of those bidders need to be protected, so -

18      THE COURT: Understood.

19      MR. ROSENTHAL: I'm hopeful we can work out an

20  agreement.

21      THE COURT: Okay, thank you.  Okay, so, I guess -

22  Was a form of order submitted with the Committee's motion?

23      MR. GIAIMO: It should have been, Your Honor.

24      THE COURT: Do you have an extra copy for me?

25      MR. GIAIMO: One moment, Your Honor.  I have one,

1   it's . . . (microphone not recording).

2          THE COURT: That's alright.  Thank you.

3          MR. ROSENTHAL: Your Honor, we think the hearing on

4   the 22nd is at 2, I believe.

5          THE COURT: Two o'clock.

6          MR. ROSENTHAL: Yes.

7          THE COURT: That's correct.  Alright, that order has

8   been signed.

9          MR. ROSENTHAL: Your Honor, based on that, I would

10  propose to adjourn the next matter as well, which is the

11  solicitation procedures motion, matter number 9 on the agenda

12  to the same date.

13         THE COURT: I think that would be appropriate.

14         MR. ROSENTHAL: And that leaves, Your Honor, I think

15  the only unresolved matter is matter number 10 on the agenda,

16  the motion of Pedro Alvarado.  Mr. Graves is going to handle

17  that for the debtors.

18         THE COURT: Alright.

19         MR. ROSENTHAL: Actually, Your Honor, this is not

20  our motion.  So, I think counsel is on the phone.

21         MS. BUCK: Your Honor, I apologize for the delay

22  getting to the podium.  Your Honor, Kate Buck here from

23  McCarter & English representing Pedro Alvarado.  Debtors are

24  in fact right, that my co-counsel, James Hawkins and Ed Hays

25  are appearing via telephone, however, I will be presenting

1  the motion to the Court today regarding authorization of the

2  provisional class claim or in the alternative to extend the

3  bar date.  We are not currently at this time requesting class

4  certification, that's not pending before the Court today so

5  I'll contain my remarks only to the issue before the Court,

6  however, if Your Honor wishes to delve a little deeper into

7  the specific issues related to that class action, I ask that

8  my co-counsel, Mr. Hawkins be permitted to address the Court.

9      THE COURT: Well, let's talk about the method of

10  proceeding.  I have reviewed a number of the cases that the

11  parties have cited and it seems to me that under the

12  Bankruptcy Rules in order for me to permit what would in

13  effect be a class filing, I have to determine that the person

14  making the filing is authorized to do so, and it seems to me

15  no present authorization exists, which then leads to the

16  question of do I not have to make, and I don't believe one

17  actually has been requested in the papers, you know, a Rule

18  23 decision.  First, I have to decide that it's applicable to

19  this contested matter and then don't I have to consider

20  whether the Rule 23 standards have been met in order to

21  permit a class filing.

22      MS. BUCK: I certainly understand your concerns,

23  Your Honor.  We would contend that the movant is a putative

24  agent for the purposes of keeping this claim alive as Judge

25  Walrath noted in her Kaiser decision in 2002.  It was noted

1   that if there's no apparent reason up front to prohibit him

2   from acting in that capacity, a provisional class claim may

3   be filed on behalf of other similar situated pending a class

4   certification.

5          THE COURT: Of course in <u>Kaiser</u> a class had actually

6   been certified as to parties other than the debtor because

7   the automatic stay had precluded such a determination in the

8   state court as to the debtor.  So, there the Judge had a

9   certification of sort already in front of her with a Court of

10  competent jurisdiction having decided that a class should be

11  certified.  I think that makes it a little different from the

12  circumstances that we have here.

13         MS. BUCK: That is correct, Your Honor.  I

14  understand that that is a difference, but nonetheless, one of

15  the points made and in the Judge's opinion, recognizing that

16  she agreed with certain 7th Circuit and 11th Circuit reasoning,

17  it was noted that the time of the bankruptcy should not serve

18  to disallow a class claim.  So while we had an underlying or

19  related class action pending since May of 2008,

20  unfortunately, in that case - it's turned out to be

21  unfortunate, we actually agreed to stay formal discovery

22  while we attempted mediation in that matter, and in fact, a

23  mediation session did take place and others were being

24  scheduled at the time that this bankruptcy was then filed.

25  So, unfortunately, Mr. Alvarado had not had a chance to

 1   either discover the necessary information nor in fact

 2   effectuate service to the proposed class members or potential

 3   class members that might have rightful claims in this matter.

 4   So while the situation was different in Kaiser we would

 5   contend that as an equitable court, the reasoning is relevant

 6   here to note that the timing should not be the factor to

 7   essentially extinguish the claims of potentially rightful

 8   claimants.  Additionally, five other Circuit Courts have

 9   recognized the allowance of class claims certainly in the

10   bankruptcy proceedings and there's nothing to suggest there

11   that a provisional claim could not be accepted to the extent

12   that then class would also need to be certified.  We do

13   understand, Your Honor, your point that we did not seek in

14   our original motion to actually have this Court determine the

15   certification, nonetheless, certainly we would not disagree

16   that this Court would be an appropriate venue for that

17   determination or as well that the state court in California

18   could make that determination.  If Your Honor does have

19   specific questions, as I mentioned, Mr. Hawkins would be

20   happy to address the class certification requirement.

21   Nonetheless, our motion here before the Court today contended

22   to make just a *prima facie* showing by addressing the Rule 23

23   certification saying that this would be a certifiable claim.

24   We did not attempt, Your Honor, to fully discuss the merits

25   of such certification, but certainly just laid out the

1   process recognizing that factors can at least on the surface

2   appear to be met for that.  The movant here did timely file

3   on behalf of the proposed class, and again, as I noticed

4   reasoning that Judge Walrath recognized in the <u>Kaiser</u> case

5   recognized the <u>Charter</u> case in the 11th Circuit which noted

6   that the claim was *prima facie* valid until it was later

7   proved otherwise.  Here, a contrary finding would be against

8   bankruptcy equitable principles and in effect would

9   improperly limit class actions in bankruptcy proceedings

10  based solely on the timing of the events that occurred below.

11  I hesitate to believe, Your Honor, that the Code was enacted

12  with that intent in mind.  I believe that it is more for the

13  equitable distribution to all rightful creditors.

14          THE COURT: Well, let's talk about the bankruptcy

15  considerations, and I'm referring, at least in this instance,

16  to the decision by the Bankruptcy Court recently in the <u>Bally</u>

17  case, Judge Lifland, and while the standard that he

18  articulates differs from, at least in part, from the approach

19  taken by Judge Walrath, and I'll mention something I've said

20  many times before, Judge Walrath finished higher than me in

21  our law school class, so I like to defer to her whenever

22  possible, but in <u>Bally</u> Judge Lifland said, The filing of a

23  class proof of claim is consistent with the Bankruptcy Code

24  generally in two principal situations.  One, where a class

25  has been certified pre-petition by a non-bankruptcy court.

1  You've explained why that hasn't happened here, well, at

2  least in terms of process, and I understand that Judge

3  Walrath didn't rely on that as a standard, and two, where

4  there has been no actual or constructive notice to the class

5  members of the bankruptcy case and the bar date.  Here the

6  debtor in its pleadings and through affidavits, indicates

7  that notices were sent of the commencement of the case, of

8  the bar date, and of this disclosure hearing, and

9  specifically, with respect to the bar date instructions in

10  how to get to a Spanish version of what needed to be done,

11  and that these notices went to - I don't know the number

12  offhand, it's about 65,000 former employees.  Now, your

13  class, purported class is around 5,000, you say, of former

14  employees, but I don't - on, again, the second prong of what

15  Judge Lifland described, it seems to me that the debtor

16  couldn't really have done anything more than that which it

17  already has to advise perspective claimants of what it they

18  should do in a language in which they would understand it.

19  Tell me why that's not sufficient.

20        MS. BUCK: Well, Your Honor, first of all, as Your

21  Honor expressed, this is a slightly different standard from

22  another jurisdiction, but nonetheless, even following that

23  standard, we can look also to another case in the Southern

24  District of New York, which the debtors in fact cited, Afedra

25  case which noted that even if such notice was provided, the

1   typical bankruptcy notice, that perhaps in a situation where

2   class notice, specifically to the effect that would be issued

3   in a class action and would provide a little bit more

4   information about the exact claims, could be provided on a

5   supplemental basis.  The <u>Afedra</u> Court noted that would be a

6   very simple solution to provide a limited extension of time

7   to the particular proposed claimants by providing a

8   supplemental notice.  This is something that the counsel for

9   Alvarado would be willing to undertake if perhaps we were

10  given enough information so that we could identify the

11  proposed class members.  While the debtors did purport to

12  serve approximately 65,000 current and former employees, the

13  information we've been privy to doesn't indicate in any way

14  which of these individuals might be the proposed class

15  members, doesn't indicate which entities they worked for, the

16  periods of employment, and various things like that,

17  information that would be necessary in order to provide the

18  proper notice.  We would contend that I understand Your

19  Honor's concern about if they did receive actual notice,

20  which again, movant has not been able to officially confirm,

21  but nonetheless, if the debtors purport to have done that, we

22  will take that at their word.  We have not been able to

23  officially confirm, but nonetheless, think that equity

24  principles would lend to at least a small extension to

25  provide the proper notice.  If Your Honor's concerned about

1    that extension of time, provisional certification of the

2    class could take place and then as proceedings are moving

3    forward in the rest of the case, steps could be undertaken

4    again with appropriate discovery to notify the appropriate

5    claimants and estimate and liquidate the claims.

6            THE COURT: Yeah, and looking to <u>Afedra</u>, the <u>Afedra</u>

7    decision, the Court also said, Since class litigation is

8    inherently more time-consuming than the expedited bankruptcy

9    proceeding for resolving contested matters, class litigation

10   would have to be commenced at the earliest possible time to

11   have a chance of being completed in the same time frame as

12   the other matters that must be resolved.  Before distributing

13   the estate here, as you've heard, we're on the verge of

14   approval of a disclosure statement, solicitation of a plan,

15   and confirmation - hoped for confirmation sometime early in

16   December.  While I understand that the case was, at least

17   initially, filed as a pre-negotiated arrangement or

18   prepackaged bankruptcy, and it hasn't quite gone exactly that

19   way, it's still moving on a relatively quick track here, and

20   it seems to me that as the debtor has made in citing the gum-

21   up-the-works language that a couple of cases now talked about

22   -

23           MS. BUCK: Right.

24           THE COURT:  - made the point that all this is going

25   to do is slow us down for the benefit of possible claimants

1   who've already received actual notice.  In addition to the

2   sending of the notices, there's also been, according again to

3   the debtors' submissions, publication notices given both in

4   English newspapers geographically around the country, and I

5   think in at least one Spanish-speaking newspaper.  So, how do

6   you respond to that?

7         MS. BUCK: I understand that point, Your Honor, very

8   clearly, however, I think that in a situation like this, and

9   I understand that certainly there are class actions involving

10  wages and very similar factual situations, but nonetheless,

11  it is not the typical situation that you have in most

12  bankruptcy matters where creditors for the majority at least

13  in my experience, however limited it may be, are generally -

14  the HIPPA creditors that are aware right off the bat that

15  they have accounts receivable or ongoing contracts, leases,

16  rental agreements, things like that, and it's pretty obvious

17  to the extent that they have claims here they actually have

18  very serious allegations even including potential fraudulent

19  allegations in the underlying class action having to do with

20  altered documentation as such the potential claimants in that

21  case really in some cases would have no possible way of

22  having known they would have a potential claim.  So, the

23  receipt of a bankruptcy notice, whether the actual receipt or

24  publication or in any other form, would not have indicated to

25  them that there was any significance of the bankruptcy

1    proceeding to them.

2         THE COURT: Well, what specifically are the claims?

3         MS. BUCK: The claims in the underlying action have

4    to do with unpaid wages and other compensation having to do

5    with break times that weren't offered at the appropriate

6    times, employees were required to work through breaks; in

7    terms of not being provided the appropriate compensation for

8    overtime hours; failure to provide required payment upon an

9    employee's departure from the company; in terms of failure to

10   indemnify necessary employee expenditures, things to that

11   effect.  However, the overriding claims of fraudulent

12   alteration of documents, documents in terms of tracking

13   things like employee hours, like their required breaks,

14   things like that that would have if the employees were aware

15   of the right documents, the correct version of the documents,

16   would have potentially indicated to them that they were being

17   wronged in some way.  These were just some employees that

18   aren't sophisticated businessmen in the sense of being part

19   of bankruptcy proceedings, court proceedings often, being

20   part of knowing the inner-workings of a company which as a

21   conglomerate with the collective debtors is one of the

22   largest residential construction companies in the United

23   States.

24        THE COURT: Well, we do have experience with that

25   type of potential claimant not just - I have it, not just in

1   this Court but in the one in which I sat before I came here,

2   where 99 percent of my docket was consumer cases.  So I've a

3   pretty good feel, I think, for - well, it's called the

4   working person.

5        MS. BUCK: Right.

6        THE COURT: One thing that strikes me is that

7   despite the fact that these former employees might not be

8   terribly sophisticated and might not know of some of the

9   claims that they might potentially have, it also strikes me

10  that in any workplace in which people feel they are being

11  unfairly treated, I mean, break-time, for example, that's

12  something they talk about, and it's pretty widely discussed.

13  I mean, those types of things tend not to be secrets.  So, I

14  would need to be convinced that these are the types of things

15  about which nobody would have any idea even an

16  unsophisticated person and that when they got a notice that

17  said they had a right to file a claim that they would have

18  thrown it away thinking, Ah, there's really nothing I have to

19  claim against the company.

20       MS. BUCK: Your Honor, I understand that, you know,

21  that's potentially a consideration, and I understand that

22  line of thinking, and perhaps even agree to some extent that

23  you would think workers talk in a workplace and may be aware

24  of such claims, however, at this point we're not aware and

25  we're not certain, again, we haven't been able to have all of

1   the identifying information, but we're not aware that in fact

2   any employee has filed this type of claim against the estate,

3   and presumably, if these actions were taking place, these

4   wrongful actions, and at this point, you know, assuming they

5   did place, presumably, at least one or more and presumably a

6   handful of the potentially 5,000 or more individuals who were

7   wronged would have filed a claim to that extent, and I

8   understand Your Honor's concern with, again, gumming up the

9   works and debtors' concern as well, and I know that that's an

10  overriding concern in bankruptcy matters in general and

11  especially one that seems to be moving on an incredibly fast

12  pace.  Nonetheless, I would say that just because of those

13  concerns, this case should not be able to move at such a fast

14  pace that it steam rolls over the rights of creditors who are

15  just as equally entitled to their appropriate distribution as

16  any other creditors.  I think that there could be a solution

17  here, in fact, if Your Honor noticed, there was not in fact a

18  proposed order submitted with our motion because there are so

19  many possible permutations, I believe, of what the solution

20  could be here, but there are, in fact, several solutions

21  which could allow this proceeding to still take place within

22  reasonable time constraints or if necessary if it had to be

23  December 31st, but nonetheless, I think that we believe there

24  are solutions that would allow both the rights of our

25  creditors and the potential class members to be recognized as

1   well as this case to continue proceeding as rapidly as

2   possible.

3          THE COURT: So, let me ask you this, Why didn't you

4   weigh in at the time the debtor moved for the fixing of a bar

5   date?

6          MS. BUCK: Your Honor, when the bar date notice was

7   served on July 23rd, it was actually only given 5 weeks at

8   that point.  There was only 5 weeks until the bar date - the

9   deadline for barring claims, and I personally was not

10  involved in this case at the time, but what I believe was the

11  case was the counsel for Alvarado was still attempting to try

12  to figure out what the potential claims were, who the

13  potential claimants were.  They were still making attempts to

14  figure out how to address these issues.  I know that 5 weeks

15  may seem like a long time, but when it's somewhat complicated

16  -

17         THE COURT: Oh, in this business it's a lifetime.

18         MS. BUCK: I understand that, Your Honor.

19  Nonetheless, the bottom line is that by the claims bar date

20  counsel for Alvarado did in fact file a motion to preserve

21  the right and did in fact file 5 proof of claims for Alvarado

22  individually and on behalf of the proposed class.  So, before

23  the expiration of the bar date, notice was given to the

24  debtors.  Furthermore, the debtors were in fact aware of the

25  class claim having scheduled it on their schedules or amended

1   schedules, financial statements, and other documentation.

2   So, although we did not object at the time, it's not as

3   though the debtors weren't aware of this claim as a class

4   claim being a matter in this case.

5        THE COURT: Well, but when the debtor moves the

6   Court to fix a bar date, normally what happens is, if there

7   are comments from others, they give those comments and

8   they're incorporated or not, depending on what the Court's

9   ruling might be, into a bar date notice.  But that didn't

10  happen here.  So the filing of a motion like this one on the

11  bar date literally isn't the most efficient way to handle it.

12  The way to handle it is before a bar date is set and a form

13  of notice is approved, for someone who wants to say something

14  else to come forward, you know, especially before 65,000

15  notices go out.

16       MS. BUCK: I understand, Your Honor, and I actually

17  believe that in addition to whatever other considerations may

18  have been going on during that 5 weeks, I do recall that

19  counsel in the state action, Mr. Hawkins, who is on the phone

20  and he could confirm this if Your Honor feels necessary, but

21  I believe his notice, he was listed as the address for notice

22  for those class claims.  His notice was sent to a previous

23  address which was contained on the complaint in California

24  action.  However, he had since moved to a new address and

25  notice was delayed to him.  So, there were a couple of

1    different issues going on there, but, you know, as it might

2    not be ideal, I understand that, but nonetheless, steps were

3    taken prior to the expiration of the bar date to address this

4    matter.

5            THE COURT: Alright, thank you.  Anything further in

6    support of the motion?

7            MR. HAWKINS (TELEPHONIC): Your Honor, this is James

8    Hawkins and I represent the class.  Just, if the Court feels

9    necessary, I could give more reasonings why the motion was

10   actually filed on the bar date and not prior.

11           THE COURT: Go ahead.

12           MR. HAWKINS (TELEPHONIC): Once I received notice, I

13   tried to hire bankruptcy counsel.  I am by no means a

14   bankruptcy attorney.  Once I did find a bankruptcy attorney

15   here in California willing to represent me, we made plans on

16   what we were going to proceed with.  He then became medically

17   ill.  At that point he advised me that he could not longer

18   represent my class in this action, and he referred me to

19   another attorney here in California, who's now on the phone.

20   In the meantime, I was calling Delaware counsel, and I guess

21   Delaware, at this time, is swamped and because of this issue

22   being complex no one wanted to touch it.  So once we found

23   McCarter & English who would take on such an action and the

24   complex matter, we filed immediately.

25           THE COURT: Alright, thank you.

1          MS. BUCK: Okay, thank you, Your Honor, that's all.

2          MR. GRAVES: For the record, this is Jeremy Graves

3     on behalf of the debtors.  Your Honor, I'm going to try to

4     keep my presentation brief, and focus initially on the

5     threshold question, which Your Honor has hit on and is an

6     important consideration, which is whether the Court should

7     exercise its discretion to extend the application of Rule 23

8     to Mr. Alvarado's class proof of claim, and as you've

9     recognized, Courts have developed sort of three factors to

10    consider in determining whether or not discretion should be

11    exercised, and obviously, the first one of these, whether the

12    class was certified prior to the petition date, the debtors

13    meet because the class in fact was not certified prior to the

14    petition date.  The second factor, whether the class members

15    received notice of the bankruptcy proceedings is more than

16    satisfied.  The debtors, as you've noted, gave all possible

17    notice that could be given under the circumstances.  They

18    provided the mailed notice to everyone they could possibly

19    identify and as well as the publication notice in all the

20    newspapers you've identified and in the Spanish newspapers

21    not only in California but also in Arizona and Nevada.  And

22    as to the question of, Did this notice land on the putative

23    class?  The answer is, Absolutely, yes.  Of the 63,000 plus

24    former non-supervisory construction employees that were

25    notified, almost 10,000 of them were employed by some of the

1   entities which were alleged to hold claims.  We don't concede

2   that they're all members of the putative class, but we gave

3   more broad notice than we really thought was necessary, and

4   this notice was legally sufficient as we've noted from our

5   quotes from the Third Circuit in the Penn Central case, and

6   as you've observed, it was a notice that was approved by Your

7   Honor after notice and a hearing, and I don't know that I

8   heard an explanation for why the notice wasn't challenged at

9   the time the bar date motion was before Your Honor.  One

10  final point on the notice issue, counsel cites a kind of a

11  throw-away quote from the Afedra case.  To the extent that

12  the Court should provide some sort of special notice because

13  this is a class action, but really that quote in the Afedra

14  case, if you read it carefully, the Judge is addressing a

15  situation where in the normal context of bankruptcy, the

16  class of claimants may not have received notice of the bar

17  date or the bankruptcy proceedings because the debtors may

18  not have scheduled them, and so the Court observed that it

19  may be appropriate in that circumstance to give actual notice

20  to the putative class members.  The Court did not say that

21  they should send a special notice which identifies

22  specifically, You may have a claim for failure to reimburse

23  payment of a rent, you may have a claim for failure to pay

24  wages.  What the Court said is, Maybe you should send a

25  notice with the bar date to these individuals as well.  The

1   debtors have done that.  But finally, in addition to the

2   points we discussed earlier, courts such as <u>Musicland</u> have

3   considered a third factor in determining whether the Court

4   should at the threshold exercise its discretion to extend the

5   application of Rule 23, which is whether allowing the class

6   proof of claim would have an adverse impact on the

7   administration of the debtors' cases, and here, for the

8   reasons we've been discussing in the context of the

9   disclosure statement hearing, obviously there would be an

10  impact by having a long drawn-out class certification

11  hearing.  One of the points that we would like to make in

12  connection with that is the fact that an unknown portion of

13  the alleged claims against the debtors is assertedly a valid

14  due priority pursuant to § 507(a)(4) of the Bankruptcy Code.

15  And, as Your Honor is aware, the debtors' plan, as it must,

16  provides that these priority claims will be satisfied in full

17  either on the effective date of the plan or within 30 days

18  after any objections to those claims are resolved.  If the

19  amount of these claims is not known as of the confirmation

20  hearing, in order to demonstrate feasibility under

21  1129(a)(11), the debtors might have to either delay the

22  confirmation hearing, which as you're well aware is not a

23  good idea here, or engage in an expensive and time-consuming

24  estimation hearing to estimate which portion of these alleged

25  claims are entitled to priority.  There's a host of other

1   reasons that the allowance of the class proof of claim would

2   result in an undue burden on these administrations of these

3   cases from distracting the debtors' management at this

4   critical juncture away to class certification motions and

5   discovery, the expense to the estate of hiring counsel to

6   defend these actions, and also the expense, if the class is

7   certified, of re-noticing the class members and the expenses

8   of a long trial, and finally, because there may be protracted

9   litigations for years to come, the class action proceeding

10  would threaten to delay the distribution to all of the

11  debtors' other unsecured creditors to their detriment.  We

12  haven't discussed at length this morning the Rule 23

13  requirements because after you get to the threshold question

14  of whether or not to extend Rule 23 to the class proof of

15  claim, the next question is whether the class proof of claim

16  could actually meet Rule 23's requirements, and I'm just

17  going to highlight briefly, this is more fully set out in our

18  briefs, but whether we hear it today or at some later date,

19  there's no way Alvarado can satisfy the requirements of Rule

20  23, specifically Rule 23's predominance requirement and Rule

21  23's superiority requirement.  Alvarado's allegations raise

22  inherently individualized questions of both fact and law

23  which predominate over any class issues that may exist.  For

24  example, one of his allegations is that the debtors failed to

25  properly reimburse employees for the purchase of a wrench.

1    Well, that's going to require an individual inquiry into

2    whether the individual actually purchased any equipment, that

3    the equipment was purchased or work and not because of

4    personal preference, that the purchase was required by a

5    supervisor pursuant to company policy, and that reimbursement

6    was sought but denied.  It's a mini-trial on individualized

7    issues within that particular consideration.  Similarly, the

8    allegations that the debtors failed to compensate people for

9    off the clock work, it's a question of whether Tom worked off

10   the clock, whether Harry worked off the clock, and the same

11   kind of allegations run through each of the debtors' claims.

12   They're simply individualized questions for which class

13   treatment is not appropriate and when Judge Lifland in the

14   Bally case considered these practically indistinguishable

15   California state law which in our claims, the Court concluded

16   on the issue of predominance the Court would have to engage

17   in a series of highly disputed mini-trials for each class

18   member to resolve the issues, making class treatment

19   untenable and impossible.  The same is true here.  And

20   similarly, the class action proceeding is not superior to

21   these bankruptcy proceedings for adjudicating the claims of

22   the class members.  The class action would require a

23   substantial cost to the debtors' estates, extensive discovery

24   and briefing on the class certification issue.  If a class is

25   certified, protracted merits discovery.  Duplicative notice

1  would have to be mailed to the class members if the class is

2  certified and a lengthy trial.  By contrast, these bankruptcy

3  proceeding allow each of the putative class members to

4  participate in the distribution of the debtors' estates for

5  the price of a stamp.  If you read -

6           THE COURT: How many of those claims by employees or

7  former employees have been filed?

8           MR. GRAVES: Of this particular class, Your Honor?

9           THE COURT: Well, let's say of any kind.

10          MR. GRAVES: Of any kind, we've received - of the

11  63,000 employees that were noticed, approximately 180 claims

12  have been filed.  In the interest of full disclosure, about

13  97 of those were involved in the other class action, the

14  Asovito action, which Your Honor has entered a 9019 motion

15  on.  So, many of these individuals who thought they had

16  claims have filed those claims.  Interestingly, we have not

17  received any claims filed on behalf of the putative class.  I

18  think the conclusion you can draw from that, Your Honor, is

19  they don't have claims, and indeed, that was the circumstance

20  in the Bally case where only the three main plaintiffs filed

21  claims on behalf of the class.  The final issue, which I

22  don't know if Your Honor's inclined to hear, is the request

23  for an extension of the bar date.  I still haven't heard an

24  explanation for how Alvarado and his counsel have standing to

25  seek this extension of the bar date on behalf of thousands of

1  individuals who they don't represent, and as Your Honor has

2  acutely recognized, there are agency problems, both in the

3  Rule 23 analysis but particularly here because the courts

4  that have allowed putative class representatives to file a

5  class proof of claim on behalf of an uncertified class, have

6  engaged in the legal fiction that once the class is

7  certified, the class representative obtains agency status

8  retroactive back to the date the class proof of claim was

9  filed.  Not all courts have accepted that, but the majority

10  admittedly have, but in the circumstance of the bar date

11  extension, he would never obtain agency status because no

12  class would ever be certified, but aside from the standing

13  issue, Alvarado fails to demonstrate excusable neglect on

14  behalf of these thousands of individuals.  This is the same

15  argument that the bar date notice was defective because the

16  debtors failed to identify specifically what kinds of claims

17  these individuals may have against the debtors.  But as we've

18  noted, this argument has been raised in other courts and has

19  been rejected including the Third Circuit which said, "The

20  purpose of the notice requirement is to advise individuals

21  who will be affected by the outcome of any proceeding of the

22  impending hearing so that they can take steps to safeguard

23  their interests.  The notice requirement is not necessarily

24  intended to advise them of the nature of those interests."

25  So, the Court concluded, "The notice that a creditor is

1    required to receive is of the Court's hearings and other

2    actions in the reorganization proceedings." Similarly, here,

3    Your Honor, the debtors provided constitutionally adequate

4    notice to these individuals and there has been no

5    demonstration that they have excusable neglect.

6           THE COURT: Alright, thank you. Do either the

7    Committee or Wells Fargo care to be heard? Both of whom

8    joined in the debtors' objection.

9           MR. GIAIMO: The Committee's comments have been

10   addressed by the debtor, Your Honor.

11          THE COURT: Alright.

12          MR. KENT: Good morning, Your Honor. Tom Kent on

13   behalf of the Wells Fargo bank agent. I think the points we

14   would have made today, I think have been made by the debtor

15   especially how we would point out the notice, the number of

16   notices that have been sent out and the cost to the estate of

17   doing so. I think the debtors, from our perspective, have

18   attempted to, in fact, give actual notice, so we just point

19   that out, Your Honor.

20          THE COURT: Thank you. Alright, I'll give the

21   movant the last word.

22          MS. BUCK: Thank you, Your Honor. Just a couple of

23   quick points. A lot has been made of the fact that notice

24   was provided to these 63,000 or 65,000 or so individuals,

25   however, we heard the debtors say that well under a hundred

1   claims apparently have been filed on the bases alleged in the

2   underlying class action.  I find it hard to believe that if

3   in fact the claims, and assuming the claims in a class action

4   are meritorious, that only that many people would want to

5   pursue their options through the Bankruptcy Court for their

6   rightful entitlement.  To me, that indicates that they

7   weren't in fact aware of the significance of the bankruptcy

8   proceedings, and if it turns out to be that in fact their

9   claims are not meritorious, well then that isn't a further

10  prejudice to the distribution of the estate.  However, I

11  believe that those creditors are entitled to the right to

12  participate in these bankruptcy proceedings notwithstanding

13  the concerns about this case moving very quickly and certain

14  deadlines that are imposed because of financing concerns and

15  the like, these creditors' rights should not be steam rolled

16  through the fast process of the bankruptcy proceeding.

17  Additionally, it was noted that there was an apparent

18  distinction with the Afedra case where it addressed that

19  claims had not been scheduled.  Here, I want to point out

20  again, that the only claim that was scheduled was the class

21  claim listed on debtors' schedules.  If they -

22          THE COURT: Well, the debtor's required to list all

23  pre-petition pending litigation, so, you know, okay, it was

24  listed but I don't - if what you're arguing is that's some

25  endorsement by the debtor that there's a meritorious claim

1    out there, that's not what I take it to mean.

2         MS. BUCK: I understand that, Your Honor, I merely

3    just wanted to make the point that that was a similarity to

4    the Afedra reasoning where here the individual claimants were

5    not in fact scheduled accordingly and would not have had

6    notice through that matter.  Also, as to the adverse affect

7    on the case, it need not be a long drawn-out process.  I

8    understand that that is certainly a valid concern, but I

9    believe with Your Honor's administration, we could set

10   reachable goals and deadlines that would allow the claims to

11   either, if the class claim is allowed, allow the claims to be

12   estimated within short order or if the class claim is not

13   allowed, then to just provide to the extent possible some

14   additional notice.  Again, I believe I heard mention of the

15   cost to the estate for this, however, counsel for Alvarado

16   has said that we will undertake this process to notify the

17   appropriate class claimants within a reasonable time set by

18   this Court.  We had requested in our motion something to the

19   extent of 90 days.  That seems like an appropriate time

20   frame, however, if Your Honor feels that because of the other

21   time constraints that that is not an appropriate time frame

22   within to get it done, we will do the best we can within a

23   given time frame.  The bottom line here though is that we

24   believe there were systematic employee practices that were

25   violations of our potential claimants' due rights.  They

1    should have their right to be heard in the bankruptcy case

2    and have their equitable distribution.  As this is a court of

3    equity, we believe Your Honor is situated to provide that

4    relief in whatever form you see fit.  Thank you.

5            THE COURT: Thank you.

6            MR. HAWKINS (TELEPHONIC): Your Honor, James Hawkins

7    for the class, if I may have one final word.

8            THE COURT: Briefly.

9            MR. HAWKINS (TELEPHONIC): Thank you, Your Honor,

10   and as a judge that sat as a consumer judge for consumer

11   class actions which I also litigate, the whole reasoning

12   behind a class action is for the small claims to be brought

13   to litigation.  If they were only intended to be brought as

14   an individual claim, no one would ever file these claims, and

15   maybe a hundred out of 65,000 would file claims, but here, an

16   individual or a creditor who holds a small claim, that may

17   not be large enough to bring on an individual basis, would be

18   a part of a creditor in a class action, and even though

19   they're in a class action, these individuals are no less a

20   creditor under the Code.  So, I think that's what why the

21   legislature intended to create a class action procedure for

22   exactly what we brought in this action.

23           THE COURT: Alright, thank you.

24           MR. HAWKINS (TELEPHONIC): With that, I rest.

25           THE COURT: Thank you.  Alright, let me return to

1    Judge Lifland's decision in <u>Bally's</u>.  He goes on to say,

2    "Bankruptcy significantly changes the balance of factors to

3    be considered in determining whether to allow class action

4    and thus class certification is often less desirable in

5    bankruptcy than in ordinary civil litigation."  Quoting

6    <u>Musicland</u>, he says, "Bankruptcy provides the same procedural

7    advantages as a class action, in fact it provides more

8    advantages.  Creditors, even corporate creditors, don't have

9    to hire a lawyer and can participate in the distribution for

10   the price of a stamp.  They need only fill out and return the

11   proof of claim sent with the bar date notice."  Again,

12   quoting <u>Woodward</u> but from the <u>Bally</u> case, Judge Lifland talks

13   about something that I think applies here, and that is,

14   "Class certification would adversely affect the

15   administration of these cases adding layers of procedural and

16   factual complexity that accompany class based claims,

17   siphoning the debtors' resources and interfering with the

18   orderly progression of the reorganization."  I'd also like to

19   return to the <u>United Company</u>'s decision or mention the <u>United</u>

20   <u>Company</u>'s decision which was decided almost at the same time,

21   also by Judge Walrath, when she decided the <u>Kaiser</u> matter.

22   In there she dealt with approximately 1,500 - facing a class

23   of 1,500 members who had ECOA claims, Equal Credit

24   Opportunity Act claims.  There she declined to certify a

25   class because it had so many individualized issues that would

1    make it inefficient and unmanageable.  As debtors' counsel

2    pointed out with respect to this particular situation, it

3    seems to me likely that there would be the countless mini-

4    trials that Judge Walrath mentions in <u>United Companies</u>, so

5    see, I've come back to her anyway.  There are just too many

6    problems with this one, and in addition to that which I've

7    already mentioned, there was a failure to participate at the

8    time of fixing the bar date which was, I think, always the

9    best opportunity in terms of the progress of the 11 to

10   address such issues, but even assuming that that's not the

11   absolute end date that such issues could be raised, this is a

12   circumstance in which actual notice, I'm satisfied, has been

13   received by the appropriate putative class members and others

14   based upon the submissions that have been made and which are

15   uncontradicted.  So, for all these reasons, I'm going to deny

16   the motion, and I'll ask counsel to confer and submit one for

17   my signature.  Is there anything further for today?

18          MR. HAWKINS (TELEPHONIC): Just for the record, Your

19   Honor, James Hawkins on behalf of the class.  In regards to

20   the Rule 23 and the Judge not having any type of evidence for

21   them cites Judge Walrath's opinion regarding denying

22   certification, just for the record I'd like to point out that

23   plaintiff for the class would like to file a Rule 23 motion

24   for certification, and it could be done within the next 30

25   days.  Also in regards to predominance and superiority in

1   regards to the factors of a class action being certified, the

2   defendants argued about a wrench, which is not compensable

3   here in California, so that has no bearing in terms of

4   whether or not there's any type of predominance here.  The

5   main claim in this case, and I want the Court to understand

6   this, is that the defendant paid their employees straight

7   time for all -

8            THE COURT: Mr. Hawkins, Mr. Hawkins -

9            MR. HAWKINS (TELEPHONIC):  - they did not pay

10  overtime.

11           THE COURT: Mr. Hawkins, forgive me for

12  interrupting, but normally after I make a ruling, the only

13  subsequent discussion I entertain is, are questions from

14  anyone who maybe didn't understand the ruling, but I see that

15  you understand it from your comments.  My ruling stands.

16           MR. HAWKINS (TELEPHONIC): And I apologize, Your

17  Honor, I just wanted to make the record.  Thank you.

18           THE COURT: That concludes this hearing -

19           UNIDENTIFIED SPEAKER: (Microphone not recording.)

20           (The remainder of this page is intentionally left

21  blank.)

22

23

24

25

1          THE COURT: Thank you.  Court will stand in recess,

2     and then, let me put it this way, if there is no agreement,

3     I'll be around, contact chambers, and I'll come back out

4     again on the record.  Thank you.

5          ALL: Thank you, Your Honor.

6          (Whereupon at 12:27 p.m., the hearing in this

7     matter was concluded for this date.)

8

9

10

11

12

13

14

15

16

17

18          I, Elaine M. Ryan, approved transcriber for the

19     United States Courts, certify that the foregoing is a correct

20     transcript from the electronic sound recording of the

21     proceedings in the above-entitled matter.

22

23     /s/ Elaine M. Ryan_____October 13, 2009
       Elaine M. Ryan
       2801 Faulkland Road
       Wilmington, DE 19808
       (302) 683-0221